# EXHIBIT B TO BAGLEY *DAUBERT* MOTION

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| LANARD TOYS LIMITED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CASE NO. |
| | ) 3:15-CV-849-J-34PDB |
| TOYS "R" US - DELAWARE, INC., | ) |
| DOLGENCORP, LLC, and JA-RU, | ) |
| INC., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

VIDEOTAPED DEPOSITION OF PARKER BAGLEY
Taken on Friday, July 14, 2017
At 10:02 o'clock a.m.
At Gordon & Rees, L.L.P.
300 S. Fourth, Ste. 1550
Las Vegas, Nevada 89101

Magna Legal Services
(866)624-6221
www.magnaLS.com

REPORTED BY:    MARY DANE McCOY, CCR NO. 219



Page 2

1                           APPEARANCES
2
    FOR THE PLAINTIFF:
3
        REID E. DAMMANN, ESQ.
4       Gordon & Rees, LLP
        101 W. Broadway, Ste. 2000
5       San Diego, California   92101
6   FOR THE DEFENDANTS:
7       FREDERICK D. PAGE, ESQ.
        Holland & Knight, L.L.P.
8       50 North Laura Street, Ste. 3900
        Jacksonville, Florida 32202
9       (Present via Skype)
10
11  ALSO PRESENT:
12      JACK VOSBURGH
        Videographer
13
14                            INDEX
15  DEPONENT: PARKER BAGLEY                               PAGE
    Examination by Mr. Page                                 4
16
17                           EXHIBITS
18  MARKED                                                PAGE
19  Defendants' A    Parker Bagley Rebuttal                14
                     Export Report
20
21
22
23
24
25



Page 4

```
 1                       PARKER BAGLEY,
 2   having been first duly sworn to testify to the truth,
 3   testified as follows:
 4                         EXAMINATION
 5   BY MR. PAGE:
 6        Q.   Mr. Bagley, would you please state your full
 7   name for us.
 8        A.   Yes, it's Parker H. Bagley.
 9        Q.   And, sir, what is your current occupation?
10        A.   I am an attorney, partner in the law firm of
11   Boies Schiller Flexner.
12        Q.   And do you work out of the -- what I'm going
13   to refer as the Boies firm, the New York office of the
14   Boies firm?
15        A.   Yes, I am -- that's my -- my official office,
16   although as we discussed off the record, I work out of
17   that office long distance currently.
18        Q.   Mr. Bagley, have you been deposed before?
19        A.   I have.
20        Q.   And I assume you've taken quite a few
21   depositions over your career?
22        A.   I have.
23        Q.   Roughly how many times have you been deposed
24   as a -- as a witness?
25        A.   Just twice.
```



Page 5

1      Q.   And how many depositions do you think you
2  personally have taken?
3      A.   Well over a hundred.
4      Q.   I will do away with any reading of the rules
5  for you or going over deposition procedure.
6      A.   Thank you.
7      Q.   And let's dive in -- dive into your
8  engagement if we can.  Would you please, Mr. Bagley,
9  explain for us how is it that you came to be involved
10 in this matter.
11     A.   Sure.  Well, Rich -- Rich Sybert is a -- is
12 an old friend of mine.  I've known Rich probably 30
13 plus years.  And he contacted me several weeks ago and
14 asked if I was willing and able to serve as an expert
15 witness in this case.  He explained it would be in
16 rebuttal to a Mr. Kemnitzer's report, and that my
17 subject matter would be my expertise in IP litigation
18 matters including design patent matters, and the
19 retention and the function of expert witnesses in that
20 context.
21     Q.   Okay, sir, is it accurate that your opinions
22 are solely in rebuttal to Mr. Kemnitzer's report?
23     A.   Correct.
24     Q.   And, sir, is it your -- is it a summary of
25 your opinion regarding the design patent issues that



Page 6

1  initially it is the province of the court and not
2  technical experts to opine on the validity and
3  invalidity of a design patent?
4      A.   That is -- I would modify that slightly in
5  that it's really the -- yeah, opining on the ultimate
6  issues in the case that, you know, are the province of
7  the court or the jury.
8      Q.   Sir, would you also agree that whether or not
9  an expert witness should testify on validity or
10 invalidity issues is a legal question for the court to
11 decide?
12     A.   Yeah, I would agree with that.
13     Q.   Sir, is it the same -- does the same -- let
14 me rephrase that.
15        Are your opinions the same on the
16 infringement or non-infringement analysis in this
17 matter?
18        MR. DAMMANN: Object to form.
19        THE WITNESS: Yeah, if by the same, you mean
20 what we were just discussing, yes, that it's a legal
21 question for the court to decide.
22 BY MR. PAGE:
23     Q.   Sir, did you have the same opinion that it is
24 a legal question for the court or the jury to decide
25 regarding the ordinary observer test used for



