x

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

LANARD TOYS LIMITED,

       Plaintiff,

v.                                  Case No.   3:15-cv-849-J-34PDB

TOYS "R" US-DELAWARE, INC.,
DOLGENCORP, LLC, and JA-RU, INC.,

       Defendants.

_____

# <u>O R D E R</u>

     **THIS CAUSE** is before the Court as a copyright, patent, trade dress and unfair competition action pertaining to a toy chalk holder.  <u>See</u> <u>generally</u> Second Amended Complaint and Demand for Jury Trial (Doc. 103; Amended Complaint).  Plaintiff Lanard Toys Limited (Lanard) developed a chalk holder in the shape of an over-sized, no. 2 pencil (the Chalk Pencil) as a fanciful toy for children.   Lanard registered a copyright in its Chalk Pencil and also obtained a design patent for the toy.   Soon thereafter, Defendant Ja-Ru, Inc. (Ja-Ru) released a similar version of a chalk holder in the shape of a pencil (the Ja-Ru Chalk Holder).   When Defendants Toys R US-Delaware, Inc. (TRU) and Dolgencorp, LLC (Dolgencorp) stopped selling Lanard's Chalk Pencil and began selling the Ja-Ru Chalk Holder instead, Lanard brought this lawsuit asserting claims for copyright infringement, patent infringement, trade dress infringement and unfair competition against Defendants.   Defendants responded with counterclaims seeking declaratory judgment as to the invalidity, unenforceability, and non-infringement of Lanard's copyright, patent and trade dress, as well as the lack of any unfair competition.   <u>See</u> Answer, Affirmative

Defenses, and Counterclaim to Second Amended Complaint, and Demand for Jury Trial (Docs. 270-272). At present, this simple toy, retailing at less than $5, has spawned five years of contentious litigation, hundreds of pages of evidence, expert testimony, and legal briefing, and no doubt hundreds of thousands of dollars in legal fees. Having unsuccessfully encouraged the parties to resolve the dispute amicably, the Court now turns to the merits of their claims.

On July 24, 2017, the parties filed cross motions for summary judgment. See Plaintiff's Motion for Partial Summary Judgment (Doc. 299; Lanard Motion); Defendants' Dispositive Motion for Summary Judgment and Memorandum of Law in Support (Doc. 302; Defendants Motion). In the Lanard Motion, Lanard seeks summary judgment in its favor on all of its claims, as well as Defendants' counterclaims for declaratory relief, and argues that damages are the only issue remaining for trial. See Lanard Motion at 1. In their Motion, Defendants move for summary judgment in their favor on all of Lanard's claims. See Defendants Motion at 1. The parties filed responses in opposition to these summary judgment motions on August 7, 2017. See Defendants Toys "R" Us-Delaware, Inc., Dolgencorp, LLC and Ja-Ru, Inc.'s Response in Opposition to Plaintiff Lanard Toys Limited's Motion for Partial Summary Judgment (Doc. 320; Defendants Response); Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Doc. 321; Lanard Response).[1] On September 5, 2017, with leave of Court, Plaintiff filed a reply in support of its Motion for Summary Judgment. See Plaintiff Lanard Toys Limited's

_____

[1] Plaintiff also filed an unopposed request for judicial notice in support of its Response. See Plaintiff's Unopposed Second Revised Request for Judicial Notice in Support of Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment (Doc. 344). As Defendants do not oppose this request, the Court will take judicial notice of the patent and copyright documents addressed in this request.

Response in Reply to Defendants' Response in Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. 382; Reply). On November 13, 2017, the Court stayed this matter due to TRU's bankruptcy. See Order (Doc. 391). After the Court lifted the stay on April 2, 2018, the parties filed notices of supplemental authority in support of their summary judgment briefing. See Plaintiff Lanard Toys Limited's Notice of Supplemental Authority in Support of its Motion for Partial Summary Judgment (Doc. 410); Defendants' Amended Notice of Supplemental Authority re: Motion for Summary Judgment (Doc. 419).[2]

On July 31, 2017, the parties filed seven Daubert motions. Lanard filed three such motions: one as to Defendants' patent and copyright expert, Ronald B. Kemnitzer, one as to Defendants' design expert, Deborah Ryan, and one as to Defendants' damages expert Michael J. Mard. See Plaintiff's Motion to (1) Strike the Supplemental Report of Ronald B. Kemnitzer as Untimely; and (2) Exclude the Opinions and Testimony of the Defendants' Purported Expert Ronald B. Kemnitzer (Doc. 310; Kemnitzer Motion); Plaintiff Lanard Toys Limited's Motion to Exclude the Opinions and Testimony of Deborah Ryan (Doc. 313; Ryan Motion); Plaintiff Lanard Toys Limited's Motion to Exclude the Opinions and Testimony of the Defendants' Purported Expert Michael J. Mard, CPA (Doc. 312; Mard Motion). Defendants responded to each of these motions on August 10, 2017. See Defendants' Response in Opposition to Plaintiff Lanard Toys Limited's Motion to Exclude the Opinion and Testimony of Deborah Ryan (Doc. 331; Ryan Response); Defendants' Response in Opposition to Plaintiff Lanard Toys Limited's Motion (1) to Strike the Supplemental Report

---

[2] Thereafter, Defendants filed a notice identifying an error in their notice of supplemental authority. See Notice of Correction Re: Defendants' Amended Notice of Supplemental Authority Re: Motion for Summary Judgment (D.E. #419) (Doc. 420).

of Ronald B. Kemnitzer as Untimely; and (2) to Exclude the Opinions and Testimony of Ronald B. Kemnitzer (Doc. 336; Kemnitzer Response); Defendants' Response in Opposition to Plaintiff Lanard Toys Limited's Motion to Exclude the Opinion and Testimony of Michael J. Mard (Doc. 333; Mard Response). Lanard also filed notices of supplemental authority in support of its Daubert motions. See Plaintiff Lanard Toys Limited's Notice of Supplemental Authority in Support of its Motion to (1) Strike the Supplemental Report of Ronald B. Kemnitzer as Untimely; and (2) Exclue [sic] the Opinions and Testimony of the Defendants' Purported Expert Ronald B. Kemnitzer (Doc. 411); Plaintiff Lanard Toys Limited's Notice of Supplemental Authority in Support of its Motion to Exclude the Opinions and Testimony of the Defendants' Purported Expert Michael J. Mard, CPA (Doc. 412).

For their part, Defendants filed four Daubert motions: one as to Plaintiff's patent and copyright expert Robert John Anders, one as to Plaintiff's patent and copyright expert Parker H. Bagley, one as to Plaintiff's industry expert Larry B. Myer, and one as to Plaintiff's damages expert William Kerr. See Defendants' Daubert Motion to Disqualify Robert John Anders and Preclude Testimony (Doc. 314; Anders Motion); Defendants' Daubert Motion to Exclude Parker H. Bagley as an Expert and to Exclude his Rebuttal Expert Report and Testimony for all Purposes (Doc. 309; Bagley Motion); Defendants' Daubert Motion to Exclude Larry B. Myer as an Expert, Exclude His Initial and Rebuttal Expert Reports and Testimony for all Purposes, or Alternatively Motion to Strike New Materials and Opinions in Rebuttal Report (Doc. 315; Myer Motion); Defendants' Daubert Motion to Exclude William Kerr's Expert Report and Reply Expert Report and to Exclude Testimony for all Purposes, or Alternatively to Strike New Materials and Opinions in Reply Report; Memorandum of Law (Doc. 316; Kerr Motion). Plaintiff responded to each of these

motions on August 10, 2017.   See Plaintiff Lanard Toys Limited's Response in Opposition to Defendants' Daubert Motion to Disqualify Robert John Anders and Preclude Testimony (Doc. 329; Anders Response); Plaintiff's Response in Opposition to Defendants' Daubert Motion to Exclude Parker H. Bagley as an Expert and to Exclude his Rebuttal Expert Report and Testimony for all Purposes (Doc. 332; Bagley Response); Plaintiff's Response in Opposition to Defendants' Daubert Motion to Exclude Larry B. Myer as an Expert, and His Initial and Rebuttal Expert Reports and Testimony, and Motion to Strike (Doc. 334; Myer Response); Plaintiff Lanard Toys Limited's Opposition to Defendants' Daubert Motion to Exclude William Kerr's Expert Report and Reply Expert Report and to Exclude Testimony for All Purposes, or Alternatively to Strike New Materials and Opinions in Reply Report (Doc. 335; Kerr Response).   Accordingly, all of those motions are ripe for review.

## I.     Background

Lanard manufactures and sells toys to retail stores throughout the world, who, in turn, sell Lanard's toys to the public.   See Lanard Response, Ex. 3: Declaration of James W. Hesterberg in Support of Lanard's Response in Opposition to Defendants' Motion for Summary Judgment (Doc. 321-3; Hesterberg Decl.) ¶ 3.   In 2010, Lanard's designers developed a design for a chalk holder—"a device that can hold pieces of colored chalk to allow children to draw on the sidewalk."   Id. ¶ 4.   The initial design for this chalk holder was in the shape of a "magic wand."   Id.   However, an individual in the Lanard Hong Kong office saw the wand prototype and made the suggestion that it look like a big pencil instead.   See Deposition of Blake C. Nichols (Doc. 341-1; Nichols Dep.) at 73-75. Lanard's corporate design director, Blake C. Nichols, then tasked Logan James Williams, a senior product designer at Lanard, with making the initial prototype of a chalk holder that

looks like a pencil.   See Nichols Dep. at 16-17, 82; Deposition of Logan James Williams (Doc. 353; Williams Dep.) at 26-28.   In creating this prototype, Williams looked at pencils present in the design shop.   See Williams Dep. at 39-40.

Lanard began selling its Chalk Pencil in the United States on November 1, 2010. See Declaration of Lewis Anten (Doc. 302-9; Anten Decl.) ¶ 6, Ex. E; see also Lanard Response, Ex. 4: Declaration of Angel Lee (Doc. 321-4; Lee Decl.) ¶ 9.   Lanard submitted a United States copyright application for the design of the Chalk Pencil on September 20, 2011.   See Lanard Response, Ex. C.   The Copyright Office issued a Certificate of Registration for Lanard's Chalk Pencil effective September 20, 2011, and assigned it Registration No. VA 1-794-458.   See Hesterberg Decl. ¶ 8; Lanard Response, Ex. D. The Certificate of Registration identifies the title of the work as "Pencil / Chalk Holder" and identifies it as a work of sculpture.[3]   See Lanard Response, Ex. D.   Since the Chalk Pencil's first publication in 2010 and continuing with every Chalk Pencil sold since that time, Lanard has stamped a copyright notice, "© 2010 LANARD" into the plastic on the Chalk Pencil.   See Hesterberg Decl. ¶ 10.

On August 3, 2011, Lanard designers Blake Christopher Nichols and Logan James Williams applied for a design patent in the Chalk Pencil with the United States Patent and Trademark Office (USPTO).   See Hesterberg Decl. ¶ 11; Lanard Response, Ex. F. On August 25, 2011, Nichols and Williams assigned their patent application to Lanard.   See Hesterberg Decl. ¶ 13; Lanard Response, Ex. G.   In late 2011, Lanard began stamping

---

[3] The Certificate of Registration identifies Lanard Toys Inc. as the author of the work.   See Lanard Response, Ex. D.   Lanard Toys Inc. assigned its intellectual property rights to Lanard in an agreement dated November 1, 2005.   See id., Ex. E.   The parties do not dispute that Lanard owns the registered copyright in the Chalk Pencil.

"Patent Pending" into the plastic of the Chalk Pencil.   See Hesterberg Decl. ¶ 14.   The USPTO issued a patent for the Chalk Pencil on November 20, 2012, assigning it patent number D671,167 (the D#167 Patent).   See Lanard Response, Ex. H.   The D#167 Patent contains one claim for "The ornamental design for a chalk holder, as shown and described," and includes five figures showing the design from all views.   Id.   Following the issuance of the D#167 Patent, Lanard stamped the full patent number into the plastic on all models of the Chalk Pencil.   See Hesterberg Decl. ¶ 17.

Lanard sold the Chalk Pencil to Dolgencorp beginning in 2011.   See id. ¶ 18; see also Lee Decl. ¶ 10.   Dolgencorp purchased the Chalk Pencil through the 2011, 2012, and 2013 selling seasons, and sold it under the label "Concrete Canvas."   See Hesterberg Decl. ¶ 18; Lee Decl. ¶ 10.   Lanard supplied the Chalk Pencil to TRU beginning with the 2012 selling season.   See Hesterberg Decl. ¶ 20; Lee Decl. ¶ 11.   TRU sold the Chalk Pencil under its "Sizzlin' Cool" private label.   Hesterberg Decl. ¶ 20.   Lanard also sold the Chalk Pencil to other major retailers, including Walgreen Co., Kmart Corporation, and Wal-Mart Stores, Inc.   See Hesterberg Decl. ¶ 22.

In the first quarter of 2012, Ja-Ru began development of the Ja-Ru Chalk Holder. See Declaration of Ivy Choderker (Doc. 302-19; Choderker Decl.), Ex. H: Defendant Ja-Ru, Inc's Responses and Objections to Plaintiff Lanard Toy's Limited's Interrogatories (Ja-Ru Interog.), No. 15.   Specifically, the director of merchandising at Ja-Ru, Angela Ku, developed the idea for the Ja-Ru Chalk Holder.   See Angela Ku Deposition (Doc. 367; Ku Dep.) at 27.   According to Ku, she came up with the idea for the Ja-Ru Chalk Holder as follows: "Shop the market, and we look at the sample.   And also, in China there are all different pencil-looking product, so we [meaning, she and the Chinese factories] put the

idea together." Id. at 27-28.   Ku explains that the Lanard Chalk Pencil was one of the samples she considered, but maintains that there were "other pencil chalk samples too." Id. at 28.   Ku concedes that she purchased a "market sample" of the Lanard Chalk Pencil in early 2012 and used that sample as a reference in the development of Ja-Ru's own version of the toy.   See id. at 30, 38, 75-77.   Although Ku insists other market samples were considered as well, the only documented reference sample is the Lanard Chalk Pencil.   See Ku Dep. at 81, 116-17; see e.g., id. at 69, Ex. LA-8 (Doc. 367-59), id. at 109-10, Ex. 56 (Doc. 367-12).   Indeed, in an August 2, 2012 email exchange, a Ja-Ru employee compares Ja-Ru's design sample to what appears to be Lanard's Chalk Pencil and specifically identifies which items of its design should remain the same as the "market sample" and which items should be changed.   See id., Ex. 56 (Doc. 367-12).

Ja-Ru's art director, Stephen Hearon, who designed the Ja-Ru Chalk Holder, recalls that he was given the Lanard Chalk Pencil as a "market sample to use for reference." See Deposition of Stephen Hearon (Doc. 351-1; Hearon Dep.) at 28.   According to Hearon, he then attempted to make "a better Ja-Ru toy by designing elements of it, making – you know, design the ferrule the way that I thought a ferrule should look.   Design the tip the way that I thought would be more functional and would give it—be more attractive." Id. at 32.   Hearon cannot recall whether he referred to any other market sample or reference sample in designing the Ja-Ru Chalk Holder.   See Hearon Dep. at 82, 84. Hearon testified that he worked with Russel Selevan and made improvements to the design "based on his suggestions and his approval."   See id. at 27.   Selevan is a vice-president with Ja-Ru, who "probably" has "the lead" role in the design and development of toys.   See Deposition of Russel Selevan (Doc. 356; R. Selevan Dep.) at 10-11.   Selevan

also concedes that Ja-Ru had the Lanard Chalk Pencil during its design of the Ja-Ru Chalk Holder, but maintains that Ja-Ru made changes to the design so that it would not look like Lanard's product.  See id. at 25-26.  According to Selevan, Ja-Ru reduced the size, changed "[t]he piece that holds . . . the eraser; the piece that holds the chalk on the bottom; changed the color of the yellow pencil to look more like what we believe a yellow No. 2 pencil looks like; and probably some other changes . . . ."  Id. at 26.  According to Selevan, Ja-Ru designed its product to look like a no. 2 lead pencil, and while it referenced the Lanard Chalk Pencil, it also referenced "[n]o. 2 lead pencils, [Selevan's] Think Big 25-year-old six-foot pencil, and many other pencils of different sizes and shapes . . . ."  Id. at 28-29.

