United States District Court
Middle District of Florida
Jacksonville Division

LANARD TOYS LIMITED,

 *Plaintiff, Counter-Defendant,*

V.            No. 3:15-CV-849-MMH-PDB

DOLGENCORP, LLC, ETC.,

 *Defendants, Counterclaimants.*

---

# Report and Recommendation[1]

 This action involved an intellectual property dispute over a children's sidewalk-chalk holder resembling a giant no. 2 pencil. After more than six years of litigation, the Federal Circuit affirmed summary judgment for the defendants on all claims—patent infringement, copyright infringement, trade dress infringement, and unfair competition. Now before the Court is their motion for an award of $2,492,765 in attorney's fees under federal and state law, D518, the plaintiff's response in opposition, D523, and the defendants' reply, D528.[2] Both sides provide declarations and other evidence.[3]

---

[1]This is the corrected report and recommendation. *See* D534.

[2]The defendants moved for a fee award before the conclusion of the appeal. D472. The Court deferred ruling on the motion pending the conclusion of the appeal. D482. After the appeal, the undersigned permitted the parties to file updated papers on attorney's fees not to exceed thirty pages and informed them earlier papers on a fee award would not be considered. D517. The undersigned later directed the defendants to file a reply addressing actual payment to their lawyers. D527.

[3]The defendants provide two offers of judgment, D518-1; correspondence between counsel, D518-2–D518-4, D518-6; Lanard's appellate brief, D518-5; a chart describing

Also before the Court is the defendants' motion for $102,764.55 in taxable costs under federal law ($26,698.01) and non-taxable costs under state law ($76,066.54), D477, and Lanard's response in opposition, D499.[4] The defendants provide declarations, other evidence, and a proposed bill of costs.[5]

In granting summary judgment and ruling on some *Daubert* motions, the Court entered a comprehensive, seventy-five-page order. This report and recommendation borrows heavily from that order.[6]

---

motions and dispositions of the motions, D518-7; Lanard's responses to requests for admission, D518-8; photographs of the Lanard Chalk Pencil, D518-9; a declaration of Lewis Anten, Esquire (with billing statements), D519; a declaration of Brian Socolow, Esquire (with billing statements), D520; a declaration of Frederick Page, Esquire (with billing statements), D521; and a declaration of Thomas Bishop, Esquire, D522.

Lanard provides a declaration of Richard Sybert, Esquire, D523-1; correspondence between counsel, D523-2–D523-5, D523-13–D523-15; emails between Lanard and Dolgencorp, D523-6; Sybert's biography, D523-7; a report of Lanard's damages expert (William Kerr), D523-8; a chart describing billing that Lanard argues is unreasonable, D523-9; a declaration of Eric Thompson, Esquire, D523-10; Lanard's trial exhibit list, D523-11; and the defendants' trial exhibit list, D523-12.

Some documents in the record have CM/ECF page numbers and original page numbers. The undersigned cites only the CM/ECF page numbers.

[4]The Court also deferred ruling on the defendants' motion for taxable costs and non-taxable costs pending the conclusion of the appeal. D482. Neither side requested leave to file updated papers.

[5]Besides the proposed bill of costs, D477-1 at 2–5; D478; the defendants provide invoices for transcripts, D477-1 at 6–41; a receipt for copies, D477-1 at 42; checks for witness appearances, D477-1 at 43–51; notices of videotaped depositions, D477-1 at 46–51; a declaration of Anten, D477-2; a declaration of Page, D477-4; expert witness invoices, D477-3 at 2–14; travel receipts, D477-3 at 15–47; D477-5 at 2–16; and videoconferencing receipts, D477-3 at 48–52.

[6]For ease of reading this report and recommendation, most citations, quotation marks, alterations, and footnotes are omitted from quoted sources.

# I.    Overview

In the order granting summary judgment for the defendants, this Court summarized the litigation:

> Plaintiff Lanard Toys Limited (Lanard) developed a chalk holder in the shape of an over-sized, no. 2 pencil (the Chalk Pencil) as a fanciful toy for children. Lanard registered a copyright in its Chalk Pencil and also obtained a design patent for the toy. Soon thereafter, Defendant Ja-Ru, Inc. (Ja-Ru) released a similar version of a chalk holder in the shape of a pencil (the Ja-Ru Chalk Holder). When Defendants Toys R Us-Delaware, Inc. (TRU) and Dolgencorp, LLC (Dolgencorp) stopped selling Lanard's Chalk Pencil and began selling the Ja-Ru Chalk Holder instead, Lanard brought this lawsuit asserting claims for copyright infringement, patent infringement, trade dress infringement and unfair competition against Defendants. Defendants responded with counterclaims seeking declaratory judgment as to the invalidity, unenforceability, and non-infringement of Lanard's copyright, patent and trade dress, as well as the lack of any unfair competition. At present, this simple toy, retailing at less than $5, has spawned five years of contentious litigation, hundreds of pages of evidence, expert testimony, and legal briefing, and no doubt hundreds of thousands of dollars in legal fees.

D468 at 1–2. This Court then summarized the facts:

> Lanard manufactures and sells toys to retail stores throughout the world, who, in turn, sell Lanard's toys to the public. In 2010, Lanard's designers developed a design for a chalk holder—"a device that can hold pieces of colored chalk to allow children to draw on the sidewalk." The initial design for this chalk holder was in the shape of a "magic wand." However, an individual in the Lanard Hong Kong office saw the wand prototype and made the suggestion that it look like a big pencil instead. Lanard's corporate design director, Blake C. Nichols, then tasked Logan James Williams, a senior product designer at Lanard, with making the initial prototype of a chalk holder that looks like a pencil. In creating this prototype, Williams looked at pencils present in the design shop.

> Lanard began selling its Chalk Pencil in the United States on November 1, 2010. Lanard submitted a United States copyright application for the design of the Chalk Pencil on September 20, 2011. The Copyright Office issued a Certificate of Registration for Lanard's

Chalk Pencil effective September 20, 2011, and assigned it Registration No. VA 1-794-458. The Certificate of Registration identifies the title of the work as "Pencil / Chalk Holder" and identifies it as a work of sculpture. Since the Chalk Pencil's first publication in 2010 and continuing with every Chalk Pencil sold since that time, Lanard has stamped a copyright notice, "© 2010 LANARD" into the plastic on the Chalk Pencil.

On August 3, 2011, Lanard designers Blake Christopher Nichols and Logan James Williams applied for a design patent in the Chalk Pencil with the United States Patent and Trademark Office (USPTO). On August 25, 2011, Nichols and Williams assigned their patent application to Lanard. In late 2011, Lanard began stamping "Patent Pending" into the plastic of the Chalk Pencil. The USPTO issued a patent for the Chalk Pencil on November 20, 2012, assigning it patent number D671,167 (the D#167 Patent). The D#167 Patent contains one claim for "The ornamental design for a chalk holder, as shown and described," and includes five figures showing the design from all views. Following the issuance of the D#167 Patent, Lanard stamped the full patent number into the plastic on all models of the Chalk Pencil.

Lanard sold the Chalk Pencil to Dolgencorp beginning in 2011. Dolgencorp purchased the Chalk Pencil through the 2011, 2012, and 2013 selling seasons, and sold it under the label "Concrete Canvas." Lanard supplied the Chalk Pencil to TRU beginning with the 2012 selling season. TRU sold the Chalk Pencil under its "Sizzlin' Cool" private label. Lanard also sold the Chalk Pencil to other major retailers, including Walgreen[s] Co., Kmart Corporation, and Wal-Mart Stores, Inc.

In the first quarter of 2012, Ja-Ru began development of the Ja-Ru Chalk Holder. Specifically, the director of merchandising at Ja-Ru, Angela Ku, developed the idea for the Ja-Ru Chalk Holder. According to Ku, she came up with the idea for the Ja-Ru Chalk Holder as follows: "Shop the market, and we look at the sample. And also, in China there are all different pencil-looking product[s], so we [meaning, she and the Chinese factories] put the idea together." Ku explains that the Lanard Chalk Pencil was one of the samples she considered, but maintains that there were "other pencil chalk samples too." Ku concedes that she purchased a "market sample" of the Lanard Chalk Pencil in early 2012 and used that sample as a reference in the development of Ja-Ru's own version of the toy. Although Ku insists other market samples were considered as well, the only documented reference sample is the Lanard Chalk Pencil. Indeed, in an August 2, 2012 email exchange, a Ja-Ru employee compares Ja-Ru's design sample to what appears to be

4

Lanard's Chalk Pencil and specifically identifies which items of its design should remain the same as the "market sample" and which items should be changed.

Ja-Ru's art director, Stephen Hearon, who designed the Ja-Ru Chalk Holder, recalls that he was given the Lanard Chalk Pencil as a "market sample to use for reference." According to Hearon, he then attempted to make "a better Ja-Ru toy by designing elements of it, making—you know, design the ferrule the way that I thought a ferrule should look. Design the tip the way that I thought would be more functional and would give it—be more attractive." Hearon cannot recall whether he referred to any other market sample or reference sample in designing the Ja-Ru Chalk Holder. Hearon testified that he worked with Russel[l] Selevan and made improvements to the design "based on his suggestions and his approval." Selevan is a vice-president with Ja-Ru, who "probably" has "the lead" role in the design and development of toys. Selevan also concedes that Ja-Ru had the Lanard Chalk Pencil during its design of the Ja-Ru Chalk Holder, but maintains that Ja-Ru made changes to the design so that it would not look like Lanard's product. According to Selevan, Ja-Ru reduced the size, changed "[t]he piece that holds the eraser; the piece that holds the chalk on the bottom; changed the color of the yellow pencil to look more like what we believe a yellow No. 2 pencil looks like; and probably some other changes." According to Selevan, Ja-Ru designed its product to look like a no. 2 lead pencil, and while it referenced the Lanard Chalk Pencil, it also referenced "No. 2 lead pencils, [Selevan's] Think Big 25-year-old six-foot pencil, and many other pencils of different sizes and shapes."

The Ja-Ru Chalk Holder was available to the public for purchase by at least as early as January 2014. TRU and Dolgencorp stopped ordering Lanard's Chalk Pencil in late 2013. Beginning with the 2014 selling season, TRU and Dolgencorp began offering the Ja-Ru Chalk Holder instead. Dolgencorp purchased approximately 21,282 units of the Ja-Ru Chalk Holder and generated $38,691 in sales from the product in 2014. Between 2013 and 2015, TRU sold 8,154 units of the Ja-Ru Chalk Holder and generated $23,444.63 in gross revenue, for total gross profits of $14,076. Ja-Ru sold the Ja-Ru Chalk Holder from 2013–2015, with 86,304 total units sold for a total gross revenue of $77,618.62. At present, however, Ja-Ru no longer sells the Ja-Ru Chalk Holder. Prior to January 2014, when TRU began selling the Ja-Ru Chalk Holder, Lanard sold a total of 581,984 units of its Chalk Pencil to its major customers in the United States, representing $1,113,077.92 in sales for the fiscal years 2011, 2012, and 2013. In total, between 2010 and 2016,

Lanard shipped 1,415,034 units of the Chalk Pencil worldwide, accumulating gross sales in excess of two million dollars.

D468 at 2–10 (some alterations in original).

In entering summary judgment for the defendants on all claims, this Court held that (1) the patent infringement claim failed because no reasonable juror could find substantial similarity between the products; (2) the copyright infringement claim failed because the copyright is invalid under a useful-article analysis, and even if the copyright was valid, the defendants copied no protectable element; (3) the trade dress infringement claim failed because Lanard offered insufficient evidence of secondary meaning; and (4) the unfair competition claim failed because that claim depended on the trade dress infringement claim. D468. In affirming summary judgment, the Federal Circuit issued a published opinion rejecting each of Lanard's claims of error. D500; *see Lanard Toys Ltd. v. Dolgencorp, LLC*, 958 F.3d 1337 (Fed. Cir. 2020). Lanard did not petition for a writ of certiorari.

Along the way, twenty-two lawyers with seven law firms appeared.[7] More than five hundred numbered docket entries were made. Twenty-six pleadings were filed.[8] Depositions occurred in at least nine states, Washington,

---

[7]Nine lawyers with two law firms appeared for Lanard. Nine lawyers with three law firms appeared for the defendants (including a new lawyer for the appeal). Four lawyers with two law firms appeared for an insurer (First Mercury Insurance Company).

[8]Lanard filed the original complaint, the defendants answered the complaint, Ja-Ru and Dolgencorp raised counterclaims, and Lanard answered the counterclaims. D1, D28, D34, D35, D55, D56. Lanard filed an amended complaint to name the correct defendants, TRU answered the amended complaint and raised counterclaims, and Lanard answered the counterclaims. D57, D61, D62, D67. Following transfer, this Court struck the amended complaint as a shotgun pleading, explaining, "[E]ach count in the Amended Complaint incorporates by reference all allegations of the preceding counts." D97. Lanard filed a second amended complaint, the defendants answered the copyright and patent infringement claims, raised counterclaims, and moved to dismiss the trade dress infringement and unfair competition claims. D103, D110–D113, D118–D120. The Court denied the motion to dismiss

D.C., and Hong Kong.[9] TRU petitioned for bankruptcy. The parties litigated a motion for a preliminary injunction (Lanard lost). They litigated a motion to transfer venue (Lanard lost). They litigated a motion to dismiss some claims or for a more definite statement of those claims (carried with summary judgment). They litigated a motion to amend the pleadings (Lanard lost). They litigated a motion to disqualify Lanard's counsel (the defendants lost). They litigated motions to compel discovery and to protect information (mixed success). They litigated a motion to impose sanctions (the defendants lost). They litigated whether to stay the case after TRU's bankruptcy (mixed success).[10] They litigated motions to exclude expert testimony (mixed success; some not decided). They litigated motions in limine (not decided). They

without prejudice, the defendants answered the second amended complaint and raised counterclaims, and Lanard answered the counterclaims. D270–D272, D281–D283, D285–D287. Lanard unsuccessfully moved for leave to file a third amended complaint to add Ja-Ru (HK) Ltd., an affiliate of Ja-Ru. D160, D253, D257, D291.

[9]*See* D346-1 (Deborah Ryan by Lanard in California); D347-1, SD361/D495 (Eric Hedberg by Lanard in Tennessee); D348-1 (Ronald Kemnitzer by Lanard in Virginia); D349-1 (Michael Mard by Lanard in Florida); D350-1 (Tyson Eavenson by Lanard in Florida); D351-1 (Stephen Hearon by Lanard in Florida); D356/SD380, SD362/D493 (Russell Selevan by Lanard in Florida); SD363/D494 (Marc Selevan by Lanard in Hong Kong); SD364/ D496 (Colleen Kane Cosgrove by Lanard in New Jersey); D365 (Marc Dubner by Lanard in New Jersey); D366 (Kenneth Marshall by Lanard in Pennsylvania); D367 (Angela Ku by Lanard in Florida); D341-1, D354 (Blake Nichols by the defendants in California); D342-1 (Robert Anders by the defendants in New York); D343-1 (Parker Bagley by the defendants in Nevada); D345-1 (Larry Myer by the defendants in Florida); D352 (Norman Cohen by the defendants in Texas); D353 (Logan Williams by the defendants in California); SD355/D488, SD357/ D492 (James Hesterberg by the defendants in Hong Kong); SD358/D487 (Angel Lee by the defendants in Hong Kong); SD359 (William Kerr by the defendants in Washington, D.C.).

[10]Ja-Ru notified the Court of TRU's bankruptcy in September 2017. D384. Lanard argued the action should proceed against Ja-Ru and Dolgencorp. D385, D389. The defendants argued the entire action should be stayed. D390. Considering the best interests of the parties and the Court, the Court stayed the action pending resolution of the bankruptcy petition or a decision by the bankruptcy court granting Lanard relief from the stay to continue the litigation. D391. Months later, Lanard moved this Court for relief from the stay, explaining the bankruptcy court had entered a stipulation of Lanard and TRU and an agreed order permitting Lanard to continue the litigation here. D393. This Court thus lifted the stay. D394.

litigated cross-motions for summary judgment (Lanard lost). They even litigated motions for leave to file replies (mixed success).[11]

The parties now litigate attorney's fees, non-taxable costs, and taxable costs. All attempts to settle the claims, the appeal, the fees, and the costs failed.

## II.   Attorney's Fees

### A.   *Law*

Under the "American Rule," each party pays its own attorney's fees, "win or lose, unless a statute or contract provides otherwise."[12] *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 253 (2010).

The defendants request a fee award under laws on which Lanard brought its unsuccessful claims: the Copyright Act, the Patent Act, the Lanham Act, and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). D518. Each law includes a provision for a discretionary award of attorney's fees. Each

---

[11]Lanard filed two opposed motions for leave to file a reply, D212, D278, with mixed success, D215, D292. The defendants filed one opposed motion for leave to file a reply. D524. The Court denied the motion but later directed the defendants to reply to one argument. D527; *see* footnote 1 (describing the subject of the reply).

At a status conference, this Court (the district judge) commented, "I was very proud of you; you agreed on something. You agreed on what motions were left to be decided. And I think that might be one of the first things you[] agreed on in the case." D417 at 7.

The parties agreed on some small things. *See* D99 (special admission); D100 (substitution); D104 (withdrawal); D108 (special admission); D130 (special admission); D161 (sealing); D204 (extension); D206 (sealing); D225 (sealing); D234 (sealing); D236 (removal of a paper from the docket); D239, D251 (discovery); D243 (extension); D247 (extension); D258 (supplement); D276 (special admission); D289 (sealing); D298 (sealing); D300 (sealing); D311 (sealing); D344 (judicial notice); D360 (special admission); D368 (reply); D401 (telephone appearance); D393 (lifting the stay); D437 (motion in limine); D445 (continuance).

[12]A determination about fees is equitable and, therefore, a district court without a jury may make findings about state of mind, intent, and culpability. *AIA Am., Inc. v. Avid Radiopharmaceuticals*, 866 F.3d 1369, 1374 (Fed. Cir. 2017).

law considers prevailing plaintiffs and prevailing defendants alike. Each law requires a case-by-case assessment. Each law requires consideration of the totality of the circumstances. Each law eschews precise rules or formulas. No law requires bad faith. Non-exclusive factors under each law overlap. The standards for the Patent Act and the Lanham Act are the same.

The undersigned addresses the laws in the sequence Lanard used in its operative pleading: the Copyright Act, the Patent Act, the Lanham Act, and FDUTPA.[13] D103.

### 1.    *Copyright Act*

The purpose of the Copyright Act is to enrich "the general public through access to creative works" by "encouraging and rewarding authors' creations while also enabling others to build on that work." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1986 (2016).

The attorney's fee provision of the Copyright Act—§ 505—provides, "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505.

In *Kirtsaeng*, the Supreme Court resolved disagreement in lower courts about "how to address an application for attorney's fees in a copyright case." 136 S. Ct. at 1984.

---

[13]In their motion for a fee award, the defendants start with FDUTPA. *See* D518 at 10–14. As will be explained, the defendants have good reason for this new primacy.

The Court began by observing that § 505 authorizes fee-shifting but fails to specify standards or guideposts for determining if an award is appropriate. *Id.* at 1984–85. The Court reaffirmed precedent recognizing that § 505 "clearly connotes discretion" and "eschews any precise rule or formula for awarding fees." *Id.* at 1985. But the Court also cautioned that "in a system of laws discretion is rarely without limits" and "[w]ithout governing standards or principles, [open-ended fee shifting statutes] threaten to condone judicial whim or predilection." *Id.* at 1985-86.

The Court reviewed from its precedent "a pair of restrictions." *Id.* at 1985. First, a court "may not award attorney's fees as a matter of course; rather, a court must make a more particularized, case-by-case assessment." *Id.* "Second, a court may not treat prevailing plaintiffs and prevailing defendants any differently; defendants should be encouraged to litigate meritorious copyright defenses to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement." *Id.*

The Court observed that it had approved "several nonexclusive factors to inform a court's fee-shifting decisions." *Id.* The factors—known as the "*Fogerty* factors"[14]—are "frivolousness, motivation, objective unreasonableness, and the need in particular circumstances to advance considerations of compensation and deterrence."[15] *Id.*

---

[14]*See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994) ("Some courts … have suggested several nonexclusive factors to guide courts' discretion. … We agree that such factors may be used to guide courts' discretion, so long as such factors are faithful to the purposes of the Copyright Act and are applied to prevailing plaintiffs and defendants in an evenhanded manner.").

[15]On compensation, the Eleventh Circuit has stated, "[I]n determining whether to award attorney's fees under § 505, the district court should consider not whether the losing

The Court then held that a court must give "substantial weight to the reasonableness of a losing party's position." *Id.* at 1985. The Court explained this "objective-reasonableness approach" advances the purpose of the Copyright Act by encouraging "parties with strong legal positions to stand on their rights" and deterring "those with weak ones from proceeding with litigation." *Id.* at 1986. The Court elaborated:

> When a litigant—whether plaintiff or defendant—is clearly correct, the likelihood that he will recover fees from the opposing (i.e., unreasonable) party gives him an incentive to litigate the case all the way to the end. The holder of a copyright that has obviously been infringed has good reason to bring and maintain a suit even if the damages at stake are small; and likewise, a person defending against a patently meritless copyright claim has every incentive to keep fighting, no matter that attorney's fees in a protracted suit might be as or more costly than a settlement. Conversely, when a person (again, whether plaintiff or defendant) has an unreasonable litigating position, the likelihood that he will have to pay two sets of fees discourages legal action. The copyright holder with no reasonable infringement claim has good reason not to bring suit in the first instance (knowing he cannot force a settlement and will have to proceed to judgment); and the infringer with no reasonable defense has every reason to give in quickly, before each side's litigation costs mount. All of those results promote the Copyright Act's purposes, by enhancing the probability that both creators and users (i.e., potential plaintiffs and defendants) will enjoy the substantive rights the statute provides.

*Id.* at 1986–87.

The Court observed this objective-reasonableness approach is "more administrable" than another approach because a "district court that has ruled on the merits of a copyright case can easily assess whether the losing party advanced an unreasonable claim or defense."[16] *Id.* at 1987. The Court added,

---

party can afford to pay the fees but whether imposition of fees will further the goals of the Copyright Act." *MiTek Holdings, Inc. v. Arce Eng'g Co.*, 198 F.3d 840, 843 (11th Cir. 1999).

[16]The Court rejected an approach that would give "special consideration to whether a lawsuit resolved an important and close legal issue and thus meaningfully clarified copyright

"That is closely related to what the court has already done: In deciding any case, a judge cannot help but consider the strength and weakness of each side's arguments." *Id.* According to the Court, "[P]lacing substantial weight on objective reasonableness also treats plaintiffs and defendants even-handedly. No matter which side wins a case, the court must assess whether the other side's position was (un)reasonable." *Id.* at 1988.

The Court emphasized that whether a party prevails and whether a party makes "serious arguments" are separate questions and that district courts are well equipped to distinguish reasonable positions that ultimately fail from "the objectively unreasonable variety." *Id.* The Court cautioned, "[I]f some court confuses the issue of liability with that of reasonableness, its fee award should be reversed for abuse of discretion." *Id.*

The Court continued, "All of that said, objective reasonableness can be only an important factor in assessing fee applications—not the controlling one." *Id.* Reiterating that a district court has broad discretion, the Court explained a district court "must take into account a range of considerations beyond the reasonableness of litigating positions." *Id.* The Court elaborated: "That means in any given case a court may award fees even though the losing party offered reasonable arguments (or, conversely, deny fees even though the losing party made unreasonable ones)." *Id.* As examples, the Court observed

---

law," finding the value of the approach "speculative." *Kirtsaeng*, 136 S. Ct. at 1985, 1987. The Court accepted the "premise that litigation of close cases can help ensure that the boundaries of copyright law are demarcated as clearly as possible, thus advancing the public interest in creative work." *Id.* at 1987. But the Court disagreed "that fee-shifting will necessarily, or even usually, encourage parties to litigate those cases to judgment," because fee awards "are a double-edged sword: They increase the reward for a victory—but also enhance the penalty for a defeat. And the hallmark of hard cases is that no party can be confident if he will win or lose." *Id.* That approach therefore "could just as easily discourage as encourage parties to pursue the kinds of suits that meaningfully clarify copyright law." *Id.*

that a district court "may order fee-shifting because of a party's litigation misconduct, whatever the reasonableness of his claims or defenses," or a district court "may do so to deter repeated instances of copyright infringement or overaggressive assertions of copyright claims, again even if the losing position was reasonable in a particular case." *Id.* at 1988–89. The Court referenced a case awarding fees against a plaintiff that had filed hundreds of lawsuits on an overbroad legal theory, including in a subset of cases in which pursuing the theory was objectively reasonable. *Id.* at 1989 (citing *Bridgeport Music, Inc. v. WB Music Corp.*, 520 F.3d 588, 593–95 (6th Cir. 2008)). The Court added that a finding of reasonableness raises no presumption against granting fees because that "goes too far in cabining how a district court must structure its analysis and what it may conclude from its review of relevant factors." *Id.*

The Court concluded, "Although objective reasonableness carries significant weight, courts must view all the circumstances of a case on their own terms, in light of the Copyright Act's essential goals."[17] *Id.*

If the record shows that a district court weighed the pertinent factors and exercised its discretion, the Eleventh Circuit "will not question the court's decision to grant or deny fees absent an abuse of that discretion." *Montgomery v. Noga*, 168 F.3d 1282, 1303 (11th Cir. 1999); *see also Zuma Press, Inc. v. Getty Images (US), Inc.*, 845 F. App'x 54, 59 (2d Cir. 2021) (encouraging district courts to explain their application of the *Fogerty* factors to the facts instead of

---

[17]Lanard fails to cite *Kirtsaeng*. *See generally* D523. Lanard cites pre-2015 district court cases and states, "Although *Fogerty* did not identify any factor as being more or less important than another, the trend in the Eleventh Circuit has been for courts to focus on objective reasonableness when deciding whether to award attorney's fees." D523 at 21–22. This briefing is out-of-date.

merely reciting the factors); *Glacier Films (USA), Inc. v. Turchin*, 896 F.3d 1033, 1042–43 (9th Cir. 2018) (explaining that a district court need not analyze all *Fogerty* factors because they are discretionary and non-exclusive but must show consideration of the factor to which it must give substantial weight—the objective reasonableness of the losing party's position).