Page 7

1  infringement or validity purposes for a design patent?
2            MR. DAMMANN:  Same objection.
3            THE WITNESS:  Yes, yeah.  In my opinion, as I
4  think I state in my report, the jury or jurors are much
5  more appropriate ordinary observers than, you know,
6  experts in designs of products.  And so that that is
7  what I state in my report.
8            MR. PAGE:  And, Counsel, you had raised an
9  objection to form there.  Would you please explain to
10 me what was wrong with the form so we can repeat that
11 question if necessary?
12           MR. DAMMANN:  Yeah, can you have the question
13 read back to me?
14                (The record was read by the Court
15                Reporter.)
16           MR. DAMMANN:  I'll withdraw the objection.
17           MR. PAGE:  Thank you.
18    Q.   Now, Mr. Bagley, your opinions apply to both
19 the testimony and report of Mr. Kemnitzer in this case
20 and the testimony and the report of Mr. Anders as well,
21 correct?
22    A.   I believe that's correct.  I don't -- if the
23 court excludes Mr. Kemnitzer's report, then there's
24 nothing to rebut.
25    Q.   Let me be clear.  The -- if, in fact, Mr.



```
 1   Kemnitzer doesn't offer opinions on validity or
 2   invalidity of the patent, then it is your position that
 3   Mr. Anders would not be permitted to as well?
 4        A.   Well, it's not up to me.  I think it's up to
 5   the court.  Certainly apart from those opinions offered
 6   by both gentlemen, you know, there is a lot of other
 7   analysis in the reports.
 8        Q.   All right.  Sir, do you have any product
 9   design experience?
10        A.   I do not.
11        Q.   Have you ever worked as an industrial
12   designer in any capacity?
13        A.   I have not.
14        Q.   Have you ever designed an article of
15   manufacture?
16        A.   I have not.
17        Q.   And as part of that, then you have never
18   designed a writing instrument or a toy either, correct?
19        A.   Correct.
20        Q.   Have you ever been listed as an inventor on
21   any design patent or utility patent?
22        A.   No.
23        Q.   Do you have any formal training in industrial
24   design or product design?
25        A.   No.
```



Page 9

```
 1      Q.    Have you ever taken any courses in industrial
 2  design?
 3      A.    I have not.
 4      Q.    Do you know what industrial design involves?
 5      A.    I have a general idea, I believe, but
 6  certainly not -- not my area of expertise.
 7      Q.    What was your degree in in undergraduate
 8  school, sir?
 9      A.    Political science.
10      Q.    And that was from Columbia?
11      A.    Correct.
12      Q.    And after you majored in political science at
13  Columbia, you went to Fordham Law School?
14      A.    That's correct.
15      Q.    Have you taken any type of post-law school
16  courses that in any way impact on industrial design or
17  product design issues?
18      A.    I have not.
19      Q.    Have you ever taught any design courses of
20  any nature?
21      A.    No.
22      Q.    Do you have any technical experience in
23  product design?
24      A.    No.
25      Q.    Do you have any technical experience in
```



Page 10

```
 1   writing instruments?
 2        A.   No.
 3        Q.   Do you have any technical experience in toy
 4   design?
 5        A.   No.
 6        Q.   Do you have any technical experience in chalk
 7   holder designs?
 8        A.   I do not.
 9        Q.   How many times have you served as an expert
10   witness previously?
11        A.   Just once previously.
12        Q.   And is it fair to say that you were an expert
13   or in that matter that you served as an expert in
14   patent law and not technical product matters?
15        A.   It was actually a trademark case, but it was
16   -- it was as to matters of trademark law, yes.
17        Q.   Was your opinion or report subject to a
18   Daubert challenge?
19        A.   It was not.
20        Q.   Did you actually testify in trial in that
21   matter?
22        A.   I did not.  The case was actually settled
23   before trial.  I put in a report, and I was deposed.
24        Q.   Have you -- do you have any experience with
25   product design and focus groups?
```