The Ja-Ru Chalk Holder was available to the public for purchase by at least as early as January 2014.  See Declaration of Kimberly Mayben (Doc. 302-48; Mayben Decl.) ¶ 8 ("TRU first sold the [Ja-Ru Chalk Holder] on or around January 17, 2014 . . . .").  Significantly, both TRU and Dolgencorp stopped ordering Lanard's Chalk Pencil in late 2013.  See Hesterberg Decl. ¶ 23.  Beginning with the 2014 selling season, TRU and Dolgencorp began offering the Ja-Ru Chalk Holder instead.  Id. ¶¶ 24-25.  Dolgencorp purchased approximately 21,282 units of the Ja-Ru Chalk Holder and generated $38,691 in sales from the product in 2014.  See Lanard Response, Ex. 5: Declaration of Richard P. Sybert (Doc. 321-5; Sybert Decl.), Ex. L  Between 2013 and 2015, TRU sold 8,154 units of the Ja-Ru Chalk Holder and generated $23,444.63 in gross revenue, for total gross profits of $14,076.  See Choderker Decl., Ex. F: Defendant Toys "R" Us-Delaware, Inc.'s Responses and Objections to Plaintiff Lanard Toy's Limited's Interrogatories, Nos. 12-13.  Ja-Ru sold the Ja-Ru Chalk Holder from 2013-2015, with 86,304 total units sold for a total

gross revenue of $77,618.62.   <u>See</u> Ja-Ru Interog., No. 12.   At present, however, Ja-Ru

no longer sells the Ja-Ru Chalk Holder.   <u>See</u> R. Selevan Dep. at 121-22.   Prior to

January 2014, when TRU began selling the Ja-Ru Chalk Holder, Lanard sold a total of

581,984 units of its Chalk Pencil to its major customers in the United States, representing

$1,113,077.92 in sales for the fiscal years 2011, 2012, and 2013.   <u>See</u> Lee Decl., Ex. J

at Bates No. LNRD000723.   In total, between 2010 and 2016, Lanard shipped 1,415,034

units of the Chalk Pencil worldwide, accumulating gross sales in excess of two million

dollars.   <u>See</u> Lee Decl. ¶ 15, Ex. J at Bates No. LNRD000740.

## II.   Standards of Review

### A.   Motions to Exclude Expert Opinions

Rule 702 of the Federal Rules of Evidence (Evidence Rule(s)) provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) The expert's scientific technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) The testimony is based on sufficient facts or data;
(c) The testimony is the product of reliable principles and methods; and
(d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.[4]   In <u>Daubert</u>, the Supreme Court explained that Evidence Rule 702

imposes an obligation on a trial court to act as gatekeeper, to ensure that any and all

scientific testimony or evidence admitted is not only relevant, but reliable.   <u>Daubert v.</u>

---

[4] The language of Evidence Rule 702 was amended in December 2011.   The Advisory Committee Notes accompanying this latest revision state that the changes are only stylistic and do not make any substantive change.   Fed. R. Evid. 702 advisory committee's note (2011 amends.).   Thus, case law interpreting and applying Evidence Rule 702 prior to the 2011 changes is still applicable.

Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993).   To determine the admissibility of

expert testimony, a trial court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he
> intends to address; (2) the methodology by which the expert reaches his
> conclusions is sufficiently reliable as determined by the sort of inquiry
> mandated in Daubert; and (3) the testimony assists the trier of fact through
> the application of scientific, technical, or specialized expertise, to understand
> the evidence or to determine a fact in issue.

See United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004).   The burden of

establishing qualification, reliability and helpfulness lies with the party offering the expert

opinion.   See McClain v. Metabolife Int'l, Inc. 401 F.3d 1233, 1238 (11th Cir. 2005).   For

the purpose of conducting the reliability inquiry mandated by Daubert, the Supreme Court

has suggested that a trial court consider a number of factors, which include: (1) whether

the theory or technique can be, and has been, tested; (2) whether the theory or technique

has been subjected to peer review and publication; (3) the known or potential rate of error;

and (4) whether the theory has attained general acceptance in the relevant scientific

community.   See Daubert, 509 U.S. at 593-94.   These factors are not exhaustive, and

the Eleventh Circuit Court of Appeals has also considered whether an expert has relied on

anecdotal evidence, such as case reports; temporal proximity; and improper extrapolation.

See Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312 (11th Cir. 1999).   The Court's

inquiry under Evidence Rule 702 must focus on the methodology, not conclusions, but the

Court is not required to admit opinion testimony only connected to existing data by an

expert's unsupported assertion.   See Daubert, 509 U.S. at 595; Gen. Elec. Co. v. Joiner,

522 U.S. 136, 146 (1997).

In addition to determining the reliability of the proposed testimony, <u>Daubert</u> instructs that Evidence Rule 702 requires the Court to determine whether the evidence or testimony assists the trier of fact in understanding the evidence or determining a fact in issue. <u>See</u> <u>Daubert</u> 509 U.S. at 591. This consideration focuses on the relevance of the proffered expert testimony or evidence. The Court explained that to satisfy this relevance requirement, the expert testimony must be "relevant to the task at hand." <u>Daubert</u>, 509 U.S. at 591. Because scientific testimony does not assist the trier of fact unless it has a justified scientific relation to the facts, the Eleventh Circuit has opined that "there is no fit where a large analytical leap must be made between the facts and the opinion." <u>McDowell v. Brown</u>, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing <u>Joiner</u>, 522 U.S. at 143-46) (finding too great an analytical gap between data suggesting that one type of cancer was caused in mice and the conclusion or opinion that such data established causation of another type of cancer in humans)).

The proponent of expert testimony need not show that the opinion proffered is scientifically correct, but only, based upon a preponderance of the evidence, that the opinion is reliable. <u>See</u> <u>Allison</u>, 184 F.3d at 1312. Thus, absolute certainty is not required. <u>See</u> <u>Jones v. Otis Elevator Co.</u>, 861 F.2d 655, 662 (11th Cir. 1988). However, an expert must know "facts which enable him to express a reasonably accurate conclusion instead of mere conjecture or speculation," <u>see</u> <u>id.</u>, and an expert's assurances that he has used generally accepted scientific methodology are insufficient, <u>see</u> <u>McClain</u>, 401 F.3d at 1244.

### B.    Summary Judgment

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a).   The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[5]   An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.   Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).   "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."   Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to

---

[5]    Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."   Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.   "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."   Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013).   Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

III.    **Summary of Decision on the Merits**

For the reasons set forth below, the Court determines that no reasonable juror, properly instructed on the applicable law and protectable elements of the D#167 Patent, could conclude that the Ja-Ru Chalk Holder is substantially similar to the patented design. As such, Lanard's patent claim fails on the basis of non-infringement and the Court need not reach the issue of patent validity.  The Court further determines that Lanard's copyright is invalid because the Chalk Pencil is an uncopyrightable "useful article." However, even if Lanard does have some protectable copyright interest in the Chalk Pencil, Defendants are entitled to summary judgment in their favor on this claim because any similarity between the two designs results from the non-protectable elements of the

work.   In addition, the Court finds that on the evidence presented, no reasonable juror could find that Lanard's purported trade dress in the Chalk Pencil has acquired secondary meaning.   As such, Lanard cannot prevail on its trade dress infringement claim.   And, because Lanard's unfair competition claim is predicated on such infringement, this claim fails as well.   Defendants are therefore entitled to summary judgment in their favor on all of Lanard's claims.   As to Defendants' counterclaims, because the foregoing determinations resolve the controversy between the parties, the Court will exercise its discretion to decline to consider Defendants' requests for declaratory relief and dismiss those counterclaims without prejudice.   As such, the Court will deny Lanard's request for summary judgment on the counterclaims as moot.

## IV.   Expert Testimony

As a preliminary matter, the Court determined that resolution of the various Daubert motions should be bifurcated with the Court first resolving only those addressing evidence relied upon in the summary judgment briefing or necessary to a resolution of the summary judgment motions.   As such, in this Order, the Court does not address the Daubert motions related to the damages experts, Mard and Kerr.   In addition, upon review of the summary judgment filings, the Court notes that Lanard does not rely on the testimony of its experts Parker Bagley or Larry Myer in its briefing.   Thus, resolution of the Daubert motions as to those experts is not necessary for purposes of resolving the summary judgment motions.   Likewise, Defendants do not substantially rely in their summary judgment briefing on the testimony of their expert Deborah Ryan, and as such

the Court need not address Lanard's <u>Daubert</u> motion as to that expert either. [6]

Accordingly, in this Order, the Court addresses the opinions of the patent and copyright experts Ronald B. Kemnitzer, on behalf of Defendants, and Robert John Anders on behalf of Lanard.

Kemnitzer is an industrial designer with over forty years of experience. <u>See</u> Expert Report of Ronald B. Kemnitzer (Doc. 310-2; Kemnitzer Report) at 2. He owned and operated a design consulting office for eighteen years, and has designed and supervised the design of over 150 products, including toys. <u>Id.</u> at 3. He has also served as a "full-time industrial design educator," for over thirty-five years, and currently serves as Professor Emeritus of Industrial Design at the Virginia Polytechnic Institute and State University. <u>Id.</u> Lanard does not challenge Kemnitzer's qualifications to serve as an expert in this case. Likewise, Anders has over fifty years of experience in the field of industrial design. <u>See</u> Anders Response, Ex. A (Doc. 329-2; Anders Report) at 2. He spent thirty years in a variety of senior design management positions, including as part of his own consultancies and with major corporations. <u>Id.</u> at 5. Anders also spent a portion of his career as a tenured Professor of Industrial Design at Pratt Institute. <u>Id.</u> at 3. Although Anders has never been involved in the design of a toy, <u>see</u> Deposition of John Anders (Doc. 342-1; Anders Dep.) at 73, Defendants do not challenge his qualifications to

---

[6] Defendants do cite to Ryan's deposition and expert report on a limited basis in their Response to Lanard's Motion for Summary Judgment. <u>See</u> Defendants Response at 9 n.11 and 18 n.31. However, because for the reasons set forth below, the Court determines that summary judgment is due to be granted in Defendants favor without consideration of that evidence, the Court need not address Lanard's <u>Daubert</u> motion as to Ryan.

serve as an expert in this case.  See Anders Motion at 2.  Both of these experts offer opinions on the issues of patent and copyright infringement.[7]

As addressed more fully below, the test for patent infringement is premised on the perception of the "ordinary observer."  See Crocs, Inc. v. Int'l Trade Comm'n, 598 F.3d 1294, 1303 (Fed Cir. 2010).  Likewise, copyright infringement is based on substantial similarity as perceived by the "average lay observer."  See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1214 (Fed. Cir. 2000).  The work at issue here is a simple toy designed to look like the ubiquitous no. 2 pencil.  As such, the Court questions whether the opinions and analysis of these experts in industrial design are in any way helpful to the fact-finder.  See Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1381-82 (Fed. Cir. 2002) ("Analysis under the 'ordinary observer' test is to be conducted with the 'ordinary observer' and not the expert designer in mind.") abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 671, 678 (Fed. Cir. 2008); see also Dyson, Inc. v. SharkNinja Operating LLC, Case No. 14-cv-779, 2018 WL 1906105, at *7-8 (N.D. Ill. Mar. 29, 2018) (collecting cases).  Indeed, in the Kemnitzer Motion, Lanard argues that "it is not helpful to the jury for an expert to opine on an ultimate issue as simple as comparing the visual similarities of two toys, especially where neither is 'technical nor sophisticated.'" See Kemnitzer Motion at 20-24 (quoting Keystone Retaining Wall Sys., Inc. v. Rockwood Retaining Wall, Inc., Case No. 00-496 (RHK/SRN), 2001 WL 36102284, at *10 (D. Minn. Oct. 9, 2001)).  Notably, Defendants do not appear to disagree.  See Kemnitzer

---

[7] The experts also opine on the validity of the D#167 Patent but as the Court does not reach that issue, the Court need not address those opinions.

Response at 16 ("Given the simple and familiar designs at issue in this matter, Defendants believe that ultimate issues of fact and law, namely the validity and infringement of the copyrights and patents in suit, are the province of the judge and jury."); Anders Motion at 7 ("Defendants further assert that the ultimate issue of infringement is not a proper subject for expert testimony in this matter."). While the Court agrees with Lanard's contention that Kemnitzer's opinions on ultimate issues are not helpful, what Lanard fails to acknowledge is that this argument equally applies to the opinions of its own expert, Anders, on these same ultimate issues. Accordingly, the Court will exclude both experts' ultimate conclusions on the issues of copyright and patent infringement. However, this determination does not apply to the factual analysis of each expert in which each describes his observations as to the similarities and differences between the prior art, the D#167 Patent, the Chalk Pencil, and the Ja-Ru Chalk Holder. Unlike their ultimate conclusions, the factual analyses are helpful in that they provide the fact-finder with the terminology to describe the features and shapes which one observes when comparing these designs. To the extent Lanard contends that Kemnitzer's detailed analysis is inconsistent with the ordinary observer standard, <u>see</u> Lanard Motion at 14-15, the Court finds this argument is not directed to the admissibility of Kemnitzer's opinions but rather whether those opinions are sufficient to demonstrate a lack of substantial similarity under the applicable law.[8] As such, the Court will address Lanard's arguments regarding the application of the ordinary

_____

[8] In its analysis below, the Court does not rely on Kemnitzer's "red-line" depiction of the D#167 Patent superimposed over the Ja-Ru Chalk Holder, nor does the Court rely on Kemnitzer's detailed measurements of the size of the elements of each design in proportion to the whole. Accordingly, the Court need not consider Lanard's request to exclude this evidence.

observer standard to Kemnitzer's findings in its analysis of the merits. The remainder of Lanard's challenges to Kemnitzer's testimony are without merit and the Court will address them briefly below.

Lanard asserts that Defendants disclosed a supplemental report from Kemnitzer on June 22, 2017, well after the Court-ordered deadline of June 9, 2017, and the day before Lanard's rebuttal expert reports were due. See Supplement to the June 9, 2017 Expert Report of Ronald B. Kemnitzer (Doc. 310-4; Kemnitzer Supplement); see also Amended Case Management and Scheduling Order (Doc. 210). The Kemnitzer Supplement contains Kemnitzer's opinions on an additional piece of uncited prior art, a "Giant Pencil" sold by Pencil Craft. See generally Kemnitzer Supplement. Lanard moves to strike this supplemental report as untimely pursuant to Rule 37(c). In response, Defendants assert that their counsel only learned of the existence of the Pencil Craft "Giant Pencil" on June 15, 2017, and that they provided this pencil to Kemnitzer for his analysis that same day. See Kemnitzer Response at 5-6. According to Defendants, counsel disclosed the "Giant Pencil" to Lanard on June 19, 2017. Id. at 6. Defendants maintain that they then served Lanard with the Kemnitzer Supplemental Report concerning this Giant Pencil on June 22, 2017, "upon receipt from Mr. Kemnitzer." Id.

Under Rule 37(c)(1), when a "party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Defendants bear the burden of establishing that the failure to disclose was substantially justified or harmless. See Mitchell v. Ford Motor

Co., 318 F. App'x 821, 824 (11th Cir. 2009). In determining whether a failure to disclose was substantially justified or harmless, courts weigh the following factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

See Mobile Shelter Sys. USA v. Grate Pallet Solutions, LLC, 845 F. Supp. 2d 1241, 1250-51 (M.D. Fla. 2012); Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc., 282 F.R.D. 655, 663 n.7 (M.D. Fla. 2012). Upon consideration of the foregoing factors, the Court finds that Defendants' failure to timely disclose the opinions in Kemnitzer's Supplemental Report was harmless. Despite the late submission, Anders responded at length to these supplemental opinions in his own expert report. See Anders Report at 52-55. Notably, Anders does not state at any point that he did not have sufficient time to consider the information in the Supplement. Moreover, Lanard received the Kemnitzer Supplement well before Kemnitzer's deposition, on July 7, 2017, and questioned Kemnitzer about these opinions at the deposition. See Deposition of Ronald Kemnitzer (Doc. 348; Kemnitzer Dep.) at 73-75. In addition, Anders had ample opportunity to consider this supplemental evidence before his own deposition on July 12, 2017. Lanard does not identify any specific harm or prejudice resulting from this untimely disclosure, nor did Lanard ever seek additional time to address the late-disclosed supplement. Accordingly, as Defendants have satisfied their burden to demonstrate that the late disclosure was harmless, Lanard's request to strike the Kemnitzer Supplement is due to be denied.