In the infringement context, substantial similarity is "rarely obvious." *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 444 (9th Cir. 1991). "When close infringement cases are litigated, copyright law benefits from the resulting clarification of the doctrine's boundaries." *MiTek Holdings, Inc. v. Arce Eng'g Co.*, 198 F.3d 840, 843 (11th Cir. 1999). "But because novel cases require a plaintiff to sue in the first place, the need to encourage meritorious defenses is a factor that a district court may balance against the potentially chilling effect of imposing a large fee award on a plaintiff, who, in a particular case, may have advanced a reasonable, albeit unsuccessful, claim." *Id.*

Because a fee determination requires a particularized, case-by-case assessment, cases applying § 505 have limited connection to this case. They do, however, provide examples of decisions in which courts have acted within their discretion and outside of their discretion and the circumstances they have considered relevant. *Cf. Nova Chems. Corp. (Canada) v. Dow Chem. Co.*, 856 F.3d 1012, 1018 (Fed. Cir. 2017) (observing in the patent context that "[o]ne could always search for more similar cases for comparison. Taken to its logical conclusion, continuing to narrow the universe of comparators to cases resolved on similar procedural postures, legal grounds, or facts would leave few or no comparators remaining"). The following cases post-date *Kirtsaeng*.

In the following two cases, appellate courts affirmed fee awards to defendants, finding no abuses of discretion. In the first case, the plaintiff "had

14

no realistic chance of success," submitted a fraudulent ghost-written expert report, tried to re-submit the report in his own name, repeatedly amended his pleading to assert new claims in response to motions to dismiss, abused the discovery process, disregarded pretrial orders, and filed the action after filing at least five others, including one in which he pressed forward with a similarly weak claim despite a warning from the court. *See Batiste v. Lewis*, 976 F.3d 493, 507–08 (5th Cir. 2020). In the second case, the works involved were not substantially similar, the issue of whether they were substantially similar was not close, the plaintiff delayed producing discovery, and the plaintiff disobeyed a court order, forcing the defendants to request another court order. *See Shame On You Prods., Inc. v. Banks*, 893 F.3d 661, 666–69 (9th Cir. 2018).

In contrast, in another case, an appellate court reversed an award to the defendants, finding an abuse of discretion. There, an appeal clarified law on an important limitation to an affirmative defense, and the district court erroneously found that the plaintiff had shifted its theory of liability. *See Univ. Instrs. Corp. v. Micro Sys. Eng'g, Inc.*, 799 F. App'x 43, 46–47 (2d Cir. 2020).

In the following two cases, appellate courts affirmed denials of awards to defendants, finding no abuses of discretion. In the first case, the plaintiff brought frivolous claims but seemingly brought them in good faith, the defendants expended little energy defending the case, there was "no chance" the plaintiff would re-assert the claims in the future, and the defendants faced no pressure to abandon a meritorious defense and settle. *See Timothy B. O'Brien LLC v. Knott*, 962 F.3d 348, 351 (7th Cir. 2020). In the second case, one claim concerned a "complex set of facts" that the plaintiffs reasonably argued favored the plaintiffs, one claim turned on a requirement that the appellate court had not addressed in a precedential opinion until after

15

summary judgment, and the defendant pointed to little in the record to undermine the finding that the plaintiffs had sued with proper motivation. *See Zuma Press*, 845 F. App'x at 59–60.

In contrast, in another case, an appellate court reversed a denial of an award to the defendants, finding an abuse of discretion. There, the defendants "prevailed across the board" on procedural issues below and on a fair-use defense on appeal; the plaintiff's arguments were objectively unreasonable in light of binding precedent; the plaintiff "did more than simply pursue an aggressive litigation strategy," suing a public-school teacher, a not-for-profit club, and parent volunteers; the plaintiff repeatedly mischaracterized its copyright interests apparently to scare two defendants into buying licenses from the plaintiff rather than to enforce its limited interests; awarding fees ensures that the defendants are compensated for defending against overreaching claims and pressing a defense that benefits those educating children; and an award ensures that an "overzealous monopolist" cannot use his copyright to stamp out the creativity the Copyright Act seeks to foster, allowing "greater breathing room for classroom educators and those involved in similar educational extracurricular activities." *See Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 652–54 (9th Cir. 2020).

2.    *Patent Act and Lanham Act*

The Constitution permits Congress to issue patents to "promote the Progress of ... useful Arts." Art. I, § 8, cl. 8. "From their inception, the federal patent laws have embodied a careful balance between the need to promote innovation and the recognition that imitation and refinement through imitation are both necessary to invention itself and the very lifeblood of a

competitive economy." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 146 (1989).

The attorney's fee provision of the Patent Act—§ 285—provides, "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "The legislative purpose behind § 285 is to prevent a party from suffering a 'gross injustice[.]'" *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 858 F.3d 1371, 1376 (Fed. Cir. 2017).[18]

The purpose of the Lanham Act "is to regulate commerce … by making actionable the deceptive and misleading use of marks in such commerce; … to protect persons engaged in such commerce against unfair competition; [and] to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks[.]" 15 U.S.C. § 1127. Section 43(a) of the Act "is remedial in nature" and "interpreted and applied broadly so as to effectuate its remedial purpose." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001).

Identical to § 285 of the Patent Act, the attorney's fee provision of the Lanham Act—§ 35(a)—provides, "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a).

In *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, the Supreme Court interpreted § 285, holding that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." 572 U.S. 545, 554

---

[18]Federal Circuit caselaw applies to a § 285 analysis. *Stone Basket Innovs., LLC v. Cook Med. LLC*, 892 F.3d 1175, 1178 (Fed. Cir. 2018).

(2014). The Court continued, "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.*

According to the Court, "As in the comparable context of the Copyright Act, there is no precise rule or formula for making these determinations, but instead equitable discretion should be exercised in light of the considerations we have identified." *Id.* The Court referenced the non-exclusive *Fogerty* factors (i.e., frivolousness, motivation, objective unreasonableness of factual or legal positions, and the need in particular circumstances to advance considerations of compensation and deterrence). *Id.* at 554 n.6. The Court cautioned that "sanctionable conduct is not the appropriate benchmark"; a district court "may award fees in the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees." *Id.* at 555.

The Court explained that a district court need not "determine both that the litigation is objectively baseless and that the plaintiff brought it in subjective bad faith"; "a case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.*

The Court rejected a requirement that a litigant establish entitlement to fees by "clear and convincing evidence." *Octane Fitness*, 572 U.S. at 557. The Court explained that § 285 "demands a simple discretionary inquiry; it imposes no specific evidentiary burden, much less such a high one." *Id.* The Court continued, "Indeed, patent-infringement litigation has always been governed by a preponderance of the evidence standard, and that is the standard

generally applicable in civil actions, because it allows both parties to share the risk of error in roughly equal fashion." *Id.* at 557–58.

In a companion case to *Octane Fitness*, the Court held that an "appellate court should apply an abuse-of-discretion standard in reviewing all aspects of a district court's § 285 determination." *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 564 (2014). After all, because a district court deals directly with the parties, that court is "well-situated" to determine if a party's conduct was unreasonable. *SiOnyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1355 (Fed. Cir. 2020); *see also Univ. of Utah v. Max-Planck-Gesellschaft zur Foerderung der Wissenschaften e.V.*, 851 F.3d 1317, 1323 (Fed. Cir. 2017) (observing that the parties pointed to facts favoring their respective sides and stating, "We should be wary to wade in such circumstantial waters. The trial judge was in the best position to understand and weigh these issues").

Because the fee provisions in the Patent Act and the Lanham Act are identical, the *Octane Fitness* standard applies to both. *Tobinick v. Novella*, 884 F.3d 1110, 1117–18 (11th Cir. 2018). Moreover, *Octane Fitness* abrogated Eleventh Circuit precedent holding that attorney's fees are appropriate under § 35(a) of the Lanham Act only if an action involves exceptional circumstances *and* there is evidence of fraud or bad faith. *Id.* at 1118.

In determining whether to award fees, *Octane Fitness* provides district courts not with a precise framework but with "several suggestions that might guide a district court's discretionary decision." *Max-Planck-Gesellschaft*, 851 F.3d at 1322–23. A district court need not reveal its assessment of every consideration but "must actually assess the totality of the circumstances." *AdjustaCam, LLC v. Newegg, Inc.*, 861 F.3d 1353, 1360 (Fed. Cir. 2017). The

totality of the circumstances includes the movant's conduct. *Romag Fasteners, Inc. v. Fossil, Inc.*, 866 F.3d 1330, 1340 (Fed. Cir. 2017).

A "district court has discretion, in an appropriate case, to find a case exceptional based on a single, isolated act." *Intell. Ventures I LLC v. Trend Micro Inc.*, 944 F.3d 1380, 1384 (Fed. Cir. 2019). "Whether the conduct is a single, isolated act or otherwise, the relevant question for the district court is the same." *Id.* "The district court must determine whether the conduct, isolated or otherwise, is such that when considered as part of and along with the totality of circumstances, the case is exceptional, i.e., the case stands out among others with respect to the substantive strength of a party's litigating position or the unreasonable manner in which the case was litigated." *Id.*

A case may present an "unusual basis for fees" if the exceptional-case determination rests on an examination of issues never fully litigated. *Thermolife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1356–57 (Fed. Cir. 2019). But that "fact alone" is not a basis to deny an award. *Munchkin, Inc. v. Luv n' Care, Ltd.*, 960 F.3d 1373, 1378 (Fed. Cir. 2020). The Federal Circuit has "made abundantly clear that district courts have wide latitude to refuse to add to the burdens of litigation by opening up issues that have not been litigated but are asserted as bases for a fee award." *Id.*; *cf. Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation."). "But when the bases of an attorney's fee motion rest on issues that had not been meaningfully considered by the district court[,] a fuller explanation of the court's assessment of a litigant's position may well be needed when a district court focuses on a freshly considered issue than one that has already been fully litigated." *Munchkin*, 960 F.3d at 1378.

A "strong or even correct litigating position is not the standard by which to assess exceptionality." *Spineology, Inc. v. Wright Med. Tech., Inc.*, 910 F.3d 1227, 1230 (Fed. Cir. 2018). A "case will not qualify as exceptional … merely because one side has zealously pursued or defended its claim, especially on an issue with no directly controlling precedent." *Tobinick*, 884 F.3d at 1119; *see also SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1310–11 (Fed. Cir. 2019) (observing that "defending a client aggressively is understandable, if not laudable," becoming a problem only when the party crosses the line).

Motivation to "harass or burden an opponent may be relevant to an 'exceptional case' finding." *Checkpoint*, 858 F.3d at 1375. But "motivation to implement the statutory patent right by bringing suit based on a reasonable belief in infringement is not an improper motive." *Id.* "A patentee's assertion of reasonable claims of infringement is the mechanism whereby patent systems provide an innovation incentive." *Id.* Simply put, the enforcement of "the statutory right to exclude those that infringe a patented invention" is not an exceptional case. *Id.*

"There is no per se rule that a case is exceptional if litigation costs exceed the potential damages." *ATEN Int'l Co. v. Uniclass Tech. Co.*, 932 F.3d 1371, 1373 (Fed. Cir. 2019). Because there is no "de minimis exception for infringement," it "cannot be the case that a plaintiff may be subjected to monetary sanctions for failing to drop a case if the cost of litigation exceeds the potential recovery." *Id.* After all, "litigation strategies motivating a patent suit are many, with monetary damages being one." *Id.* "A patentee may also bring suit to deter other competitors from infringement, encourage licensing, or test a patent's ability to withstand validity challenges." *Id.*; *see also AdjustaCam*, 861 F.3d at 1361 ("[T]here is no minimum damages requirement to file a patent

infringement case. Asserting seemingly low damages against multiple defendants—or settling with defendants for less than the cost of litigation— does not necessarily make a case 'exceptional' under § 285.").

A "consideration that can and often should be important to an exceptional-case determination is whether the party seeking fees provided early, focused, and supported notice of its belief that it was being subjected to exceptional litigation behavior." *Thermolife*, 922 F.3d at 1357. But because the standard for determining whether an award is warranted "is a flexible one within the framework and guidelines established by governing precedents," notice is not "rigidly required," and failing to provide notice does not require denial of an award if one is otherwise justified. *Id.* at 1358.

"Civil litigation often includes numerous phases. But a case should be viewed more as an 'inclusive whole' rather than as a piecemeal process when analyzing fee-shifting under § 285." *Therasense, Inc. v. Becton, Dickinson & Co.*, 745 F.3d 513, 517 (Fed. Cir. 2014). Moreover, § 285 does not distinguish "between awarding attorney fees in the district court and in the appellate court" and "does not bar the trial court from awarding fees for the entire case, including any subsequent appeals."[19] *Id.*

Because a fee determination requires a particularized, case-by-case assessment in the patent and trade dress infringement context (like in the

---

[19]Under the Federal Circuit's rules, the Federal Circuit "may award attorney fees and expenses when authorized by law" on "its own motion or on application of a party." Fed. Cir. Rule 47.7(a)(1). A party also can seek appellate fees in the district court. *PPG Indus., Inc. v. Celanese Polymer Spec. Co., Inc.*, 840 F.2d 1565, 1569 (Fed. Cir. 1988).

Here, the Federal Circuit did not award attorney's fees on its own motion, and the defendants did not apply for attorney's fees in the Federal Circuit. Lanard does not dispute that, for any of the laws, this Court has authority to award fees for the appeal as part of the entire case. *See generally* D523.

copyright context), cases applying § 285 and § 35(a) have limited connection to this case but provide examples of decisions in which courts have acted within their discretion and outside of their discretion and the circumstances courts consider relevant. *See SiOnyx LLC*, 981 F.3d at 1355 (observing that "[u]ltimately, abuse of discretion is a deferential standard, and while the district court may have been within its right to grant [the] motion for fees under these circumstances, we cannot say that it abused its discretion in denying fees"). The following cases post-date *Octane Fitness*.

In the following nine cases, the Federal Circuit (for § 285) or the Eleventh Circuit (for § 35(a)) affirmed fee awards to defendants (or affirmed exceptional case determinations but reversed for other reasons), finding no abuses of discretion. In the first case, the plaintiff's litigating position was "meritless" and "frivolous"; the plaintiff's "exercise of even a modicum of due diligence would have revealed the weaknesses"; the plaintiff knew of the defendants' intention to seek fees; the plaintiff made nuisance value settlement offers, decreasing in amount over time; the plaintiff unreasonably delayed producing documents, withheld documents until after its corporate representative's deposition, and failed to produce other responsive documents; on the day pretrial submissions were due and shortly before the defendants' motion for summary judgment was to be decided, the plaintiff filed a notice of dismissal, a covenant not to sue, and a motion to dismiss without notifying the defendants' counsel; and the plaintiff had filed more than one hundred patent infringement lawsuits with none decided on the merits in its favor. *See Blackbird Tech LLC v. Health In Motion LLC*, 944 F.3d 910, 914–17 (Fed. Cir. 2019). In the second case, the plaintiffs induced a witness to provide false testimony, spoliated evidence, and asserted fraudulently revived patents. *See In re Rembrandt Techs. LP Pat. Litig.*, 899 F.3d 1254, 1267, 1277 (Fed. Cir.

2018). In the third case, the plaintiff took positions in bad faith to vexatiously multiply the proceedings and avoid early dismissal, causing the defendants to incur significant fees and costs. *See Raniere v. Microsoft Corp.*, 887 F.3d 1298, 1302 (Fed. Cir. 2018). In the fourth case, the district court ruled against one plaintiff in three orders, and the plaintiffs repeatedly failed to make new arguments or produce new evidence to distinguish prior rulings, repeatedly sought to add new parties and new claims after the court twice ruled against them, and "tried to inject new issues into the proceedings by making unsupported allegations of perjury." *See Tobinick*, 884 F.3d at 1118. In the fifth case, the plaintiff's litigation conduct—in the face of evidence contradicting its "contorted reading" of an agreement—was unreasonable, the plaintiff failed to perform a diligent pre-suit investigation of its claims, and the plaintiff filed a frivolous motion for a preliminary injunction. *See Bayer CropScience AG v. Dow AgroSciences LLC*, 851 F.3d 1302, 1303–05 (Fed. Cir. 2017). In the sixth case, the plaintiff's allegations of infringement were ill-supported and appeared baseless, particularly considering the parties' communications and claim constructions. *See Lumen View Tech., LLC v. Findthebest.com, Inc.*, 811 F.3d 479, 483 (Fed. Cir. 2016). In the seventh case, the plaintiff failed to respond to the defendant's motion for fees and costs; the defendant repeatedly warned the plaintiff about the shortcomings of the claims; four of seven factors used to test likelihood-of-confusion weighed heavily against the plaintiff; the commercial context revealed the source of the goods such that no reasonable consumer had been or likely would be confused; the mark lacked distinctiveness and fame in Florida; and the plaintiff failed to provide evidence of a loss of commercial value, made weak arguments, and provided little support at the summary judgment stage. *See Off Lease Only, Inc. v. Lakeland Motors, LLC*, 846 F. App'x 772, 775 (11th Cir. 2021). In the eighth case, the

24

plaintiff failed to conduct an adequate pre-filing investigation, which would have revealed the weaknesses of its infringement claims; most of the plaintiff's evidence was irrelevant to infringement; and the plaintiff failed to timely respond to the defendants' motions to dismiss and discovery requests, served multiple discovery requests just before the end of the discovery period, employed discovery tactics that caused unnecessary motion practice and briefing, and even after a discovery sanction continued filing motions and refused to comply with court orders, causing more expense and a motion to hold the plaintiff in contempt. *See Most Worshipful Nat'l Grand Lodge, Free & Accepted Ancient Yorkrite Masons, Prince Hall Origin Nat'l Compact, U.S.A. v. United Grand Lodge GA AF & AYM, Inc.*, 813 F. App'x 455, 460–61 (11th Cir. 2020). Finally, in the ninth case, the plaintiffs' litigating position was "unusually weak" because they had admitted—and a nonjudicial panel had found—the defendants used the marks first, the plaintiffs threatened that the defendants would be "begging for mercy," the plaintiffs demanded a licensing fee to settle the dispute, and the plaintiffs baselessly claimed on appeal that the district court had conspired to help the defendant in exchange for payment. *See Domond v. PeopleNetwork APS*, 750 F. App'x 844, 848 (11th Cir. 2018).

In contrast, in the following case, the Federal Circuit reversed an award to the defendants, finding an abuse of discretion. There, although the plaintiff's expert tested products manufactured in a different location than the accused products, the defendants made no claim that the accused products differed from the tested products; there was no allegation of falsity, fraud, or bad faith by the plaintiff or its expert; the plaintiff survived a *Daubert* challenge and summary judgment on infringement; and the plaintiff previously had obtained two infringement opinions from counsel as well as favorable judgments. *See Checkpoint*, 858 F.3d at 1376.

In the following case, the Federal Circuit affirmed the denial of an award to the defendant, finding no abuse of discretion. There, the plaintiff's positions on claim construction and indefiniteness "did not stand out," the defendant proffered insufficient evidence of improper motivation, and the district court found no evidence of any misrepresentation or misleading statements by the plaintiff during the litigation. *See SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1348–52 (Fed. Cir. 2015).

In contrast, in the following four cases, the Federal Circuit reversed denials of awards to defendants, finding abuses of discretion. In the first case, the plaintiff mailed standardized demand letters and filed repeat patent infringement actions to obtain low-value "license fees" and force quick settlements with no intention of testing the strength of the patent or the allegations of infringement, and the district court failed to consider the objective unreasonableness of the plaintiff's allegations in light of two prior adverse rulings against the plaintiff. *See Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 963 F.3d 1371, 1377 (Fed. Cir. 2020). In the second case, the plaintiff's lawsuit was baseless; the district court failed to consider irregularities in the plaintiff's damages model; and the plaintiff used "after-the-fact declarations" repeatedly, served a new expert report on the day of the expert's deposition, made new infringement arguments on appeal but failed to disclose them as new, and "asserted nuisance-value damages against many defendants, settled with them for widely varied royalty rates, and continued to press baseless infringement contentions well past an adverse *Markman* order and expert discovery." *See AdjustaCam*, 861 F.3d at 1361–62. In the third case, the district court erroneously conflated the standard for Rule 11 sanctions with the standard for § 285 fees; and the plaintiff willfully ignored prior art, asserted its patent in fifty-eight cases against varied defendants, and settled

26

all or nearly all for significantly below the cost of defense. *See Rothschild Connected Devices Innovs., LLC v. Guardian Prot. Servs., Inc.*, 858 F.3d 1383, 1388–89 (Fed. Cir. 2017). In the fourth case, the district court clearly erred in finding that the defendant had engaged in litigation misconduct by declining to rely on a technical expert when challenging the validity of the patent at the preliminary injunction stage and in finding that the defendant had made inconsistent statements. *See Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prod., Inc.*, 790 F.3d 1369, 1373 (Fed. Cir. 2015).

In the following case, the Federal Circuit held that an award of fees to the plaintiff, who prevailed on declaratory judgment claims of copyright, patent, and trade dress non-infringement, was proper only to the extent the fees were awarded under the Lanham Act. For the copyright and patent claims, the defendants neither filed frivolous submissions nor engaged in unreasonable conduct; but for the trade dress claim, the defendants substantially pursued the claim while providing "only bare assertions of non-functionality," "no evidence of likelihood of confusion," and "no direct consumer surveys or testimony." *See Indus. Models, Inc. v. SNF, Inc.*, 716 F. App'x 949, 958–60 (Fed. Cir. 2017).[20]

---

[20]The plaintiff succeeded on the merits in these additional cases.

In the following case, the Federal Circuit reversed an award to the plaintiff, finding an abuse of discretion. There, the district court failed to consider the bad conduct of both sides, erroneously found that the defendant had belatedly withdrawn anticipation and obviousness defenses, failed to find those defenses were objectively unreasonable, and erroneously found an indefiniteness defense frivolous. *See Romag*, 866 F.3d at 1336, 1338–40.

In contrast, in the following case, the Federal Circuit affirmed an award to the plaintiff, finding no abuse of discretion. There, the defendant filed claims against the plaintiff's customers only to drop them after extensive litigation, misrepresented facts related to the date of key evidence, and used motion practice to hide false evidence. *See Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*, 726 F.3d 1359, 1367 (Fed. Cir. 2013).

3.    *FDUTPA*

The purpose of FDUTPA is to (1) "simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices"; (2) "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce"; and (3) "make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202.

The attorney's fee provision of FDUTPA provides, "In any civil litigation resulting from an act or practice involving a violation of this part … after judgment in the trial court and exhaustion of all appeals, if any, [a party] may receive his or her reasonable attorney's fees and costs from the nonprevailing party."[21] Fla. Stat. § 501.2105(1).

Under this provision, a trial court has discretion to award attorney's fees to a prevailing plaintiff or a prevailing defendant.[22] *Coral Gables Imports, Inc.*

---

In the following case, the Federal Circuit affirmed the denial of an award to the plaintiff, finding no abuse of discretion. There, although a jury found willful infringement, the defenses were not so weak as to be exceptional, evidenced by the plaintiff's failure to move for summary judgment on infringement and validity; the plaintiff provided no evidence of a deliberate attempt to increase the cost and complexity for an improper purpose; and although the defendant refused to settle or waive service of process, provided incomplete information during discovery, and filed numerous post-trial motions, the defendant had no obligation to settle or waive service and the defendant's purpose was not delay alone. *See SiOnyx*, 981 F.3d at 1355.

[21]Under Florida law, a Florida trial court has no jurisdiction to award appellate fees. *H Greg Auto Pompano, Inc. v. Raskin*, 314 So. 3d 547, 549 n.1 (Fla. 3d DCA 2020). Lanard does not contend this is a state substantive law that should be applied here. *See generally* D523.

[22]Before a 1994 amendment, FDUTPA mandated a fee award to a prevailing party. *Humane Soc. of Broward Cnty., Inc., v. Fla. Humane Soc.*, 951 So. 2d 966, 971 (Fla. 4th DCA

28

*v. Suarez*, 306 So. 3d 348, 349 n.3 (Fla. 3d DCA 2020); *Humane Soc. of Broward Cnty., Inc. v. Fla. Humane Soc.*, 951 So. 2d 966, 969 (Fla. 4th DCA 2007). In addition to fees, "FDUTPA allows for the award of non-taxable costs, i.e. those costs that are not taxable under federal law at 28 U.S.C. § 1920." *Chow v. Chak Yam Chau*, 640 F. App'x 834, 836 n.4 (11th Cir. 2015).

In exercising its discretion, a court "might consider" seven non-exclusive factors: (1) "the scope and history of the litigation"; (2) "the ability of the opposing party to satisfy an award of fees";[23] (3) "whether an award of fees against the opposing party would deter others from acting in similar circumstances"; (4) "the merits of the respective positions—including the degree of the opposing party's culpability or bad faith"; (5) "whether the claim brought was not in subjective bad faith but frivolous, unreasonable, [and] groundless"; (6) "whether the defense raised a defense mainly to frustrate or stall";[24] and (7) "whether the claim brought was to resolve a significant legal question under FDUTPA law."[25] *Humane Soc.*, 951 So. 2d at 971–72; *accord*

---

2007). The amendment "placed an award of prevailing party attorney's fees within the discretion of the trial court." *Id.*

[23]For the second factor, no one suggests that Lanard would be unable to satisfy a fee award. *See generally* D518, D523; *see also* D316-1/SD319-1 at 5–6 (Kerr's report explaining that by 2015, Lanard had designed and manufactured more than 950 toys covering more than 30 brands, and in fiscal year 2015, had $31.2 million in revenue). The defendants contend this factor is "neutral." D518 at 12. Lanard does not include the factor in its list of factors relevant here. *See generally* D523 at 18–20. Consideration of this factor is unnecessary.