Page 11

```
 1      A.    Yes, in the litigation context.
 2      Q.    Could you explain to me in general what that
 3  experience entails?
 4      A.    Sure.  In one -- a design patent case that I
 5  actually tried to a jury, the defendant -- I
 6  represented Masco Corporation and Delta Faucet.  The
 7  defendant was Price Pfister Faucets, and Price Pfister
 8  had actually conducted some focus group research on a
 9  new faucet it was coming out with.  And that was
10  actually very relevant evidence in the case.
11      Q.    Other than that one case, did you have any
12  opportunity or have you ever had any opportunity to
13  work with focus groups reviewing product designs?
14      A.    I -- I -- I can't identify any as we sit
15  here.
16      Q.    Sir, do you consider yourself qualified to
17  offer an opinion on what an ordinary observer would do
18  in this particular case if faced with the 167 patented
19  design and the accused design of JA-RU?
20      A.    Yes.  As much as Mr. Kemnitzer is able to
21  opine on that, I think I understand the test, I
22  understand who ordinary observers are.  And, again, I'm
23  as well qualified, I believe, as Mr. Kemnitzer would
24  be, perhaps more so by having litigated the issue of
25  the ordinary observer test on more than one occasion.
```



Page 13

```
 1   Kemnitzer's description of somebody, a designer of
 2   ordinary skill in the art in this matter?
 3        A.   No.  I -- I don't have a reason to disagree
 4   with that.  That would be more Mr. Anders' province.
 5        Q.   Sir, do you agree that you do not qualify as
 6   a designer of ordinary skill in the art in this matter?
 7        A.   Yes.
 8        Q.   All right, I'd better break that up.  Do you
 9   agree, sir -- because it's a negative -- do you agree
10   that you are not a designer of ordinary skill in the
11   art?
12        A.   Yes.
13        Q.   And that means you do agree with that
14   statement?
15        A.   I agree with that statement.
16        Q.   Thank you.  Mr. Bagley, have you published
17   any articles in the last ten years?
18        A.   I'm trying to think on timing.  Yes.  I was
19   for over 15 years a regular columnist for the New York
20   Law Journal and published many articles on many aspects
21   of IP law.
22        Q.   Did you provide -- I'm sorry -- a list of
23   those publications in your report for this matter?
24        A.   I did not.  It is -- you know, it's more
25   historical than anything else.  Like I said, it's
```



```
 1   probably been around that ten-year cutoff since I
 2   resigned as columnist.  But I would say that I think
 3   all those articles would be archived under the New York
 4   Law Journal website.
 5        Q.   Did you, Mr. Bagley, do anything to determine
 6   if there were articles within the last ten years that
 7   you had published?
 8        A.   I did not, other than do a rough -- rough
 9   calculus in my mind concerning, you know, when I
10   resigned.  It's been -- it's been a while.
11        Q.   You know what I'm getting at, sir.  You are
12   familiar with the requirements for expert disclosures?
13        A.   Yes, sir.
14        Q.   And that includes publications authored in
15   the previous ten years?
16        A.   Yes, sir.
17        Q.   All right.  Sir, if I could have a copy of
18   your report handed to you and marked as Defendants'
19   Exhibit A for your deposition.
20             (Defendants' Exhibit A was marked.)
21             THE WITNESS:  I have that in front of me.
22   BY MR. PAGE:
23        Q.   Sir, would you please just identify that for
24   us for purposes of this deposition in this matter?
25        A.   Yes.  This is my rebuttal expert report dated
```



Page 15

1  June 23rd, 2017.
2      Q.   Sir, is it a fair statement that you were
3  retained some time approximately a week prior to this
4  report and then prepared this report over that seven-
5  day period?
6           MR. DAMMANN:  Objection, form.
7           THE WITNESS:  Yes.  I would say prepared the
8  report more like over a four and a half day period,
9  but -- that's largely correct.
10 BY MR. PAGE:
11     Q.   Turning over to your qualifications and
12 compensation, you indicate you've successfully tried
13 two design patent cases?
14     A.   That's correct.
15     Q.   In paragraph 3.
16     A.   Yes.
17     Q.   Have you tried -- have you unsuccessfully
18 tried other design patent cases?
19     A.   No.  Two for two.
20     Q.   So you've tried -- I'm sorry, go ahead.
21     A.   I just said -- I was being -- joking, but I
22 said two for two.
23     Q.   Have you tried any other design patent cases
24 other than those two?
25     A.   Those are the only two cases, design patent