Next, Lanard seeks the exclusion of Kemnitzer's opinion that the D#167 Patent is "primarily functional, not ornamental." See Kemnitzer Motion at 11; Kemnitzer Report at 8-9. According to Lanard, Kemnitzer relies on the wrong legal standard in determining functionality, such that "his testimony emanating from this faulty assumption must be excluded." See Kemnitzer Motion at 11. Specifically, in his report, Kemnitzer assumes that a design is "primarily functional if it is 'essential to the use or purpose of the article or if it affects the cost or quality of the article.'" See Kemnitzer Report at 8. Lanard maintains that this standard applies to the functionality of trademarks, not patents. See Kemnitzer Motion at 10-11. Upon review, however, the Court finds that the Federal Circuit has applied the definition of functionality on which Kemnitzer relies in patent design cases. See Amini Innovation Corp. v. Anthony California, Inc., 439 F.3d 1365, 1371 (Fed. Cir. 2006); see also Keurig, Inc. v. JBR, Inc., No. 11-11941-FDS, 2013 WL 2304171, at *8 (D. Mass. May 24, 2013) aff'd 558 F. App'x 1009 (Fed. Cir. 2014). As such, the Court will not exclude Kemnitzer's testimony on this basis. Regardless, Lanard does not challenge Kemnitzer's factual analysis of the functions performed by the various elements of the design. See Kemnitzer Report ¶ 28 a.-g. Thus, even if Kemnitzer applied the wrong legal standard in arriving at his ultimate determination of primary functionality, this does not undermine the reliability or relevance of Kemnitzer's factual assessment that the eraser "functions to erase chalk," the body "provides a solid foundation for a writer or artist to hold onto while using the chalk pencil," and so forth. Id. The Court will address below

whether those functional features limit the scope of the patent or render any elements of the design "primarily functional" as that term is defined in patent law.[9]

Lanard also contends that Kemnitzer's opinions are unreliable because he cites prior art references without establishing that the references did in fact exist prior to the D#167 Patent.  See Kemnitzer Motion at 18-19.[10]  Specifically, Lanard challenges the prior art existence of the Dixon Ticonderoga #2 and SenseMatic pencils, the Palomino pencil, the Office Depot pencil, and the Pencil Craft "Giant Pencil."  Id.  As to the Dixon pencils, Defendants present unrebutted evidence that the Ticonderoga no. 2 pencil has been used in commerce since at least 1983, and the SenseMatic mechanical pencil has been in United States commerce since 1988.  See Choderker Decl. ¶¶ 11-13, Exs. J-L.

_____

[9] In addition, Lanard moves to exclude Kemnitzer's opinions in their entirety because, according to Lanard, defense counsel directed Kemnitzer to render "a 'non-infringement opinion.'"  See Kemnitzer Motion at 11-12.  Lanard's argument in this regard is unsupported and without merit.  The relevant deposition testimony in proper context is as follows:

> Q: When you were retained in this case, were you told what opinions they wanted from you?
> A: Whenever I am engaged, I am asked to opine on a subject of their discretion.  And oftentimes, there are more than one patents involved, utility patents, trademark, and not always asked to do everything, seldom, in fact.
> Q: So you were asked to give and render a non-infringement opinion?
> A: Yeah.

See Kemnitzer Dep. at 72.  The inartful wording of the question notwithstanding, Kemnitzer was plainly speaking to the subjects on which he was hired to opine, and not suggesting that he was directed to reach a particular result.  Notably, Lanard's own expert acknowledged during his deposition that he was retained to "rebut" Kemnitzer's opinions and "opine on validity and infringement of design patent that's been asserted as well as opine on infringement of a registered copyright."  See Anders Dep. at 14.  Presumably, Lanard does not believe that this testimony is likewise evidence of improper "result-oriented logic" warranting Anders' exclusion as well.  See Lanard Motion at 11-12.  While zealous advocacy has its place, under these circumstances, Lanard's argument regarding Kremnitzer borders on absurd.

[10] Lanard contends that Kemnitzer's report includes "false statements of fact," because Kemnitzer refers to U.S. Patent No. 1,920,680 (the Davis Patent) as uncited prior art.  See Kemnitzer Motion at 16.  Indeed, it does appear that Kemnitzer made an error in characterizing the Davis Patent as uncited prior art because the Davis Patent was in fact cited by the examiner.  See Kemnitzer Dep. at 48-49.  Kemnitzer acknowledged this error at his deposition and clarified that correcting the error does not change his opinion.  Id. at 49.  This mistake has no impact on the Court's analysis of the infringement issue below and does not warrant exclusion of Kemnitzer's opinions.

In addition, Defendants submit the Declaration of Vic Flegel (Doc. 303-1; Flegel Decl.), the owner of Pencil Craft LLC, who asserts that Pencil Craft has sold the Giant Pencil in United States commerce since at least 2009.   See Flegel Decl. ¶¶ 2-3, Exs. A-B.   Lanard does not challenge or even acknowledge this evidence establishing that the Dixon pencils and the Giant Pencil pre-dated the Chalk Pencil patent application.   As such, Lanard's request to exclude Kemnitzer's opinions on this basis are without merit.   As to the Palomino and Office Depot pencils, the Court finds it unnecessary to rely on these examples of prior art in its analysis, and as such, the Court will not consider Kemnitzer's opinions regarding those pencils.   Based on the foregoing, the Kemnitzer Motion is due to be denied, in part, and granted, in part, as set forth above.

With regard to the Anders Motion, even viewing the remaining relevant and reliable portions of Anders' testimony in the light most favorable to Lanard, the Court finds that Defendants are entitled to summary judgment on the issues of patent and copyright infringement.   As such, aside from excluding his ultimate opinions, the Court need not specifically address Defendants' request to exclude the remainder of Anders' opinions, and will deny the remainder of the Anders Motion as moot.   The Court will now proceed to the merits of the case.

V.    **Patent**

A.  **Applicable Law**

Pursuant to 35 U.S.C. § 171, "[w]hoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title."   See 35 U.S.C. § 171.   Unlike utility patents, "[a] design patent protects the nonfunctional aspects of an ornamental design as shown in the patent."

See Elmer v. ICC Fabricating, Inc., 67 F.3d 1571, 1577 (Fed. Cir. 1995).   Determining

whether a design patent has been infringed requires two steps.   See id.   The court must

first construe the claim "to determine its meaning and scope."   Id.   Then, the factfinder

compares the properly construed claim to the accused design "to determine whether there

has been infringement."   Id.   In Egyptian Goddess, Inc. v. Swisa, Inc., the Federal Circuit

clarified the appropriate form of claim construction in the context of design patents.   See

Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 679 (Fed. Cir. 2008).   The Egyptian

Goddess Court explained that design patents "'typically are claimed as shown in drawings,'

and that claim construction 'is adapted accordingly.'"   Id. (quoting Arminak & Assocs., Inc.

v. Saint-Gobain Calmar, Inc., 501 F.3d 1314, 1319 (Fed. Cir. 2007)).   This means that

trial courts are not required "to provide a detailed verbal description of the claimed design,

as is typically done in the case of utility patents."   Id.   Indeed, "the preferable course

ordinarily will be for a district court not to attempt to 'construe' a design patent claim by

providing a detailed verbal description of the claimed design."   Id.   Nonetheless, it may

be helpful to point out "various features of the claimed design as they relate to the accused

design and the prior art."   Id. at 680.   In addition, it may be helpful to address other issues

that bear on the scope of the claim, such as "distinguishing between those features of the

claimed design that are ornamental and those that are purely functional."   Id.

Turning to the second step, "[d]esign patent infringement is a question of fact, which

a patentee must prove by a preponderance of the evidence."   See Richardson v. Stanley

Works, Inc., 597 F.3d 1288, 1295 (Fed. Cir. 2010).   To determine whether an accused

product infringes a patented design, the "ordinary observer" test applies.   See Egyptian

Goddess, 543 F.3d at 678; Crocs, Inc., 598 F.3d at 1303.   The "ordinary observer" test is

properly defined as: whether "an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design." See Crocs, Inc., 598 F.3d at 1303. Significantly, this test "applies to the patented design in its entirety, as it is claimed," and "'[m]inor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement.'" Id. (quoting Payless Shoesource, Inc. v. Reebok Int'l Ltd., 998 F.2d 985, 991 (Fed. Cir. 1993)). The infringement inquiry is not limited to those features visible at the time of sale, but rather extends to "those features visible at any time in the 'normal use' lifetime of the accused product." See Int'l Seaway Trading Corp. v. Walgreens Corp., 589 F.3d 1233, 1241 (Fed Cir. 2009) (quoting Contessa Food Prods., Inc., 282 F.3d at 1379). The "normal use" lifetime of a product "extends from the completion of manufacture or assembly until the ultimate destruction, loss, or disappearance of the article," which includes, but is not limited to, the point of sale. Id. Additionally, as the D#167 Patent is not limited to a particular size, color or construction material, "such factors should not be taken into consideration in performing an infringement analysis." See Hutzler Mfg. Co., Inc. v. Bradshaw Int'l, Inc., No. 11 Civ 7211 (PGG), 2012 WL 3031150, at *12 (S.D.N.Y. July 25, 2012) (collecting cases); see also Unique Functional Prods., Inc. v. Mastercraft Boat Co., Inc., 82 F. App'x 683, 690 (Fed. Cir. 2003) (finding that the trial court erred by considering features such as size and color which were not included in the patent).

In some cases, "[w]here the claimed and accused designs are 'sufficiently distinct' and 'plainly dissimilar,'" it is unnecessary to consider the prior art. Ethicon Endo-Surgery, Inc. v. Covidien, Inc., 796 F.3d 1312, 1335, 1335 (Fed. Cir. 2015). However, where the

claimed and accused designs are not plainly dissimilar, it "can be difficult to answer the question whether one thing is like another without being given a frame of reference." See Egyptian Goddess, Inc., 543 F.3d at 676-77. The background prior art provides this frame of reference. Id. Significantly, "[w]here the frame of reference consists of numerous similar prior art designs, those designs can highlight the distinctions between the claimed design and the accused design as viewed by the ordinary observer." Id. at 677. The Federal Circuit explains:

> When the differences between the claimed and accused designs are viewed in light of the prior art, the attention of the hypothetical ordinary observer may be drawn to those aspects of the claimed design that differ from the prior art. If the claimed design is close to the prior art designs, small differences between the accused design and the claimed design assume more importance to the eye of the hypothetical ordinary observer. The ordinary observer, however, will likely attach importance to those differences depending on the overall effect of those differences on the design.

Crocs, Inc., 598 F.3d at 1303 (internal citations omitted). Significantly, these differences "must be evaluated in the context of the claimed design as a whole, and not in the context of separate elements in isolation." See Ethicon Endo-Surgery, Inc., 796 F.3d at 1335. Thus, it is error to conduct "[a]n element-by-element comparison, untethered from application of the ordinary observer inquiry to the overall design . . . ." Id.[11]

---

[11] Prior to Egyptian Goddess, the Federal Circuit applied an additional "point of novelty" test for infringement. This test required the patentee to identify the point of novelty which distinguished the claimed design from the prior art and demonstrate that this point of novelty had been appropriated by the accused design. Egyptian Goddess, 543 F.3d at 676. The Egyptian Goddess Court rejected this "point of novelty" test as inconsistent with Supreme Court precedent and unnecessary. Id. at 672. Nonetheless, the Federal Circuit clarified that its rejection of the point of novelty test "does not mean, of course, that the differences between the claimed design and prior art designs are irrelevant." Id. at 678. Rather, "examining the novel features of the claimed design can be an important component of the comparison of the claimed design with the accused design and the prior art." Id. But, such examination must be part of the overall ordinary observer test, not as a separate test focused on particular points of novelty. Id.

**B. Claim Construction**

"In construing a design patent claim, the scope of the claimed design encompasses, 'its visual appearance as a whole,' and in particular 'the visual impression it creates.'" See Contessa Food Prods., Inc., 282 F.3d at 1376 (quoting Durling v. Spectrum Furniture Co., 101 F.3d 100, 104-05 (Fed. Cir. 1996)).   Lanard owns the D#167 Patent, entitled "Chalk Holder," which recites one claim for "the ornamental design for a chalk holder, as shown and described" in five figures.   The five exemplary figures are reproduced below:



The Court will not undertake a detailed written description of the D#167 patent, and relies on these exemplary drawings.

The Court next considers the functional features of the design.   See OddzOn Prods., Inc. v. Just Toys, Inc., 122 F.3d 1396, 1404-05 (Fed. Cir. 1997) ("Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent."); Richardson, 597 F.3d at 1294.   By definition, the patented design is for a chalk holder, "a device that can hold pieces of colored chalk to allow children to draw on the sidewalk," see Hesterberg Decl. ¶ 4, and thus, has functional components that serve this purpose.   Although Lanard makes much of the fact that its patent covers the design of a

"toy," Lanard cites no authority to suggest that toys categorically cannot have functions, nor does Lanard argue that chalk holders are not functional devices. See OddzOn Prods., Inc., 122 F.3d at 1406 (discussing the functional aspects of a toy tossing ball). Lanard makes no effort to distinguish between those aspects of the patented design that are functional and those aspects of the design that are ornamental, insisting more globally that overall the patented design is primarily ornamental because there are numerous alternative designs for chalk holders on the market. See Lanard Response at 12-13 (citing L.A. Gear, Inc. v. Thom McAn Shoe Co., 988 F.2d 1117, 1123 (Fed. Cir. 1993)).

Lanard's position is correct, insofar as it goes, but Lanard fails to recognize that the functional characteristics of its design, while not invalidating the design, do "limit the scope of the protected subject matter." See OddzOn Prods., Inc., 122 F.3d at 1406; Ethicon Endo-Surgery, Inc., 796 F.3d at 1333-34; Richardson, 597 F.3d at 1293 ("By definition, the patented design is for a multi-function tool that has several functional components, and we have made clear that a design patent, unlike a utility patent, limits protection to the ornamental design of the article."). For purposes of claim construction, the Court must distinguish the underlying functional elements of the design which are not protected, from the particular ornamental features of those elements that are protected. See Ethicon Endo-Surgery, 796 F.3d at 1333-34, 1336. The design consists of four elements: the conical tapered piece, the hexagonal elongated body, the cylindrical ferrule, and the columnar eraser. See Kemnitzer ¶ 28; see also Anders Report at 45, Table 4. Defendants contend that "each element of the D#167 design and the Ja-Ru Chalk Holder serves a functional purpose." See Defendants Motion at 14. For example, Kemnitzer opines that the conical tapered piece holds the chalk in place for writing, the elongated

body stores chalk and provides a surface for the user to grasp, the ferrule attaches the eraser to the body of the chalk holder and unscrews to allow the user to access the inside of the device for storage, and the eraser serves to erase. See Kemnitzer Report ¶ 28. Lanard presents no probative evidence which actually rebuts the functional aspects of these elements, and indeed, Lanard's packaging materials for the Chalk Pencil, the commercial embodiment of the patented design, advertise these very functions. See Hesterberg Decl., Ex. B; Ethicon Endo-Surgery, Inc., 796 F.3d at 1330 (identifying "whether the advertising touts particular features of the design as having a specific utility" as one of the factors to which courts may look in the functionality analysis).[12] The configuration of these elements is also dictated by the design's functional purpose as a writing utensil. Indeed, every piece of prior art pertaining to a writing utensil identified by the parties which incorporates similar elements does so with the same general configuration. See Richardson v. Stanley Works, Inc., 610 F. Supp. 2d 1046, 1049 (D. Ariz. 2009) aff'd 597 F.3d 1288 (Fed. Cir. 2010) (finding functional necessity of configuration illustrated by the prior art where "[e]very piece of prior art identified by the

_____

[12] Anders disputes Kemnitzer's characterization of these elements as functional. See Anders Report ¶ 85. For example, Anders contends that the eraser is not functional because there is "no indication that what appears to be the eraser portion can actually function to erase chalk," id. ¶ 85.1. But, this opinion is not supported by the record as Lanard promotes the eraser as a "Working Eraser" in the Chalk Pencil's packaging See Hesterberg Decl. ¶ 5, Ex. B; see Richardson, 610 F. Supp. 2d at 1050 (relying on the product's marketing materials to determine functionality of the design). Indeed, to the extent Anders disputes Kemnitzer's characterization of the functional aspects of the D#167 Design simply because the Patent itself does not teach those functions, this testimony fails to create an issue of fact. Neither Lanard nor Anders cites any authority instructing that the Court may look only to the teachings of the design patent to determine whether the design's features are functional. As a design patent is limited to the ornamental aspects of an article of manufacture, one would not expect the design patent itself to teach the functional aspects of the product. Thus, Kemnitzer's testimony regarding the functions served by each element of the patented design and Lanard's own packaging materials provide unrebutted evidence of the functionality inherent in the design elements.

parties that incorporates similar elements configures them in the exact same way");
Ethicon Endo-Surgery, Inc., 796 F.3d at 1334 (finding the design patent did not protect the
particular functional configuration of the design elements).   In addition, the general
thickness of the design is also dictated by the functional need to accommodate the larger
size of sidewalk chalk.   See Kemnitzer Report at 16 ("[T]he thicker proportions of the '167
patent are due to it needing to store and hold thick pieces of sidewalk chalk rather than
narrow pencil leads."); Anders Dep. at 210-11 ("Q: Do you have any opinions on the extent
that the size of sidewalk chalk affected any difference in appearance between the Lanard
chalk pencil and Dixon No. 2 [pencil]? A. Yes, well, sidewalk chalk is larger so the resulted
product has to be larger.").   Likewise, the circular opening at the tapered end is necessary
to the device's function as a writing utensil which utilizes chalk.   See Anders Dep. at 216;
see also Hesterberg Decl., Ex. B (packaging which depicts the user inserting chalk in the
opening for use as a writing tool).   Thus, these broad design concepts are not protected
by the D#167 Patent.   See Ethicon Endo-Surgery, Inc., 796 F.3d at 1333 ("The scope of
that claim, however, must be limited to the ornamental aspects of the design, and does
not extend to 'the broader general design concept.'" (quoting OddzOn Prods., Inc., 122
F.3d at 1405)).