[24]Consideration of the sixth factor—whether the defense raised a defense mainly to frustrate or stall—is unnecessary because the defendants succeeded. The defendants contend this factor is "neutral." D518 at 12. Lanard does not include this factor in its list of factors relevant here. *See generally* D523 at 18–20. Consideration of this factor is unnecessary.

[25]For the seventh factor, no one contends that Lanard brought the FDUTPA claim to resolve a significant legal question under FDUTPA law. *See generally* D518, D523, D528. The defendants contend this factor is "neutral." D518 at 12. Lanard does not include this factor in its list of factors relevant here. *See generally* D523 at 18–20. Consideration of this factor is unnecessary.

*Chow*, 640 F. App'x at 838–39; *Colomar v. Mercy Hosp., Inc.*, 335 F. App'x 29, 31 (11th Cir. 2009); *N. Am. Clearing, Inc. v. Brokerage Comp. Sys., Inc.*, 395 F. App'x 563, 566 (11th Cir. 2010). A finding of frivolity, unreasonableness, or the absence of foundation is unnecessary. *Humane Soc.*, 951 So. 2d at 968.

In *Diamond Aircraft Industries, Inc. v. Horowitch*, the Florida Supreme Court addressed the FDUTPA fee provision. 107 So. 3d 362, 367–68 (Fla. 2013). The court explained that the provision is tied to the purpose of the law. *Id.* The court determined that the Florida Legislature made fees available to "encourage citizens to invoke the protections of FDUTPA and file actions under that statute[.]" *Id.* Still, the court cautioned that by "invoking FDUTPA and seeking redress under its remedial provisions," a plaintiff exposes itself to "both the benefits and the possible consequences of that act's provision." *Id.* at 369. The court also stated, "[T]he purpose of FDUTPA's attorney's fees provision … is to award attorney fees to the party that prevailed in civil litigation that involved a violation of FDUTPA[.]" *Id.* at 371.

Addressing allocation of fees, the court explained that the FDUTPA fee provision contemplates "recovery for the hours an attorney dedicated to litigating a civil action involving a FDUTPA claim unless the attorney's services clearly were not related in any way to establishing or defending an alleged violation" of FDUTPA. *Id.* at 367–68. The court elaborated: "Even if a FDUTPA claim is based on the same transaction as an alternative theory of recovery, a court may allocate attorney's fees for only the FDUTPA portion" if "either (1) counsel admits that the other services provided in that action were unrelated to the FDUTPA claim, or (2) a party establishes that the services related to non-FDUTPA claims were clearly beyond the scope of a [FDUTPA] proceeding." *Id.*; *see Chow*, 640 F. App'x at 843 (applying *Diamond Aircraft* and

holding that the losing party failed to show the services related to non-FDUTPA claims were clearly beyond the scope of the FDUTPA proceeding; the plaintiffs' observation that the FDUTPA claim was only one of nineteen claims and counterclaims "says nothing about how much time was devoted to the various claims, the importance of each claim in the litigation, and whether some non-FDUTPA claims nonetheless fell within the scope of the FDUTPA claims").

Some district courts have refused to award FDUTPA fees if the FDUTPA claim merely "tagged along" with federal claims for which fees are either unavailable or not awarded. *See, e.g., JES Props., Inc. v. USA Equestrian, Inc.*, 432 F. Supp. 2d 1283, 1291 (M.D. Fla. 2006); *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, No. 6:09-cv-1945-Orl-28GJK, 2013 WL 1174399, at *7 (M.D. Fla. Feb. 7, 2013), *report and recommendation adopted*, No. 6:09-cv-1945-Orl-28GJK, 2013 WL 1174841 (M.D. Fla. Mar. 20, 2013). More recent cases have rejected those cases under the rationale that they lack analysis, were decided before *Diamond Aircraft* or based on pre-*Diamond Aircraft* caselaw, and are contrary to *Diamond Aircraft* and post-*Diamond Aircraft* decisions.[26] *Procaps S.A. v. Patheon Inc.*, No. 12-24356-Civ-GOODMAN, 2017 WL 3536917, at *24–29 (S.D. Fla. Aug. 17, 2017); *accord Temurian v. Piccolo*, No. 18-62737-CIV, 2021 WL 1121003, at *2–3 (S.D. Fla. Mar. 24, 2021) (rejecting report and recommendation recommending that a FDUTPA fee award was unwarranted

---

[26]In *Chow*, the Eleventh Circuit upheld a fee award to the defendants who had prevailed on a FDUTPA claim against them even though they recovered nothing on their counterclaims. 640 F. App'x at 837–43 (remanding only to correct an arithmetic error). In *Alhassid v. Bank of Amer., N.A.*, the Eleventh Circuit observed that the district court could have awarded fees for hours devoted to the entire action, not just to the FDUTPA claim, because the work on those claims related in some way to establishing a FDUTPA violation. 688 F. App'x 753, 759 (11th Cir. 2017).

because the FDUTPA claim was intertwined with a Lanham Act claim and agreeing with the "very strong opinion" in *Procaps*).

Because a fee determination requires a particularized, case-by-case assessment in the FDUTPA context (like the federal law context), cases applying the FDUTPA fee provision have limited connection to this case but provide examples of decisions in which courts have acted within their discretion and the circumstances courts consider relevant. There are few readily available cases at the appellate level discussing circumstances driving a fee-award decision.

In the following two cases, appellate courts affirmed fee awards to defendants, finding no abuses of discretion. In the first case, the claims were straightforward but the case was "unreasonably contentious" and "aggressively litigated," the case involved "extensive discovery disputes," the parties were "extremely adversarial" since the case began, and by the end of the trial, the plaintiffs had abandoned or had lost four of sixteen claims and had abandoned claims raised against more than half of the defendants. *See Chow*, 640 F. App'x at 842–43. In the second case, the plaintiff was a larger organization with "deeper pockets"; the defendant hired a lawyer, hoping to succeed and recover its fees; a finding of frivolousness or unreasonableness is unnecessary; and "[t]his was not a test case with broad application; it was a business dispute involving two litigants under narrow circumstances." *See Humane Soc.*, 951 So. 2d at 970–72. In contrast, in another case, the Eleventh Circuit affirmed the denial of an award to the defendant, finding no error or abuse of discretion. There, the plaintiff lacked bad faith, and the district court weighed the seven factors. *See Colomar*, 335 F. App'x at 31.

**B.    *Circumstances***

Each side offers circumstances for this Court's consideration. *See* D477, D499, D518, D523. The undersigned summarizes the circumstances—omitting hyperbole in the briefing—and then turns to the analysis.

*1.    Objective Reasonableness or Frivolousness*

a.    <u>Copyright Infringement Claim</u>

In April 2014, within weeks of suing, Lanard moved for a preliminary injunction based on the copyright claim only, asking the original court (the District of New Jersey) to enjoin the defendants from selling the accused products and take related actions. D6, D6-13. Lanard argued it otherwise would suffer irreparable harm because the Lanard Chalk Pencil is a product especially sold during warm-weather months and the "cheaper" accused product would permanently alter the market during those months. D6-1 at 4, 5. Lanard posited that other large retail customers like Walgreens could start buying the accused product from Ja-Ru instead of buying the Lanard Chalk Pencil from Lanard, which would preclude Lanard from selling "at market prices that prevailed before infringement began." D6-1 at 14; D47 at 6–7. Lanard contended that customers with an "unsatisfactory" experience with the accused product would be disinclined to buy the Lanard Chalk Pencil at a higher price the following season. D6-1 at 14. Lanard argued that continued sales of the accused product would "wipe out" the time and money it had

expended developing the Lanard Chalk Pencil, and Lanard needed to "sell now and re-establish its pricing for the warm weather months."[27] D6-1 at 14.

Immediately after hearing arguments, the original court denied the motion on the record. D46; D47 at 34–38. The court explained:

> So as it relates to a reasonable likelihood of success, to the ordinary eye, the products look very, very similar. There's no dispute of that. It doesn't even seem there is a real argument that there is any real true, true distinction of the two products to the ordinary eye. There are some minimal distinctions, but as I said, one is larger, one's smaller. But for the most part, the coloring, the components, the features of it are very, very similar. So as — and it appears, quite frankly, that the plaintiff[], their product they have a copyright as it relates to their product. And at this point, you know, the Court could conclude that there's a reasonable likelihood of success on that.

D47 at 35. The court stated that it would forego deciding issues about the proper entities to sue and a claim that Lanard had fraudulently obtained its intellectual property rights. D47 at 35–36. The court then assumed a reasonable likelihood of success on the copyright-infringement claim and ruled against Lanard based on its failure to show irreparable harm:

> Assuming for the moment that there is a reasonable likelihood of success as it relates to the plaintiff's claim, I turn to the second component, which is the irreparable harm, which obviously, as we all know, the issuance of injunctive relief is an extraordinary remedy that should be used lightly and certainly sparingly, and so the Court is tasked with looking very seriously and very closely at the irreparable

---

[27]Lanard supported its motion for a preliminary injunction with a declaration by James Hesterberg, its managing director. D6-2. He declared, "The selling season for outdoor chalk generally runs from March through July. By August, the retail season changes and stores are transitioning out of the product." D6-2 ¶ 29. In his later deposition, asked if the Lanard Chalk Holder is a "seasonal item," he answered, "No. It's an evergreen staple item year round." SD355/D488 at 17. The defendants do not raise any possible inconsistency as a basis for a fee award. *See generally* D518. The Court therefore need not consider it.

harm that will result if this injunctive relief is not granted. And that is it [sic] where I have some trouble.

Without question, there are two products that are similar. But what I don't know and I don't see it — what I hear is a lot of speculation in terms of what damages are going to result if the products continue to sell. The argument that the market share is going to be affected, I mean, nothing has been presented to the Court and I looked back while counsel was arguing to look again at the certification that was received[.] [W]hat is not clear to the Court is that what is being sought is nothing more than, quite frankly, monetary damages. Monetary damages that can in fact be quantified at the conclusion of a litigation. And, quite frankly, once that information is set forth before the Court, that can be determined rather readily. What is not indicated is that there is in fact some large market share that the plaintiffs had or have and that that market share has been significantly affected and can no longer be regained. What's been put before the Court is a lot of speculation as to: This could happen. This may happen. We believe this will happen. And as far as I'm concerned, that's not a sufficient basis upon which to grant injunctive relief when we talk about irreparable harm.

D47 at 35–36. The court ruled the decision was "without prejudice" to Lanard bringing another motion if "something occurs that is certainly more substantial and distinct in terms of the irreparable harm." D47 at 37.

The defendants answered the copyright infringement claim. *See* D28, D34, D35, D62, D110–D112, D270–D272. In ultimately granting summary judgment for the defendants on the claim, this Court determined the copyright is invalid because the Lanard Chalk Pencil is a useful article:

Lanard's Certificate of Registration for the Chalk Pencil, made within five years after the first publication of the work, is prima facie evidence of the validity of the copyright, including the requirements of originality and susceptibility to copyright under 17 U.S.C. § 102(a). However, the Certificate of Registration is not conclusive on the copyright ownership issue, rather it shifts the burden to defendants to establish that the work in which the copyright is claimed is unprotectable.

Defendants attempt to rebut the presumption of validity by arguing that the Chalk Pencil is not sufficiently distinguishable from the preexisting no. 2 pencil design in the public domain. Notably, Lanard's design does copy to a significant degree elements found in the prior art, such as the yellow, hexagonal body of a no. 2 pencil with a silver, grooved ferrule, pink columnar eraser, and tapering to hold a writing medium. However, the originality requirement is a low bar, and all that is required is that the work possess some creative spark, no matter how crude, humble or obvious. Although Lanard's designer admits that he chose a number of the design features because they were common, viewing the evidence in the light most favorable to Lanard, a reasonable juror could conclude that he independently created some features of the Chalk Pencil design. And, given the low threshold for originality, Lanard's design appears to evidence the modicum of creativity necessary to warrant protection. Nonetheless, the limited protection its copyright affords is not particularly strong given that much of the expression in the Chalk Pencil still reflects the uncopyrightable features of the no. 2 pencil in the public domain.

Defendants also argue that Lanard's copyright is invalid in its entirety because the Chalk Pencil is a useful article. In response, Lanard maintains that the Chalk Pencil is inherently a non-functional toy. Viewing the evidence in the light most favorable to Lanard, the Chalk Pencil has two purposes—the utilitarian purpose of storing and holding chalk to facilitate writing, and the artistic purpose of evoking a cartoonish pencil to delight children. Lanard contends that this latter purpose renders the design of the Chalk Pencil a protectable sculptural work, and not a useful article. However, the artistic design of Lanard's Chalk Pencil is protectable only to the extent that it is separable from the useful article (i.e., chalk holder) in which it is incorporated.

A useful article is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. To the extent Lanard contends that the Chalk Pencil is not a useful article simply because it is intended as a toy for children, this argument is not persuasive. While the Chalk Pencil may be a toy, it is nevertheless a toy with the intrinsic utilitarian function of storing and holding chalk to facilitate writing or drawing. Indeed, Lanard's packaging for the Chalk Pencil instructs the user how to insert chalk into the device, depicts a person's hand using the Chalk Pencil to draw on the sidewalk, and touts a working eraser. The Chalk Pencil is not like a toy which is designed only to portray the appearance of another object, with no function other than in a child's imagination. Nor is the Chalk Pencil designed merely to simulate writing. Children do not

36

hold the Chalk Pencil and imagine using it to draw, children can, and are intended to, actually draw with the device. While the over-sized design may render the Chalk Pencil an inefficient tool for writing as Lanard maintains, the efficiency of a utilitarian article is irrelevant for copyright purposes. Thus, the undisputed evidence demonstrates that the Chalk Pencil is a useful article.

The more pertinent question in this case is whether the Chalk Pencil incorporates features, specifically its pencil design, that are sufficiently separable from its utilitarian purpose to be eligible for copyright protection. Significantly, to qualify as a pictorial, graphic, or sculptural work on its own, the feature cannot itself be a useful article or an article that is normally part of a useful article (which is itself considered a useful article). In <u>Star Athletica</u>,[28] the works at issue were two-dimensional lines, chevrons and shapes applied to cheerleading uniforms. The Court found those surface decorations of the cheerleading uniforms qualified as two-dimensional applied art, separable from the uniforms themselves, and therefore protectable. The <u>Star Athletica</u> Court explained that imaginatively removing the surface decorations from the uniforms and applying them in another medium would not replicate the uniform itself. The Court emphasized, however, that the copyright protection did not extend to the shape, cut and dimensions of the cheerleading uniforms on which the decorations in this case appear.

Here, Lanard contends that the Chalk Pencil design is a sculptural work separable from the chalk holder function of the device. Although Lanard does not identify any specific sculptural feature of the overall design that it maintains is separable, Lanard's position appears to be that the pencil design itself serves no utilitarian function and merely encases the chalk holder. The problem with Lanard's argument, however, is that the pencil design does not merely encase or disguise the chalk holder, it <u>is</u> the chalk holder. When one imagines the pencil design as a separate work of sculptural art, one is merely picturing a replica of the chalk holder. While Lanard may have developed this particular design for aesthetic and imaginative reasons, this fact alone does not make the entire useful article copyrightable.

Moreover, unlike <u>Star Athletica</u>, Lanard does not seek protection for artistic surface features, applied to the utilitarian object; Lanard seeks to protect the entirety of the Chalk Pencil—including its shape and form—the very components that make up the chalk holder itself. While the Chalk Pencil in its entirety may be a unique and attractively

---

[28]*See Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1008 (2017).

shaped chalk holder, its features are not capable of existing independently as a work of art, and therefore, it is not protectable under copyright law. Accordingly, Lanard does not own a valid copyright in the Chalk Pencil and its copyright claim must fail.

D468 at 53–59.

This Court rejected as "confusing" Lanard's argument that the Lanard Chalk Pencil contrasted with a no. 2 pencil:

> Lanard asserts that in contrast to its Chalk Pencil, a no. 2 pencil includes the following elements: yellow color, six sides, made of wood, graphite or lead interior, metal top before the eraser, pink eraser, may be sharpened, approximately eight inches long with a diameter of about 1/8 inch. Sometimes the pencils have a manufacturer's identity, place of manufacture, and No. 2 or 2 in a black circle written on one side. This list is confusing given that the Chalk Pencil is also yellow in color with six sides, a 2 in a black circle written on one side, and a pink eraser. Likewise, Lanard's reliance on the material of construction, wood and metal vs. plastic, as a point of distinction is misplaced. To support a copyright there must be at least some substantial variation, not merely a trivial variation such as might occur in the translation to a different medium.

D468 at 54 n.24.

This Court rejected as "nonsensical" Lanard's argument that the Lanard Chalk Pencil cannot derive from the no. 2 pencil because the no. 2 pencil design is in the public domain:

> The Court rejects Lanard's nonsensical argument that the Chalk Pencil cannot be derivative of the no. 2 pencil as a matter of law because the no. 2 pencil design is in the public domain. Plainly, a work can be derivative of material existing in the public domain. And Lanard's Chalk Pencil is indisputably derivative of the public domain no. 2 pencil design as Lanard admits that it specifically designed the Chalk Pencil to look like a no. 2 pencil and plainly recast, transformed, or adapted the pencil into a chalk holder. See 17 U.S.C. § 101 (defining a "derivative work" as a "work based upon one or more preexisting works, such as … [an] art reproduction, abridgment, condensation, or any other form in which a

38

work may be recast, transformed, or adapted."). Nevertheless, to the extent any aspects of Lanard's Chalk Pencil are original, those aspects are copyrightable.

D468 at 52 n.22 (alterations in original).

This Court alternatively determined that even if Lanard has a protectable copyright interest in the Chalk Pencil, any similarities between the Lanard Chalk Pencil and the accused product are from the non-protectable elements of the work:

> The infringement analysis in this case is closely akin to the Eleventh Circuit's decision in <u>Baby Buddies, Inc. v. Toys "R" Us, Inc.</u>, 611 F.3d 1308 (11th Cir. 2010). In <u>Baby Buddies</u>, the plaintiff had designed a pacifier holder featuring a white, plastic teddy bear attached to a ribbon tether with a bow, and obtained a copyright registration for the design. The defendant, Toys "R" Us, initially carried the plaintiff's pacifier holder, but later decided to design its own. The Toys "R" Us pacifier holder also featured a small white plastic bear with a ribbon tether and a bow. The plaintiff sued Toys "R" Us for copyright infringement and after discovery, the district court granted summary judgment in favor of Toys "R" Us finding no infringement. Notably, the evidence in that case revealed that the Toys R Us designer was sent a copy of plaintiff's pacifier holder with a note saying in part "I need a new animal design." The Eleventh Circuit affirmed, finding that when focusing on only the elements protected by the copyright laws (that is, setting aside the unoriginal and nonexpressive elements of the Baby Buddies pacifier holder), the pacifier holders were not substantially similar.

> In <u>Baby Buddies</u>, the court's analysis began with a determination that the plastic bears and bows were the only elements of the design eligible for copyright protection, as the remainder of the design served the utilitarian function of connecting a baby's pacifier to his clothes. The court then compared the bears and found that while they shared the same basic anatomical features, this was not a sufficient basis to find similarity because every sculpture of a teddy bear shares these features simply because these features are what defines a teddy bear. To protect this basic combination of features would in effect give Baby Buddies exclusive rights over the very idea of a plastic sculpted teddy bear, which is expressly precluded under the copyright laws. The court then

considered the particularized expression of the two bears and found distinctive features such that no properly instructed juror could find these bears substantially similar.

Here, both Lanard and Defendants have incorporated a no. 2 pencil design into a chalk holder. Thus, both designs employ the general features of a no. 2 pencil—a tapered conical holder for the writing element, a yellow, hexagonal elongated body, a silver, grooved ferrule, a pink columnar eraser, and the number 2 in a darkened oval. But, as with the anatomical features of a teddy bear, every sculpture of a no. 2 pencil contains these features as they are what define a no. 2 pencil. To protect this basic combination of features would in effect give Lanard exclusive rights over the very idea of a no. 2 pencil, which is expressly precluded under the copyright laws. Thus, the Court must consider the particular ways in which those general features or ideas are expressed. As stated in the patent analysis, there are readily apparent differences in each company's expression of a pencil-shaped chalk holder. Most notably, the appearance of the ferrules on the two chalk holder designs are dissimilar, the proportions of the separate elements in relation to each other are different, and the color, surface and slope of the tapered conical pieces are distinct, as is the specific pink shade of the eraser. In addition, not only are the words on the chalk holders different, both the positioning and font of the words are distinctly different as well.

Lanard asks the Court to find substantial similarity because the works both involve no. 2 pencil designs applied to chalk holders, and there are numerous other ways to design a chalk holder that do not employ the look of a pencil. This argument is faulty as the Court must consider the sculptural design separately from the useful article into which it is incorporated. Notably, in <u>Baby Buddies</u>, the court analyzed the similarity of the bears separately from their application to pacifier holders. Indeed, the Eleventh Circuit rejected the plaintiff's attempt to invoke the protection of copyright laws to prevent a competitor from using the idea of putting a sculpted teddy bear and a color-coordinated bow on a ribbon tether to create an aesthetically appealing pacifier holder. The <u>Baby Buddies</u> Court explained that this type of creative competition is entirely consistent with the copyright laws, and that while Baby Buddies has the right to prevent others from copying its creative expression, it does not have the ability to stop others from expressing similar ideas differently. As in <u>Baby Buddies</u>, Lanard is not entitled to copyright protection for the idea of a pencil-shaped chalk holder. Lanard's insistence that there are many ways to design a chalk holder that do not utilize a pencil design misses the point—there are also many ways to design a baby's pacifier holder that do not utilize a

40

teddy bear, and many ways to design a jewelry pin that do not utilize a bee. Ja-Ru, TRU and Dolgencorp are free to utilize the idea of a pencil-shaped chalk holder, so long as they do not plagiarize its expression. Given the differences in the pencil features of the designs, no reasonable juror could conclude that Defendants have appropriated Lanard's expression of a pencil-shaped chalk holder, as opposed to the idea of such an item. Accordingly, the Court determines that Defendants are entitled to summary judgment in their favor on the claim for copyright infringement

D468 at 59–63.

This Court rejected Lanard's reliance on opinions of its expert (Robert Anders) to support its copyright infringement claim:

> Anders' entire analysis of similarity consists of the following statement: there is enough similarity between the accused infringing work and the copyrighted work to conclude the former copied from the later. He adds that it is apparent that each Defendant infringed Lanard's copyright because the accused product is substantially the same as each and every image contained in the copyright. As Anders makes no attempt to identify the unprotectable elements of Lanard's pencil design or distinguish between similarity arising out of Lanard's particularized expression as opposed to its unprotectable idea, Anders' conclusory opinions are entirely insufficient to create a genuine issue of material fact. Indeed, given this complete lack of analysis, Anders' opinions are based on nothing more than his own ipse dixit and as such fail to satisfy the requirements of <u>Daubert</u>.

D468 at 62 n.26.

In affirming summary judgment for the defendants on the copyright infringement claim, the Federal Circuit explained:

> As the district court found, Lanard's '458 copyright for a "Pencil/Chalk Holder" has an intrinsic utilitarian function—storing and holding chalk and facilitating writing or drawing—which makes it a useful article under the Copyright Act. Thus, as the district court noted, the pertinent question is whether the copyright incorporates features that are sufficiently "separable" from the utilitarian aspects of the

article to be eligible for copyright protection. In resolving that question, the court found that:

> [T]he pencil design does not merely encase or disguise the chalk holder, it <u>is</u> the chalk holder. When one imagines the pencil design as a separate work of sculptural art, one is merely picturing a replica of the chalk holder.

> Based on that finding, the court concluded that the features of Lanard's copyright are not capable of existing independently as a work of art, and therefore, it is not protectable under copyright law.

> Lanard argues that its '458 copyright is a cartoonish No. 2 pencil design that can be perceived as a sculptural work separate from its function as a chalk holder and would qualify as a protectable work on its own if imagined in another medium separate from its utility as a chalk holder. Appellees respond that Lanard cannot identify any feature incorporated into the design of its copyright that is separate from the utilitarian chalk holder and that Lanard is merely attempting to assert copyright protection over the useful article itself.

> We agree with Appellees. In attempting to identify separable features, the feature cannot itself be a useful article. Here, Lanard's '458 copyright is for the chalk holder itself, and Lanard's arguments in the district court and in this appeal merely confirm that it seeks protection for the dimensions and shape of the useful article itself. Because the chalk holder itself is not copyright protectable, Lanard cannot demonstrate that it holds a valid copyright.

> Furthermore, the '458 copyright shows images that appear to be a pencil with the words "Chalk Pencil" on it, and the copyright is titled "Pencil/Chalk Holder." Based on that limited information, in conjunction with its arguments in the district court and this appeal, Lanard is essentially seeking to assert protection over any and all expressions of the idea of a pencil-shaped chalk holder. But copyright protection does not extend to an "idea." For this additional reason, we conclude as a matter of law that Lanard does not own a valid copyright for a pencil-shaped chalk holder. Thus, we hold that the district court correctly granted summary judgment in favor of Appellees on Lanard's claim for copyright infringement.