Page 16

```
 1   cases, that went to trial.
 2       Q.   And do you recall roughly when those cases
 3   went to trial?
 4       A.   Well, the first was -- was called Baldwin
 5   Hardware versus FrankSu Enterprise.  I believe that
 6   went to trial in 1992.  The second was a case I
 7   mentioned earlier, Delta Faucet against Price Pfister
 8   Faucet.  That went to trial approximately 1996.
 9       Q.   So when you were talking earlier about your
10   -- the one previous focus group experience you could
11   recall, that was over 20 years ago?
12       A.   Yes.
13       Q.   Are you also mention in your qualifications
14   and compensation that you represented Lanard in a few
15   cases, the plaintiff in this case, correct?
16       A.   Correct.
17       Q.   How many times did you represent Lanard?
18       A.   I used few.  I believe it was three matters
19   that I was involved in, two of which I was involved at,
20   you know, a junior associate level.  So but that was
21   the -- that was the scope of my representation of
22   Lanard.
23       Q.   Is that how you came to know Richard Sybert
24   personally?
25       A.   I'm trying to think, it's been a long time.
```



Page 17

1  I believe I met Rich through a case for another client,
2  but ultimately, yes, we worked together for Lanard on
3  some matters. And, yes, so my -- I believe my initial
4  introduction to Rich was through my -- the partner I
5  worked a lot with, Russell Falconer, who had worked
6  with Rich on some other cases, non-Lanard cases. And I
7  believe when I first met Rich, it was actually a case
8  for Mastercard and then subsequently some Lanard work.
9      Q.  When you did work for Lanard, was Mr. Sybert
10 the general counsel for Lanard?
11     A.  He was not.
12     Q.  Did he work for Lanard at that time?
13     A.  He did not. He was -- actually, I believe,
14 Rich was introduced to Lanard by Mr. Falconer. We were
15 both outside counsel at this point in time.
16     Q.  Have you ever worked in the same firm with
17 Mr. Sybert?
18     A.  I have not.
19     Q.  So when you indicated that you worked with
20 Mr. Sybert while you were working for Lanard on those
21 matters, was that as co-counsel or co-defendants?
22     A.  It's been a long time. I believe there
23 was -- there was one matter in Los Angeles that Rich
24 was local counsel for -- for Lanard. We were -- my
25 firm at the time, Brumbaugh Graves Donohue & Raymond,



```
                                                       Page 18
 1    and Mr. Falconer were lead counsel.  My involvement in
 2    that case was very minor, but I did -- I did know that
 3    Mr. Sybert was involved.  And, as I said, I had -- I
 4    had met him previously.
 5         Q.   When was the last time you or one of the
 6    firms you were working with or a partner in performed
 7    work for Lanard prior to this matter?
 8         A.   Certainly over 20 years.
 9         Q.   That's good enough for today.
10         A.   Okay.
11         Q.   Sir, do you have any special training or
12    expertise that you believe permits you to give opinions
13    on comparisons of the patented design or the commercial
14    product of Lanard with prior art materials?
15              MR. DAMMANN:  Objection, form.
16              THE WITNESS:  I believe yes, based on my
17    experience in performing those types of comparisons in
18    previous litigations involving design patents.
19    BY MR. PAGE:
20         Q.   So, in other words, your work as a lawyer for
21    plaintiffs and defendants in design patent cases?
22         A.   Correct.
23         Q.   And earlier you indicated you had been a --
24    an expert on a trademark case.  Have you also ever been
25    an expert on a design patent case?
```



Page 60

CERTIFICATE OF REPORTER

STATE OF NEVADA   )
                  )   ss:
COUNTY OF CLARK   )

        I, Mary Dane McCoy, CCR No. 219, do hereby declare: That I reported the proceedings in the before entitled matter at the time and place indicated;

        That prior to being examined, the witness was duly sworn by me to testify to the truth. That I thereafter transcribed my said shorthand notes into typewriting and that the foregoing transcript is a complete, true and accurate transcription of my said shorthand notes, to the best of my knowledge, skill and ability.

        That during the deposition a request was made for the deponent to read and sign the transcript. The deponent will be notified by letter when the transcript is available for review; and that upon review or after 30 days, the original deposition transcript will be forwarded to the custody and control of Frederick Page, Esq.

        I further declare that I am not a relative or employee of counsel, of any of the parties, nor a person financially interested in the action.

        Dated this 17th day of July, 2017.


        MARY DANE McCOY, CCR NO. 219