    Nonetheless, while the functional elements of the patented design are not protected
on a conceptual level, there is no evidence that the particular ornamental designs adorning
these elements are essential to the use of the article.   See Ethicon Endo-Surgery, Inc.,
796 F.3d at 1334.   For example, the Court can discern no functional reason dictating the
columnar shape of the eraser, the specific grooved appearance of the ferrule, the smooth
surface and straight taper of the conical piece, and the specific proportional size of these

elements in relation to each other as shown in the D#167 Patent.[13]   In keeping with Egyptian Goddess, the Court will not attempt any further description of every ornamental feature and relies instead on the drawings above, with the understanding that the scope of the D#167 Patent is limited to the ornamental aspects of the design, and not the underlying functional design elements.   See Ethicon Endo-Surgery, Inc., 796 F.3d at 1334 ("Thus, although the Design Patents do not protect the general design concept of an open trigger, torque knob, and activation button in a particular configuration, they nevertheless have some scope—the particular ornamentation designs of those underlying elements.").

In Egyptian Goddess, the Federal Circuit explained that it may also be helpful to point out as part of claim construction "various features of the claimed design as they relate to the accused design and the prior art."   See Egyptian Goddess, Inc., 543 F.3d at 680. Here, the patent examiner cited fifteen prior patents as references in the D#167 Patent. See Lanard Motion, Ex. H.   These references include patents for pencils, containers shaped to look like pencils, and other hexagonal shaped containers.   See Anders Report at 40-42.   In addition, Defendants identified several other pencil designs which pre-date the D#167 Patent, including the Dixon Ticonderoga and SenseMatic pencils, the pencil design shown in U.S. Patent No. 1,927,142 (the Van Dorn Patent), and the Giant Pencil sold by Pencil Craft.   See Kemnitzer Report at 12-14; Choderker Decl. ¶¶ 11-13, Exs. J-

---

[13] In addition, the parties dispute whether the hexagonal shape of the body is dictated by function.   Compare Kemnitzer Report ¶ 28(e) (explaining that the hexagonal shape prevents the device from rolling) with Anders Report ¶ 85.4 (arguing that the hexagonal shape is not effective at preventing rolling).   Viewing the evidence in the light most favorable to Lanard, the Court will accept for purposes of the summary judgment analysis that the hexagonal shape of the body is an ornamental feature.

L; Flegel Decl., Exs. A-B. Although Lanard emphasizes throughout its briefing that the D#167 Patent pertains to a chalk holder specifically, Lanard does not contend that pencils and pencil-shaped containers are not appropriately considered as prior art. Accordingly, the Court will consider the following prior art designs:

| Cited Prior Art | | | |
|---|---|---|---|
| The Davis Patent (Pencil Ferrule) | The Hebron Patent (Space-blotting writing instrument) | The McIntyre Patent (Eraser Tip for Lead Pencils and the Like) | The Das Patent (Insulated Container for Water, Beverages, and Soups) |
| | | | |
| Uncited Prior Art | | | |
| Dixon Ticonderoga #2 | Dixon SenseMatic | The Van Dorn Patent (Eraser and Holding Tip) | The Giant Pencil |
| Dixon Ticonderoga #2 | Dixon SenseMatic | | |

As is evident from the above, design features such as a smooth, conical tapered end; hexagonal elongated body; cylindrical, grooved ferrule; and columnar eraser are well-established in the prior art.   In addition, over-sized pencils and over-sized pencil-shaped containers are also present in the prior art.   Thus, the overall appearance of Lanard's design is distinct from this prior art only in the precise proportions of its various elements in relation to each other, the size and ornamentation of the ferrule, and the particular size and shape of the conical tapered end.   <u>See</u>, <u>e.g.</u>, Anders Report at 29 (distinguishing the patented design from the Davis Patent based on the length of the tapered end, the stoutness of the body, and the shape of the ferrule); <u>id.</u> at 54 (distinguishing the patented design from the Giant Pencil based on different overall proportionality, the length of the tapered end and ferrule, and the size of the eraser).   Lanard concedes that the prior art features "similar <u>elements</u> of the Patent," but maintains that the D#167 is distinct from the prior art because "[n]one of the prior art combines the Patent's unique design with a <u>chalk holder</u>."   <u>See</u> Lanard Response at 10-12, 17.   Lanard's reliance on this functional difference is misplaced.

Lanard argues that the Court must include in its claim construction both the D#167 Patent's illustrations <u>and</u> "its written description that specifies the patent as being a design for a chalk holder."   <u>See</u> Lanard Response at 9.   This construction of the claim is critical to Lanard's patent infringement argument because it relies heavily on the chalk holder function of its design as the overriding point of similarity between the patented design and accused design that is absent from the prior art.   <u>See</u> Lanard Response at 11, 15; Lanard Motion at 31 (describing the D#167 Patent's novel features as "its <u>combined features</u> as a chalk holder with a hexagonal body, cylindroid tip, an eraser and ferrule" (emphasis

added)).  To be sure, the article of manufacture to which a design is applied is an important component of a design patent.  See In re Schnell, 46 F.2d 203, 208 (C.C.P.A. 1931) ("'The invention is not the article and is not the design PER SE, but is the design APPLIED.'" (internal citation omitted)); Curver Luxembourg, SARL v. Home Expressions Inc., No. 2:17-cv-4079-KM-JBC, 2018 WL 340036, at *8 (D.N.J. Jan. 8, 2018).  But, to the extent Lanard's argument is that the Court should consider the article of manufacture itself as an element of the design separate from its visual appearance, the Court is not persuaded.[14]  Such an argument is inconsistent with the long-standing principle in design patent law that "[u]nlike an invention in a utility patent, a patented ornamental design has no use other than its visual appearance," such that "its scope is 'limited to what is shown in the application drawings.'"  In re Harvey, 12 F.3d 1061, 1064 (Fed. Cir. 1993) (citing In re Glavas, 230 F.2d 447, 450 (C.C.P.A. 1956) and quoting In re Mann, 861 F.2d 1581, 1582 (Fed. Cir. 1988)); Dyson, Inc., 2018 WL 1906105, at *9; see also Hupp v. Siroflex, 122 F.3d 1456, 1464 (Fed Cir. 1997) ("A design patent contains no written description; the drawings are the claims to the patented subject matter.  To infringe a design patent the

_____

[14] In support of its argument, Lanard relies on a statement in Spencer v. Taco Bell Corp., No. 8:12-cv-387-T-23TGW, 2013 WL 5499609, at *2 (M.D. Fla. Oct. 2, 2013), that in "[c]onstruing the claims here, 'the written description requirement for a design patent is applied against a drawing.'"  See Lanard Response at 9.  However, when placed in proper context, this statement does not support, but rather undermines, Lanard's argument.  In Spencer, the court was explaining that the "written description" disclosure requirement of 25 U.S.C. § 112 is accomplished through drawings in the design patent context, because "the sole disclosure method [for a design patent] is a drawing."  Id.; see also In re Daniels, 144 F.3d 1452, 1456 (Fed. Cir. 1998).  While the Spencer court acknowledges that the written text can help describe the drawings, it emphasizes that the scope of a design patent is limited to what is depicted in the drawings.  See Spencer, 2013 WL 5499609, at *2-3 & n.6; see also Reddy v. Lowe's Co., Inc., 60 F. Supp. 3d 249, 256-57 (D. Mass. 2014).  As the other case on which Lanard relies pertains to utility patents, it is inapposite to the issue here.  See Lanard Response at 9 (citing Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc., Case No. 8:12-cv-691-T-24MAP, 2014 WL 4545857, at *12-13 (M.D. Fla. Sept. 12, 2014)).

accused article must appropriate the features of the patented design and its overall appearance."); <u>Reddy v. Lowe's Co., Inc.</u>, 60 F. Supp. 3d 249, 251-52 (D. Mass. 2014) ("'In a design patent application, the subject matter which is claimed is the design embodied in or applied to an article of manufacture (or portion thereof) <u>and not the article itself</u>.'") (emphasis added) (quoting <u>Manual of Patent Examining Procedure</u> (9th ed. Rev. Mar. 2014) § 1502)).

Lanard appears to contend that function matters because the patent examiner decided to issue the D#167 Patent, despite her awareness of the no. 2 pencil design, and thus, must have viewed the application of the pencil design to a chalk holder as the distinguishing feature. <u>See</u> Lanard Response at 10-11. Similarly, Lanard points to the fact that "design patents are valid and issued for toy designs that evoke different utilitarian objects" as evidence that applying an existing design to a different object distinguishes the design from the prior art. <u>See</u> Lanard Response at 11. This argument is not persuasive as it is based on the hypothetical and entirely speculative assumption that the patent examiner issued the design patent based on the new function of the design, rather than its unique appearance.[15] Significantly, "[t]he adaptation of old devices or forms to new purposes, however convenient, useful, or beautiful they may be in their new role, is not invention. . . . [A] person cannot be permitted to select an existing form, and simply put it

---

[15] Nor is the Court persuaded by Lanard's assertion that in the cases on which Defendants rely, the closest prior art discussed in the infringement analysis are articles which serve the same function as the subject patented design. <u>See</u> Lanard Response at 11. It is undoubtedly true that in most cases the prior art most similar to the claimed design will involve an article of the same function. But, in this case, Lanard specifically adopted the features of a no. 2 pencil in designing its chalk holder. As such, it is not surprising that the prior art most similar to Lanard's design are pencils. Indeed, the references cited by the patent examiner included pencils and pencil-shaped containers, not chalk holders, and Lanard does not dispute that the Court can properly consider such objects in its analysis of the prior art.

to a new use, any more than he can be permitted to take a patent for the mere double use of a machine." See Smith v. Whitman Saddle Co., 148 U.S. 674, 679 (1893); Phoenix Knitting Works v. Hygienic Fleeced Underwear Co., 194 F. 703, 706 (E.D. Pa. 1911) ("[T]he mere transferring of an old design to a new and analogous use is not patentable design invention."); Bevin Bros. Mfg. Co. v. Starr Bros. Bell Co., 114 F. 362, 363 (D. Conn. 1902) ("[T]his design is merely a double use,—is, at most, the adaptation of an old form to a new purpose."); see also Neo-Art, Inc. v. Hawkeye Distilled Prods. Co., 654 F. Supp. 90, 92 (Fed. Cir. 1987) ("[T]he 'article of manufacture,' which [plaintiff] claims is a new and original design, is so nearly identical to the article for which it was intentionally designed to resemble, that it seems more accurate to describe [plaintiff's] commercial contribution as finding a new use for an old product rather than designing a new product."). Indeed, in Smith, the Supreme Court gave the following examples of designs which were non-patentable combinations of old elements:

> the use of a model of the Centennial building for paper weights and ink stands; the thrusting of a gas pipe through the leg and arm of the statute of a shepherd boy, for the purpose of a drop light; the painting upon a familiar vase of a copy of Stuart's portrait of Washington . . . .

Smith, 148 U.S. at 679.

As such, the existence of the toy patents on which Lanard relies reflects a determination by the patent examiner that the ornamental elements of the "toy" designs are distinct from the ornamental elements of the corresponding utilitarian objects. Had the patent examiner viewed the visual appearance of these designs as substantially the same, differing only in function, the examiner would have rejected such designs as anticipated. See In re Glavas, 230 F.2d at 450 ("It is true that the use to which an article

is to be put has no bearing on its patentability as a design and that if the prior art discloses any article of substantially the same appearance as that of an applicant, it is immaterial what the use of such article is."); see also Black & Decker Inc. v. Pittway Corp., 636 F. Supp. 1193, 1196 (N.D. Ill. 1986) ("First, a mere difference in [the prior art's] function does not negate [defendant's] claim that the [prior art] design anticipates [the claimed design].""). Thus, if the Chalk Pencil was no more than a large plastic model of a Dixon SenseMatic pencil with chalk grippers on the inside, it would not be a patentable design. See Smith, 148 U.S. at 679.

Nonetheless, because the Court need not reach Defendants' challenge to the validity of the D#167 Patent, the Court will assume without deciding that the visual appearance of Lanard's patented design is not substantially similar to the prior art depicted above. But, the lack of similarity is not due to the distinct functions of these devices, rather it stems from the differences in the ornamental features discussed above.[16] Lanard's attempt to use function as an aspect of the design untethered from the visual appearance of the design is unavailing. With this understanding of the ornamental

_____

[16] Although he later contradicted himself, even Lanard's own design expert conceded, at times, that it is not the function of the articles that distinguish the D#167 Patent from the prior art but the difference in "overall shape and proportions." Compare Anders Dep. at 94-95 ("Q: Sir, do you agree the Lanard design of the 167 patent is nearly identical to the design of . . . the Dixon No. 2 [pencil]? A: No. Q. Why not? A. Different overall shape and proportions." Q. Does the fact that they may serve slightly different functions matter? A. No, but the design is different.") and id. at 135 ("My understanding is that this is a new ornamental design that was not in the prior art. It has a different shape, proportionality and configuration."); with id. at 95-96 ("Q Do you agree, sir, that the fact that [the patented design and prior art] serve slightly different functions, markets and needs has nothing to do with whether or not the design of the Dixon No. 2 yellow pencil is similar to the design claimed in the 167 patent?" A. Well, I wrote this and I so believe it, otherwise I wouldn't have written it."); see also Anders Report at 19 (distinguishing the patented design from the Dixon No. 2 yellow pencil because they have "different overall appearances," and "serve completely different functions, markets, and needs"). To the extent Anders relies on function to distinguish the D#167 Patent from the prior art, such opinions are irrelevant and the Court will not consider them.

features of the design and how those features relate to the prior art, the Court now turns to the question of infringement.

### C. Infringement

In Egyptian Goddess, the Federal Circuit described a two-stage analysis for infringement.  See Egyptian Goddess, 543 F.3d at 678.  First, "where the claimed and accused designs are 'sufficiently distinct' and 'plainly dissimilar,' the patentee does not meet its burden of proving infringement," and the Court need not resort to an analysis of the prior art.  See High Point Design LLC v. Buyer's Direct, Inc., 621 F. App'x 632, 641 (Fed. Cir. 2015) and Wallace v. Ideavillage Prods. Corp. (Wallace I), 640 F. App'x 970, 972 (Fed. Cir. 2016) (both citing and quoting Egyptian Goddess, 543 F.3d at 678).  If "the claimed and accused designs are not plainly dissimilar," then the analysis proceeds to the second stage where it is necessary to compare "the claimed and accused designs with prior art to identify differences that are not noticeable in the abstract but would be significant to the hypothetical ordinary observer familiar with the prior art."  Ethicon Endo-Surgery, 796 F.3d at 1335; Egyptian Goddess, 543 F.3d at 678.  In this case, given the ubiquity of the no. 2 pencil—the undersigned has several within arm's reach—it is almost impossible to consider these designs without reference to the prior art.  Thus, the Court will assume without deciding that the two designs are not plainly dissimilar and proceed to the second stage of the analysis.  Indeed, because the field of writing utensils and pencil-shaped containers is crowded, it is both necessary and helpful to rely on the prior art as a frame of reference.  See Egyptian Goddess, Inc., 543 F.3d at 676-77 ("[I]t can be difficult to answer the question whether one thing is like another without being given a frame of reference."); Wallace v. Ideavillage Prods. Corp. (Wallace II), No. 06-CV-5673-JAD, 2014

WL 4637216, at *4 (D.N.J. Sept. 15, 2014) ("[S]ince the marketplace for brushes with handles is rather crowded, the spirit of <u>Egyptian Goddess</u> wilt be better served by introducing prior art into the analysis.") <u>aff'd</u> 640 F. App'x 970 (Fed. Cir. 2016); <u>Wing Shing Prods. (BVI) Co. Ltd. v. Sunbeam Prods., Inc.</u>, 665 F. Supp. 2d 357, 363 (S.D.N.Y. 2009) ("Here, however, in the cluttered world of the drip-coffeemakers, it seems senseless to attempt to determine whether the ordinary observer would confuse two designs without looking to the prior art for a point of reference.") <u>aff'd</u> 374 F. App'x 956 (Fed. Cir. 2010).