D500 at 12–14 (alteration in original).

b.   Patent Infringement Claim

The defendants also answered the patent infringement claim. *See* D28, D34, D35, D62, D110–D112, D270–D272. In ultimately granting summary judgment for the defendants on the claim, this Court held that no reasonable juror could conclude that Ja-Ru's chalk pencil is substantially similar to the patented design:

> Plainly, the patented design and the accused design share a broad design concept—they are both chalk holders designed to look like a no. 2 pencil—and thus, at a conceptual level they look quite similar. The problem for Lanard, however, is that the design similarities stem from aspects of the design that are either functional or well-established in the prior art. The conceptual elements of the design and their particular configuration are functional. And, as to the ornamental aspects of these elements, the columnar shape of the eraser, the hexagonal shape of the body, and the cylindrical grooved appearance of the ferrule are common design features of no. 2 pencils. Thus, while the ordinary observer will easily recognize both of these chalk holders as using a no. 2 pencil design, this does not mean the ordinary observer will be deceived into believing they are using the same design. Rather, the attention of the ordinary observer will be drawn to those aspects of the claimed design that differ from the prior art. Lanard's design differs from the prior art in the precise proportions of its elements, the size of the ferrule and the specific design of its grooves, and the particular size and shape of the conical end.

> With this frame of reference, the distinctions between the patented and accused designs are readily apparent. First, the proportions of the designs are different. The overall appearance of the D#167 design is more slender and elongated, while the Ja-Ru Chalk Holder has a thicker, more stunted, appearance. In addition, the appearance of the conical tapered portion of the designs are distinct, with the Ja-Ru Chalk Holder employing a shorter, sloping taper with ridges along the surface and a wide opening, while the patented design has a longer, straighter taper, narrower opening and smooth surface. And, perhaps most prominently, the appearance of the ferrules in each design is different. The ferrule on the patented design has three horizontal ridges in the center, while the ferrule on the accused design has a series of vertical lines in the center, with two horizontal ridges at the top and bottom of the vertical lines. While the undersigned

43

recognizes that courts do not engage in an element-by-element analysis or consider any element in isolation, the quality of the photographs, or lack thereof, requires a close view to adequately depict what would be readily visible to an ordinary observer viewing the actual objects.

While the ferrules are similar in that they both appear to be shortened versions of the cylindrical, crimped ferrules common in no. 2 pencils, the patented design is more akin to a cut-off version of the Davis Patent, while the accused design appears to be a condensed version of the ferrule utilized with the Hebron Patent and Dixon pencils. Given that the ordinary observer is familiar with the great number of no. 2 pencil designs in the prior art, it is these features that dominate the overall appearance of the patented and accused designs.

Lanard dismisses these differences in the appearance of the two designs as inconsequential, minor differences. In support, Lanard relies on Anders who concedes that differences in the designs exist, including the ones the Court identified above, but maintains that an ordinary observer would be unaware of these "microscopic differences." Instead, Lanard contends that the broader similarity between the two designs— the presence of a conical tapered end, hexagonal body, ferrule, and eraser of similar proportions—is sufficient to satisfy the ordinary observer test. Anders opines that the features of these two designs are substantially similar in size, proportionality and relationship to each other and the whole. This argument is unavailing, however, because such high-level similarities are insufficient to demonstrate infringement. Indeed, Anders' analysis has little probative value because he fails to distinguish between the similarity arising from the unprotected design concept, and any purported similarity arising from the ornamental features of the design. When one excludes the functional design elements from the scope of the design claim at the conceptual level, and places the ornamental aspects of the designs in context of the prior art, the differences between the patented and accused design take on greater significance. Because Anders fails to employ the correct frame of reference, his opinions are insufficient to create an issue of fact, and Lanard cites no other evidence that the differences between the two designs would not be immediately apparent to any ordinary observer familiar with the design of no. 2 pencils and no. 2 pencil-shaped objects.

Lanard's reliance on the similar "proportions" of the patented and accused designs, as distinguishable from the prior art, to establish substantial similarity is problematic because the relative size and thickness of the designs as compared to no. 2 pencils is a functional modification necessary to accomplish the chalk holder function of the

devices. Aside from the fact that both designs are thicker than a standard no. 2 pencil in order to accommodate sidewalk chalk, the specific proportions of the patented and accused designs are visibly distinct and provide different visual impressions. Moreover, over-sized pencils are present in the prior art as well—both as a design feature necessary to allow for internal storage, as in the Das Patent, and as a feature to promote novelty, as in the Giant Pencil. Indeed, it appears to the Court that the overall proportions of the patented design are as similar to the Giant Pencil as they are to the accused design. Thus, an ordinary observer would not be deceived into thinking the patented and accused designs are the same simply because they are both in the shape of over-sized pencils.

Here, Lanard's patented design consists of no more than bringing together old elements, the conical tapered end, the hexagonal body, the ferrule, the columnar eraser, with slight modifications of form, to create its unique pencil-shaped chalk holder design. This design is not infringed by Ja-Ru using the same elements with its own variations of form, because the accused design is distinguishable by the ordinary observer from the patented design. Based on the evidence presented, no reasonable fact finder could find that Lanard has met its burden of showing that an ordinary observer, taking into account the prior art, would believe the accused design to be the same as the patented design. To conclude otherwise despite the dissimilarities in the two designs, would improperly broaden the scope of Lanard's patent to include all chalk holders that incorporate a pencil design. While Lanard might desire such an outcome, that is not what Lanard is entitled to under the D#167 Patent.

D468 at 41–48.

This Court found Lanard's reliance on comments by the District of New Jersey at the preliminary injunction hearing "misplaced":

Lanard's reliance on the comments of the judge who presided over the preliminary injunction hearing prior to the transfer of this case is misplaced. The judge's references to the similarity of the "coloring" and "components" of the designs make clear that her assessment was based, at least in part, on aspects of the design that are not protected by the D#167 Patent. And indeed, the predecessor court denied the request for preliminary injunction based on a lack of irreparable harm, such that it simply assumed without deciding that Lanard had established a substantial likelihood of success on infringement.

D468 at 44 n.20

Based on its ruling, this Court declined to decide the merits of the defendants' counterclaims for patent invalidity. D468 at 48.

In affirming summary judgment for the defendants on the patent infringement claim, the Federal Circuit explained:

> Determining whether a design patent has been infringed is a two-part test: (1) the court first construes the claim to determine its meaning and scope; (2) the fact finder then compares the properly construed claim to the accused design. In comparing the patented and accused design, the "ordinary observer" test is applied—i.e., infringement is found if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other. The infringement analysis must compare the accused product to the patented design, not to a commercial embodiment.

> Lanard asserts three challenges against the district court's decision on design patent infringement. First, Lanard argues that the court erred in its claim construction by eliminating elements of the design based on functionality and lack of novelty. Second, Lanard argues that the court erred in its infringement analysis by conducting an element-by-element comparison rather than comparing the overall designs. Third, Lanard argues that the court used a rejected "point of novelty" test to evaluate infringement.

> Appellees respond that the court properly construed the claims by relying on the drawings and also noting the ornamental and novel aspects of the design. Appellees argue that the court used the correct "ordinary observer" test to compare the overall appearance of the patented design with the Ja-Ru product. According to Appellees, the court properly considered how each element, particularly non-functional and novel elements, impacts the overall appearance of the patented design. For the following reasons, we agree with Appellees.

> We review a district court's claim construction of a design patent de novo. Regarding claim construction, we have instructed trial courts that design patents typically are claimed as shown in drawings, but that

46

it can be helpful to distinguish between those features of the claimed design that are ornamental and those that are purely functional. Indeed, we have made clear that where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent.

Here, the district court followed our claim construction directives to a tee. The court began its claim construction analysis by reproducing the five exemplary figures from the patent and noting its reliance on those drawings. Then, in an effort to clarify the scope of the protected subject matter, the court considered the functional features of the design, as well as the functional purpose of the writing utensil as a whole, including its proportions. Although Lanard criticizes the court for allegedly "eliminating" entire elements of the claimed design, on the contrary, the district court meticulously acknowledged the ornamental aspects of each functional element, including the columnar shape of the eraser, the specific grooved appearance of the ferrule, the smooth surface and straight taper of the conical piece, and the specific proportional size of these elements in relation to each other. In light of our precedent regarding claim construction for design patents, we see no error in the approach taken by the district court to construe the claims commensurate with the statutory protection afforded to an ornamental design.

Next the district court considered our instruction that it is helpful to point out various features of the claimed design as they relate to the accused design and the prior art. Thus, the court considered the numerous prior art references cited by the examiner on the face of the D167 patent, as well as other designs identified by Appellees, all directed to the shape and design of a pencil. The district court thus recognized that "the overall appearance of Lanard's design is distinct from this prior art only in the precise proportions of its various elements in relation to each other, the size and ornamentation of the ferrule, and the particular size and shape of the conical tapered end." In so doing, the district court fleshed out and rejected Lanard's attempt to distinguish its patent from the prior art by importing the "the chalk holder function of its design" into the construction of the claim. Again, we see no error in the district court's approach to claim construction.

Finally, having construed the claim consistent with the drawings and pointed out the ornamental and functional features of the design as well as the various features as they relate to the prior art, the district court proceeded to the question of infringement. The court applied the well-established "ordinary observer" test to compare the overall design

and appearance of the claimed design with that of the accused Ja-Ru product. The court began by placing the patented design side-by-side with the Ja-Ru product and noting that they "share a broad design concept—they are both chalk holders designed to look like a no. 2 pencil." But, importantly, the court noted that "[t]he problem for Lanard, however, is that the design similarities stem from aspects of the design that are either functional or well-established in the prior art." Thus, the court found that "the attention of the ordinary observer 'will be drawn to those aspects of the claimed design that differ from the prior art,'" which would cause "the distinctions between the patented and accused designs [to be] readily apparent." The court concluded, based on the evidence presented, that no reasonable fact finder could find that an ordinary observer, taking into account the prior art, would believe the accused design to be the same as the patented design.

Lanard insists that the district court made two errors in its infringement analysis. First, Lanard argues that the court conducted an element-by-element comparison "in lieu of" a comparison of the overall design and appearance of the claimed design and the Ja-Ru product. Second, Lanard argues that the court revived the "point of novelty" test that we have rejected. We disagree with both contentions.

To be clear, the "ordinary observer" test for design patent infringement requires the fact finder to compare similarities in overall designs, not similarities of ornamental features in isolation. But, while the "ordinary observer" test is not an element-by-element comparison, it also does not ignore the reality that designs can, and often do, have both functional and ornamental aspects. Under the "ordinary observer" test, a court must consider the ornamental features and analyze how they impact the overall design. That is what the district court did in this case.

In comparing the overall design of the patent with the overall design of the Ja-Ra product, the court necessarily considered how the ornamental differences in each element would impact the ordinary observer's perception of the overall designs. Indeed, the court expressly considered Lanard's argument that the differences were "inconsequential" to the overall designs, but the court rejected that argument for failure to properly place the ornamental aspects of the design in the proper context. The court refocused its analysis on the correct context—the impact of the ornamental differences on the overall design—and concluded that "the differences between the patented and accused design take on greater significance." We conclude that the district court struck the correct balance of considering the ornamental aspects of the design while remaining focused on how an ordinary observer would view the overall design.

48

We also disagree with Lanard's contention that the court reinstated the "point of novelty" test in its infringement analysis. It is true that we have rejected the notion that the "point of novelty" test is a free-standing test for design patent infringement in which the patent owner must prove that the similarities between the patented design and the infringing product are attributable to the novelty which distinguishes the patented device from the prior art. But we have never questioned the importance of considering the patented design and the accused design in the context of the prior art. Indeed, we stated unequivocally that:

> The ordinary observer is deemed to view the differences between the patented design and the accused product in the context of the prior art. When the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer will be drawn to those aspects of the claimed design that differ from the prior art. And when the claimed design is close to the prior art designs, small differences between the accused design and the claimed design are likely to be important to the eye of the hypothetical ordinary observer.

Here, as a matter of claim construction, the district court undoubtedly considered the points of novelty of the patented design over the prior art. And the court placed those points of novelty in context by considering that those points of novelty would draw the attention of the ordinary observer. Again, we conclude that the district court correctly balanced the need to consider the points of novelty while remaining focused on how an ordinary observer would view the overall design.

Lastly, we deliberately disregard Lanard's seeming attempt to side-track the infringement analysis by emphasizing similarities between its product—the Lanard Chalk Pencil—and the Ja-Ru product. The test for infringement requires that an accused design be compared to the claimed design, not to a commercial embodiment. To the extent that the Lanard Chalk Pencil embodies features that are not claimed in its D167 patent, features that are purely functional, or features that are in the prior art, those features are not themselves entitled to patent protection.

We ultimately conclude that Lanard's position is untenable because it seeks to exclude any chalk holder in the shape of a pencil and thus extend the scope of the D167 patent far beyond the statutorily protected new, original and ornamental design. Lanard's appellate

challenge emphasizes the district court's extensive discussions of design elements, ornamental aspects, and points of novelty, but fails to acknowledge the court's proper placement of those discussions in the context of its overall infringement analysis. The district court's detailed analysis was supportive of its conclusion that an ordinary observer, taking into account the prior art, would not believe that the accused Ja-Ru product was the same as the patented design. Thus, we hold that the district court correctly granted summary judgment of noninfringement.

D500 at 4–11 (alterations in original).

c.     Trade Dress Infringement Claim

The defendants originally answered the trade dress infringement claim, but after Lanard filed a second amended complaint at this Court's directive to correct a "shotgun pleading" problem, the defendants moved to dismiss, or for a more definite statement of, substantially the same claim. D113; *compare* D61 ¶¶ 48–53, *with* D103 ¶¶ 48–53; *see* footnote 7 (describing the pleadings filed).

In the second amended complaint, Lanard included photographs of the point-of-sale packaging of the Lanard Chalk Pencil and photographs of the accused product sold by the defendants and described its trade dress as follows: "Lanard enjoys substantial demand for this product, and Lanard's trade dress embodied in this Chalk Pencil has become well known to consumers and the trade by virtue of widespread, long, continuous, and exclusive use thereof. The purchasing public and customers of Lanard associate the Chalk Pencil trade dress exclusively with Lanard." D103 ¶ 18.

In their motion to dismiss or for a more definite statement, the defendants argued that Lanard failed to identify elements of the allegedly protectable trade dress and failed to allege that the asserted trade dress is

primarily non-functional. D113. Lanard countered that it had alleged enough, including by putting the photographs in the pleading. D116.

Consideration of other motions (the defendants' motion to disqualify Lanard's lawyers, D175, D176, and Lanard's motion for leave to file a third amended complaint, D160), delayed consideration of the motion to dismiss or for a more definite statement, D250. After decisions on those other motions, the Court conducted a telephone conference to discuss the procedural posture of the case. D263. The Court explained that it was inclined to rule the trade dress infringement claim was at least plausible and likely to survive a motion to dismiss and stated its preference for addressing the issues through summary judgment, observing that the parties would not obtain a ruling on the motion to dismiss or for a more definite statement in sufficient time for the ruling to make a difference in how they prosecuted the action. *See* D263 (rough transcript).[29] The parties agreed the procedure made sense and had no objection. *See* D263 (rough transcript). The Court therefore denied the motion without prejudice, explaining, "The substantive arguments raised in the motion will be addressed within the summary judgment briefing." D263 (rough transcript). The defendants then answered the claim. D270–73.

During discovery, the defendants asked Lanard to describe the specific elements of the Lanard Chalk Pencil that Lanard claimed constituted protectable trade dress. D302-36 at 7. Lanard described aspects of the Lanard Chalk Pencil itself and then stated, "In addition, there are substantial similarities in packaging, including illustrations, test and instructions, and card." D302-36 at 7–8. The defendants also asked Lanard to admit "that the

---

[29]The parties never ordered a transcript of the telephone conference but can do so by contacting the court reporter. *See* D263 (minutes identifying the court reporter).

[second amended complaint] does not charge [the defendants] with trade dress infringement of the packaging of the [Lanard Chalk Pencil]." D518-8 at 3. Lanard responded, "Deny. Paragraph 49 [of the second amended complaint], and the [second amended complaint] *passim*, allege Defendants' infringement of Lanard's trade dress generally. Paragraphs 12 [a photograph of Lanard's point-of-sale packaging] and 17 [a photograph of Dolgencorp's private label product] specifically call out the packaging." D518-8 at 3; *see* D103 ¶¶ 12, 17 (second amended complaint).

In their motion for summary judgment, the defendants asserted several undisputed facts about packaging, including: "Lanard's initial product packaging for the Lanard Chalk Holder resembles the generic packaging of many other chalk and toy products," D302/ SD324 ¶ 20; "In comparing the TRU private label packaging to Lanard's, Lanard's own toy industry expert, Larry Myer, stated that the packaging of both items were 'just basic' and were 'packaging like a thousand other items,'" D302/ SD324 ¶ 21; and "Myer also conceded that Ja-Ru and Lanard's Product Packaging were 'not a copy of the other' and that 'the artwork is different.' When asked what about Ja-Ru's packaging was problematic, Myer responded by stating 'forget about the packaging … it's not the packaging … it's the product itself [that] creates the problem,'" D302/ SD324 ¶ 22. The defendants observed that trade dress falls into two categories (product design and product packaging), contended that whether Lanard was asserting a product design or product packaging claim was unclear, and argued that, regardless, the claim fails, including because of the asserted undisputed facts about the packaging. D302/SD324 at 27–31.

52

Lanard responded, "Defendants misconstrue the trade dress at issue here, focusing on the product's packaging. … Lanard is not claiming protected trade dress in its packaging, but in the Chalk Pencil itself." D322/SD327 at 22.

For secondary meaning, Lanard cited several sales figures, including figures of sales of the Lanard Chalk Pencil to TRU and Dolgencorp that reached "end consumers with sales of over six million [Lanard] Chalk Pencils sold," and argued, "Based on these sales figures reflecting the success of the [Lanard] Chalk Pencil, and the indisputable evidence of Defendants' intentional copying, Lanard's Chalk Pencil acquired secondary meaning and is protected trade dress." D299/SDD326 at 33.

In ultimately granting summary judgment for the defendants on the trade dress infringement claim, this Court held that no reasonable juror could find that Lanard's purported trade dress in the Lanard Chalk Pencil has acquired secondary meaning:

> The Eleventh Circuit recognizes a federal cause of action for the infringement of unregistered trade dress pursuant to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Trade dress involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques. Although most trade dress infringement actions involve the packaging or labeling of goods, courts have also recognized that the design of a product itself may constitute protectable trade dress under § 43(a) of the Lanham Act. To prevail on its claim for trade dress infringement, Lanard must prove three things: (1) that the trade dress of the two products is confusingly similar, (2) that the features of the trade dress are primarily non-functional, and (3) that the trade dress has acquired secondary meaning.
>
> Here, Defendants contend that Lanard cannot prevail on its trade dress claim because Lanard fails to present sufficient evidence that the Chalk Pencil has acquired secondary meaning. Lanard does not and cannot argue that its Chalk Pencil is inherently distinctive.

To establish secondary meaning the plaintiff must show that the primary significance of the product in the minds of the consuming public is not the product itself but the producer. Establishing secondary meaning is best accomplished by surveys or other quantitative evidence. Nonetheless, although survey evidence is the most direct and persuasive evidence to establish secondary meaning, it is not required. Absent consumer survey evidence, four factors can be considered in determining whether a particular mark has acquired a secondary meaning. These factors are:

> (1) The length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the name and the plaintiff's business; and (4) the extent to which the public actually identifies the name with the plaintiff's product.

Significantly, a plaintiff has the burden of sustaining a high degree of proof establishing secondary meaning.

Here, Lanard argues that it has established secondary meaning based on evidence of the following: 1) intentional copying, 2) significant sales, and 3) substantially exclusive use of the trade dress for five years. Upon careful consideration, however, the Court determines that Lanard vastly overstates its evidence of secondary meaning. When placed in proper context, Lanard's evidence woefully fails to meet its high burden of establishing any connection between Lanard and the Chalk Pencil in the mind of the consumer. As no reasonable juror could find secondary meaning on the record before this Court, the Court finds, for the reasons set forth below, that Defendants are entitled to summary judgment on Lanard's trade dress infringement and unfair competition claims as well.

First, the Court reviews Lanard's evidence of intentional copying. Lanard presents evidence that unequivocally establishes that Ja-Ru used Lanard's Chalk Pencil as a "reference" or "market" sample in designing the Ja-Ru Chalk Holder. However, this evidence also shows that Ja-Ru modified the design, in the ways detailed above, as well as with respect to the overall size of the chalk holder. Significantly, Lanard does not assert, and there is no evidence to suggest, that Defendants engaged in any instances of actual palming off or deception related to

the Ja-Ru Chalk Holder. As the Eleventh Circuit recognized in <u>Brooks Shoe Mfg.</u>[30]:

> close copying does not necessarily indicate that the defendant has attempted to capitalize on the secondary meaning of plaintiff's trademark or trade dress because there may have been many other motivations for defendant's actions. Further, it must not be forgotten that there is absolutely nothing legally or morally reprehensible about exact copying of things in the public domain.

Indeed, attempts to copy a product configuration will quite often not be probative: the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product. Given the differences in the two designs, the ubiquity of the no. 2 pencil design in the public domain, and the absence of any evidence that Defendants intended to benefit from Lanard's reputation, this evidence of copying is entitled to little weight in establishing secondary meaning. Indeed, this point is especially salient as to TRU who sold the Chalk Pencil under its own private label, Sizzlin' Cool. Thus, it is hard to conceive how TRU intended to profit from Lanard's reputation, as consumers would have associated both versions of the pencil-shaped chalk holder with TRU.

Second, Lanard's reliance on its "substantial sales" is not born out by the evidence. Secondary meaning must attach to the mark <u>before</u> Defendants first used the mark. Thus, Lanard's assertions that it has "shipped 1,415,034 units of its Chalk Pencil between 2010 and 2016, accumulating gross sales in the amount of $2,770,047.06, and has $2,879,787.46 in total gross sales up to July 21, 2017" are irrelevant. Rather, the Court looks to the length and manner of the Chalk Pencil's use from November 2010, when Lanard introduced the item to the market, to January 2014, when TRU began retail sales of the Ja-Ru Chalk Holder. During this period of time, Lanard sold 581,984 units of its Chalk Pencil in the United States, totaling $1,113,007.90 in sales. Lanard's sales data, however, does not establish any connection in the consumer's mind between Lanard and the Chalk Pencil. Accordingly, it is difficult to draw any inference of secondary meaning from Lanard's evidence of sales alone.

Notably absent from the record is any evidence of Lanard's advertising or promotion of the Chalk Pencil, much less the effectiveness

---

[30] <i>See Brooks Shoe Mfg. Co. v. Suave Shoe Corp.</i>, 716 F.2d 854 (11th Cir. 1983).

of those efforts in creating a consumer association between Lanard and the Chalk Pencil. To the contrary, the record reflects that Lanard did not engage in any advertising or promotional activities with respect to the Chalk Pencil. Moreover, there is no evidence whatsoever that consumers, either the public or retailers, actually draw a connection between the Chalk Pencil and Lanard, much less any evidence of actual confusion between the products. Lanard concedes that it has no knowledge of any inquiries as to the source or sponsorship of the Lanard Chalk Pencil and Ja-Ru Chalk Holder, nor does it have any evidence of actual consumer confusion. Even viewing the evidence in the light most favorable to Lanard, Lanard's attempt to establish secondary meaning solely based on evidence that Ja-Ru copied its idea of a pencil-shaped chalk holder and that Lanard sold approximately 600,000 Chalk Pencils in the United States during the relevant time period is insufficient to meet its high evidentiary burden of establishing secondary meaning. As this is an essential element of Lanard's trade dress infringement claim, the Court determines that summary judgment in favor of Defendants on Lanard's trade dress claim is warranted.

D468 at 63–71.

This Court rejected as unsupported Lanard's argument that it had presented prima facie evidence of acquired distinctiveness:

> Lanard also argues that it has presented prima facie evidence of acquired distinctiveness because it had substantially exclusive use of the trade dress for five years. This argument is not supported by the evidence. As stated above, prior to the Ja-Ru Chalk Holder entering the market, Lanard had substantially exclusive use of the trade dress for just over three years. Indeed, Lanard had not even used its purported trade dress for five years at the time it initiated this lawsuit. Thus, Lanard's reliance on 15 U.S.C. § 1052(f) is misplaced. See 15 U.S.C. § 1052(f) ("The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for five years before the date on which the claim of distinctiveness is made.").

D468 at 69 n.32.

This Court rejected Lanard's argument that the defendants are estopped from challenging the validity of Lanard's trade dress under the licensee

estoppel doctrine.[31] D468 at 66–67 n.30. This Court observed that "Lanard cites no authority to support its contention that the licensee estoppel doctrine can apply to bar an attack on the validity of a trade dress for lack of secondary meaning." D468 at 66–67 n.30. This Court continued, "Regardless, even if licensee estoppel could apply in this context, Lanard has not provided any evidence that it licensed the use of its purported trade dress rights in the Lanard Chalk Pencil to Dolgencorp or TRU, the wholesale purchasers of the product." D468 at 67 n.30.

On appeal, Lanard argued, "Here, the relevant consumer group is Lanard's customers—retailers and wholesalers. While the Florida district court below mentioned retailers as a relevant consumer group (along with the public), it failed to take retailers into account in its secondary meaning analysis." D518-5 at 39. Lanard then argued:

> It cannot be said that no reasonable juror could find that retailers and wholesalers associated the Lanard Chalk Pencil trade dress with Lanard, given that (i) for many years (2010–2014) Lanard sold a large number of its Lanard Chalk Pencil—the only chalk holder that resembled a cartoonish, No. 2 pencil—to a large group of national, regional, and online retailers, as well as wholesalers; (ii) Lanard's sales team personally reached out to customers and prospective customers in the tight-knit community of toy retailers and wholesalers; (iii) as time went on during the 2010–2014 period, more and more retailers and wholesalers sought to buy the Lanard Chalk Pencil; and (iv) the retailers and wholesalers were repeat customers of the Lanard Chalk Pencil and thus associated the product with Lanard.