Although infringement is a question of fact, the parties submit competing motions for summary judgment on the issue. Lanard insists no reasonable juror could find that the two designs are <u>not</u> substantially similar, while Defendants maintain that no reasonable juror could find that they <u>are</u> substantially similar. In support of their respective positions, the parties rely on the opinions of the design experts Kemnitzer and Anders. As addressed above, while the Court considers each expert's factual analysis of the similarities and differences in the designs, the Court has excluded their ultimate factual and legal conclusions on substantial similarity or lack thereof. Significantly, competing expert opinions do not necessarily mandate the existence of a genuine dispute of fact on the issue of infringement. "[E]xpert testimony 'cannot create a material issue of fact, where [a] visual comparison reveals that the alleged infringing [design] is not substantially similar to the [patented] design.'" <u>See</u> <u>Dyson, Inc.</u>, 2018 WL 1906105, at *8 (quoting <u>Harel v. K.K. Int'l Trading Corp.</u>, 994 F. Supp. 2d 276, 284 (E.D.N.Y. 2014)); <u>Wing Shing Prods. (BVI) Co. Ltd.</u>, 665 F. Supp. 2d at 368; <u>see also</u> <u>Egyptian Goddess, Inc.</u>, 543 F.3d at 681-82; <u>OddzOn Prods., Inc.</u>, 122 F.3d at 1405-06

To determine whether or not these designs are substantially similar, "[t]he proper comparison requires a side-by-side view of the drawings of the [D#167] patent design and the accused products."   See Crocs, Inc., 598 F.3d at 1304.   A side-by-side view of the two designs is set forth below:



Fig. 1 '167 patent        Defendant's "Chalk Pencil"

Plainly, the patented design and the accused design share a broad design concept—they are both chalk holders designed to look like a no. 2 pencil—and thus, at a conceptual level they look quite similar.   The problem for Lanard, however, is that the design similarities stem from aspects of the design that are either functional or well-established in the prior art.   As stated above, the conceptual elements of the design and their particular configuration are functional.   And, as to the ornamental aspects of these elements, the columnar shape of the eraser, the hexagonal shape of the body, and the cylindrical grooved appearance of the ferrule are common design features of no. 2 pencils.   Thus, while the ordinary observer will easily recognize both of these chalk holders as using a no. 2 pencil design, this does not mean the ordinary observer will be deceived into believing they are using the same design.   Rather, the attention of the ordinary observer "will be

drawn to those aspects of the claimed design that differ from the prior art." See Egyptian Goddess, 543 F.3d at 676. As stated above, Lanard's design differs from the prior art in the precise proportions of its elements, the size of the ferrule and the specific design of its grooves, and the particular size and shape of the conical end.

With this frame of reference, the distinctions between the patented and accused designs are readily apparent. First, the proportions of the designs are different. The overall appearance of the D#167 design is more slender and elongated, while the Ja-Ru

 

Chalk Holder has a thicker, more stunted, appearance. In addition, the appearance of the conical tapered portion of the designs are distinct, with the Ja-Ru Chalk Holder employing a shorter, sloping taper with ridges along the surface and a wide opening, while the patented design has a longer, straighter taper, narrower opening and smooth surface. And, perhaps most prominently, the appearance of the ferrules in each design is different. The ferrule on the patented design has three horizontal ridges in the center, while the ferrule on the accused design has a series of vertical lines in the center, with two horizontal ridges at the top and bottom of the vertical lines, as depicted here.[17]

---

[17] While the undersigned recognizes that courts do not engage in an element-by-element analysis or consider any element in isolation, the quality of the photographs, or lack thereof, requires a close view to adequately depict what would be readily visible to an ordinary observer viewing the actual objects.

While the ferrules are similar in that they both appear to be shortened versions of the cylindrical, crimped ferrules common in no. 2 pencils, the patented design is more akin to a cut-off version of the Davis Patent, while the accused design appears to be a condensed version of the ferrule utilized with the Hebron Patent and Dixon pencils.   See supra p.33. Given that the ordinary observer is familiar with the great number of no. 2 pencil designs in the prior art, it is these features that dominate the overall appearance of the patented and accused designs.   Wing Shing Prods. (BVI) Co. Ltd, 665 F. Supp. 2d at 367 (acknowledging that courts should not engage in an element-by-element comparison, but finding that "when the prior art is used as a 'frame of reference,' the tops and bases of the devices in question dominate the overall visual impressions they make." (internal citation omitted)); see also Elmer, 67 F.3d at 1577-78.

Lanard dismisses these differences in the appearance of the two designs as inconsequential, minor differences.[18]   In support, Lanard relies on Anders who concedes that differences in the designs exist, including the ones the Court identified above, but maintains that an ordinary observer would be unaware of these "microscopic differences." See Anders Report at 36.[19]   Instead, Lanard contends that the broader similarity between

---

[18] Lanard also relies on the "doctrine of equivalents" to argue that the minor differences between the two designs do not prevent a finding of infringement.   See Lanard Response at 14-15.   Because the "doctrine of equivalents" is subsumed within the substantial similarity analysis, the Court need not conduct a separate analysis on this issue.   See Minka Lighting, Inc. v. Craftmade Int'l, Inc., 93 F. App'x 214, 217 (Fed. Cir. 2004) ("The substantial similarity test by its nature subsumes a doctrine of equivalents analysis.") (citing Lee v. Dayton-Hudson Corp., 838 F.2d 1186, 1189-90 (Fed Cir. 1988)).

[19] As the Court easily observed the design differences identified above, without the aid of a microscope or other instrument, Anders' dismissal of any differences between the two designs as "microscopic" is without factual support.   However, the Court does find that several of the differences which Kemnitzer identified in his Report would not be readily apparent to an ordinary observer when their impact on the overall design is considered.   For example, the slight differences between the two designs when viewed directly from the top and bottom, as depicted in figures 4 and 5 of the D#167 Patent, have little to no impact on the overall

the two designs—the presence of a conical tapered end, hexagonal body, ferrule, and eraser of similar proportions—is sufficient to satisfy the ordinary observer test. Anders opines that the features of these two designs "are substantially similar in size, proportionality and relationship to each other and the whole." See Anders Report at 45-50. This argument is unavailing, however, because such "high-level" similarities are insufficient to demonstrate infringement. See High Point Design LLC, 621 F. App'x at 642 ("We recognize that both designs essentially consist of a slipper with a fuzzy portion extending upward out of the foot opening. Such high-level similarities, however, are not sufficient to demonstrate infringement."); Ethicon Endo-Surgery, Inc., 796 F.3d at 1336 ("Similarity at this conceptual level, however, is not sufficient to demonstrate infringement of the claimed designs."). Indeed, Anders' analysis has little probative value because he fails to distinguish between the similarity arising from the unprotected design concept, and any purported similarity arising from the ornamental features of the design.[20] See OddzOn Prods., Inc., 122 F.3d at 1405-06. When one excludes the functional design elements from the scope of the design claim at the conceptual level, and places the ornamental aspects of the designs in context of the prior art, the differences between the

_____

appearance of the two products, especially when one considers how an ordinary observer would perceive the designs from that angle during the normal use of the products. Likewise, the Court, and presumably the ordinary observer, struggles to perceive the difference in the seams which separate the body from the tapered piece in each design. See Kemnitzer Report at 26-27. And, while the top of one eraser is convex and the other is flat, this subtle difference has little impact on the overall appearance of the two designs. As such, the Court does not consider these differences in its infringement analysis above.

[20] For the same reason, Lanard's reliance on the comments of the judge who presided over the preliminary injunction hearing prior to the transfer of this case is misplaced. The judge's references to the similarity of the "coloring" and "components" of the designs make clear that her assessment was based, at least in part, on aspects of the design that are not protected by the D#167 Patent. See Transcript of May 14, 2014 Preliminary Injunction Hearing (Doc. 47) at 35. And indeed, the predecessor court denied the request for preliminary injunction based on a lack of irreparable harm, such that it simply assumed without deciding that Lanard had established a substantial likelihood of success on infringement. See id. at 36-37.

patented and accused design take on greater significance.   See Egyptian Goddess, Inc., 543 F.3d at 683 ("When considering the prior art in the nail buffer field, this difference between the accused design and the patented design cannot be considered minor."); Wing Shing Prods. (BVI) Co. Ltd., 665 F. Supp. 2d at 367 ("As Egyptian Goddess itself recognized, where a particular design element sharply distinguishes, against the context of the prior art, the claimed design from the accused design, it is not error to focus on that element in the infringement analysis."); see also Ethicon Endo-Surgery, 796 F.3d at 1336. Because Anders fails to employ the correct frame of reference, his opinions are insufficient to create an issue of fact, and Lanard cites no other evidence that the differences between the two designs would not be immediately apparent to any ordinary observer familiar with the design of no. 2 pencils and no. 2 pencil-shaped objects.

Likewise, Lanard's reliance on the similar "proportions" of the patented and accused designs, as distinguishable from the prior art, to establish substantial similarity is problematic because the relative size and thickness of the designs as compared to no. 2 pencils is a functional modification necessary to accomplish the chalk holder function of the devices.   See Kemnitzer Report at 16 ("[T]he thicker proportions of the '167 patent are due to it needing to store and hold thick pieces of sidewalk chalk rather than narrow pencil leads."); Anders Dep. at 210-11 ("Q: Do you have any opinions on the extent that the size of sidewalk chalk affected any difference in appearance between the Lanard chalk pencil and Dixon No. 2? A. Yes, well, sidewalk chalk is larger so the resulted product has to be larger.").   Aside from the fact that both designs are thicker than a standard no. 2 pencil in order to accommodate sidewalk chalk, the specific proportions of the patented and accused designs are visibly distinct, as the Court observed above, and provide

different visual impressions.  Moreover, over-sized pencils are present in the prior art as well–both as a design feature necessary to allow for internal storage, as in the Das Patent, and as a feature to promote novelty, as in the Giant Pencil.[21]  Indeed, it appears to the Court that the overall proportions of the patented design are as similar to the Giant Pencil as they are to the accused design.  Thus, an ordinary observer would not be deceived into thinking the patented and accused designs are the <u>same</u> simply because they are both in the shape of over-sized pencils.

Here, Lanard's patented design consists of no more than "bringing together old elements," the conical tapered end, the hexagonal body, the ferrule, the columnar eraser, "with slight modifications of form," to create its unique pencil-shaped chalk holder design. See Minka Lighting, Inc. v. Maxim Lighting Int'l, Inc., No. 3:06-CV-995-K, 2009 WL 691594, at *6 (N.D. Tex. Mar. 16, 2009).  This design is not infringed by Ja-Ru using "'the same elements with [its] own variations of form,'" because the accused design "'is distinguishable

_____

[21] During his deposition, Anders compared the Lanard Chalk Pencil to the Giant Pencil as follows:
> First of all, this is made of wood with, I assume, a pencil lead embedded in the center and there's no such teaching in the patent or in the Lanard product itself.   The eraser is similar. And the ferrule is somewhat similar.   <u>And the overall shape of the body and the size of the body is somewhat similar also.</u>   But it's the combination of all of these things, particularly the fact that this is a pencil with a sharpened point where this has a removable collar that basically comes to a flat area which is not depicted.   So this is a chalk holder and this is a pencil, two different structures having different ornamental appearances.

See Anders Dep. at 214-15 (emphasis added).   Anders goes on to state that the Chalk Pencil and Giant Pencil are not substantially similar because "[t]here are, of course, differences in the size of the eraser and the size of the ferrule, but the biggest difference is the fact that the pencil has a sharpened cone at the front, whereas the 167 design has a separate element which in [sic] the pencil doesn't have."   Id. at 222. Significantly, Anders does not point to any difference in the thickness or proportions of the body.   Rather, he relies primarily on functional differences to distinguish the patented design from the Giant Pencil. Specifically, Anders repeatedly points to the truncated, separate conical element of the patented design. However, the conical element is truncated to allow for the insertion of chalk, see Anders Dep. at 216, and its design as a separate piece from the body functions to allow the user to twist the piece and tighten the chalk mechanism.   See Hesterberg Decl., Ex. B.   Significantly, the truncated conical element on the patented design is visually distinct from the truncated conical element on the accused design—most obviously due to the ridges on the accused design, but also in the length of the slope and shape of the taper.

by the ordinary observer from the patented design.'" See id. (quoting Zidell v. Dexter, 262 F. 145, 146 (9th Cir. 1920)); see also Egyptian Goddess, Inc., 543 F.3d at 674. Based on the evidence presented, no reasonable fact finder could find that Lanard has met its burden of showing that "an ordinary observer, taking into account the prior art, would believe the accused design to be the same as the patented design." Egyptian Goddess, 543 F.3d at 682 (emphasis added); OddzOn Prods., Inc., 122 F.3d at 1399-1400 (affirming summary judgment of noninfringement concerning two rocket-shaped tossing balls where "overall similarity" was not based on the ornamental features of the design); High Point Design LLC, 621 F. App'x at 640-42 (affirming summary judgment of noninfringement between two slipper designs with a fuzzy opening for the foot where the curves and slopes of the shoes were dissimilar); Ethicon Endo-Surgery, Inc., 796 F.3d at 1336 (finding similarity at the conceptual level insufficient to demonstrate infringement); Wallace, 640 F. App'x at 972-75; cf. Crocs, Inc., 598 F.3d at 1306 ("In one comparison after another, the shoes appear nearly identical. If the claimed design and the accused designs were arrayed in matching colors and mixed up randomly, this court is not confident that an ordinary observer could properly restore them to their original order without very careful and prolonged effort."). To conclude otherwise despite the dissimilarities in the two designs, would improperly broaden the scope of Lanard's patent to include all chalk holders that incorporate a pencil design. See In re Mann, 861 F.2d at 1582 ("Design patents have almost no scope."); Minka Lighting, Inc. v. Maxim Lighting Int'l, Inc., 2009 WL 691594, at *8 ("Were the Court to find infringement by Defendants' dissimilar product, it would effectively broaden the scope of Plaintiff's patent to cover all lamp support arms that

incorporate a scroll design."). While Lanard might desire such an outcome, that is not what Lanard is entitled to under the D#167 Patent.

In light of the foregoing, the Court determines that Defendants are entitled to summary judgment in their favor on the issue of infringement. This finding resolves the patent dispute between the parties and the Court cannot discern any added benefit from resolving the issue of invalidity raised in Defendants' Counterclaims. Indeed, in their briefs, when analyzing the prior art, Defendants often argued that to the extent the patented design is distinguishable from the prior art, and thus not anticipated, it is likewise distinguishable from the accused design, and thus not infringed. Accordingly, Defendants maintain that these were "distinction[s] without a difference to the instant case . . . [e]ither way, Lanard's patent claim fails." See Defendants Motion at 18, 20. Thus, it appears to make no difference to Defendants on which point the Court ruled in resolving the patent dispute, and indeed, Defendants did not move for summary judgment on their invalidity Counterclaims. Accordingly, the Court will exercise its discretion to dismiss Defendants' Counterclaims for patent invalidity without prejudice. See Phonometrics, Inc. v. No. Telecom Inc., 133 F.3d 1459, 1468 (Fed. Cir. 1998) ("We have previously held that a district court has discretion to dismiss a counterclaim alleging that a patent is invalid as moot where it finds no infringement."); Voter Verified, Inc. v. Premier Election Solutions, Inc., No. 6:09-cv-1968-Orl-19KRS, 2011 WL 3268576, at *1-2 (M.D. Fla. July 29, 2011); Astrazeneca LP v. Breath Ltd., 542 F. App'x 971, 981-82 (Fed. Cir. 2013). As such, Lanard's request for summary judgment in its favor on Defendants' Counterclaims for patent invalidity is denied as moot.