D518-5 at 39.

---

[31]"The licensee estoppel rule is founded on the view that a licensee of intellectual property should not be permitted to enjoy the use of the licensed property while at the same time challenging that intellectual property as being invalid." 3 McCarthy on Trademarks and Unfair Competition § 18:63 (5th ed.).

In affirming summary judgment on the trade dress infringement claim, the Federal Circuit explained:

> To prevail on a claim for trade dress infringement, a plaintiff must prove three things: (1) that the trade dress of two products is confusingly similar; (2) that the features of the trade dress are primarily non-functional; and (3) that the trade dress has acquired secondary meaning. To establish secondary meaning the plaintiff must show that the primary significance of the product in the minds of the consuming public is not the product itself but the producer. The district court found that Lanard cannot provide sufficient evidence that the Lanard Chalk Pencil has acquired secondary meaning.
>
> Lanard argues that the district court erred by limiting its secondary meaning analysis to end-users of the Lanard Chalk Pencil even though Lanard's actual customers are wholesalers and retail stores to whom Lanard's sales team promotes its products through direct communications, presentations, and pitches. Lanard further contends that it sold a large number of units of the Lanard Chalk Pencil, the only pencil-shaped chalk holder on the market, which should at least be sufficient to create a triable issue of fact regarding whether the wholesalers and retail stores associated the product—the Lanard Chalk Pencil—with its producer—Lanard.
>
> Appellees respond that Lanard relied exclusively on Ja-Ru's copying and its own sales as evidence of secondary meaning, and the court found that the evidence "woefully fails" to show secondary meaning. Appellees insist that Lanard never presented evidence or argument that distinguished between end-users versus wholesalers and retail stores, nor evidence of efforts to promote its product through its sales force.
>
> We agree with the district court that, based on the evidence in the record, no reasonable trier of fact could reach the conclusion that the Lanard Chalk Pencil has acquired secondary meaning. On appeal, Lanard merely emphasizes that it sold a lot of units of the Lanard Chalk Pencil through direct marketing to wholesalers and retail stores, but Lanard cites no evidence as to how those customers view its Lanard Chalk Pencil product. Essentially, regardless of the identity of Lanard's customers, Lanard has not identified evidence with which it could satisfy its burden to prove at trial that, when customers see the Lanard Chalk Pencil, their minds jump to the producer of the product rather than the product itself. We conclude that, on this record, the district

court correctly granted summary judgment in favor of Appellees on Lanard's claim for trade dress infringement.

D500 at 14–15.

d.   <u>Unfair Competition</u>

As with the trade dress infringement claim, the defendants originally answered the unfair competition claim, but after Lanard filed the second amended complaint, they moved to dismiss, or for a more definite statement of, substantially the same claim. D113; *compare* D61 ¶¶ 54–59 (citing New Jersey statute and other laws), *with* D103 ¶¶ 54–59 (citing FDUTPA and other laws).

In the second amended complaint, for the unfair competition claim, Lanard alleged:

<b><u>Common-Law Unfair Competition Under<br>Federal Law and The Laws of Florida</u></b>

54. Plaintiff realleges and incorporates herein by this reference each of the allegations contained in Paragraphs 1 through 34 [all allegations preceding all claims] as if fully set forth herein.

55. The aforementioned acts by Defendants in causing confusion among the relevant public and causing a false association or sponsorship between Defendants' goods and Lanard, in Florida and elsewhere, constitute unfair competition and unfair business practices contrary to the common laws of the United States (Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)) and the laws of the State of Florida, including, but not limited to, Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*.

56. The acts by Defendants were committed willfully, knowingly, maliciously, and in conscious disregard of Lanard's rights.

57. As a result of Defendants' unfair competition, Lanard has suffered damage to its goodwill and reputation and has lost sales of its products.

58. Defendants have made substantial profits based on their unauthorized sales of their infringing "Chalk Pencil" copies.

59. The aforesaid conduct by Defendants has caused, and unless restrained by this Court will continue to cause, immediate, great, and irreparable harm to Lanard's property and business. Lanard has no adequate remedy at law.

D103 ¶¶ 54–57.

Lanard thus referenced four laws in its claim for unfair competition: federal common law, Florida common law, § 43(a) of the Lanham Act, and FDUTPA. Federal common law does not recognize a general claim for unfair competition. *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 670 (Fed. Cir. 1988), *accord Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 524 n.7 (11th Cir. 2015). Florida common law recognizes a general claim for unfair competition, requiring a showing of deceptive or fraudulent conduct by a competitor and a likelihood of customer confusion. *Donald Frederick Evans & Assoc. v. Cont'l Homes, Inc.*, 785 F.2d 897, 914 (11th Cir. 1986). Section 43(a) of the Lanham Act "forbids unfair trade practices involving infringement of trade dress, service marks, or trademarks, even in the absence of federal trademark registration." *Univ. of Fla. v. KPB, Inc.*, 89 F.3d 773, 775–76 (11th Cir. 1996). FDUTPA makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Stat. § 501.204(1). Trade dress or trademark infringement is an "unfair and deceptive trade practice that constitutes a violation of FDUTPA." *Commodores Ent. Corp. v. McClary*, 324 F. Supp. 3d 1245, 1252 (M.D. Fla. 2018) (trademark), *aff'd*, 822 F. App'x 904 (11th Cir. 2020). The Eleventh Circuit has explained, "Common law and statutory trademark infringements are merely specific aspects of unfair

competition." *Planetary Motion*, 261 F.3d at 1193 n.5. The analysis of Florida statutory and common law claims of trade dress or trademark infringement and unfair competition therefore is the same as the analysis of a § 43(a) claim. *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 802 (11th Cir. 2003) (trademark).

In their motion to dismiss or for a more definite statement, the defendants argued that the Copyright Act preempted the claim[32] and Lanard failed to state a plausible claim under *Iqbal* and *Twombly*.[33] D113. Observing that Lanard appeared to lump four claims together, the defendants contended, "As currently framed, the [claim] is unintelligible, jumbled, unclear, and confused." D113 at 4–5. Lanard responded that its claim "is based in **whole or part** on trade dress infringement" and therefore is not preempted by the Copyright Act. D116 at 15 (emphasis added). According to Lanard, "As the

---

[32]This Court (the district judge) has succinctly explained preemption under the Copyright Act:

> The Eleventh Circuit has recognized that the Copyright Act preempts only those state law rights that may be abridged by an act which, in and of itself, would infringe one of the exclusive rights provided by federal copyright law. The exclusive rights under the Copyright Act include the rights to reproduce the copyrighted work, to prepare derivative works, and to distribute copies to the public. To determine whether an overlap exists, the Eleventh Circuit employs an "extra element" test. If an extra element is required instead of or in addition to the acts of reproduction, performance, distribution, or display, in order to constitute a state-created cause of action, then the right does not lie within the general scope of copyright and there is no preemption. A state law claim is not preempted if the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim.

*Arbitron Inc. v. Renda Broad. Corp.*, No. 3:13-CV-716-J-34JRK, 2014 WL 1268587, at *10 (M.D. Fla. Mar. 27, 2014).

[33]*See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that, to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (same).

Second Amended Complaint alleges deceptive and fraudulent conduct by Defendants, including marketing of their infringing products, that has created a likelihood of customer confusion, Lanard's unfair competition claims are not preempted by the Copyright Act." D116 at 15–16. Lanard argued that the motion for a more definite statement was "frivolous" because the defendants previously had answered the claim in substantially similar form. D116 at 17.

As with the trade dress infringement claim, the Court carried the issues with summary judgment, and the defendants answered the claim. D263, D270–D273; *compare* D61 ¶¶ 54–59, *with* D103 ¶¶ 54–59.

At the summary judgment stage, Lanard took the position that the claims for trade dress infringement and "federal and state common law unfair competition" should be addressed together because their elements are nearly identical. D299/SD326 at 34–35; D321/SD327 at 24. Lanard made the summary argument, "Because Lanard's statutory and common law unfair competition claims under federal and Florida law are predicated on Defendants' indisputable infringement outlined in detail above, Defendants are not due summary judgment in their favor," D321/SD327 at 24; *see also* D299/SD326 at 35 (Lanard's same argument in its motion for summary judgment). The defendants responded that Lanard "acknowledges that its unfair competition claim is merely a repackaged trade dress claim." D320/SD325 at 24–27. The defendants added that, to the extent the claim was under FDUTPA or Florida common law, the Copyright Act preempted the claim, and to the extent the claim was under Florida common law, Lanard had no evidence of deceptive or fraudulent conduct or likelihood of consumer confusion. D302/SD324 at 31–33; D320/SD325 at 24.

62

In ultimately granting summary judgment for the defendants on the unfair competition claim, this Court held the claim could not survive because it depended on the trade dress infringement claim:

> Lanard also asserts claims for statutory and common law unfair competition under the Lanham Act and Florida common law. In its Motion for Summary Judgment, Lanard does not distinguish between its unfair competition claims and its trade dress infringement claim, and concedes that its "statutory and common law unfair competition claims under federal and Florida law are predicated on" Defendants' purported trade dress infringement. As Lanard's trade dress infringement claim fails the Court need not conduct a separate analysis of Lanard's unfair competition claims.

D468 at 63 n.27. At the end of the order, this Court added that "because Lanard fails to present sufficient evidence of infringement as to any of its claims, Lanard's unfair competition claim also fails." D468 at 72.

In affirming summary judgment for the defendants on the unfair competition claim, the Federal Circuit explained:

> Finally, we address Lanard's claims for statutory and common law unfair competition under state and federal law. The district court found that the unfair competition claims fail because they are based entirely on Lanard's infringement claims. On appeal, Lanard does not challenge that finding, arguing only that since none of Lanard's other claims should fail on summary judgment, the district court's grant of summary judgment on the unfair competition claim should be reversed. Thus, because we find that the district court correctly granted summary judgment in favor of Appellees on Lanard's other claims, we hold that the court also correctly granted summary judgment on the unfair competition claims.

D500 at 15–16.

2.      *Lanard's Motivation*

The sides possessed (and continue to possess) starkly contrasting views about Lanard's motivation for suing. The Court never made a factual finding about motivation. To support their argument that Lanard had improper motivation, the defendants observe that Lanard previously sued Dolgencorp, and as a condition of settlement, Dolgencorp agreed to buy toys from Lanard. D518 at 7 (citing D302-49).

3.      *Deterrence, Compensation, and Other Circumstances*

a.      Lanard's Decision to Sue in New Jersey

When Lanard filed the original complaint in New Jersey, Lanard was a Hong Kong company with its principal place of business in Hong Kong; Ja-Ru was a Florida corporation with its principal place of business in Florida; TRU was a Delaware corporation with its principal place of business in New Jersey; and Dolgencorp was a Kentucky corporation with its principal place of business in Tennessee. D1 ¶¶ 6–10.

The defendants moved to transfer the action here as a more convenient forum.[34] D69, D82, D83, D89. According to them, the "only discernable reason" Lanard sued in New Jersey "is because its lawyers are located in New Jersey." D69 at 6; D83 at 8. Lanard responded by emphasizing that TRU's principal place of business was in New Jersey, TRU's witnesses and documents are in

---

[34]A defendant no longer in the case (Dollar General Corporation) moved to dismiss for lack of personal jurisdiction and improper venue. D36–38. Before a decision on that motion, Lanard dropped that defendant. D57, D61. The defendants do not contend that naming the wrong defendant is a circumstance favoring a fee award for them. *See generally* D518. The Court therefore need not consider it.

New Jersey, and a "substantial part of the accused conduct was undertaken by" TRU employees in New Jersey. D76 at 6–12.

The original court granted the motion to transfer, concluding the balance of interests favored venue here. D92 at 9–10. The court explained: the "center of gravity" of the dispute is here because Ja-Ru designed and developed the accused product here;[35] Lanard's choice of forum is entitled to little deference because New Jersey is not Lanard's home forum; the defendants' choice of forum is entitled to more deference because the "center of gravity" of the dispute is here; requiring Lanard to litigate here will create minimal inconvenience to Lanard because its representatives have to travel internationally regardless of where the dispute is litigated; the tangible evidence about the accused product is here; most witnesses and other evidence about the accused product are here; deciding local controversies locally favors transfer; and New Jersey jurors should not be burdened with deciding claims based on conduct outside New Jersey. D92 at 9–10.

Following transfer, depositions occurred all over, with Florida hosting the most. *See* footnote 8 (describing in more detail where the depositions occurred).[36]

---

[35]In its opposition to the motion for a fee award, Lanard states it had no knowledge of where the allegedly infringing product was designed and developed when it filed the complaint in New Jersey, D523 at 9, but cites no evidence for the statement, *see generally* D523. The statement is disregarded as unsupported.

[36]To support their motion to transfer venue, the defendants explained that Ja-Ru witnesses and Ja-Ru (HK) Ltd. witnesses are in Florida and Hong Kong, observed that some of the Ja-Ru (HK) Ltd. witnesses in Hong Kong occasionally visit Jacksonville, and stated that their visits could be coordinated to coincide with their depositions. D69 at 13–14; D83 at 15; D89 at 6. The defendants added that non-affiliated, non-party witnesses are in Hong Kong. D69 at 13–14; D83 at 15. Following transfer, the parties coordinated Hong Kong depositions to occur on consecutive days. See SD355/D488 (deposition of James Hesterberg

b.    Lanard's Motion for Leave to File a Third Amended Complaint

After the deadline to add parties, Lanard moved for leave to file a third amended complaint to add Ja-Ru (HK) Ltd. D160. Lanard cited the liberal amendment standard for timely amendments rather than the good cause standard for belated amendments. D160 at 5. Many papers showed that Lanard had possessed the pertinent information about Ja-Ru (HK) Ltd. before the deadline to add parties expired. D253 at 1–7. Lanard earlier had refused to consent to an extension of the case management deadlines under the rationale that the deadlines were "adequate and in fact generous." D141-3 at 5. Lanard called the defendants' production of documents on the eve of the amendment deadline "gamesmanship" even though Lanard had possessed pertinent documents earlier and itself had suggested picking up the documents at that time. D253 at 9, 14. And Lanard asserted without a sound basis that Ja-Ru's conduct effectively acknowledged liability for any infringement by Ja-Ru (HK) Ltd. *See* D160 at 4.

---

by the defendants on March 27), SD358/D487 (deposition of Angel Lee by the defendants on March 29); SD363/ SD494 (deposition of Marc Selevan by Lanard on March 30).

> In his declaration opposing the motion for a fee award, Lanard's counsel states:

> > In connection [with the motion to transfer venue, Ja-Ru represented that its] employees and witnesses, including key employees of its Hong Kong-based subsidiary … would be readily available for discovery in Jacksonville, Florida, and this purportedly was a reason in support of transfer. When, however, the case was so transferred and Lanard subsequently requested these employees for deposition in Florida, Ja-Ru reneged on its prior agreement and representations, rejected Lanard's request, and required these witnesses be deposed in Hong Kong at much greater expense.

D523-1 ¶ 3. These statements are disregarded because they lack record citations and sufficient detail—important considering that "readily" appears nowhere in the transfer briefing, *see* D69, D83, D89, the original court did not use the asserted representation as a reason for the transfer, *see* D92, and some depositions may have had to occur in Hong Kong anyway, *see* SD355/D488 (deposition of James Hesterberg by the defendants in Hong Kong); SD358/D487 (deposition of Angel Lee by the defendants in Hong Kong).

The undersigned denied the motion, concluding that Lanard had failed to act diligently and showed no good cause. D253. Lanard objected. D257. The Court (the district judge) overruled the objections, finding no error, much less clear error. D291.

c.    Discovery Conduct

In eight years of serving as a magistrate judge, the undersigned cannot recall litigation that spawned more discovery disputes than this litigation. At a telephone conference, this Court (the district judge) observed that the parties "are certainly spending a lot of time with the magistrate judge on discovery issues. I'm not sure a week goes by—I'm not sure two days go by where I don't see some filing in this case, which is kind of unusual." D263 (rough transcript).

A conference shortly after the transfer from the District of New Jersey portended later disputes. At that conference, the parties disputed the number of depositions, the length of the depositions, and the place of the depositions. D135 at 5, 25. They disputed the wording of a protective order. D135 at 27, 34. And they requested a procedure to enforce informal discovery agreements, with each side claiming the other side had reneged on one. D135 at 27, 34, 40. The defendants complained that Lanard had unilaterally scheduled seventeen depositions; Lanard explained that it had not intended to move forward with the depositions unilaterally but felt it had "no choice but to get the party started" after perceiving from communications with defense counsel that the defendants were unwilling to start the robust discovery Lanard wanted. D135 at 14–18. One lawyer surmised: "[T]he two sides are talking past each other. We've had, I don't know, six e-mails a day trying to confer on those initial disclosures issues. And we've just not gotten any traction. So there's definitely

a communication issue here." D135 at 40. Disputes followed. Some resolved in Lanard's favor; some resolved in the defendants' favor.[37]

The undersigned described an argument Lanard made during discovery as seeming "nonsensical." *See* D163 at 11 (quoted). TRU had asked Lanard to describe all facts that support or relate to Lanard's allegation in paragraph 51 of its pleading. D138 at 53–54. In paragraph 51, Lanard alleged, "As a result of the likelihood of confusion that now exists in the marketplace, Lanard has suffered damages to its goodwill and reputation and has lost sales of its products." D103 ¶ 51. Lanard objected, contending the facts are already in paragraph 51 and TRU "does not request [Lanard] to identify any evidence supporting those facts (which in itself makes no sense, 'facts supporting facts') but, rather, just those facts, which are alleged in Paragraph 51. As such, Plaintiff's objection is sound. Plaintiff cannot be held to account if Defendants wrote a nonsensical interrogatory, nor is there any obvious reinterpretation of it." D147 at 9–10. The undersigned stated, "The latter contention, not the interrogatory, seems nonsensical," observing that TRU "plainly seeks evidence of the claimed damages to Lanard's goodwill and reputation and lost product

---

[37]*See* D138, D163 (the defendants' motion to compel; mixed success); D140, D153 (the defendants' motion for a protective order; mixed success); D141, D163 (Lanard's motion to compel; mixed success); D145, D153 (Lanard's motion to compel; mixed success); D159, D248 (Lanard's motion challenging Ja-Ru's designation of its customer list as highly confidential—attorney's eyes only; denied); D197, D202 (TRU's motion to compel; mixed success); D211, D229 (Lanard's motion to determine the number of depositions; mixed success); D228, D264 (Lanard's motion for a protective order; denied); D230, D264 (Lanard's motion to modify the protective order; denied); D268, D292 (Lanard's motion to file a document under seal; denied); D288, D373 (Lanard's motion to compel; mixed success); D374, D441 (Lanard's motion to maintain confidentiality; denied without prejudice); D375, D441 (the defendants' motion to maintain information under seal; granted); D465, D467 (Lanard's motion to maintain documents under seal; mixed success). At the parties' request, the undersigned also conducted a conference to discuss anticipated issues during the Hong Kong depositions. D232, D237.

sales resulting from the alleged confusion" and that "Lanard cannot recover those claimed damages without evidence." D163 at 11.

d.   Declaration About When Lanard Stamped the Full Patent Number

The defendants possess samples of the Lanard Chalk Pencil bought by their counsel after Lanard sued, and the samples have a stamp showing a November 2013 manufacture date but no stamp showing the full patent number. D518 at 21–22 & n.26; D518-9.

During the discovery period, Lanard failed to provide information—and failed to prepare its corporate representative to answer deposition questions—about when Lanard had begun stamping the Lanard Chalk Pencil with the full patent number. D316/SD319 at 17–18; D355 at 114–16, 121–22; D518 at 21. In opposition to the defendants' motion for summary judgment, Lanard filed a declaration of its corporate representative, who stated, "Following the USPTO's issuance of the '167 Patent, Lanard stamped the full patent number into the plastic on all models of the Chalk Pencil." D321-3 ¶ 17.

In the order granting summary judgment for the defendants, this Court explained that Lanard had been stamping a copyright notice into the plastic of the Lanard Chalk Pencil since 2010 but, for the patent, said only, in accordance with the declaration, "Following the issuance of the D#167 Patent, Lanard stamped the full patent number into the plastic on all models of the Chalk Pencil." D468 at 6, 7.

Marking or when a defendant has actual notice of a patent affects damages,[38] but this Court never had to reach the issue of when the defendants had possessed actual notice of the patent.

e.    Defendants' Motion to Disqualify Lanard's Lawyers

TRU moved to disqualify Lanard's lawyers after discovering other lawyers with their firm had begun representing TRU as local counsel in another action in California. D176. In response to the motion, Lanard's lead counsel represented that the lawyers with his firm, in representing TRU in the California action, had served as a mere "local mail drop for a single pleading" as part of a "mechanical process." D176-1 at 22, 25. But the lawyers with his firm had performed additional work; they had edited a draft answer and had prepared a memorandum. D202 at 17 n.11. The particular work the lawyers had performed for TRU was important to the merits of the motion to disqualify. *See generally* D202. The undersigned found lead counsel's representations inattentive at best, intentionally misleading at worst. D202 at 17 n.11.

Still, the undersigned denied the motion, concluding Lanard's lawyers "plainly violated" a Florida Bar rule but declining to disqualify the lawyers after balancing interests and applying the law that disqualification is a harsh sanction that must be used sparingly. D202. At a later status conference, this Court (the district judge) observed that "while there ultimately was no conflict, it was not an insubstantial question." D417 at 5.

---

[38]*See Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1537 (Fed. Cir. 1993) ("We construe [35 U.S.C. § 287(a)] to preclude recovery of damages only for infringement for any time prior to compliance with the marking or actual notice requirements of the statute. [A] delay between issuance of the patent and compliance with the marking provisions of section 287(a) will not prevent recovery of damages after the date that marking has begun.").

In denying the motion, the undersigned observed, "The conflict itself was not too dismaying given the regrettable but understandable human error that caused it to be missed at the outset. But the handling of it [by Lanard's lead counsel] was, making an otherwise easy decision on the disqualification motion harder and leaving one to wonder who TRU's local 'advocate and champion' was in the California case after the conflict alert but before court-approved withdrawal." D202 at 17–18.

f.   <u>Defendants' Motion for Sanctions</u>

The defendants moved for sanctions against Lanard for (1) repeatedly violating a stipulated protective order by disclosing competitive cost, price, and customer information and (2) the "cavalier and arrogant" way in which Lanard's lead counsel responded to their concerns. D406. In emails to the defendants' counsel responding to concerns about the violations, Lanard's lead counsel had written: "Are you joking? THAT'S the basis of your motion? Stop wasting my time with your nonsense"; "It is emphatically not your responsibility to shepherd or bird-dog us"; "Stop wasting everyone's time and trying to delay"; "I consider this not only to be a minor matter but a non-matter"; "Another non-issue and you trying to spin gold from straw"; "I decline to respond to your latest witchhunt or attempt to fabricate issues and manufacture disputes"; "Not interested in making this an issue … it's not—nor in responding further to what likely will be your next 20 emails on this manufactured dispute"; "There is nothing to discuss. This is simply another phony issue manufactured by you"; "This is yet another manufactured issue and crackpot theory of [defendants' counsel], and we will not waste further time on it"; "There has been no 'breach.' You're making this up and fabricating another issue. At some point, … you might actually want to spend some time

on the merits. Despite your best efforts, this case will be tried"; "Don't be ridiculous." D406-1; D406-3; D406-4.

The undersigned denied the motion, concluding that the defendants showed "carelessness (or maybe even professional incompetence) resulting from many documents, many markings under the protective order, different lawyers practicing in different states in different cases (this case and the bankruptcy case), and an apparent absence of protocol effective against improper disclosures" but failed to show "the subjective bad faith or egregious conduct required for the Court to take the unusual step of exercising inherent authority to sanction the lawyers" or dismiss the action with prejudice. D442 at 4. Responding to the defendants' complaint about the way in which Lanard's lead counsel responded to their concerns about the violations of the protective order, the undersigned stated:

> [Lanard's lead counsel] is not a member of the Court's bar but has been permitted to specially appear to represent Lanard here. His reaction to other concerns expressed by the defendants' counsel was a topic in the order on the defendants' disqualification motion. *See* [D202] at 16–17. After he sent a particular email concerning another matter ("Please stop harassing me with this endless stream of unnecessary and indeed useless emails as you get brain waves during the course of the day.") he was gently reminded of the expectation that he embrace a spirit of cooperation and civility while practicing here. D264 at 1 n.*. The reminder, less gentle now, is repeated.

D442 at 2 n.1.

g.    Damages Available Had Lanard Prevailed

The sides possessed (and continue to possess) starkly contrasting views about damages available had Lanard prevailed, and those views predominated

most disputes, including the present one. The Court never decided any damages issue.[39]

For a successful copyright infringement claim, the claimant may elect either "actual damages and any additional profits of the infringer" or "statutory damages." 17 U.S.C. § 504(a). For actual damages and additional profits, the claimant may "recover the actual damages suffered … as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." *Id.* § 504(b). For statutory damages, the claimant may receive "a sum of not less than $750 or more than $30,000 as the court considers just." *Id.* § 504(c)(1). But if the claimant "sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." *Id.* § 504(c)(2).

For a successful patent infringement claim, a court "shall" award the claimant "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. The court can increase damages "up to three times the amount found or assessed," *id.*, but enhanced damages "are generally reserved for egregious cases of culpable behavior," *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016).