## VI. Copyright

### A. Applicable Law

The Copyright Act of 1976 extends copyright protection to "original works of authorship fixed in any tangible medium of expression . . . " and defines "work of authorship" to include "(5) pictorial, graphic, and sculptural works." See 17 U.S.C. § 102(a)(5). Sculptural works include "three-dimensional works of fine, graphic, and applied art," however only "insofar as their form but not their mechanical or utilitarian aspects are concerned." Id. § 101. The Copyright Act includes a "special rule for copyrighting a pictorial, graphic, or sculptural work incorporated into a 'useful article.'" See Star Athletica, L.L.C. v. Varsity Brands, Inc., 137 S. Ct. 1002, 1008 (Mar. 22, 2017). A 'useful article' is one "having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." 17 U.S.C. § 101. Although "useful articles" themselves are not subject to copyright protection, the design of a useful article may be protected as a pictorial, graphic, or sculptural work, but "only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." See id. (emphasis added). This reflects Congress' decision to provide copyright protection "for original works of art, but not for industrial design." Star Athletica, 137 S. Ct. at 1007.

"Additionally, copyright protection extends only to the original elements of expression in a work: 'The mere fact that a work is copyrighted does not mean that every element of the work may be protected.'" Baby Buddies, Inc. v. Toys "R" Us, Inc., 611 F.3d 1308, 1316 (11th Cir. 2010) (quoting Feist Publ'ns, Inc. v. Rural Telephone Serv. Co.,

Inc., 499 U.S. 340, 348 (1991)).   Nonetheless, "[t]o merit protection from copying, a work need not be particularly novel or unusual."   See Mattel, Inc. v. Goldberger Doll Mfg. Co., 365 F.3d 133, 135 (2d Cir. 2004).   All that is required to demonstrate copyrightable originality is "'independent creation' by the author 'plus a modicum of creativity.'"   See Home Legend, LLC v. Mannington Mills, Inc., 784 F.3d 1404, 1409 (11th Cir. 2015) (quoting Feist Publ'ns, Inc., 499 U.S. at 346).   Indeed, the "requisite level of creativity is extremely low; even a slight amount will suffice," and "[t]he vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be."   Feist Publ'ns, Inc., 499 U.S. at 340 (quoting 1 M. Nimmer & D. Nimmer, Copyright § 1.08 [C][1] (1990)).

"Equally fundamentally, '[i]n no case does copyright protection for an original work of authorship extend to any idea.'"   Baby Buddies, Inc., 611 F.3d at 1316 (quoting 17 U.S.C. § 102(b)).   Rather, the copyright only protects "the author's particularized expression of the idea."   See Mattel, Inc., 365 F.3d at 135-36.   This concept is known as the "idea/expression dichotomy" and "lets the author profit from his particular expression while ensuring that the author's raw ideas are immediately available for use in the public domain."   Baby Buddies, Inc., 611 F.3d at 1313 n.15; see Oravec v. Sunny Isles Luxury Ventures, L.C., 527 F.3d 1218, 1224 (11th Cir. 2008) ("In identifying the protected elements of a plaintiff's work, the court must be mindful of the fundamental axiom that copyright protection does not extend to ideas but only to particular expressions of ideas.").

To establish infringement of a copyright, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"   See Baby Buddies, Inc., 611 F.3d at 1315 (quoting Feist Publ'ns, Inc., 499 U.S.

at 361). "The plaintiff can prove copying either directly or indirectly, by establishing that the defendant had access, and produced something 'substantially similar,' to the copyrighted work." See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1214 (11th Cir. 2000). However, "[n]o matter how the copying is proved, the plaintiff also must establish specifically that the allegedly infringing work is substantially similar to the plaintiff's work with regard to its protected elements." Id.; see also Davidson v. United States, 138 Fed. Cl. 159, 172 (Fed. Cl. 2018) ("A necessary element to any infringement claim is not just that the work as a whole is original but also that the part copied by the defendant actually be original."). An allegedly infringing work is "substantially similar" to a copyrighted work where "'an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'" See Leigh, 212 F.3d at 1214 (quoting Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 829 (11th Cir. 1982)). Here, as in many copyright infringement cases, "the issue of infringement is intertwined with the issue of determining which parts of the work are actually protected by the copyright . . . ." See Baby Buddies, Inc., 611 F.3d at 1314. Thus, while infringement is an issue of fact, "'[n]on-infringement may be determined as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.'" See Baby Buddies, Inc., 611 F.3d at 1314 (quoting Oravec, 527 F.3d at 1223).

## B. Discussion

Defendants challenge Lanard's copyright infringement claim on both prongs. Defendants maintain that Lanard's copyright registration is invalid because there is no

"distinguishable variation" between Lanard's copyrighted design and the pre-existing pencil design in the public domain. In addition, Defendants contend that the copyright is invalid because Lanard's Chalk Pencil is a useful article. Defendants further contend that even if the copyright is valid, the Ja-Ru Chalk Holder does not infringe the copyright because Ja-Ru did not copy the limited protectable aspects of the design. Indeed, Defendants maintain that while it may have copied the idea of a pencil-shaped chalk holder, it did not copy Lanard's particular expression of that idea.

Lanard maintains that Defendants fail to rebut the presumption of validity arising out of its copyright registration. According to Lanard, its Chalk Pencil is an original work, sufficiently distinct from the appearance of a no. 2 pencil to be entitled to copyright protection.[22] See Lanard Motion at 21. Lanard describes the Chalk Pencil as a "giant, oversized pencil-inspired toy, which renders it a fanciful cartoon or version of a traditional

─────────────────────

[22] The Court rejects Lanard's nonsensical argument that the Chalk Pencil cannot be derivative of the no. 2 pencil as a matter of law because the no. 2 pencil design is in the public domain. See Lanard Response at 18-19. Plainly, a work can be derivative of material existing in the public domain. Sherry Mfg. Co., Inc. v. Towel King of Fla., Inc., 753 F.2d 1565, 1565, 1568-69 (11th Cir. 1985) (discussing whether a towel design was sufficiently original to be copyrightable when compared to a pre-existing design in the public domain). And Lanard's Chalk Pencil is indisputably derivative of the public domain no. 2 pencil design as Lanard admits that it specifically designed the Chalk Pencil to look like a no. 2 pencil and plainly "recast, transformed, or adapted" the pencil into a chalk holder. See 17 U.S.C. § 101 (defining a "derivative work" as a "work based upon one or more preexisting works, such as . . . [an] art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted."); see also Williams Dep at 28, 39-40 (explaining that he was told to make the Chalk Pencil prototype look like a pencil and that he looked at pencils in the work shop when making the prototype); Hesterberg Decl. ¶ 5 (stating that the design of Lanard's chalk holder evolved "into a design that evokes the distinctive appearance of a pencil found in children's schools, on a larger scale"). Nevertheless, to the extent any aspects of Lanard's Chalk Pencil are original, those aspects are copyrightable. See Home Legend, LLC v. Mannington Mills, Inc., 784 F.3d 1404, 1409-11, 1414 (11th Cir. 2015) ("Because much of the expression in Mannington's finished Glazed Maple design still reflects the uncopyrightable features of each plank—features like the shape of the natural underlying wood grain and the plank's shape, both of which are in the public domain—Mannington's copyright gives it the limited protection of a derivative work."); see also 17 U.S.C. § 103(b) ("The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material.").

pencil."  See Lanard Motion at 21.   Because the Chalk Pencil does not write as precisely

as a traditional pencil and given that there are numerous designs for a chalk holder that

do not look like pencils, Lanard contends that the Chalk Pencil is not a "useful article."

See Lanard Motion at 21; Lanard Response at 20.   Lanard also contends that it is entitled

to summary judgment on copyright infringement because the two designs are nearly

identical "in shape and design . . . ."  See Lanard Motion at 26; Lanard Response at 21.

The two designs relevant to the copyright analysis are depicted below:

| Copyrighted Work[23] | Accused Product |
|:---:|:---:|
|  | |

Lanard's Certificate of Registration for the Chalk Pencil, made within five years after

first publication of the work, is "prima facie evidence of the validity of the copyright," see

17 U.S.C. § 410(c), including "the requirements of originality and susceptibility to copyright

_____

[23] Because the pictures of the Chalk Pencil deposited with the Copyright Office are dark and difficult to see, the Court declines to use those pictures to conduct its analysis.   See Hesterberg Decl., Ex. D.   The parties do not dispute that the Chalk Pencil as depicted above is the work for which Lanard obtained the Certificate of Registration.   See Hesterberg Decl. ¶¶ 5-10.   Although not discernible from the pictures above, the products are different sizes, as the Chalk Pencil is significantly longer than the Ja-Ru Chalk Holder.   See Kemnitzer Report at 30; see also Declaration of Richard P. Sybert in Support of Lanard's Motion for Partial Summary Judgment (Doc. 299-3; Sybert Decl.), Ex. Q.

under 17 U.S.C. § 102(a)."  See Donald Frederick Evans & Assocs., Inc. v. Continental Homes, Inc., 785 F.2d 897, 903 (11th Cir. 1986).  However, the Certificate of Registration "is not conclusive on the copyright ownership issue," rather it shifts the burden to defendants "'to establish that the work in which the copyright is claimed is unprotectable . . . .'"  See Progressive Lighting, Inc. v. Lowe's Home Ctrs., Inc., 549 F. App'x 913, 918 (11th Cir. 2013) (quoting Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1233 (11th Cir. 2010)).  "'[T]o rebut the presumption of validity, an infringement defendant must simply offer some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement'"  Id. (quoting United Fabrics Int'l, Inc. v. C & J Wear, Inc., 630 F.3d 1255, 1257 (9th Cir. 2011)).

Defendants attempt to rebut the presumption of validity by arguing that the Chalk Pencil is not sufficiently distinguishable from the preexisting no. 2 pencil design in the public domain.  Notably, Lanard's design does copy to a significant degree elements found in the prior art, such as the yellow, hexagonal body of a no. 2 pencil with a silver, grooved ferrule, pink columnar eraser, and tapering to hold a writing medium.[24]  However, "the originality requirement is a low bar," and all that is required is that "the work possess 'some creative spark, no matter how crude, humble or obvious.'"  See Home Legend,

---

[24] Lanard asserts that "in contrast" to its Chalk Pencil, a no. 2 pencil includes the following elements: "yellow color, six sides, made of wood, graphite or lead interior, metal top before the eraser, pink eraser, may be sharpened, approximately eight inches long with a diameter of about 1/8 inch.  Sometimes the pencils have a manufacturer's identity, place of manufacture, and 'No. 2' or '2' in a black circle written on one side."  See Lanard Response at 19.  This list is confusing given that the Chalk Pencil is also yellow in color with six sides, a '2' in a black circle written on one side, and a pink eraser.  Likewise, Lanard's reliance on the material of construction, wood and metal vs. plastic, as a point of distinction is misplaced.  See L. Batlin & Sons, Inc. v. Snyder, 536 F.2d 486, 491 (2d Cir. 1976) ("[T]o support a copyright there must be at least some substantial variation, not merely a trivial variation such as might occur in the translation to a different medium.").

LLC, 784 F.3d at 1409 (quoting Feist Publ'ns, 499 U.S. at 345); see also Progressive Lighting, Inc., 549 F. App'x at 920 n.5 ("Although a conventional fleur-de-lis is certainly not eligible for copyright protection, a design is not automatically deprived of copyright protection because it derives from a design in the public domain."). Although Lanard's designer admits that he chose a number of the design features because they were "common," viewing the evidence in the light most favorable to Lanard, a reasonable juror could conclude that he independently created some features of the Chalk Pencil design. See Williams Dep. at 32-47. And, given the low threshold for originality, Lanard's design appears to evidence the "'modicum of creativity'" necessary to warrant protection. See Home Legend, LLC, 784 F.3d at 1409 (quoting Feist Publ'ns, 499 U.S. at 346). Nonetheless, the limited protection its copyright affords "is not particularly strong" given that much of the expression in the Chalk Pencil still reflects the uncopyrightable features of the no. 2 pencil in the public domain. See Home Legend, LLC, 784 F.3d at 1409; Progressive Lighting, Inc., 549 F. App'x at 920 n.5 (finding that to the extent the works at issue, derived from the public domain design of a fleur-de-lis, were entitled to copyright protection at all, "they only deserve 'thin' protection—they are copyrightable only for their specific stylized rendering of a conventional fleur-de-lis," meaning they only protect against "virtually identical copying").

Defendants also argue that Lanard's copyright is invalid in its entirety because the Chalk Pencil is a "useful article." See Defendants Motion at 22-24. In response, Lanard maintains that the Chalk Pencil "is inherently a non-functional toy . . . ." See Lanard Response at 19-20. Viewing the evidence in the light most favorable to Lanard, the Chalk Pencil has two purposes—the utilitarian purpose of storing and holding chalk to facilitate

writing, and the artistic purpose of evoking a cartoonish pencil to delight children. Lanard contends that this latter purpose renders the design of the Chalk Pencil a protectable sculptural work, and not a useful article. However, as discussed below, the artistic design of Lanard's Chalk Pencil is protectable only to the extent that it is "separable" from the useful article (i.e., chalk holder) in which it is incorporated.

A useful article is "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." See 17 US.C. § 101. To the extent Lanard contends that the Chalk Pencil is not a useful article simply because it is intended as a toy for children, this argument is not persuasive. While the Chalk Pencil may be a toy, it is nevertheless a toy with the intrinsic utilitarian function of storing and holding chalk to facilitate writing or drawing. See Hesterberg Decl. ¶ 4. Indeed, Lanard's packaging for the Chalk Pencil instructs the user how to insert chalk into the device, depicts a person's hand using the Chalk Pencil to draw on the sidewalk, and touts a "working eraser." See id., Ex. B. The Chalk Pencil is not like a toy which is designed only to portray the appearance of another object, with no function other than in a child's imagination. Compare Gay Toys, Inc. v. Buddy L Corp., 703 F.2d 970, 973 (6th Cir. 1983) ("To be sure, a toy airplane is to be played with and enjoyed, but . . . [o]ther than the portrayal of a real airplane, a toy airplane, like a painting, has no intrinsic utilitarian function."); Mattel, Inc. v. MGA Entm't, Inc., 616 F.3d 904, 916 n.12 (9th Cir. 2010) (explaining that doll clothes are not "useful articles" because they are "intended only to portray the appearance of clothing" and have no utilitarian function given that "[d]olls don't feel cold or worry about modesty"). Nor is the Chalk Pencil designed merely to "simulate" writing. Compare Lanard Toys Ltd. v. Novelty, Inc., 375 F. App'x 705, 710 (9th Cir. 2010)

("A child can make the toy 'copters' fly high into the air, but that 'flight' is simply a portrayal of the real objects, and the toys are not capable of actually flying, or transporting people or supplies, like real helicopters.").   Children do not hold the Chalk Pencil and imagine using it to draw, children can, and are intended to, actually draw with the device.   While the over-sized design may render the Chalk Pencil an inefficient tool for writing as Lanard maintains, "the efficiency of a utilitarian article is irrelevant for copyright purposes."   See Norris Indus., Inc. v. Int'l Tel. & Tel. Corp., 696 F.2d 918, 922 n.8 (11th Cir. 1983).   Thus, the undisputed evidence demonstrates that the Chalk Pencil is a "useful article."

The more pertinent question in this case is whether the Chalk Pencil incorporates features, specifically its pencil design, that are sufficiently "separable" from its utilitarian purpose to be eligible for copyright protection.   See Star Athletica, L.L.C., 137 S. Ct. at 1008 (explaining that design features of a useful article "'that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article'" may be copyrighted (quoting 17 U.S.C. § 101)).   Significantly, "to qualify as a pictorial, graphic, or sculptural work on its own, the feature cannot itself be a useful article or '[a]n article that is normally a part of a useful article' (which is itself considered a useful article)." Id. at 1010 (quoting 17 U.S.C. § 101)).   In Star Athletica, the works at issue were two-dimensional lines, chevrons and shapes applied to cheerleading uniforms.   Id. at 1008-09.   The Court found those "surface decorations" of the cheerleading uniforms qualified as two-dimensional applied art, separable from the uniforms themselves, and therefore protectable.   Id. at 1012-13.   The Star Athletica Court explained that "imaginatively removing the surface decorations from the uniforms and applying them in another medium would not replicate the uniform itself."   Id. at 1012.   The Court emphasized, however,

that the copyright protection did not extend to the "shape, cut and dimensions" of the cheerleading uniforms "on which the decorations in this case appear."  Id. at 1013.