---

[39]The respective positions on damages are expressed in many papers, including the defendants' *Daubert* motion to exclude the testimony of Lanard's damages expert (William Kerr) and Lanard's response in opposition, *see* D316/SD319, D335/SD379; the defendants' motion for summary judgment and Lanard's response in opposition, *see* D302/SD324 at 33–35; D322/SD327 at 24–25; and various motions in limine and responses in opposition, D421, D438, D451, D455.

For a successful trade dress infringement claim, the claimant "shall be entitled" to recover the "defendant's profits" and "any damages sustained by the plaintiff." 15 U.S.C. § 1117(a). "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." *Id.* "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." *Id.* "Such sum in either of the above circumstances shall constitute compensation and not a penalty." *Id.*

For a successful FDUTPA claim, the plaintiff "may recover actual damages." Fla. Stat. § 501.211(2). Punitive damages are unavailable under FDUTPA. *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 3d DCA 1984); *accord Crmsuite Corp. v. Gen. Motors Co.*, No. 8:20-cv-762-WFJ-AAS, 2020 WL 5898970, at *4 (M.D. Fla. Oct. 5, 2020). But they may be available under Florida common law for "egregious and sufficiently reprehensible" conduct rising "to the level of truly culpable behavior deserving of punishment." *See Bistline v. Rogers*, 215 So. 3d 607, 609–10 (Fla. 4th DCA 2017) (explaining the showing required for punitive damages for business torts); Fla. Stat. § 768.72 ("A defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence.").

Lanard consistently took the position that high dollars were at stake, emphasizing that it had sold more than 1.4 million Lanard Chalk Pencils for nearly $2.9 million in sales and arguing primarily based on statutory language that it could recover $150,000 from each of the three defendants for willful

copyright infringement, treble damages for intentional patent and trade dress infringement, the value of its lost long-term relationships with TRU and Dolgencorp, and attorney's fees. *See, e.g.* D135 at 14; D322/SD327 at 6; D518-2 at 8. The defendants consistently pressed the seeming insignificance of the product (a cheap toy), the relatively paltry amount of their total gross profits from sales of the accused product (less than $90,000), and their cessation of sales of the accused product.[40] *See, e.g.*, D316-1/SD319-1 at 17; D518 at 2.

The disconnect on damages primarily centered on two issues. The first issue was whether the defendants were serial infringers. Lanard asserted it possessed evidence of prior bad acts showing willfulness and supporting treble damages, pointing to prior infringement litigation against the defendants; cease and desist letters to Ja-Ru; allegations of Ja-Ru's infringement of Lanard's "power toss product"; and allegations of Dolgencorp's infringement of Lanard's "Funsplashers water toys," "power toss product," and "Soaker Slammer" toys. *See* D427 at 4–7. The defendants countered that the evidence consisted of nothing more than unproven allegations with no probative value. D427 at 7–10. The defendants described Lanard's position as a "great irony," contending Lanard's "business is founded on 'knock off' toys, including 'knock off' versions of the 'My Little Pony' and 'GI Joe' lines," is known as a "knock off" company, and has been sued—and on the losing end—more than any defendant here. D427 at 3 n.2.

The second issue was whether Lanard could recover monies it had lost because TRU and Dolgencorp ceased buying toys from Lanard after Lanard

---

[40]Lanard filed the lawsuit in March 2014. D1. Ja-Ru sold the accused product in 2013, 2014, and 2015. D302/SD324 at 9. TRU sold the accused product in 2014 and only four units in 2015. D302-28 at 11. Dolgencorp sold the accused product in 2014. D302-29 at 11.

sued them. Lanard argued that the defendants' infringement caused the losses and, therefore, Lanard could recover the losses as damages. *See* D322/SD327 at 24–25; D335/SD379 at 5–8; D455 at 8–13. According to Lanard, "The accused conduct in this case includes the wrongful termination of Lanard as a vendor by … Dolgencorp and TRU in retaliation for asserting its intellectual property rights; these historic and substantial sales relationships were destroyed as a direct result of … Ja-Ru's conduct." D523 at 7. The defendants countered that Lanard could show no causal connection between the alleged infringement and the lost sales of unrelated products and that TRU and Dolgencorp, as consumers, had no obligation to continue buying goods from Lanard, especially because Lanard sued them. D302/SD324 at 33–35; D316/SD319 at 8–10; D438 at 5–17. They also disputed that TRU and Dolgencorp ceased buying toys from Lanard because of this lawsuit, pointing to evidence supporting other valid reasons (for example, that Lanard is difficult to deal with and had sued Dolgencorp before). *See* D316/SD319 at 14–16. Neither side cited statutory law or caselaw definitively showing that one side was right and the other side was wrong.

Lanard's damages expert, William Kerr, provided opinions about three areas of damages: (1) lost profits from lost sales when TRU and Dolgencorp ceased buying toys from Lanard; (2) lost profits from lost sales of the Lanard Chalk Pencil to TRU and Dolgencorp; and (3) the defendants' profits from their sales of the accused product. D316-1/SD319-1. He provided no opinion about damages for copyright infringement. D316-1/SD319-1 at 3 n.1. For the first area, he assumed that TRU and Dolgencorp had ceased buying toys from Lanard improperly and, using Lanard's three-year sales average from 2011 to 2013, opined that Lanard lost profits of $301,495 from TRU and $1,226,285 from Dolgencorp, for a total of $1,527,780, between 2014 and 2016. D316-

1/SD319-1 ¶¶ 33, 40. For the second area, he opined that Lanard lost profits of $22,596 from TRU and $90,353 from Dolgencorp, totaling $112,949. D316-1/SD319-1 ¶¶ 44–45. For the third area, he opined that TRU's profits were $14,076; Dolgencorp's profits were $20,493; and Ja-Ru's profits, including profits of Ja-Ru and non-party Ja-Ru (HK) Ltd., were $53,576. D316-1/SD319-1 ¶¶ 47–50.

The defendants' rebuttal expert, Michael Mard, provided no figures of his own but identified problems with Kerr's opinions. *See generally* D312-2/SD376-2. Mard opined Kerr failed to attribute any damages to specific claims, failed to consider the date that the Lanard Chalk Pencil had been patented, used the wrong profit margins based on Lanard's historic sales generally instead of Lanard's historic sales with TRU and Dolgencorp specifically, failed to explain if the lost profits for business include the Lanard Chalk Pencil lost profits, failed to identify the article of manufacture and apportion damages instead of claiming damages for the whole pencil, and erroneously included damages attributable to non-party Ja-Ru (HK) Ltd. D312-2/SD376-2 at 4–8.

Kerr replied that his profit margins were accurate (but he offered an alternative figure of $1,280,066 based on historic sales to only TRU and Dolgencorp); he had apportioned damages; he had included sales of the Lanard Chalk Pencil in the larger lost profits figure; he had not used use the wrong timeframe because he calculated future lost profits; the product cannot be separated into components to otherwise apportion damages; and whether non-party Ja-Ru (HK) Ltd. can be included is a legal conclusion, but Ja-Ru had sold the accused product from both entities. D316-3/SD319-3 ¶¶ 12–20. He added that if the court considers damages beyond 2016, any lost profit damages would

be $566,536 annually; and for any prejudgment interest, the appropriate rate is the contemporaneous average prime rate. D316-3/SD319-3 ¶¶ 25–26.

h.   _Daubert_ Motions

Lanard moved to exclude the testimony of the defendants' patent and copyright expert (Ronald Kemnitzer), damages expert (Michael Mard), and design expert (Deborah Ryan). D310, D312/SD376, D313. Lanard argued Kemnitzer based his analysis on "result-oriented assumptions," misapplied the law (including the "ordinary observer" and the "designer of ordinary skill" standards), opined on ultimate issues of law and fact, relied on misleading facts and unsubstantiated evidence (such as the alleged prior art he used), and offered opinions outside the scope of Lanard's patent. D310 at 10–25. Lanard also asked the Court to strike Kemnitzer's supplemental report as untimely. D310 at 9–10. Lanard argued Mard misapplied the law, relied on false and misleading facts, and offered legal opinions. D312/SD376 at 6–11. Lanard argued Ryan was unqualified; offered unsupported, result-oriented, and conclusory opinions (such as her opinions on consumer perceptions of the Lanard Chalk Pencil and the accused product); and opined on matters within the understanding of the average lay person. D313 at 7–19.

The defendants moved to exclude the testimony of Lanard's patent and copyright experts (Robert Anders and Parker Bagley), industry expert (Larry Myer), and damages expert (William Kerr). D309, D314, D316/SD319. The defendants argued Anders "cherry-picked" evidence, opined on ultimate issues, misapplied the law (including improperly relying on the function of the patented design), used faulty methodology, and provided legal opinions that could confuse the jury. D314 at 3–14. The defendants argued Bagley, a lawyer, lacked the requisite experience and offered only legal conclusions. D309 at 7–

10. The defendants argued Myer was unqualified and partisan as a former Lanard executive and a friend of Lanard's managing director; his opinions were conclusory, speculative, unsupported, and in part irrelevant; and he relied on information disclosed in violation of the stipulated protective order. D315 at 10–20. The defendants also asked the Court to strike portions of Myer's rebuttal report because they contained opinions outside the scope of rebuttal. D315 at 20–22. The defendants argued Kerr's testimony should be excluded because lost profits for unrelated products based on ended relationships with TRU and Dolgencorp are not permitted and not based on the facts of the case, any estimate of lost future profits for unrelated products is speculative because it does not consider actual profit margins for TRU and Dolgencorp and does not consider the life cycle of a toy, his calculations are speculative because no evidence supports when the Lanard Chalk Pencil was stamped with the full patent number, profits from non-party Ja-Ru (HK) Ltd. are improper, and he fails to apportion any damages beyond the "article of manufacture" for the design patent. D316/SD319 at 8–20.

The Court ruled only on the motions affecting the motions for summary judgment, granting in part and denying in part Lanard's motion to exclude the opinions of the defendants' patent and copyright expert (Kemnitzer) and granting in part and denying in part as moot the defendants' motion to exclude the opinions of one of Lanard's patent and copyright experts (Anders). D468 at 15–23, 74. The motions were granted to the extent that the experts' opinions on the ultimate issues of copyright and patent infringement were excluded as unhelpful to a factfinder. D468 at 17-18. While denying as moot the rest of the defendants' motion to exclude Anders's opinions, the Court observed that his opinions on similarity were "based on nothing more than his own *ipse dixit*" and thus failed to meet the *Daubert* standard. D468 at 62 n.26.

In ruling on Lanard's motion to exclude Kemnitzer's opinions, the Court rejected one of Lanard's arguments as unsupported, without merit, and bordering on absurd:

> Lanard moves to exclude Kemnitzer's opinions in their entirety because, according to Lanard, defense counsel directed Kemnitzer to render "a 'non-infringement opinion.'" Lanard's argument in this regard is unsupported and without merit. The relevant deposition testimony in proper context is as follows:
>
> > Q: When you were retained in this case, were you told what opinions they wanted from you?
> >
> > A: Whenever I am engaged, I am asked to opine on a subject of their discretion. And oftentimes, there are more than one patents involved, utility patents, trademark, and not always asked to do everything, seldom, in fact.
> >
> > Q: So you were asked to give and render a non-infringement opinion?
> >
> > A: Yeah.
>
> The inartful wording of the question notwithstanding, Kemnitzer was plainly speaking to the subjects on which he was hired to opine, and not suggesting that he was directed to reach a particular result. Notably, Lanard's own expert acknowledged during his deposition that he was retained to "rebut" Kemnitzer's opinions and "opine on validity and infringement of design patent that's been asserted as well as opine on infringement of a registered copyright." Presumably, Lanard does not believe that this testimony is likewise evidence of improper "result-oriented logic" warranting Anders' exclusion as well. While zealous advocacy has its place, under these circumstances, Lanard's argument regarding [Kemnitzer] borders on absurd.

D468 at 22 n.9.

i.   Parties' Motions in Limine

Lanard filed seven motions in limine.[41] The defendants filed twenty motions in limine.[42] Upon entry of summary judgment, the Court terminated all motions in limine. D468 at 75. Whether the number of motions in limine alone reflects unreasonableness on the movant or the non-movant is unclear without analyzing each motion and each response.

j.   Cost of the Litigation

Nine lawyers with two law firms appeared for Lanard. Nine lawyers with three law firms appeared for the defendants (including a new lawyer for the appeal). Lanard propounded 84 interrogatories and 183 document requests. D523-1 ¶ 4. The defendants propounded 53 interrogatories and 170 document

---

[41]*See* D428 (to prohibit evidence or mention of Ja-Ru's community involvement); D429 (to prohibit evidence or mention of Ja-Ru's financial information pertaining to sales of the accused product); D430 (to prohibit referring to the Lanard Chalk Pencil as an actual no. 2 pencil); D431 (to prohibit evidence or mention of Lanard's alleged infringement of the accused product); D434 (to prohibit evidence or mention of Lanard's alleged infringement of intellectual property of non-parties); D435 (to prohibit evidence or mention of Dolgencorp's receipt of clearance from legal counsel); D436 (to prohibit evidence or mention of Lanard's Phthalates Test failure).

[42]*See* D421 (to prohibit evidence or mention of TRU's bankruptcy, injunctive relief sought by Lanard, and any alleged intentional or willful misconduct); D422 (to prohibit evidence or mention of a stipulated settlement between Lanard and TRU in the bankruptcy action); D423 (to prohibit evidence or mention of secondary meaning); D424 (to prohibit evidence or mention of patent marking as notice to the defendants); D425 (to prohibit evidence or mention of license agreements with retailer defendants and licensee estoppel); D426 (to prohibit evidence or mention of indemnification); D427 (to prohibit evidence or mention of alleged claims of prior misconduct); D437 (to prohibit evidence or mention of insurance, expert reports, and asserted trade dress protection for packaging; all unopposed); D438 (to prohibit evidence or mention of historic sales by Lanard to TRU and Dolgencorp of unrelated products, related lost sales, and damages under FDUTPA); D439 (to prohibit any suggestion that non-party Ja-Ru (HK) Ltd. was formed for an improper purpose); D440 (to prohibit evidence or mention of summary judgment rulings, pre-trial misconduct, personal knowledge possessed by Lanard's counsel, attorney's fees and litigation costs, the causes of TRU's bankruptcy, evidence not properly disclosed during discovery, and the actual no. 2 pencils Lanard's designers used or consulted).

requests D523-1 ¶ 4. Lanard listed 133 trial exhibits. D518 at 3. The defendants listed 122 trial exhibits. D523-12. Lanard, with the burden of proving its claims, designated four expert witnesses (two affirmative and two rebuttal). D523 at 12; D523-1 ¶ 7. The defendants, with the burden of proving their counterclaims, designated three expert witnesses (two affirmative and one rebuttal). D523 at 12; D523-1 ¶ 7.

According to Lanard, the defendants' main witnesses could not recall many facts during their depositions, forcing Lanard to have to conduct additional discovery. D523-1 ¶ 6. The undersigned ultimately had to decide how many depositions Lanard could take. D229. According to the defendants, Lanard planned to call twenty witnesses—including four experts—and demanded that Ja-Ru present a Hong Kong witness from non-party Ja-Ru (HK) Ltd. under threat of seeking an adverse inference instruction. D518 at 3.

Lanard paid nearly $1.9 million in attorney's fees and costs. D523-1 ¶ 12. The defendants, through Ja-Ru's insurer,[43] paid at least $2.6 million in attorney's fees and costs. D477 at 20; D518 at 1–2 & nn.1–2.

k.    Years Taken to Resolve the Merits of the Claims

The years taken to resolve the merits of the claims resulted from many factors, including crowded dockets in three federal courts.

---

[43]Under Florida law, "any insurer who pays any taxable costs or attorney's fees which would be recoverable by the insured but for the fact that such costs or fees were paid by the insurer shall be considered a party for the purpose of recovering such fees or costs." Fla. Stat. § 627.4136(2). Except in arguing about reasonable rates, Lanard takes no issue with the fact that an insurer paid the defendants' fees. *See generally* D523.

The case was in the District of New Jersey from March 2014 until June 2015, with most of the litigation over Lanard's motion for a preliminary injunction and the defendants' motion to transfer. *See generally* D1–D93. The case was twice stayed in this Court, from March to December 2016 to decide the defendants' motion to disqualify counsel, D167, D202, and from November 2017 to April 2018 because of TRU's bankruptcy, D391, D394. After the second stay was lifted, the motions for summary judgment were pending until March 2019. D394, D468. The case was with the Federal Circuit from April 2019 to June 2020. D469, D502. The parties' attempts to resolve the issues of fees and costs, their preparation and submission of updated briefing, and the undersigned's consideration of the issues brought the case to now, August 2021. Along the way, the parties requested only modest extensions of time.[44]

l.    Parties' Settlement Attempts[45]

Lanard's counsel states in a declaration:

---

[44]Lanard filed two motions for modest extensions of time. D45, D50 (seventeen more days to oppose the motions to dismiss and transfer); D204 (seven more days to comply with an order). The defendants filed five motions for modest extensions of time. D10 (fourteen more days to respond to the motion for a preliminary injunction); D14, D15 (ten more days to respond to the original complaint); D170 (ten days after a ruling on a pending motion to file the motion to disqualify Lanard's lawyers); D243 (seven more days to respond to a motion to compel); D247 (fourteen more days to respond to the same motion to compel). The parties filed a joint motion to extend the deadline to take expert depositions by fourteen days and adjust related deadlines accordingly. D274.

[45]Under the Federal Rules of Evidence, the following evidence is inadmissible "to prove or disprove the validity or amount of a disputed claim": (1) "furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim"; and (2) "conduct or a statement made during compromise negotiations about the claim[.]" Fed. R. Evid. 408(a). But a "court may admit this evidence for another purpose"; for example, to prove "bias or prejudice" or to negate a "contention of undue delay." Fed. R. Evid. 408(b).

Both sides ask the Court to consider information about resolution attempts. The defendants explain they "have not, and will not unless ordered, disclose any content from any

> Before this litigation began, Lanard approached each of the named
> defendants and sought to resolve the infringement disputes short of
> legal action. … Defendants Dollar General and Toys-R-Us each simply
> dismissed Lanard's stated concerns. Attached as Exhibit 5 is a true and
> correct copy of pre-suit discussions between Lanard and Dollar General.
> Defendant Ja-Ru, through its principal Russ Selevan, dropped by
> Lanard while on a visit to Ja-Ru's facilities in Hong Kong, boasted to the
> Managing Director of Lanard that he had "never gone to trial," and
> instead suggested the matter be settled through a charitable donation.
> None of these were serious or meaningful responses, and amounted to a
> response to Lanard, effectively, to "pound sand."

D523-1 ¶ 11. Exhibit 5 referenced in the declaration is an email string in which someone with Lanard complains about the "clone" chalk pencil and threatens, "Redress against the perpetrator of the counterfeiting and those who deal in the distribution of the infringing product will unfold quickly and to the full extent of the law available to us," and someone with Dolgencorp responds, "Let's talk about this one." D523-6.

Roughly twenty months into the litigation, in November 2015, Lanard offered to settle the entire action for $1.5 million; or to settle the claims against TRU and Dolgencorp for $500,000 each; or to settle the claims against Ja-Ru for $1 million. D518-2 at 8. A few months later, in January 2016, TRU and Dolgencorp each made an offer of judgment for $20,000 and a permanent injunction prohibiting the purchase or sale of the accused product. D518-1.

The following year, in August 2017, court-ordered mediation resulted in impasse. D328. The next month, in September 2017, Lanard offered to settle only non-intentional tort claims for the $1 million limit of Ja-Ru's insurance

---

of the mediation conferences." D518 at 4 n.5. Neither side contends the Court should disregard any information provided. *See generally* D518, D523.

policy. D518-2 at 3–4. Lanard's counsel informed the insurer the case likely involved punitive damages in the $10 to $20 million range. D518-2 at 5.

The next year, in January 2018, TRU's counsel wrote Lanard's counsel to convey his belief that the claims against TRU should settle because TRU was not involved in the decision to make the accused product; TRU lacked knowledge of Lanard's intellectual property rights before Lanard sued; at the time TRU took delivery of the accused product, the patent had not issued; Lanard unilaterally refused future orders from TRU; total gross profits of TRU on sales of the accused product were less than $15,000; TRU bought no accused products after notice of Lanard's claim; the realistic maximum potential award of damages against TRU would be far less than legal fees to continue the claims against TRU; and Lanard would be an unsecured creditor in the bankruptcy case. D518-2 at 6–7.

The next year, in April 2019, having prevailed at summary judgment, the defendants offered to settle for $1.46 million to them, which was the approximate amount Lanard had paid its lawyers by that time. D518-3 at 3–4. In an email to Lanard's counsel, the defendants' counsel wrote:

> My clients attempted to settle this case from almost the day they were sued and all settlement offers made by your client were unrealistic, based entirely on a novel legal theory that no Court (or even your damages expert) ever accepted. I appreciate that it is difficult for your client to accept paying the Defendants money after rejecting a settlement offer from the Defendants of hundreds of thousands of dollars. However, continuing the lawsuit will only cost your client substantially more in the long run.

D518-3 at 4.

After the case returned from the Federal Circuit, this Court directed the parties to confer to resolve the motions for attorney's fees and costs; notify the

Court of the status of conferral efforts; and if disputes remained unresolved, include in the notification the name of a mediator. D503.

Emails between counsel followed. D518-4. Lanard offered to pay $25,000 in costs and $100,000 to Catholic Charities.[46] D510 at 2 n.2; D518-4 at 17, 21. The defendants rejected the offer as nowhere "close to seven figures" and asked Lanard to remove the charity condition because the insurer wanted to recoup some of what it had paid. D518-4 at 17, 19.

The defendants' counsel tried to get Lanard's lead counsel to discuss an agreement on reasonable rates and hours, but Lanard's lead counsel refused to "piecemeal" the dispute in favor of discussing all issues at mediation. D518-4 at 12–13, 17–18. He wrote:

> We also decline to separate what you call the issues of reasonableness and entitlement, because doubtless you would then argue that agreement on the former raises an inference of the latter, and it does not. They are a holistic whole. To be clear, we believe there is no entitlement to fees and therefore the reasonable rate is zero.

D518-4 at 6.

Lanard's lead counsel tried to get "original, unedited, and unredacted bills" and evidence of payment of the bills. D511 at 1. The defendants' counsel

---

[46]Ja-Ru is a family-owned and privately held business. D316-1/SD319-1 at 9. In its motion in limine to prohibit evidence or mention of Ja-Ru's community involvement, Lanard explained that during the deposition of Russell Selevan (Ja-Ru's vice president), Selevan referenced his involvement with a Jacksonville synagogue. D428 at 1–2. In their response to the motion in limine, the defendants clarified that Selevan, answering a question about how Ja-Ru addresses infringement of Ja-Ru products, suggested resolving the issue by donating to the synagogue. D449 at 2. To the extent that Lanard's lead counsel was being snarky in suggesting a donation to Catholic Charities because of Selevan's involvement with a synagogue, that is another example of his less than professional conduct. The defendants do not raise any possible inappropriateness in this regard as a basis for a fee award. *See generally* D518. The Court therefore need not consider it.

represented that all fees requested had been paid and persisted that the billing records provided—with redactions of privileged and protected information and of descriptions of work for which the defendants were not seeking fees—sufficed. D518-4 at 2–11. The communications devolved. *See, e.g.,* D518-4 at 9 (Lanard's lead counsel: "I will respond to your questions after you respond to mine. Avoiding questions by asking your own is another well-known Lewis Anten tactic, whom you are clearly channeling"). Ultimately, the defendants filed a straightforward status report, D508, Lanard filed an argumentative status report, D509, the defendants filed a response to that status report, D510, and Lanard filed a reply to that response, D511. Court-ordered mediation in October 2020 resulted in impasse. D514.

m.   <u>Incivility Exhibited by Lanard's Lead Counsel</u>

As stated, the undersigned twice admonished Lanard's lead counsel for lack of civility and professionalism. Early emails from him to the defendants' counsel included:

> I do not require instruction from you, Mr. Page, or your feigned sense of phony condescension which, believe me, wears thin in a hurry. All we've gotten from you so far is obstruction and a desire to avoid the merits. I'll be glad to talk with you when you show some courtesy and cooperation on your own part. Until then, spare me your pious and self-serving cant, and stick to your knitting as local counsel.

D518-6 at 2. They further included, "Nor, by the way, is it your place to talk about 'misconduct' or lack of 'respect.' Who the hell are you?" 518-6 at 2. The admonishments are described above in discussing the defendants' motion for sanctions for Lanard's violations of the protective order. *See* D442 at 2 n.1.

Yet emails about the current dispute over attorney's fees and costs show Lanard's lead counsel's behavior continued to be less than civil. In one email

to opposing counsel, he analogizes communications from the defendants'
counsel to "The Big Lie," writing:

> No matter how many times you accuse us of not negotiating in good
> faith, or mischaracterize our position, it does not make it so. Joseph
> Stalin pioneered that approach under the rubric, "The Big Lie"—say it
> and repeat it in hopes that people will believe it [b]ut it remains a lie.
> The fact remains that all you are doing is name-calling rather than
> respond in good faith to our substantive points.

D518-4 at 3.[47]

> Lanard's lawyer now apologizes:

> I will be the first to concede that many of my exchanges with defense
> counsel, as this litigation proceeded in this manner, were less than civil,
> and that I should have used more constrained language and instead
> "vented" privately. For this, I apologize to the Court and to defense
> counsel. I can only plead extreme frustration in having to deal with this
> kind of defense, which I have seldom seen in my experience, and which
> I viewed as facilitating the Defendants' immoral acts of piracy.