Here, Lanard contends that the Chalk Pencil design is a sculptural work separable from the chalk holder function of the device.  Although Lanard does not identify any specific sculptural "feature" of the overall design that it maintains is separable, Lanard's position appears to be that the pencil design itself serves no utilitarian function and merely encases the chalk holder.  See Ted Arnold Ltd. v. Silvercraft Co., 259 F. Supp. 733, 734-35 (S.D.N.Y. 1966) (finding that an antique telephone design which was used as a casing for a pencil sharpener was a copyrightable design).  The problem with Lanard's argument, however, is that the pencil design does not merely encase or disguise the chalk holder, it is the chalk holder.  When one imagines the pencil design as a separate work of sculptural art, one is merely picturing a replica of the chalk holder.  See Star Athletica, 137 S. Ct. at 1012, 1013 n.2.  While Lanard may have developed this particular design for aesthetic and imaginative reasons, "this fact alone does not make the entire useful article copyrightable."  See Progressive Lighting, Inc., 549 F. App'x at 921; Norris Indus., Inc., 696 F.2d at 924 (""[E]ven if the appearance of an article is determined by aesthetic (as opposed to functional) considerations, only elements, if any, which can be identified separately from the useful article as such are copyrightable.'" (emphasis added) (quoting H.R.Rep. No. 94-1476, 94th Cong., 2d Sess. 55, reprinted in 1976 U.S. Code Cong. & Admin. News 5667, 5668)).  Moreover, unlike Star Athletica, Lanard does not seek protection for artistic surface features, applied to the utilitarian object; Lanard seeks to protect the entirety of the Chalk Pencil—including its shape and form—the very components that make up the chalk holder itself.  See Star Athletica, 137 S. Ct. at 1013

("To be clear, the only feature of the cheerleading uniform eligible for a copyright in this case is the two-dimensional work of art fixed in the tangible medium of the uniform fabric . . . . [R]espondents have no right to prohibit any person from manufacturing a cheerleading uniform of identical shape, cut, and dimensions to the ones on which the decorations in this case appear."); id. at 1016 ("[O]ur test does not render the shape, cut, and physical dimensions of the cheerleading uniforms eligible for copyright protection."); see also id. at 1032-33 (Breyer, J., dissenting) ("A separable design feature must be 'capable of existing independently' of the useful article as a separate artistic work that is not itself the useful article."). While the Chalk Pencil in its entirety may be a "'unique and attractively shaped'" chalk holder, its features are not capable of "existing independently" as a work of art, and therefore, it is not protectable under copyright law. Id. at 1011 (quoting 37 C.F.R. § 202.10(c) (1960)); Progressive Lighting, Inc., 549 F. App'x at 920-21 ("Our precedent makes clear that an entire useful article cannot receive copyright protection, no matter how many superfluous, aesthetic individual components it has."); Norris Indus., Inc., 696 F.2d at 924. Accordingly, Lanard does not own a valid copyright in the Chalk Pencil and its copyright claim must fail.

However, even if Lanard does have a protectable copyright interest in the Chalk Pencil, Lanard fails to demonstrate that Defendants infringed any protectable aspect of that work. The infringement analysis in this case is closely akin to the Eleventh Circuit's decision in Baby Buddies, Inc. v. Toys "R" Us, Inc., 611 F.3d 1308 (11th Cir. 2010). In Baby Buddies, the plaintiff had designed a pacifier holder featuring a white, plastic teddy bear attached to a ribbon tether with a bow, and obtained a copyright registration for the design. See Baby Buddies, Inc., 611 F.3d at 1311. The defendant, Toys "R" Us, initially

carried the plaintiff's pacifier holder, but later decided to design its own.   Id. at 1311-12.

The Toys "R" Us pacifier holder also featured a small white plastic bear with a ribbon tether and a bow.   Id. at 1312.   The plaintiff sued Toys "R" Us for copyright infringement and after discovery, the district court granted summary judgment in favor of Toys "R" Us finding no infringement.[25]   Id. at 1310-11.   The Eleventh Circuit affirmed, finding that when "focusing on only the elements protected by the copyright laws (that is, setting aside the unoriginal and nonexpressive elements of the Baby Buddies pacifier holder)," the pacifier holders were not substantially similar.   Id. at 1317-21.

In Baby Buddies, the court's analysis began with a determination that the plastic bears and bows were the only elements of the design eligible for copyright protection, as the remainder of the design served the utilitarian function of connecting a baby's pacifier to his clothes.   Id. at 1317-18.   The court then compared the bears and found that while they shared the same basic anatomical features, this was not a sufficient basis to find similarity because "every sculpture of a teddy bear shares these features simply because these features are what defines a teddy bear."   Id. at 1317.   "To protect this basic combination of features would in effect give Baby Buddies exclusive rights over the very idea of a plastic sculpted teddy bear, which is expressly precluded under the copyright laws."   Id.   The court then considered the "particularized expression" of the two bears and found distinctive features such that "[n]o properly instructed juror could find these bears substantially similar."   Id. at 1319.

---

[25] Notably, the evidence in that case revealed that the Toys R Us designer was sent a copy of plaintiff's pacifier holder with a note saying in part "'I need a new animal design.   The buyer likes this bear but I do not want to produce the same exact thing. Can you please work on a similar design.'"   Id.

Here, both Lanard and Defendants have incorporated a no. 2 pencil design into a chalk holder. Thus, both designs employ the general features of a no. 2 pencil—a tapered conical holder for the writing element, a yellow, hexagonal elongated body, a silver, grooved ferrule, a pink columnar eraser, and the number 2 in a darkened oval. But, as with the anatomical features of a teddy bear, every sculpture of a no. 2 pencil contains these features as they are what define a no. 2 pencil. "To protect this basic combination of features would in effect give [Lanard] exclusive rights over the very idea of a [no. 2 pencil], which is expressly precluded under the copyright laws." Baby Buddies, Inc., 611 F.3d at 1317; see also Mattel, Inc., 365 F.3d at 135-36 ("[Plaintiff's] copyright in a doll visage with an upturned nose, bow lips, and widely spaced eyes will not prevent a competitor from making dolls with upturned noses, bow lips, and widely spaced eyes, even if the competitor has taken the idea from [plaintiff's] example, so long as the competitor has not copied [plaintiff's] particularized expression."). Thus, the Court must consider "the particular ways in which those general features or ideas are expressed." Id. at 1318. As stated above in the patent analysis, there are readily apparent differences in each company's expression of a pencil-shaped chalk holder. Most notably, the appearance of the ferrules on the two chalk holder designs are dissimilar, the proportions of the separate elements in relation to each other are different, and the color, surface and slope of the tapered conical pieces are distinct, as is the specific pink shade of the eraser. In addition, not only are the words on the chalk holders different, both the positioning and font of the words are distinctly different as well.

Lanard asks the Court to find substantial similarity because the works both involve no. 2 pencil designs applied to chalk holders, and there are numerous other ways to design

a chalk holder that do not employ the look of a pencil.[26]   This argument is faulty as the Court must consider the sculptural design <u>separately</u> from the useful article into which it is incorporated.   <u>See</u> <u>Star Athletica</u>, 137 S. Ct. at 1007; <u>Baby Buddies, Inc.</u>, 611 F.3d at 1317-21.   Notably, in <u>Baby Buddies</u>, the court analyzed the similarity of the bears separately from their application to pacifier holders.   Indeed, the Eleventh Circuit rejected the plaintiff's attempt to "invoke the protection of copyright laws to prevent a competitor from using the idea of putting a sculpted teddy bear and a color-coordinated bow on a ribbon tether to create an aesthetically appealing pacifier holder."   <u>See</u> <u>Baby Buddies, Inc.</u>, 611 F.3d at 1320.   The <u>Baby Buddies</u> Court explained that "this type of creative competition is entirely consistent with the copyright laws," and that while Baby Buddies "has the right to prevent others from copying its creative expression," it does not have the ability to stop others "from expressing similar ideas differently."   <u>Id.</u> at 1320-21.   As in <u>Baby Buddies</u>, Lanard is not entitled to copyright protection for the <u>idea</u> of a pencil-shaped chalk holder.   <u>See</u> <u>id.</u> at 1320 (finding no copyright infringement where "there are almost no similarities between the two pacifier holders beyond the general idea of including a teddy bear . . . , a ribbon bow, and a pastel-based color scheme on a baby's pacifier

_____

[26] Lanard relies on Anders' expert opinions to support its copyright infringement claim.   Anders' entire analysis of similarity consists of the following statement: "there is enough similarity between the accused infringing work and the copyrighted work to conclude the former copied from the later."   <u>See</u> Anders Report at 52.   He adds that "[i]t is apparent" that each Defendant infringed Lanard's copyright "because the accused product is substantially the same as each and every image contained in the copyright."   <u>See</u> <u>id.</u>   As Anders makes no attempt to identify the unprotectable elements of Lanard's pencil design or distinguish between similarity arising out of Lanard's particularized expression as opposed to its unprotectable idea, Anders' conclusory opinions are entirely insufficient to create a genuine issue of material fact.   Indeed, given this complete lack of analysis, Anders' opinions are based on nothing more than his own <u>ipse dixit</u> and as such fail to satisfy the requirements of <u>Daubert</u>.   <u>See</u> <u>Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.</u>, 402 F.3d 1092, 1111-13 (11th Cir. 2005) (affirming district court's decision to exclude an expert opinion that was "connected to existing data only by the <u>ipse dixit</u> of the expert," and "unsubstantiated by any proffered facts, explanation, or analysis").

holder"). Lanard's insistence that there are many ways to design a chalk holder that do not utilize a pencil design misses the point—there are also many ways to design a baby's pacifier holder that do not utilize a teddy bear, and many ways to design a jewelry pin that do not utilize a bee. Baby Buddies, Inc., 611 F.3d at 1320; Herbert Rosenthal Jewelry Corp. v. Kalpakian, 446 F.2d 738, 740-41 (9th Cir. 1971). Ja-Ru, TRU and Dolgencorp, "are free to utilize" the idea of a pencil-shaped chalk holder, "so long as they do not plagiarize its expression." See Herbert Rosenthal Jewelry Corp., 446 F.2d at 741. Given the differences in the pencil features of the designs, no reasonable juror could conclude that Defendants have appropriated Lanard's expression of a pencil-shaped chalk holder, as opposed to the idea of such an item. Accordingly, the Court determines that Defendants are entitled to summary judgment in their favor on the claim for copyright infringement.

**VII. Trade Dress**[27]

The Eleventh Circuit recognizes a federal cause of action for the infringement of unregistered trade dress pursuant to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). See John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 980 (11th Cir. 1983). "'Trade dress' involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques."

---

[27] Lanard also asserts claims for statutory and common law unfair competition under the Lanham Act and Florida common law. In its Motion for Summary Judgment, Lanard does not distinguish between its unfair competition claims and its trade dress infringement claim, and concedes that its "statutory and common law unfair competition claims under federal and Florida law are predicated on" Defendants' purported trade dress infringement. See Lanard Motion at 34-35. As Lanard's trade dress infringement claim fails for the reasons set forth below, the Court need not conduct a separate analysis of Lanard's unfair competition claims. See Planetary Mtn., Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193 n.4 (11th Cir. 2001) (citing Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C., 931 F.2d 1519, 1521 (11th Cir. 1991)).

Id.  Although "[m]ost trade dress infringement actions involve the packaging or labeling of goods," courts have also recognized that "the design of a product itself may constitute protectable trade dress under § 43(a) of the Lanham Act."  Id.; see also Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 209-10 (2000).  To prevail on its claim for trade dress infringement, Lanard must prove three things: (1) "'[t]hat the trade dress of the two products is confusingly similar,'" (2) "'that the features of the trade dress are primarily non-functional,'" and (3) "'that the trade dress has acquired secondary meaning.'"  See John H. Harland Co, 711 F.2d at 980 (quoting Black & Decker Co. v. Ever-ready Appliance Mfg. Co., 518 F. Supp. 607, 616 (E.D. Mo. 1981) aff'd 684 F.2d 546 (8th Cir. 1982)).  "'[A]ll three elements are necessary for a finding of trade dress infringement,'" such that any one of them can be "'characterized as threshold.'"  See Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC, 369 F.3d 1197, 1202 (11th Cir. 2004) (internal quotation omitted). Here, Defendants contend that Lanard cannot prevail on its trade dress claim because Lanard fails to present sufficient evidence that the Chalk Pencil has acquired secondary meaning.[28]

"'To establish secondary meaning the plaintiff must show that the primary significance of the product in the minds of the consuming public is not the product itself but the producer.'"  See Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp., 716 F.2d 854, 857 n.7 (11th Cir. 1983) (quoting Vision Ctr. v. Opticks, Inc., 596 F.2d 111, 118 (5th Cir.

---

[28] Lanard does not and cannot argue that its Chalk Pencil is inherently distinctive.  See Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 212-14, 216 (2000) (holding that a product-design trade dress can never be inherently distinctive) ("[I]n an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning.").

1979)[29]); <u>Wal-Mart Stores, Inc.</u>, 529 U.S. at 211 (instructing that secondary meaning "occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself'" (quoting <u>Inwood Labs., Inc. v. Ives Labs., Inc.</u>, 456 U.S. 844, 851 n.11 (1982))). "'Establishing secondary meaning is best accomplished by surveys or other quantitative evidence.'" <u>See</u> <u>Olem Shoe Corp. v. Wash. Shoe Corp.</u>, No. 09-23494-CIV, 2011 WL 6202282, at *20 (S.D. Fla. Dec. 1, 2011) (quoting <u>Habersham Plantation Corp. v. Investment P'ship, L.P.</u>, No. 10-61532-CIV, 2011 WL 4005454, at *6 (S.D. Fla. Sept. 8, 2011)). Nonetheless, although survey evidence is "the most direct and persuasive evidence" to establish secondary meaning, it is not required. <u>See</u> <u>Sugar Busters LLC v. Brennan</u>, 177 F.3d 258, 269 (5th Cir. 1999); <u>see also</u> <u>Vision Ctr.</u>, 596 F.2d at 119 ("In assessing a claim of secondary meaning, 'the chief inquiry is the attitude of the consumer toward the mark; does it denote to him a, single thing coming from a single source? Short of a survey, this is difficult of direct proof.'" (quoting <u>Aloe Crème Labs., Inc. v. Milsan, Inc.</u>, 423 F.2d 845, 849 (5th Cir. 1970))). Absent consumer survey evidence, "four factors can be considered in determining whether a particular mark has acquired a secondary meaning." <u>See</u> <u>Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.</u>, 931 F.2d 1519, 1525 (11th Cir. 1991). These factors are:

"(1) [T]he length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the name and the

---

[29] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

plaintiff's . . . business; and (4) the extent to which the public actually identifies the name with the plaintiff's [product]."

Id. (quoting Conagra, Inc. v. Singleton, 743 F.2d 1508, 1513 (11th Cir. 1984)). Significantly, "a plaintiff has the burden of sustaining a high degree of proof establishing secondary meaning . . . ." See Gift of Learning Foundation, Inc. v. TGC, Inc., 329 F.3d 792, 800 (11th Cir. 2003); Investacorp, Inc., 931 F.2d at 1525 (instructing that the "high degree of proof" necessary to establish secondary meaning "must be considered by the court when ruling on a motion of summary judgment"); Vision Ctr., 596 F.2d at 118; see also Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC, 259 F.3d 25, 43 (1st Cir. 2001) ("[P]roof of secondary meaning entails vigorous evidentiary requirements." (internal quotation omitted)).