D523-1 ¶ 10. This apology comes with additional qualifiers: his emails are
"taken out of context" and are "symptomatic of simmering frustration at delay
and a years-long campaign by [the defendants] to engage in tit-for-tat discovery
disputes, chase down every last point regardless of relevance or importance,
and be as obstructive as possible." D523 at 29.

---

[47]In the motion for a fee award, the defendants contend, "The dispute that led to the
'Big Lie' reference was whether Lanard had made an offer to reimburse any fees to the
Defendants—which they had not at that time—or were otherwise willing to respond to the
current offers to negotiate on rate and reasonableness issues—which they were not at that
time." Doc. 518 at 5. Emails before "The Big Lie" reference indicate Lanard had offered to
settle the fee issue. *See generally* D518-4.

### C.    *Arguments*

The defendants argue the *Fogerty* factors for the federal claims and the similar state factors for the FDUTPA claim favor their side. Lanard argues the opposite.

### 1.    *Defendants' Arguments*

The defendants generally argue that Lanard brought a pennyante lawsuit with dubious liability and damages claims and litigated it to the hilt not to protect its intellectual property rights but to "wage a vendetta" against Ja-Ru and send a message to the toy industry that "if you dare to 'copy' a Lanard product, this is what you will face." D518 at 6–7. Flummoxed over why a toy manufacturer would sue two of its large retail customers, the defendants posit that Lanard sued TRU and Dolgencorp "to create tension between Ja-Ru and its customers and give Lanard leverage to coerce the retailers to buy more of its products going forward," D518 at 7, pointing to Lanard's previous settlement with Dolgencorp under which Dolgencorp agreed to buy toys from Lanard. D518 at 7 (citing D302-49 ¶ 5). According to the defendants,

> Because of this approach, [Lanard] aggressively pursued claims that had questionable or no merit, filed initially in a distant forum and sought a needless preliminary injunction, fought transfer of the action, sought discovery disproportionate to the needs of the case, manufactured frivolous and unsupported damage claims of "millions" of dollars, made baseless "serial infringer" accusations to advance treble and exemplary damage claims, claimed an expectation of a $10–$20 million punitive damage award when Defendants sought to open settlement discussions, fought every issue to the bitter end with a well-documented lack of civility, and generally tried to make defending this matter as expensive and difficult as possible.

D518 at 2–3. The defendants observe the early offers of judgment TRU and Dolgencorp made ($20,000 each) exceeded their profits from sales ($14,076 and

$20,493 before consideration of overhead and indirect expenses) and contend Lanard refused to consider the offers, instead pushing "forward with its claims 'full speed ahead.'" D518 at 3, 4 n.4.

The defendants list reasons they believe Lanard acted unreasonably in the context of the copyright infringement claim, with many reasons pertinent to all claims:

a.   by pursuing frivolous or at least objectively unreasonable claims for over $1.5 million in damages for "unrelated products" without legal support and contrary to traditional causation principles;

b.   by pursuing unsupportable willfulness and "serial infringer" claims without evidentiary or legal support contrary to controlling precedent and claiming such evidence supported an award of $10-$20 million in punitive damages;

c.   by never reasonably discussing settlement and rejecting early offers from TRU and Dolgencorp to pay more than profits and accept adverse injunctions;

d.   by trying to attribute sales of Ja-Ru (HK) to Ja-Ru, even after taking the opposite position while trying to belatedly add Ja-Ru (HK) in the case;

e.   by engaging in vexatious and needlessly adversarial litigation conduct on minor issues;

f.   by attempting to use copyright law to claim ownership of the idea of a pencil-shaped chalk holder without regard to functionality concerns or public domain designs;

g.   by never identifying any "protected expression" to the Copyright Office or in discovery in this matter that it claimed as its own original contribution to its Chalk Pencil design, other than the overall appearance of its product when used [as] a chalk holder, which included both functional elements and public domain elements of all pencils;

h.   by never attempting to meet its burden of proving "actionable copying" – i.e., copying of specific protected expression as opposed

to copying of the idea of a chalk holder shaped like a standard yellow no. 2 pencil;

i.  by challenging any characterization of its "Chalk Pencil" as looking like a "real" or "realistic" pencil despite its own documents showing that was the intent of the product and how it was sold to companies such as Wal-Mart;

j.  by denying the functionality of its product by, inter alia, ignoring its own design documents on that functionality – "we need to be clear to the customer what the purpose and/or function of the chalk pencil is, and that is drawing with chalk";

k.  by contesting whether the chalk holder was a "useful article" in this Court despite clear evidence to the contrary and then admitting that the chalk holder was a "useful article" on appeal given its inherent functionality;

l.  by appealing this Court's opinion that Lanard was trying to copyright the entire useful article itself (which the Federal Circuit upheld);

m.  by persisting on appeal with its copyright claim despite this Court's finding that Plaintiff was essentially seeking to claim rights to the idea of a pencil shaped chalk holder, which the Federal Circuit affirmed, noting that Plaintiff "was essentially seeking to assert protection over any and all expressions of the idea of a pencil-shaped chalk holder"; and

n.  by repeatedly violating the Stipulated Protective Order for Confidential Information and/or Trade Secrets, which the Court acknowledged "show[ed] carelessness (or maybe even professional incompetence)."

D518 at 18–19. For the patent infringement claim, the defendants add that the declaration of Lanard's corporate representative—"Following the USPTO's issuance of the '167 Patent, Lanard stamped the full patent number into the

plastic on all models of the Chalk Pencil," D321-3 ¶ 17—neared "fraud on the Court" unless "following" means more than a year later.[48] D518 at 21 & n.24.

## 2. *Lanard's Arguments*

Lanard generally responds that this case is not exceptional and an award of attorney's fees would chill enforcement of intellectual property claims based on copyrights and patents issued by the United States. D523 at 7. Lanard contends that it sued merely to protect its intellectual property rights and recoup millions in damages caused by the "unscrupulous," "malicious," and "immoral" conduct of its competitor (Ja-Ru) and its customers (TRU and Dolgencorp), whose counsel responded to the lawsuit with "scorched earth" tactics and relentless emails. D523 at 7, 28; D523-1 at 9, 10. According to Lanard, opposing counsel's method of operation was to "identify an

---

[48]The defendants contend that if this Court determines a fee award is warranted for fewer than all claims, allocation of fees is unnecessary because they prevailed on all claims and the claims were intertwined. D518 at 25. The defendants observe that the functionality and the exclusivity of the Lanard Chalk Pencil design and features were central to the copyright infringement, patent infringement, and unfair competition claims; Lanard sought the same damages for each claim; and the trade dress infringement and unfair competition claims both depended on secondary meaning. D518 at 25–26.

As an alternative, the defendants propose, for work for the district court proceedings, a total of $2,187,288 ($130,338 for the copyright infringement claim; $89,390 for the patent infringement claim; $91,123 for the trade dress infringement and unfair competition claims, collectively; and $1,875,897 for all claims jointly and paralegal fees); and for work for the appellate court proceedings, a total of $436,675 ($42,770 for the copyright infringement claim; $45,428 for the patent infringement claim; $48,733 for the trade dress infringement and unfair competition claims, collectively; and $299,745 for all claims jointly and paralegal fees). D518 at 27.

The proposed allocated fees for work for the district court proceedings total $2,186,748 ($540 less than the amount requested). The proposed allocated fees for work for the appellate court proceedings total $436,676 ($1 more than the amount requested). But the totals claimed for each ($2,187,288 and $436,675) add up to the total fees requested before a proposed five percent reduction ($2,623,963.17), rounded to the nearest dollar. *See* D518 at 28.

inconsequential imagined 'issue,' and chase it into the ground without consideration for reason, logic, or the merits of the litigation." D523 at 29.

Lanard complains that the defendants' characterization of its motivation for suing is "speculation," "false," "self-serving," "far-fetched," and "pure conjecture." D523 at 23–24. Lanard contends that it tried to resolve the dispute before suing and asserts that "[t]here can be no purer a motivation in bringing an infringement action—particularly copyright, which explicitly requires evidence of copying—than to enforce intellectual property rights against a known copier." D523 at 23–24. Lanard argues its motivation is a "far cry" from motivation courts have found improper. D523 at 24. Lanard states, "Lanard does not want to be knocked off," and then Lanard asks, "Is that so unreasonable?" D523 at 24. Lanard continues, "The Court cannot imagine that a toy company would lightly sue two of the biggest toy retailers in the country, nor undertake the considerable cost of litigation in any event, unless it were at the end of its tether." D523 at 24.

Lanard argues that the defendants present a "revisionist version of the procedural and litigation history" to try to "whitewash their own intentional conduct and to minimize, if not denigrate, Lanard's intellectual property rights in its commercially successful 'Chalk Pencil' toy." D523 at 7. Lanard concedes the "case has been contentious" but asserts that "litigation is a two-way street" and "it takes two to tango." D523 at 28–29.

Lanard argues that if this action had been frivolous, adjudication would have been swift. D523 at 23. Lanard observes that, instead, the Court denied the motion to dismiss, or for a more definite statement of, the trade dress infringement and unfair competition claims; took considerable time and pages to decide the summary judgment motions; and entered the order on those

motions on the eve of trial. D523 at 23. Lanard argues the defendants "ignore the fact that this case survived their motions to dismiss and that the previously-presiding judge found a likelihood of success on the question of infringement—specifically noting how similar the products at issue appeared." D523 at 27. Lanard also argues that the defendants "wholly ignore their unnecessary—and unsuccessful—motion to disqualify counsel, as if not discussing such a frivolous and disfavored motion absolves them of culpability for inciting the vitriol among counsel that such motions often engender." D523 at 28. As other examples of the defendants' "unreasonable motion practice," Lanard points to the number of motions in limine—seven for Lanard; twenty for the defendants. D523 at 28–29.

Lanard contends the defendants' focus on the "minor sales" at issue "completely misses the mark" because the Court never adjudicated damages. D523 at 23. Lanard continues that even if potential damages had been as limited as the defendants contend, the defendants cite no support for the claim that the value of potential damages compared to the cost of the litigation relates to exceptionality and that the cases that discuss the value of the potential damages "merely highlight non-practicing entity 'patent troll' plaintiffs who bring suit 'for the improper purpose of obtaining a nuisance value settlement.'" D523 at 26. Lanard continues, "Lanard is not a 'troll' or non-practicing entity, but had a verifiable commercial interest in seeking redress for a competitor's knocking off a successful product and selling it to the same customers who had previously bought Lanard's toy." D523 at 27.

Under the title, "The Moral Component," Lanard concludes:

> The goal of any justice system is justice. Sometimes that is lost in the technical legal analysis. It should not be here. Although this Court and the Federal Circuit found that Defendants had made minor changes

in Lanard's design sufficient to escape liability, that does not make Defendants' conduct right or morally defensible. It remains the case that the Defendants knowingly profited from someone else's—Lanard's—time, money, and effort in coming up with an original concept and design. They should not now effectively be rewarded for it. Nor should Lanard effectively be punished for trying to protect its business and defend its rights.

D523 at 29.

## D.   *Analysis*

The undersigned is well familiar with this action, having entered more than fifty orders and having carefully read the rest of the record, including this Court's order granting summary judgment and the Federal Circuit's opinion. With that familiarity, the undersigned turns to the factors and then to the totality of the circumstances. The relevant FDUTPA factors substantially overlap with the *Fogerty* factors and therefore are considered together.[49]

### 1.   *Frivolousness*

On one hand, while Lanard lost all claims before this Court and the Federal Circuit, no claim itself appears frivolous. The defendants initially answered all claims, and although the defendants later moved to dismiss the trade dress infringement and the unfair competition claims, this Court determined from its initial review of the operative pleading that the Court was

---

[49]The relevant non-exclusive FDUTPA factors are "whether the claim brought was not in subjective bad faith but frivolous, unreasonable, [and] groundless," which compares to the *Fogerty* factor of frivolousness; "the merits of the respective positions—including the degree of the opposing party's culpability or bad faith," which compares to the *Fogerty* factors of motivation and objective unreasonableness; and "whether an award of fees against the opposing party would deter others from acting in similar circumstances," which compares to the *Fogerty* factor of compensation and deterrence. *See Humane Soc.*, 951 So. 2d at 971–72 (quoted). FDUTPA also includes "the scope and history of the litigation," *see id.* (quoted), which can be considered within each *Fogerty* factor.

inclined to rule the trade dress infringement claim was at least plausible and likely to survive a motion to dismiss.

On the other hand, Lanard made frivolous or groundless arguments during the litigation. Lanard's belated motion for leave to file a third amended complaint to add Ja-Ru (HK) Ltd. was frivolous or groundless, including because Lanard argued the wrong standard, clearly possessed pertinent information about Ja-Ru (HK) Ltd. before expiration of the deadline to add parties, and feebly suggested Ja-Ru's actions equated to acceptance of liability for Ja-Ru (HK) Ltd. Lanard's argument in response to a motion to compel seemed "nonsensical." D163 at 11. In analyzing whether to grant summary judgment to the defendants on Lanard's copyright infringement claim, this Court found "confusing" Lanard's argument that the Lanard Chalk Pencil contrasted with a no. 2 pencil and "nonsensical" its argument that the Lanard Chalk Pencil cannot derive from the no. 2 pencil because the no. 2 pencil is in the public domain. D468 at 52 n.22 & 54 n.24. The Court also found one of Lanard's arguments for excluding Kemnitzer's opinions unsupported, without merit, and bordering on absurd.

Regarding the defendants' argument that Lanard's position on damages was frivolous, the Court need not "add to the burdens of litigation by opening up" the issue of what damages were available had Lanard prevailed, *see Munchkin*, 960 F.3d at 1378 (quoted), which would require considering the arguments in the defendants' motion to exclude Kerr's opinions, Lanard's motion to exclude Mard's opinions, the defendants' motion in limine to exclude evidence of unrelated-products and FDUTPA damages, the defendants' motion in limine to exclude evidence of alleged prior infringements, and the responses to those motions. Suffice it to say that, on one hand, Lanard possessed

evidence of prior infringement by the defendants and at least some of that evidence may have been admissible to show willfulness to support increasing damages.[50] The defendants' less-than-six-figure profits from sales of the accused product that the defendants repeatedly referenced were never the sole measure of damages, as the defendants acknowledge. The defendants did not staff their defense in a manner suggesting they believed modest damages were clear-cut. And had Lanard demanded modest amounts, the defendants may have felt pressure to abandon their meritorious defenses or may have argued Lanard was improperly litigating to obtain a nuisance-value settlement.

On the other hand, while Lanard possessed disputed evidence that TRU and Dolgencorp ceased buying toys from Lanard because of this lawsuit, Lanard's other-products damages theory seemed a stretch.

## 2.   *Motivation*

This Court never determined what had motivated Lanard to sue. On one hand, proper commercial considerations are present: protecting copyrighted and patented property against use by a competitor, recapturing or retaining customers for a profitable toy, and generally deterring copying in the toy industry. Although not required for a fee award, there is no evidence to suggest that Lanard, unlike many losing plaintiffs ordered to pay fees, frequently

---

[50]*See* D427 (the defendants' motion in limine to prohibit evidence or mention of alleged claims of prior misconduct); D453 (Lanard's response). Evidence of a wrong or other act may be admissible for purposes besides character. Fed. R. Evid. 404(b). Excluding relevant evidence for prejudice, confusion, waste of time, or another reason is an extraordinary remedy that must be used sparingly. *United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011). Evidence of a wrong or other act need not be reduced to a verdict or a judgment to be admissible. *See* Fed. R. Evid. 104 (addressing relevance dependent on a fact).

litigates dubious claims to force others to sign licensing agreements or pay nuisance value settlements.

On the other hand, Lanard sued its competitor and two retail customers of both Lanard and its competitor after settling a previous case with one of the customers with a condition that it buy more toys from Lanard, suggesting that Lanard may have been motivated at least in part by considerations beyond those just articulated.

3.   *Objective Unreasonableness*

On one hand, the U.S. Copyright Office issued a certificate of registration, and the USPTO issued a design patent, providing presumptions of validity. This Court determined that the Lanard Chalk Pencil design bore sufficient creativity to warrant copyright protection, albeit not particularly strong protection because of uncopyrightable features of the no. 2 pencil. Lanard stamped the Lanard Chalk Pencil with a copyright notice and at least a patent pending notice. Ja-Ru thereafter used the Lanard Chalk Pencil as a market sample to create the accused product. The products appear similar; indeed, both TRU and Dolgencorp ceased buying the Lanard Chalk Pencil when they started buying the accused product. The defendants devoted substantial resources to fighting the claims, including by using top-of-the-line intellectual property lawyers from two firms. Neither this Court nor the Federal Circuit gave the copyright infringement and patent infringement claims short shrift. In an industry in which copying appears widespread, this Court's detailed order and the Federal Circuit's published opinion provide Lanard and Ja-Ru business-specific legal parameters upon which they can compete and Dolgencorp business-specific legal parameters upon which it can

make buying decisions. Lanard lost on the merits but at least succeeded in getting all three defendants to cease selling the accused product.

On the other hand, many of Lanard's arguments about the merits of its claims were weak, and all were losers in this Court and the Federal Circuit. On the trade dress infringement and unfair competition claims in particular, Lanard poorly identified the trade dress it was claiming and confusingly described the law on which it was relying to claim actionable unfair competition. Lanard thereafter hardly developed those claims, appearing to expend most of its energies and resources on the stronger siblings in its infringement family of claims while still pushing the notion of punitive damages available for a state common law unfair competition claim. During discovery, Lanard said its trade dress included packaging (even against TRU, which owned its own packaging and had Lanard package the Lanard Chalk Pencil under TRU's proprietary brand), but for summary judgment, Lanard said its trade dress did not include packaging and went so far as to say the defendants "misconstrue the trade dress at issue here, focusing on the product's packaging." *See* D322/SD327 at 22 (quoted). Lanard waited until summary judgment to finally explain that the trade dress infringement and unfair competition claims should be addressed together while confusingly referencing "indisputable infringement outlined in detail above," which included alleged copyright, patent, and trade dress infringement. *See* D321/SD327 at 24 (quoted). For the trade dress infringement and unfair competition claims, this Court found that Lanard "vastly" overstated its evidence of secondary meaning and further found that the evidence "woefully" failed to satisfy the high burden of establishing in the consumer's mind a connection between Lanard and the Lanard Chalk Pencil. *See* D468 at 66 (quoted). The Court observed that "absent from the record is any evidence of

Lanard's advertising or promotion of the Chalk Pencil, much less the effectiveness of those efforts in creating a consumer association between Lanard and the Chalk Pencil," that "the record reflects that Lanard did not engage in any advertising or promotional activities with respect to the Chalk Pencil," and that "there is no evidence whatsoever that consumers, either the public or retailers, actually draw a connection between the Chalk Pencil and Lanard, much less any evidence of actual confusion between the products." D468 at 70–71 (quoted). The Court dismissed as unsupported Lanard's arguments that it had presented prima facie evidence of acquired distinctiveness and that the licensee estoppel doctrine applied. And the Federal Circuit observed Lanard merely emphasized that it sold a lot of units of the Lanard Chalk Pencil through direct marketing to wholesalers and retail stores but cited no evidence about how customers viewed the Lanard Chalk Pencil. The defendants had to expend extra resources responding to those claims in their motion to dismiss, discovery requests, motion for summary judgment, motions in limine, and appellate brief.

4. *Compensation, Deterrence, and Other Factors*

On one hand, a fee award would discourage a business from trying to test the strength of its presumptively valid copyright and patent when confronted with a competitor's decision to use the business's creative work as a market sample and then swipe the business's sales from major retailer customers. Even without an award of fees and non-taxable costs, Lanard has suffered much, with expenditures of nearly $2 million for its own fees and costs, losses at the trial and appellate levels, losses of two large retail customers, binding precedent against its intellectual property, and an obligation to pay the defendants taxable costs. On the other hand, a fee award would encourage a

business to consider more carefully the strength of its copyright and patent, whether it possessed a protectable trade dress, and whether it had sufficient evidence to prove trade dress infringement and unfair competition before bringing four claims against three companies and asserting damages in the $10 to $20 million range.

On one hand, the defendants point to no "early, focused, and supported notice" of their belief they were being subject to exceptional litigation behavior. *See Thermolife*, 922 F.3d at 1357 (quoted). On the other hand, the defendants persisted from the outset that the dispute did not warrant major litigation, including because of the minor profits they realized from sales of the accused product.

On one hand, Lanard had valid reasons for suing in New Jersey and wanting to stay there, Lanard's motion for a preliminary injunction was denied without prejudice, and Lanard explained it had never intended to move forward with seventeen unilaterally noticed depositions. On the other hand, the District of New Jersey ruled against Lanard on venue and on irreparable harm, and few if any reasons ever justify starting discovery by unilaterally noticing seventeen depositions.

Regarding the declaration about when Lanard stamped the full patent number on the Lanard Chalk Pencil, on one hand, the declarant told no lie; the defendants never moved to compel disclosure of the date; the defendants knew from their samples that at least some Lanard Chalk Pencils on the market after issuance of the patent failed to include the full patent number; the defendants used Lanard's failure to disclose the date in their *Daubert* motion to exclude Kerr's testimony, motion in limine to exclude evidence of patent marking, and opposition to Lanard's motion for summary judgment; and this

Court's order on summary judgment merely mirrored the declaration's statement without inferring a date immediately after the patent's issuance. On the other hand, Lanard's failure to ever specify when it had stamped the full patent number onto the Lanard Chalk Pencil during discovery or in the declaration appears cagey.

On one hand, neither side is responsible for the other side's decision to staff the case with many lawyers and many law firms or for the locations of the witnesses. Both sides aggressively litigated the action, finding mixed success on their various discovery and other motions. Neither side is blameworthy for the time it took to resolve the merits. On the other hand, Lanard or its counsel violated the protective order multiple times and unreasonably dismissed the violations. Lanard's lead counsel was inattentive at best and intentionally misleading at worst in representing facts pertinent to the motion to disqualify Lanard's lawyers, and Lanard continues to dismiss the motion as frivolous despite the existence of an actual conflict of interest and an order showing the motion was unsuccessful but well taken. And of course there is the incivility exhibited by Lanard's lead counsel, with his pseudo-apology coming only in response to the possibility of an award of millions of dollars in attorney's fees against his client doing little to remedy it.

5.     *Totality of the Circumstances*

The pertinent circumstances are detailed in the more than one hundred pages above and are not repeated here but are incorporated here.

Considering the purposes of the laws, had Lanard brought only the copyright and patent infringement claims, a fee award would be unwarranted under § 505 and § 285. For the Lanard Chalk Pencil, Lanard possessed a

presumptively valid copyright and a presumptively valid patent, Lanard's competitor used the Lanard Chalk Pencil to create a similar product, and Lanard lost sales when its retail customers started buying the similar product. The reasons why Lanard brought those claims and lost those claims were not obvious in a way that, together with all other circumstances, a fee award is warranted.

What makes this case exceptional (i.e., what makes this case stand out from others with respect to the substantive strength of Lanard's litigating position—considering the law and the facts—and the unreasonable manner in which the case was litigated), and the reason why a fee award is warranted under § 35(a) and FDUTPA, is Lanard's trade dress infringement and unfair competition claims, considered with all other circumstances. For those claims, in addition to some unreasonableness in the way Lanard conducted the litigation, Lanard's litigating position was unusually weak, from the way it pleaded the claims; to the way it barely developed the claims while arguing higher damages based on them; to the way it reversed its position on packaging; to the way it waited until summary judgment to finally say its unfair competition claim should be analyzed with its trade dress infringement claim; to the way it vastly overstated its evidence of, and woefully failed to satisfy its burden on, secondary meaning; to the way it made unsupported arguments about acquired distinctiveness and licensee estoppel; to the way it tried to obtain reversal on appeal with a focus not pressed below.

Lanard directs the Court to other circumstances—Lanard tried to resolve the dispute before suing (unclear); Lanard is unblameworthy for the time it took to resolve the merits (true); this Court never decided damages or motivation (true, but that does not prevent the Court from considering both);

the summary judgment order was long (true, but many pages were spent on the other claims and the *Daubert* issues); Lanard possessed a copyright and a patent (true, but the copyright ended up being invalid); and Ja-Ru copied the Lanard Chalk Pencil (true, but not in a way that was actionable). *See generally* D523. Considered with the totality of the circumstances, these circumstances—even viewing all of them favorable to Lanard—do not compel a different outcome. To the extent Lanard tries to incorporate its stronger copyright infringement and patent infringement claims into its unfair competition claim through reference to all infringement, Lanard cannot get past that it took the position that the claims for trade dress infringement and unfair competition should be addressed together.

Lanard emphasizes the on-the-record statements of the District of New Jersey despite that this Court already found Lanard's reliance on the statements "misplaced." *See* D468 at 44 n.20 (quoted). Lanard states, "Lanard is aware that this Court's summary judgment order has explained away those comments but, with respect, Lanard disagrees. In any event, Lanard would certainly have been entitled to take those comments to heart at the time as an indicator of the validity of its claims." D523 at 10 n.2. Lanard continues to draw too much from those statements. In any event, the District of New Jersey made them only in the context of the copyright infringement claim, not the trade dress infringement and unfair competition claims.

Lanard also emphasizes the on-the-record statements this Court made when deciding to carry with summary judgment the arguments in the defendants' motion to dismiss the trade dress infringement and unfair competition claims. Lanard draws too much from those statements too. The most that can be drawn from them is that this Court was inclined to rule the

trade dress infringement claim was at least plausible and likely to survive a motion to dismiss but never actually ruled on the arguments in favor of a more economic procedural path.

Lanard argues that the emails alone "fail to demonstrate that the manner of litigation was unreasonable … and so should not be used to support an award of fees." D523 at 29. This argument is well taken to the extent Lanard argues the emails alone would not justify a fee award but not well taken to the extent Lanard argues the emails should not be considered as one of many circumstances in the totality-of-the-circumstances analysis.