Here, Lanard argues that it has established secondary meaning based on evidence of the following: 1) intentional copying, 2) significant sales, and 3) "substantially exclusive use of the trade dress for five years . . . ." See Lanard Motion at 33. Upon careful consideration, however, the Court determines that Lanard vastly overstates its evidence of secondary meaning. When placed in proper context, Lanard's evidence woefully fails to meet its high burden of establishing any connection between Lanard and the Chalk Pencil in the mind of the consumer. As no reasonable juror could find secondary meaning on the record before this Court, the Court finds, for the reasons set forth below, that Defendants are entitled to summary judgment on Lanard's trade dress infringement and unfair competition claims as well.[30]

_____

[30] To the extent Lanard argues that Defendants are estopped from challenging the validity of Lanard's trade dress under the licensee estoppel doctrine, this argument is without merit. Lanard cites no authority to support its contention that the licensee estoppel doctrine can apply to bar an attack on the validity of a trade

First, the Court reviews Lanard's evidence of intentional copying. Lanard presents evidence that unequivocally establishes that Ja-Ru used Lanard's Chalk Pencil as a "reference" or "market" sample in designing the Ja-Ru Chalk Holder. However, this evidence also shows that Ja-Ru modified the design, in the ways detailed above, as well as with respect to the overall size of the chalk holder. Significantly, Lanard does not assert, and there is no evidence to suggest, that Defendants engaged in any instances of actual palming off or deception related to the Ja-Ru Chalk Holder. See Brooks Shoe Mfg. Co., 716 F.2d at 859 n. 11 ("'Palming off is an attempt by one person to induce consumers to believe that his product is actually that of another; it requires an intent to deceive and

_____

dress for lack of secondary meaning. See John C. Flood of Va., Inc. v. John C. Flood, Inc., 642 F.3d 1105, 1110-12 (D.C. Cir. 2011) (finding trademark licensee barred from arguing abandonment of the mark on the basis of naked licensing as it had benefited from the license of the disputed marks for over two decades); Creative Gifts, Inc. v. UFO, 235 F.3d 540, 548 (10th Cir. 2000) (holding licensee was estopped from arguing abandonment of a trademark based on naked licensing where it was the failure to police the licensee's own conduct which predicated the naked licensing argument); Prof'l Golfers Ass'n of Am. v. Bankers Life & Cas. Co., 514 F.2d 665 (5th Cir. 1975) (finding licensee was estopped from arguing abandonment of trademark where the facts on which licensee relies arose during the course of its licensing agreement). Notably, "[t]he point of licensee estoppel is to foreclose the sort of claim . . . where the licensee blames the licensor for the licensee's own failure to preserve the value of the license . . . ." See John C. Flood of Va., Inc. v. John C. Flood, Inc., 700 F. Supp. 2d 90, 98 (D.D.C. 2010) aff'd 642 F.3d 1105, 1112 (D.C. Cir. 2011). That is not the situation here. Rather, in the instant action Lanard attempts to use the licensee estoppel doctrine not to equitably estop Defendants from raising an affirmative defense, but as a means of satisfying Lanard's burden to establish secondary meaning. Lanard presents no authority that the licensee estoppel doctrine can be used in this way.

Regardless, even if licensee estoppel could apply in this context, Lanard has not provided any evidence that it licensed the use of its purported trade dress rights in the Lanard Chalk Pencil to Dolgencorp or TRU, the wholesale purchasers of the product. Although Lanard contends that Dolgencorp and TRU are licensees "by virtue of their distributor agreements with Lanard," Lanard does not provide any copies of those agreements which could indicate whether any licensing agreement related to Lanard's purported trade dress rights in the Chalk Pencil were present. Moreover, while "[p]arties do not need an express writing for a court to find that a license relationship exists," Lanard cites no evidence from which a fact-finder could infer that the parties had entered into a licensing agreement with respect to Lanard's purported trade dress rights. Cf. Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC, No. 09-61490-Civ, 2011 WL 2174012, at *5-7 (S.D. Fla. June 2, 2011). Thus, absent any evidence that Dolgencorp or TRU ever "recognized the validity of the licensor's ownership" of any trade dress rights, the equitable basis for applying this doctrine is absent. See John C. Flood of Va., Inc., 642 F.3d at 1110 ("[I]n general, trademark licensees are estopped from challenging the validity of the licensor's title because by agreeing to the license, the licensee has recognized the validity of the licensor's ownership." (emphasis added)).

proof of actual fraud.'" (quoting <u>Ralston Purina Co. v. Thomas J. Lipton, Inc.</u>, 341 F. Supp. 129, 135 (S.D.N.Y. 1972))). As the Eleventh Circuit recognized in <u>Brooks Shoe Mfg.</u>:

> close copying does not <u>necessarily</u> indicate that the defendant has attempted to capitalize on the secondary meaning of plaintiff's trademark or trade dress because "[t]here may have been many other motivations for defendant's actions." Further, "[i]t must . . . not be forgotten that there is absolutely nothing legally or morally reprehensible about exact copying of things in the public domain."

<u>Id.</u> at 860 (internal citations omitted) (quoting 1 J.T. McCarthy, Trademarks and Unfair Competition, § 15:4, at 531 (1973)). Indeed, "attempts to copy a product configuration will quite often not be probative: the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product." <u>See Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.</u>, 40 F.3d 1431, 1453 (3d Cir. 1994); <u>Yankee Candle Co., Inc.</u>, 259 F.3d at 44-45. Given the differences in the two designs, the ubiquity of the no. 2 pencil design in the public domain, and the absence of any evidence that Defendants intended to benefit from Lanard's <u>reputation</u>, this evidence of copying is entitled to little weight in establishing secondary meaning. <u>Brooks Shoe Mfg.</u>, 716 F.2d at 859-60, 861 n.17.[31]

Second, Lanard's reliance on its "substantial sales" is not born out by the evidence. "[S]econdary meaning must attach to the mark <u>before</u> [Defendants] first used the mark . . . ." <u>See Investacorp, Inc.</u>, 931 F.2d at 1525 (emphasis added); <u>see also Knights Armament Co. v. Optical Sys. Tech., Inc.</u>, 654 F.3d 1179, 1189 (11th Cir. 2011) ("The party

---

[31] Indeed, this point is especially salient as to TRU who sold the Chalk Pencil under its own private label, Sizzlin' Cool. Thus, it is hard to conceive how TRU intended to profit from Lanard's <u>reputation</u>, as consumers would have associated both versions of the pencil-shaped chalk holder with TRU.

seeking trademark protection must demonstrate that its mark acquired secondary meaning before the alleged infringer first began using the mark.").   Thus, Lanard's assertions that it has "shipped 1,415,034 units of its Chalk Pencil between 2010 and 2016, accumulating gross sales in the amount of $2,770,047.06, and has $2,879,787.46 in total gross sales up to July 21, 2017" are irrelevant.   See Lanard Motion at 33.   Rather, the Court looks to the length and manner of the Chalk Pencil's use from November 2010, when Lanard introduced the item to the market, to January 2014, when TRU began retail sales of the Ja-Ru Chalk Holder.[32]   During this period of time, Lanard sold 581,984 units of its Chalk Pencil in the United States, totaling $1,113,007.90 in sales.   Lanard's sales data, however, does not establish any connection in the consumer's mind between Lanard and the Chalk Pencil.   See Investacorp, Inc., 931 F.2d at 1525-26 ("[T]he length of [plaintiff's] use of the mark was five years prior to the [defendant's] use of their mark.   However, there is nothing significant about the manner of [plaintiff's] use of the mark, other than [plaintiff] merely 'displayed its service mark on nearly all of its transactional documents.'"); Vision Ctr., 596 F.2d at 119 ("'[C]ourts have summarily rejected claims of secondary meaning predicated solely upon the continued use of the mark for many years.'" (internal quotation omitted)); Brooks Shoe Mfg. Co., Inc., 716 F.2d at 860 ("We recognize that

---

[32] Lanard also argues that it has presented prima facie evidence of acquired distinctiveness because it had "substantially exclusive use of the trade dress for five years."   See Lanard Motion at 33.   This argument is not supported by the evidence.   As stated above, prior to the Ja-Ru Chalk Holder entering the market, Lanard had "substantially exclusive use" of the trade dress for just over three years.   Indeed, Lanard had not even used its purported trade dress for five years at the time it initiated this lawsuit.   See Complaint and Demand for Trial by Jury (Doc. 1), filed March 27, 2014.   Thus, Lanard's reliance on 15 U.S.C. § 1052(f) is misplaced.   See 15 U.S.C. § 1052(f) ("The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for five years before the date on which the claim of distinctiveness is made.").

evidence of sales, advertising and promotional activities may be relevant to determining whether a trademark or trade dress has acquired secondary meaning, but we are unable to conclude that [plaintiff's] evidence is sufficient to prove secondary meaning in this case."). Indeed, as the Third Circuit Court of Appeals explained in <u>Duraco Products., Inc.</u>:

> Sales success by itself will typically not be as probative of secondary meaning in a product configuration case as in a trademark case, since the product's market success may well be attributable to the desirability of the product configuration rather than the source-designating capacity of the supposedly distinguishing feature or combination of features. And unlike with a trademark, where repeated purchases of a product support an inference that consumers have associated the mark with the producer or source, one can much less confidently presume that a consumer's repeated purchase of a product has created an association between a particular product configuration and the source.

<u>Id.</u> at 1452-53. Accordingly, it is difficult to draw any inference of secondary meaning from Lanard's evidence of sales alone.

Notably absent from the record is any evidence of Lanard's advertising or promotion of the Chalk Pencil, much less the effectiveness of those efforts in creating a consumer association between Lanard and the Chalk Pencil. To the contrary, the record reflects that Lanard did not engage in any advertising or promotional activities with respect to the Chalk Pencil. <u>See</u> Choderker Decl. ¶ 17, Ex. P: Plaintiff/CounterDefendant Lanard Toys Limited's Verified Amended Response to Defendant/Counterclaimant Toys R US Delaware, Inc.'s Interrogatories, Set One (Doc. 302-39; Lanard Interrog.), No. 23. Moreover, there is no evidence whatsoever that consumers, either the public or retailers, actually draw a connection between the Chalk Pencil and Lanard, much less any evidence of actual confusion between the products. Lanard concedes that it has no knowledge of any inquiries as to the source or sponsorship of the Lanard Chalk Pencil and Ja-Ru Chalk

Holder, nor does it have any evidence of actual consumer confusion. See Lanard Interrog., Nos. 3-4, 14. Even viewing the evidence in the light most favorable to Lanard, Lanard's attempt to establish secondary meaning solely based on evidence that Ja-Ru copied its idea of a pencil-shaped chalk holder and that Lanard sold approximately 600,000 Chalk Pencils in the United States during the relevant time period is insufficient to meet its high evidentiary burden of establishing secondary meaning. See Investacorp, Inc., 931 F.2d at 1525-26 (affirming summary judgment for defendant where undisputed facts show that trademark had not acquired secondary meaning); Gift of Learning Foundation, Inc., 329 F.3d at 801-02 (affirming entry of summary judgment despite evidence of intentional copying and actual confusion); Yankee Candle Co., Inc., 259 F.3d at 43-45 (affirming entry of summary judgment based upon finding that evidence of extensive sales, expenditure of significant resources in advertising, and intentional copying was insufficient to establish secondary meaning given the lack of any evidence that actual consumers associated the claimed trade dress with the plaintiff); Duraco Prods., Inc., 40 F.3d at 1453-54; see also Olem Shoe Corp., 2011 WL 6202282, at *21 (finding plaintiff failed to meet its evidentiary burden to establish secondary meaning in trade dress claim where plaintiff failed to produce legally sufficient evidence to establish that the public actually identifies the trade dress with the plaintiff or its brands); Barn Light Electric Co., LLC v. Barnlight Originals, Inc., No. 8:14-cv-1955-MSS-AEP, 2016 WL 7135076, at *5 (M.D. Fla. Sept. 28, 2016); Vision Ctr., 596 F.2d at 119. As this is an essential element of Lanard's trade dress infringement claim, the Court determines that summary judgment in favor of Defendants on Lanard's trade dress claim is warranted.

## VIII. Conclusion

In the foregoing analysis, the Court has determined that Lanard failed to satisfy its burden of demonstrating that the Ja-Ru Chalk Holder infringed the D#167 Patent. In addition, the Court found that Lanard's copyright in the Chalk Pencil is invalid as the Chalk Pencil is a useful article. Alternatively, the Court found that even if the copyright is valid, Defendants did not copy any of the protectable elements of Lanard's work, and as such Lanard failed to demonstrate a material issue of fact on infringement. As to the trade dress claim, on the record before the Court, Lanard cannot satisfy its burden of establishing secondary meaning in the design of the Chalk Pencil. Finally, because Lanard fails to present sufficient evidence of infringement as to any of its claims, Lanard's unfair competition claim also fails. In light of the foregoing, Defendants Motion for Summary Judgment on all counts of the Amended Complaint is due to be granted, and Lanard's Motion for Summary Judgment as to the claims in the Amended Complaint is due to be denied.

The Court now turns to the remaining Counterclaims for declaratory judgment in this action. Federal courts have "unique and substantial discretion in deciding whether to declare the rights of litigants[,]" or to dismiss or stay an action seeking a declaratory judgment. Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995); see also Fed. Reserve Bank of Atlanta v. Thomas, 220 F.3d 1235, 1247 (11th Cir. 2000) ("[I]t undoubtedly is true that, in ordinary circumstances, 18 U.S.C. § 2201 would give the district court the discretion to dismiss a declaratory judgment action such as this even though the action comes within its original jurisdiction."). In exercising its discretion, however, a district court may not decline to entertain a declaratory judgment action "on the basis of whim or personal

disinclination[,]" <u>Angora Enters. Inc., v. Condo. Ass'n of Lakeside Village, Inc.</u>, 796 F.2d 384, 387 (11th Cir. 1986) (per curiam), but "the range of considerations available to the district court in deciding whether to entertain the declaratory action is vast and the deference afforded to its decision is substantial." <u>See</u> <u>Manuel v. Convergys Corp.</u>, 430 F.3d 1132, 1137-38 (11th Cir. 2005). Significantly, "[w]here a district court has before it a declaratory judgment action and a direct action containing all of the issues in the declaratory judgment action, and decides the common issues in the direct action, it may exercise its discretion to dismiss the declaratory judgment complaint." <u>Orion Pictures Corp. v. Showtime Networks, Inc.. (<i>In re</i> Orion Pictures Corp.)</u>, 4 F.3d 1095, 1100 (2d Cir. 1993) (citing <u>Tyler Pharmacal Distrib., Inc. v. U.S. Dep't of Health, Educ. and Welfare</u>, 408 F.2d 95, 97 (7th Cir. 1969)); <u>see also</u> <u>Knights Armament Co. v. Optical Sys. Tech.</u>, 568 F. Supp. 2d 1369, 1374-75 (M.D. Fla. 2008) ("Because the parties' rights with respect to trademarks will be decided by the infringement claims at hand, there is no need for declaratory judgment.").

Here, Defendants brought several Counterclaims seeking declaratory judgments as to the invalidity, unenforceability, and non-infringement of Lanard's Copyright Registration No. VA 1-794-458, the D#167 Patent, and any purported trade dress rights in the Chalk Pencil, as well as a declaration that Defendants have not engaged in unfair competition. Notably, however, Defendants did not move for summary judgment in their favor on the claims raised in their Counterclaims. Nonetheless, as the Court's rulings on Lanard's direct claims have either addressed the issues raised by the Counterclaims or otherwise resolved the controversy between the parties, the Court will exercise its discretion to dismiss the Counterclaims without prejudice. Accordingly, to the extent Lanard moves

for summary judgment in its favor on various claims raised in the Counterclaims, the Court will deny that request as moot.   In light of the foregoing, it is

**ORDERED:**

1. Plaintiff's Motion to (1) Strike the Supplemental Report of Ronald B. Kemnitzer as Untimely; and (2) Exclude the Opinions and Testimony of the Defendants' Purported Expert Ronald B. Kemnitzer (Doc. 310) is **GRANTED, in part, and DENIED, in part** as set forth above.

2. Defendants' <u>Daubert</u> Motion to Disqualify Robert John Anders and Preclude Testimony (Doc. 314) is **GRANTED, in part,** as set forth above, and otherwise **DENIED as moot**.

3. Defendants' Dispositive Motion for Summary Judgment and Memorandum of Law in Support (Doc. 302) is **GRANTED**.

4. Defendants' Counterclaims (Doc. 270-272) are **DISMISSED without prejudice**.

5. Plaintiff's Motion for Partial Summary Judgment (Doc. 299) is **DENIED** as to the claims raised in the Amended Complaint, and **DENIED as moot** as to the claims raised in the Counterclaims.

6. The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendants Toys "R" Us-Delaware, Inc., Dolgencorp, LLC, and Ja-Ru, Inc. and against Plaintiff Lanard Toys Limited on all counts of the Second Amended Complaint and Demand for Jury Trial (Doc. 103).

7.    The Clerk of the Court is further directed to terminate any pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida this 21st day of March, 2019.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:

Counsel of Record