Lanard argues that the Court should decline to award FDUTPA fees because the FDUTPA claim "was simply derivative of its other federal infringement claims" as evidenced by the order on summary judgment devoting only a footnote to the claim. D523 at 16–17. Lanard correctly observes that some federal district courts have exercised their discretion to decline to award FDUTPA fees under this rationale. *See, e.g., JES Props.*, 432 F. Supp. 2d at 1291; *Suntree Techs.*, 2013 WL 1174399, at *7. As stated, however, more recent cases have rejected those cases under the rationale that they lack analysis, were decided before *Diamond Aircraft* or based on pre-*Diamond Aircraft* caselaw, and are contrary to *Diamond Aircraft* and post-*Diamond Aircraft* decisions. *See Temurian*, 2021 WL 1121003, at *2–3; *Procaps S.A.*, 2017 WL 3536917, at *24–29. Instead of deciding which courts are correct, it suffices to say that no law requires a court to exercise its discretion in that manner, and exercising discretion in that manner is unwarranted here. Fees are warranted under the Lanham Act. Even if they were not, Lanard invoked FDUTPA and should not benefit from the fact that it also brought other claims that it pursued more vigorously or the fact that the Court addressed the unfair

105

competition claim only briefly based on Lanard's assertion that the claim should be analyzed with the trade dress infringement claim.

Lanard argues the Court should decline to award FDUTPA fees because "this case was not unreasonable," was not "pursued in bad faith," and was "not exceptional." D523 at 18. Lanard acknowledges FDUTPA does not use the term "exceptional" but contends the defendants point to no case ("and Lanard was unable to identify" one) in which a court awarded FDUTPA fees "without also satisfying the 'exceptional' standard of related Patent or Lanham Act claims." D523 at 18. Neither FDUTPA itself nor caselaw interpreting FDUTPA requires exceptionality, and Lanard's invitation to add that requirement to Florida law should be declined as outside this federal district court's role. Regardless, exceptionality is present.

Thus, the undersigned recommends declining to award fees under the Copyright Act and the Patent Act but awarding fees under the Lanham Act and fees and non-taxable costs under FDUTPA.

The parties submitted their papers before the effective date of Local Rule 7.01 (February 1, 2021). The rule requires a bifurcated procedure for attorney's fees and related non-taxable expenses (entitlement first, reasonableness second). Considering the new bifurcated procedure and the interests of judicial economy, the undersigned does not analyze the reasonableness of the requested fees (and the non-taxable costs allowed under FDUTPA) in this report and recommendation. The billing statements—from multiple law firms—are hundreds of pages of line-item descriptions of work performed. D519–D521. Lanard argues that, for many reasons, the rates are too high, the hours are too many, and the defendants otherwise fail to satisfy their burden. D523 at 30–37. If fees are awarded under the Lanham Act and FDUTPA,

additional briefing is needed on reasonableness. The undersigned recommends directing the undersigned to expeditiously prepare a report and recommendation on reasonable attorney's fees and non-taxable costs after obtaining any necessary briefing on reasonableness and deferring ruling on the defendants' motion for a fee award, D518, and the defendants' motion for costs, D477, pending reasonableness determinations.

## III.   Taxable Costs

The defendants ask the Court to tax $26,698.01 against Lanard under Federal Rule of Civil Procedure 54(d)(1) and 28 U.S.C. § 1920.[51] D477, D478. Although the law presumes the defendants are entitled to costs because they prevailed, Lanard is unwilling to directly concede taxation of any cost. *See generally* D499. Relying on FDUTPA, the defendants also ask the Court to award as non-taxable costs $76,066.54 and any requested taxable costs the Court considers non-taxable. D477 at 1.

## A.   *Law*

Federal Rule of Civil Procedure 54(d)(1) provides that costs "should be allowed to the prevailing party" unless federal law or a court order provides otherwise. The rule codifies the "venerable presumption that prevailing parties are entitled to costs." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 377 (2013). The word "should" in the rule makes clear that "whether to award costs ultimately lies within the sound discretion of the district court." *Id.* If a court

---

[51]Although TRU and Dolgencorp provide offers of judgment, D518-1, they do not request costs under Federal Rule of Civil Procedure 68, *see generally* D477. The rule applies "only to judgments obtained by the [offeree]." *Delta Air Lines, Inc. v. August*, 450 U.S. 346, 352 (1981); *accord Jones v. United Space All., L.L.C.*, 494 F.3d 1306, 1309 (11th Cir. 2007) ("Rule 68 does not allow for recovery when the defendant obtains a judgment in its favor.").

exercises its discretion to deny full costs, the court "must have and state a sound basis." *Chapman v. AI Transp.*, 229 F.3d 1012, 1039 (11th Cir. 2000) (en banc).

Rule 54(d)(1) works with 28 U.S.C. § 1920, under which a court may tax only specified costs in six categories. *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1225 (11th Cir. 2002). The six categories are:

(1)    Fees of the clerk and marshal;

(2)    Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3)    Fees and disbursements for printing and witnesses;

(4)    Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5)    Docket fees under section 1923 of this title; [and]

(6)    Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920.[52]

Section 1920 reflects congressional policy to place "rigid controls on cost-shifting in federal courts." *Parkes v. Hall*, 906 F.2d 658, 659 (11th Cir. 1990) (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 444 (1987)). As evident from § 1920, costs are "limited to relatively minor, incidental

---

[52]The "costs" in § 505 of the Copyright Act concern the same six categories of costs. *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 875–76 (2019). For a patent claim, the Federal Circuit interprets § 1920 under the law of the regional circuit. *In re Ricoh Co., Ltd. Pat. Litig.*, 661 F.3d 1361, 1364 (Fed. Cir. 2011).

expenses," and "almost always amount to less than the successful litigant's total expenses in connection with a lawsuit." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 573 (2012). A court may decline to allow costs in § 1920 but may not allow costs outside of § 1920. *Crawford*, 482 U.S. at 442–43.

"Items proposed by winning parties as costs should always be given careful scrutiny." *Farmer v. Arabian Am. Oil Co.*, 379 U.S. 227, 235 (1964), *disapproved of on another ground by Crawford*, 482 U.S. at 442–43. Once the prevailing party has shown the requested costs are allowable under § 1920, the losing party may rebut the presumption favoring their award. *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 639 (11th Cir. 1991); *see Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 893 (7th Cir. 2019) ("There is a presumption that the prevailing party will recover costs, and the losing party bears the burden of an affirmative showing that taxed costs are not appropriate."). The losing party may rebut the presumption by presenting some rationale under which the court should disallow costs. *168th & Dodge, LP v. Rave Revs. Cinemas, LLC*, 501 F.3d 945, 958 (8th Cir. 2007).

The categories pertinent to the dispute here are "(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case"; "(3) Fees and disbursements for printing and witnesses"; and "(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case[.]" *See* 28 U.S.C. § 1920 (quoted); *see generally* D477, D478, D499. Because shipping costs are not included in these categories, a court may not tax them. *Watson v. Lake Cnty.*, 492 F. App'x 991, 997 (11th Cir. 2012).

"Rigid rules play no role in determining" whether transcripts or copies are "necessarily obtained for use in the case." *Newman v. A.E. Staley Mfg. Co.*

648 F.2d 330, 337 (5th Cir. Unit B June 18, 1981). A court has "great latitude" in making the determination. *Id.* Still, if the "costs were merely incurred for convenience, to aid in thorough preparation, or for purposes of investigation only, the costs are not recoverable." *EEOC v. W&O, Inc.*, 213 F.3d 600, 620 (11th Cir. 2000).

A court does not abuse its discretion in taxing costs for a deposition transcript used with a summary judgment motion, *id.* at 620–21; for a transcript of a deposition of someone on the losing party's witness list, *Maris Distrib.*, 302 F.3d at 1225; or even for a transcript not used at summary judgment or a trial, as long as the transcript was necessarily obtained for use in the case, *In re Fundamental Long Term Care, Inc.*, 753 F. App'x 878, 882 (11th Cir. 2019). Indeed, "it does not matter if the use of" a deposition is "minimal" or "not critical to the party's ultimate success." *Fundamental Long Term Care*, 753 F. App'x at 882 (cleaned up). "The operative principle is that such costs are taxable when the party opposing the costs has not demonstrated that any portion of the depositions was not related to an issue which was present in the case at the time the deposition was taken." *Id.*

The former Fifth Circuit found an abuse of discretion in awarding costs for an expedited daily transcript of a trial ordered only by the movant, but the Eleventh Circuit later clarified the former Fifth Circuit did "not hold that the costs associated with expedited transcripts could never be deemed 'necessary' by a district court." *Maris Distrib.*, 302 F.3d at 1225 (discussing *In re Nissan Antitrust Litig.*, 577 F.2d 910, 918 (5th Cir. 1978)). The court cautioned that a district court should not tax "costs associated with expedited trial transcripts" automatically "lest litigation costs be unnecessarily increased[.]" *Id.* at 1226.

The Eleventh Circuit, interpreting Federal Rule of Civil Procedure 30(b)(2) (a deposition may be recorded by audio, audiovisual, or stenographic means) and a pre-2008 version of § 1920(2) ("[F]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case"), has held that "when a party notices a deposition to be recorded by nonstenographic means, or by both stenographic and nonstenographic means, and no objection is raised at that time by the other party to the method of recordation, it is appropriate under § 1920 to award the cost of conducting the deposition in the manner noticed." *Morrison v. Reichhold Chems., Inc.*, 97 F.3d 460, 464–65 (11th Cir. 1996). Courts continue to apply this rule under the current version of § 1920(2) as long as videotaping is necessarily obtained for use in the case. *See, e.g., Watson*, 492 F. App'x at 997; *Stanley v. Cottrell, Inc.*, 784 F.3d 454, 464–67 (8th Cir. 2015); *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 579 F.3d 894, 897–98 (8th Cir. 2009).

"Fees and disbursements for printing and witnesses," 28 U.S.C. § 1920(3), are specified in 28 U.S.C. § 1821(b), which provides, "A witness shall be paid an attendance fee of $40 per day for each day's attendance. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance." For witness fees under the third category of costs in § 1920, a court therefore may tax $40 a day plus travel expenses. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 298 (2006).

A court may tax costs of copying documents for discovery if necessarily obtained for use in the case. *W&O*, 213 F.3d at 623. And a court may tax costs for producing oversized documents if necessarily obtained for use in the case.

*Arcadian Fertilizer, L.P. v. MPW Indus. Servs., Inc.*, 249 F.3d 1293, 1296 (11th Cir. 2001). But a court may not tax costs for general copying. *Duckworth v. Whisenant*, 97 F.3d 1393, 1399 (11th Cir. 1996). A court may exclude costs of copies if the requesting party makes no showing the copies were necessary for use in the case. *See, e.g., Pelc v. Nowak*, 596 F. App'x 768, 771 (11th Cir. 2015) (holding that the court did not abuse discretion in excluding costs of copies because the requesting parties "made no showing that the copies were necessary for use in the case"); *Watson*, 492 F. App'x at 998 (remanding for further findings because the district court awarded costs for "B&W printing" and "color copies" but the record did not explain what documents were copied).

## B.    *Proposed Bill of Costs*

In the proposed bill of costs for $26,698.01 ($25,797.59 for transcripts, $390 for witness fees, and $510.42 for copies), the defendants' counsel signs his name under the declaration, "I declare under penalty of perjury" that the costs "are correct and were necessarily incurred in this action and that the services for which fees have been charged were actually and necessarily performed." D478 at 1.

The defendants ask the Court to tax $25,646.34 for transcripts of thirty-three depositions and, relatedly, $390 for witness fees and travel expenses of three of the deponents.[53] D477 at 9–11, 14–15. The defendants point to places

---

[53]The amounts reflect early-payment discounts given to the defendants by some court reporters. *See* D477-1 at 14–19, 23, 25–27, 30, 33, 35–37.

Some invoices indicate that the defendants received an original and a certified copy of a transcript. *See* D478 at 13–17, 22, 24–26, 29, 32–33, 35. Other invoices indicate the defendants received only a certified copy of a transcript. D478 at 5–11, 18–21, 23, 28, 31, 37. The per-page rates for an original and a certified copy indicate the fees were for the originals only, with the copies included as a courtesy. Lanard does not raise an issue about this. *See generally* D499.

112

in the record where most of the depositions were used, including, for many, in connection with summary judgment. D477 at 8–9. The following chart lists the witnesses and, for the witnesses whose deposition transcript was not used in connection with summary judgment, a description of their involvement:

| Witness | Description | Costs |
|---|---|---|
| **Glenn Adams** | Lanard's third-party sales representative for Dolgencorp; SD355/D488 at 37; D523-8 at 8–9; D366 at 45 | transcript—**358.38**<br>exhibits—**11.88**<br>shipping—4.75<br>parking/toll—9.51<br>witness fee—**40.00**<br>witness mileage to deposition—**108.00** |
| **Robert Anders D342** | | transcript—**1446.90**<br>5-day delivery—723.45<br>attendance—95.00<br>waiting time—32.50<br>expert technician—**136.50**<br>video pages—136.50<br>rough draft—492.00<br>disk/litigation package—35.00<br>shipping—60.00<br>video first 2 hours—**214.13**<br>video additional hours—**435.24**<br>shipping—4.65<br>parking/toll—44.69 |
| **Parker Bagley D343** | | transcript—**234.47**<br>expedite—93.80<br>exhibits—**1.30**<br>attendance—41.89<br>rough draft—55.86<br>shipping—4.65<br>video first 2 hours—**214.13**<br>video addition hours—**39.57**<br>shipping—4.65 |
| **Yvonne Cheung** | Lanard's general manager and designated witness for calculating profits; SD355/D488 at 72; SD358/D487 at 17; D523-8 at 5 | transcript—**2091.32**<br>facility rental fee—304.96<br>shipping—4.75 |
| **Norman Cohen D352** | | transcript—**283.24**<br>shipping—4.75<br>facility rental—118.83<br>witness fee—**40.00**<br>witness mileage to deposition—**108.00** |
| **Colleen Cosgrove SD364/D496** | | transcript—**798.00**<br>exhibits—**54.95** |

| | | |
|---|---|---|
| **Marc Dubner**<br>**D365** | | transcript—**416.50**<br>video—53.55<br>litigation support package/eCD—39.00<br>condensed—19.50<br>handling/processing/archiving—35.00<br>shipping/deliver—25.00 |
| **Tyson Eavonson**<br>**D350** | | transcript—**76.70** |
| **Eric Hedberg**<br>**D347, SD361/D495** | | transcript—**707.60**<br>condensed—35.00<br>exhibits—**78.00**<br>confidential excerpt—**17.40** |
| **Stephen Hearon**<br>**D351** | | transcript—**333.35**<br>condensed—35.00<br>exhibits (scan)—**9.00** |
| **James Hesterberg**<br>**SD355/D488**<br>**(3/27–3/28/17)** | | transcripts—**2091.32**<br>facility rental fee—304.98<br>shipping—4.75 |
| **James Hesterberg**<br>**SD355/D488**<br>**(3/27–3/28/17)** | | combined with costs for Cheung |
| **James Hesterberg**<br>**SD357/D492 (7/6/17)** | | transcript—**278.37**<br>exhibits—**1.12**<br>evening attendance—69.82<br>evening pages—97.65<br>shipping—4.65<br>parking/toll—13.97 |
| **William Hibbard** | Ja-Ru's designated corporate representative on IT matters; D214 at 5 | **transcript—85.55** |
| **Ronald Kemnitzer**<br>**D348** | | transcript—**259.70**<br>condensed—35.00<br>exhibits—**67.00**<br>deliver/handling—20.00<br>unedited ASCII—180.00 |
| **William Kerr**<br>**SD359** | | transcript—**375.81**<br>Saturday attendance—69.82<br>Saturday page surcharge—131.80<br>shipping—4.65 |
| **Angela Ku**<br>**D367** | | transcript—**575.25**<br>condensed—35.00<br>exhibits—**32.75**<br>delivery/handling—20.00 |
| **Yiu Wah Kwong** | Lanard's head of engineering department; identified in initial disclosures as a designer/developer of Lanard Chalk Pencil; SD364-20 at 3–4/D496-20; SD357/D492 at 19 | combined with costs for Cheung |

| | | |
|---|---|---|
| **Ali Lee** | Ja-Ru (HK) employee; mentioned as "Ja-Ru HK Merch" in email Marc Selevan sent directing changes to the accused product; D299-24/SD326 at 2, 5 | transcripts—**2091.32**<br>facility rental fee—308.66<br>shipping—4.75 |
| **Angel Lee**<br>SD358/D487 | | combined with costs for Ali Lee |
| **Michael Mard**<br>D349 | | transcript—**369.60**<br>expedite—258.72<br>condensed—20.00 |
| **Kenneth Marshall**<br>D366 | | transcript—**693.25**<br>exhibits—**45.00**<br>exhibits (color)—**2.00**<br>shipping/handling—22.00 |
| **Larry Myer**<br>D345 | | transcript—**428.20**<br>expedited—320.82<br>shipping—4.75<br>facility rental—109.85 |
| **Blake Nichols**<br>D341/D354 | | transcript—**630.62**<br>exhibits—**17.84**<br>shipping—4.90 |
| **Thomas Ratz** | Dolgencorp's designated corporate representative for IT matters; D214 at 5 | **transcript—286.80** |
| **Deborah Ryan**<br>D346 | | transcript—**356.50**<br>condensed—35.00<br>exhibits—**41.00**<br>delivery/handling—20.00 |
| **Andrew Selevan** | Worked for Ja-Ru on sales to Dolgencorp and was involved in presenting the accused product to Dolgencorp; D356-1 at 50, 52 | transcript—**76.70**<br>condensed—35.00 |
| **Jack Selevan**[54] | Ja-Ru president and one of five people at Ja-Ru in charge of bookkeeping; D42 ¶ 16; D356-1 at 12 | transcript—**29.50**<br>condensed—35.00<br>exhibits—**2.00**<br>delivery/handling—25.00 |
| **Marc Selevan**<br>SD363/D494 | | transcript—**1140.73**<br>facility rental—286.43<br>shipping—4.75 |
| **Russell Selevan**<br>D356/SD362,<br>SD361/D493 | | transcript—**1416.00**<br>condensed—70.00<br>exhibits—**126.00**<br>delivery/handling—50.00 |
| **Logan Williams**<br>D353 | | transcript—**353.53**<br>exhibits—**83.05**<br>shipping—4.90<br>parking/toll—20.58 |

---

[54]An invoice includes an extra $241.75 in transcript charges. *See* D478 at 11. The defendants claim only $91.50 in their itemization of costs. D478 at 3.

| | | |
|---|---|---|
| **Logan Williams (for Lanard Toys, Inc.)** | Corporate representative deposition taken after learning Lanard Toys, Inc., was selling a smaller chalk holder; D468 at 5–6 | transcript—**228.60**<br>exhibits—**4.68**<br>exhibits (color)—**7.84**<br>shipping—4.75<br>parking/toll—19.96<br>witness fee—**40.00**<br>witness mileage to deposition—**54.00** |
| **Brian Zeller** | TRU manager; mentioned in Kerr's expert report; D302/SD324-8 at 21 | transcript—**199.50**<br>litigation support package/eCD—39.00<br>condensed—19.50<br>handling/processing/archiving—35.00<br>shipping/deliver—25.00 |

D477, D478. For the depositions that were videotaped (Anders, Bagley), the notices explained the depositions would be videotaped, and Lanard asserted no objection to videotaping. D477-1 at 46, 49; D477-6 at 2, 5.

The defendants ask the Court to tax $151.25 for the transcript of a status conference conducted on April 25, 2018. D403, D417, D477-1 at 41. At the conference, the Court discussed the procedural posture of the case, reactivated motions that had been dormant during the bankruptcy stay, permitted the parties to supplement the motions, discussed a realistic timeline for decisions on the *Daubert* and summary judgment motions, and scheduled the trial to occur during the February 2019 trial term. D417 at 4–6, 7, 13, 16. The defendants had asked for a trial during a different month because of a major toy fair requiring the attendance of all of Ja-Ru's principals. D417 at 14–15. Minutes of the status conference include the important takeaways (describing the reactivated motions, the deadline for the supplements, and the trial term). D403.

Finally, the defendants ask the Court to tax $510.42 for copies. D477 at 12. They provide a FedEx Office receipt for that amount showing documents were copied, scanned, and placed on a CD. D477-1 at 42. They explain:

The only photocopies sought to be taxed are in connection with Defendants' initial production of documents to Plaintiff in January 2016, which involved cutting down numerous over-sized documents from Hong Kong before they could be photocopied, photocopying documents from all three Defendants, and also putting the documents on discs provided to Plaintiff. There were a substantial number of documents involved in this action and the copies sought to be taxed, which represent a small portion of costs actually incurred by Defendants for copying costs throughout this case, were necessarily obtained for use in the case in connection [with] discovery. Many of these documents were also used in court filings, the development of Defendants' litigation strategy and defense and preparation of trial exhibits.

D477 at 11–12.

## C.   *Arguments*

The defendants contend that each transcript "was useful to the litigation." D477 at 8. They add that many transcripts helped them prepare their motion for summary judgment and *Daubert* motions, their motions in limine, their opposition to Lanard's motions in limine, and the joint final pretrial statement that the parties had been preparing to file before the Court entered summary judgment for the defendants. D477 at 8.

Lanard argues that the "claimed transcript costs are unjustified, excessive, and beyond the scope of those allowed under" § 1920. D499 at 2. Lanard specifically complains about taxing costs beyond the transcripts themselves (e.g., fees for facility rentals, wait times, parking and tolls, shipping and handling, expedited service, and condensed and rough transcripts). Doc. 499 at 2–5. Lanard also argues that the Court should tax nothing for the transcripts of depositions of ten witnesses (Adams, Cheung, Hibbard, Kwong, Lee, Ratz, A. Selevan, J. Selevan, Williams, and Zeller), contending, "Defendants have also wholly failed to explain why deposition costs related to no less than ten … witnesses should be recoverable at all[.] … Defendants have

provided no indication that these depositions were utilized in any motion practice, nor provided any explanation for why or how that person's testimony was 'related to an issue which was present in the case at the time the deposition was taken.'" D499 at 5. Lanard further argues that the Court should tax nothing for the transcript of the status conference because the defendants "have not explained how the transcript of a status conference was useful in preparing for additional argument, nor have Defendants[] directed the court to any later-filed motion that cites the transcript." D499 at 6. And Lanard argues that the Court should tax nothing for copies because there "is nothing in [the copy] invoice or in the Motion papers even remotely specifying or describing which copies or printing of which documents were necessarily incurred." D499 at 7.

## D.   *Analysis*

Taxing as costs $20,745.69 for the transcripts of the depositions of all witnesses listed above, the video depositions of Anders and Bagley, and the related witness fees is warranted. For their part, the defendants contend that each transcript "was useful to the litigation," D477 at 8; their counsel declares the costs for the transcripts were necessarily incurred, D478 at 1; the record supports the declaration, *see* the chart above; and the defendants show Lanard never objected to videotaping Anders's and Bagley's depositions, D477-1 at 46, 49. For its part, Lanard only generally complains about an insufficient showing and fails to demonstrate—much less attempt to demonstrate—"that any portion of the depositions was not related to an issue which was present in the

case at the time the deposition was taken." *See Fundamental Long Term Care*, 753 F. App'x at 882 (quoted); *see generally* D499.[55]

Taxing as costs $151.25 for the transcript of the status conference and $5,290.65 for the "extras" (e.g., fees for facility rentals, wait times, parking and tolls, shipping and handling, expedited service, and condensed and rough transcripts) is unwarranted. The defendants fail to explain how these costs are allowable under § 1920, including why expediting the transcripts was necessary. *See Manor Healthcare*, 929 F.2d at 639; *see generally* D477. Insofar as the takeaways of the status conference were in the minutes, *see* D403, no discernable reason for ordering the transcript is readily apparent beyond the ability to provide Ja-Ru an explanation of why trial might occur during the toy fair, *see* D417 at 14–15.

Taxing as taxable costs $510.42 for the copies is warranted. Copies attributable to discovery and costs associated with the production of oversize documents are taxable. *See W&O*, 213 F.3d at 623; *Arcadian Fertilizer*, 249 F.3d at 1296. Contrary to Lanard's summary argument, the defendants establish that the copies were necessary for use in the case (i.e. responding to Lanard's discovery requests).

---

[55]For Hibbard and Ratz—corporate representatives on IT matters—the defendants contended during the litigation that their depositions "yielded no valuable information," "were a waste of time and money," and were apparently taken by Lanard "solely to inconvenience" the defendants, "raise concerns about whether their confidential IT information would be at risk of disclosure, and unnecessarily increase the attorneys' fees and costs spent in this case." D214 at 6. Still, Lanard fails to demonstrate much less attempt to demonstrate that any portion of their depositions—required because of discovery by Lanard—was unrelated to an issue present when the depositions were taken. *See generally* D499.

Thus, the undersigned recommends taxing $21,256.11 in taxable costs against Lanard.

## IV.   Recommendation[56]

The undersigned recommends entering an order:

(1)   **determining** that the defendants are entitled to an award of fees under the Lanham Act and FDUTPA but not under the Copyright Act or Patent Act;

(2)   **determining** that taxable costs total **$21,256.11**;

(3)   **directing** the undersigned to expeditiously prepare a report and recommendation on reasonable attorney's fees and non-taxable costs after the undersigned obtains any supplemental briefing; and

(4)   **deferring** final rulings on the defendants' motion for a fee award, D518, and the defendants' motion for costs, D477, pending reasonableness determinations.

**Entered** in Jacksonville, Florida, on August 20, 2021.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

---

[56]"Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1.

c:   The Hon. Marcia Morales Howard
     Counsel of record