United States District Court
Middle District of Florida
Jacksonville Division

LANARD TOYS LIMITED,

   *Plaintiff, Counter-Defendant,*

V.                                        NO. 3:15-CV-849-MMH-PDB

DOLGENCORP, LLC, ETC.,

   *Defendants, Counterclaimants.*

_____

## Supplemental Report and Recommendation ("R&R")[1]

The undersigned previously entered an R&R on the defendants' pending motions for costs, D477, and attorney's fees, D518, recommending: (1) a determination that the defendants are entitled to a fee award under the Lanham Act and Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") but not under the Copyright Act or Patent Act; (2) a determination that taxable costs total **$21,256.11**; (3) a direction to the undersigned to expeditiously prepare an R&R on reasonable fees and non-taxable costs after supplemental briefing; and (4) deferral of rulings on the motions pending reasonableness determinations. D535.

Only the defendants objected, and only to the recommendation they are not entitled to a fee award under the Copyright Act or Patent Act. D530. They proposed deferring ruling on the objections pending the reasonableness

---

[1]Page numbers in record citations in this supplemental R&R are to CM/ECF page numbers, not document page numbers.

determinations because the determinations could avoid the need to rule on the objections. D530 at 18. Accepting the proposal, the Court deferred consideration of the pending R&R and recommitted the motions to the undersigned for a supplemental R&R on reasonableness and allocation of fees for work done for the Lanham Act and FDUTPA claims.[2] D532.

The parties have provided supplemental briefing, billing records, and other papers. D536, D536-1, D536-2, D537, D538, D538-1, D538-2. After reviewing the briefing and papers, the undersigned conducted a telephone conference to clarify information.[3] D539, D540, D542. From that conference came more briefing. D541, D543, D544. The sides argue about rates, hours, allocation, and non-taxable costs. The length of this supplemental R&R is driven by the fee amount requested (nearly **$2 million**) and the number of arguments (many).

The pending R&R details the litigation. *See* D535. Suffice it to say here that during seven years of litigation in the District of New Jersey, this Court, and the Federal Circuit, six partners, five associates, five paralegals, and one clerk with three law firms worked on defending three defendants[4] against four claims arising from sales of look-alike giant sidewalk-chalk holders resembling a No. 2 pencil (and on furthering related counterclaims), resulting in more than 500 entries on the lower-court docket.

---

[2]In consultation with the district judge, the undersigned extended the requested deadline for this supplemental R&R.

[3]A transcript of the telephone conference is being prepared. References to what occurred at the conference are based on the audio recording of the conference.

[4]Two other defendants were involved at the beginning of the case — Toys "R" Us, Inc., and Dollar General Corporation. D1. Lanard dropped those companies when it filed the amended complaint. D61.

The claims and counterclaims themselves were neither novel nor especially complex, except to the extent that patent law was involved. But the claims were cumbersome, and Lanard pressed a novel damages theory it could recover money lost because defendants TRU and Dolgencorp ceased buying toys from Lanard.[5]

Both sides aggressively fought nearly every issue (and continue to fight nearly every issue). The defendants obtained summary judgment on all claims and affirmance on appeal. Along the way, they won disputes (for example, they defeated the motion for a preliminary injunction and successfully argued for transfer) and lost disputes (for example, they unsuccessfully moved for disqualification of Lanard's counsel and for sanctions for violating the protective order). They ceased selling the accused product to minimize potential damages and participated in formal and informal settlement discussions but failed to settle.[6]

Defendant Ja-Ru paid **$50,000** to satisfy a deductible, and its commercial general liability insurer paid for the rest of the defense.[7] The defendants, all

---

[5]The defendants' lawyers refrain from describing the claims as complex. Two of the lawyers — both with decades of experience in intellectual property litigation — say, "The representation of Defendants required specialized knowledge of the interplay of copyright, patent, trade dress and unfair competition law, as well as federal trial, procedural, evidentiary, and appellate matters. Plaintiff's counsel is also an experienced IP litigator who aggressively pursues claims, so comparable experience on the defense side was needed." D519 ¶ 15(c) (Anten's declaration); D521 ¶ 13(c) (Page's declaration). A third lawyer says without elaboration, "This case involved unique issues under the Copyright Act involving the copyrightability of the chalk pencil at issue." D520 ¶ 22(ii) (Socolow's declaration).

[6]The record contains only some details of the settlement discussions. *See* D535 at 83–87 (pending R&R summarizing settlement discussions).

[7]A fee award can be appropriate even if counsel "received payment from a source other than the client[.]" *Schafler v. Fairway Park Condo. Ass'n*, 147 Fed. App'x 113, 114 (11th Cir. 2005). Florida law makes this point clear by considering the insurer a party to a fee or cost proceeding. *See* Fla. Stat. § 627.4136(2) ("[A]ny insurer who pays any taxable costs or

three using the same lawyers and presenting the same arguments, spent more than **$2.5 million** in fees to defend against the claims and prosecute the counterclaims, an amount that might have tripled or quadrupled had the case stayed in New Jersey and each defendant retained its own counsel. On the other side, Lanard spent almost **$1.9 million** on fees to prosecute the claims and defend against the counterclaims.

In a motion filed on January 12, 2022, the defendants raise new issues and request additional relief. D546. They ask this Court to expedite decisions on the fee and cost motions and order Lanard to confer and provide discovery on its assignment of its intellectual property assets. D546 at 1, 5–7. They contend the assignment could support a fee award under the Copyright Act and Patent Act, but they do not ask the Court to delay decisions on the fee and cost motions pending the requested discovery. *See generally* D546. Lanard opposes the motion, contending the "motion is a premature collection action outside the purview of this Court, based on unfounded and false speculation, and plainly intended to unfairly prejudice Lanard while the underlying fees and costs motion which has already been fully briefed and argued is pending[.]" D547 at 1. The motion and a just-filed motion for leave to reply, D548, have been referred to the undersigned, are pending, and are not further discussed in this R&R.

---

attorney's fees which would be recoverable by the insured but for the fact that such costs or fees were paid by the insurer shall be considered a party for the purpose of recovering such fees or costs.").

Here, the insurer's involvement is no ground to deny the fee and cost motions, and Lanard does not contend otherwise. *See generally* D499 (Lanard's response to the cost motion); D523 (Lanard's response to the fee motion); D528-2 ¶ 3 (Anten's declaration explaining the insurer's involvement).

## I.      Fees

### A.      *Request*

As with their assessments of potential damages, the sides are far apart on their assessments of reasonable fees under the Lanham Act and FDUTPA.

In the fee motion, the defendants requested a fee award of **$2,492,765** for approximately 6,000 hours of work on the four claims and related counterclaims, including for appellate work in the Federal Circuit (**$414,841**). D518 at 2, 28, 30. They used hourly rates ranging from **$350** to **$747**[8] for partners, **$265.50** to **$585** for associates, **$200** to **$364.50** for paralegals, and **$306** to **$315** for a clerk. D518 at 28; D519 at 4; D520 at 7; D521 at 3. They excluded fees for work on their unsuccessful motion to disqualify Lanard's counsel (D176, D202), their request to stay the case pending TRU's bankruptcy (D387, D390), and the post-appeal, court-ordered mediation (D503, D514). D518 at 2 n.2; D519 ¶ 9. They reduced the total by five percent assertedly "to ensure the reasonableness of the request and negate any billing or accounting issues and/or duplication of tasks by multiple firms."[9] D518 at 2 n.2.

---

[8]In the motion, the defendants stated that Socolow's hourly rates ranged from **$630** to **$652.50**. D518 at 28. Socolow actually billed 10.5 hours (about 18 percent of his hours) at **$747** an hour. D520 ¶¶ 19, 21 & p. 7 n.3.

[9]The figures in the fee motion fail to align with the figures in the billing records. *Compare* D518 at 28, *with* D519-3, D519-4, D520-2, D521-3, D541-1. In the fee motion, the defendants say the billing records total **$2,623,963.17**, but the billing records total **$2,622,571.37**. *Compare* D518 at 28, *with* D519-3, D519-4, D520-2, D521-3, D541-1. In a declaration submitted with the fee motion, a lawyer says one firm's billing records total **$745,246**, but the firm's original billing records total **$752,522.50**, and the firm's supplemental billing records total **$745,006**. *Compare* D518 at 28 (fee motion), *with* D521-3 (original billing records), *and* D541-1 (supplemental billing records); *see also* D539 at 2 (order requesting clarification); D541 at 4–5 (clarification).

5

In their supplemental briefing, for only the claims under the Lanham Act and FDUTPA, the defendants request a fee award of **$1,977,521**, reserving any right to request more if fees are awarded under the Copyright Act and Patent Act and for fees incurred since filing the fee motion. D536 at 2 & n.1, 18. To arrive at that amount, they exclude fees for work they contend was limited to the copyright and patent claims (**$284,754**), make uniform and thereby reduce some rates, exclude fees for work challenged by the insurer (4.3 percent of the hours of the lawyers with Lewis Anten, P.C.), and reduce by 20 percent fees for work specifically challenged by Lanard in its response to the fee motion. D536 at 1, 18.

In its supplemental briefing, Lanard responds that the reductions to the amount requested in the fee motion "are moves in the right direction" but argues that the defendants fail to "concede nearly enough." D538 at 1. According to Lanard, the defendants' "highly inflated request, now 'reduced' to $1.9 million, remains legally unsupported, intellectually dishonest, and simply hopeful."[10] D538 at 1. Lanard proposes alternative calculations, the lowest resulting in a fee award of **$69,046.84**, which excludes all fees incurred jointly for all claims. D538 at 7.

At the recent telephone conference, the defendants agreed to further reduce the amount requested by withdrawing their request for fees for the

---

[10]"Some circuits have held that a district court may, in its discretion, deny a request for attorney's fees in its entirety when the request is outrageously unreasonable." *Loranger v. Stierheim*, 10 F.3d 776, 782 n.8 (11th Cir. 1994). Although Lanard suggests the requested amount is outrageously unreasonable, Lanard does not request outright denial of a fee award.

clerk — T. Cummins[11] — totaling **$7,035.30**, and by requesting an hourly rate of **$200** for all paralegals. *See* D541 at 4.

The defendants have not updated the total amount they are requesting in fees since withdrawing their request for clerk fees and requesting a uniform paralegal rate. Determining the new total amount requested and resolving numerous errors in the fee application, as supplemented, has taken time and diverted judicial resources. Errors are described in footnotes 8, 9, 11, 14 to 16, 22, 27, 29, 64 to 66.

"Disputes over attorney's fees are fact-intensive inquiries." *In re Home Depot Inc.*, 931 F.3d 1065, 1072 (11th Cir. 2019). Still, "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). "Ideally, of course, litigants will settle the amount of a fee." *Id.*

Here, the disparate views on reasonable rates, reasonable hours, and allocation have made agreement on a reasonable fee award impossible.

### B.   *Lodestar Method*

A fee-shifting statute allows counsel for the prevailing party to recover a reasonable fee. *Home Depot*, 931 F.3d at 1082. "A reasonable fee is one sufficient to attract competent counsel to represent the case, but not one that provides a windfall for attorneys." *Id.* "Courts are not authorized to be generous with the money of others, and it is as much the duty of courts to see that excessive fees and expenses are not awarded as it is to see that an adequate

---

[11]In his declaration, Socolow uses both "Tim Cummins" and "Terri Cummins." *Compare* D520 ¶ 12 ("Tim Cummins"), *with* D520 ¶ 21 ("Terri Cummins"). Socolow appears to be referring to the same person.

amount is awarded." *ACLU of Georgia v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999).

Under both federal law (here, for a fee award under the Lanham Act) and Florida law (here, for a fee award under FDUTPA),[12] the "lodestar method" is used to determine a reasonable fee. *See Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 253 F.3d 1332, 1336–37 (11th Cir. 2001) (applying the lodestar method for a fee award under the Lanham Act); *Alhassid v. Bank of Am., N.A.*, 688 F. App'x 753, 757–60 (11th Cir. 2017) (applying the lodestar method for a fee award under FDUTPA); *see also Fla. Patient's Comp. Fund v. Rowe*, 472 So. 2d 1145, 1150 (Fla. 1985) (adopting the federal lodestar method for determining a reasonable fee award for fee-shifting under Florida law).

Under the lodestar method, a court determines a reasonable hourly rate and a reasonable number of hours and then multiplies the figures to arrive at a "lodestar." *Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1302 (11th Cir. 1988); *Rowe*, 472 So. 2d at 1150−51. The lodestar is the presumptively reasonable fee. *Home Depot*, 931 F.3d at 1082. A court may adjust the lodestar, but only under exceptional circumstances. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010).

Here, the defendants apply the lodestar method, D518 at 27, and Lanard does not dispute that the lodestar method applies, *see generally* D523 at 30–

---

[12]"Just as a federal court must apply state law to determine whether a party is entitled to fees, [the court] must also apply state law to resolve disputes about the reasonableness of fees." *Kearney v. Auto–Owners Ins. Co.*, 713 F. Supp. 2d 1369, 1373 (M.D. Fla. 2010); *see also Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 775 F.3d 242, 248 (5th Cir. 2014) ("State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision." (quoted authority omitted)).

37. The parties focus their arguments on the rates, hours, and allocation. *See generally* D518 at 27–30; D523 at 30–37; D536 at 2–16; D538 at 2–17.

Traditional factors governing reasonableness are the time and labor required to provide the legal services; the novelty and difficulty of the issues; the skill required to provide the legal services; preclusion of other employment because of the case; the customary fee; whether the fee is fixed or contingent; time limitations imposed by the client or the circumstances; the amount involved and results obtained; the experience, reputation, and ability of counsel; the undesirability of the case; the nature and length of the professional relationship with the client; and awards in similar cases. *Perdue*, 559 U.S. at 551 n.4; *see also Rowe*, 472 So. 2d at 1150 & n.5 (observing that the Florida factors are "essentially the same" as the federal factors).

The factors are "almost always" subsumed within the lodestar. *Home Depot*, 931 F.3d at 1091. For example, the skill and experience of a lawyer is reflected in the lawyer's rate, and the novelty and difficulty of the issues are reflected in the lawyer's hours. *Id.* at 1083. The factors therefore are "largely redundant to," and "have little independent bearing on," the lodestar analysis.[13] *Id.* at 1091. While a court "may" use the factors to determine reasonable rates and hours (for example, to evaluate comparable litigation offered to assess rates), the court need not "march" or "slog" through the factors. *Id.* at 1090–91; *accord Zediker v. OrthoGeorgia*, 857 F. App'x 600, 608 n.14 (11th Cir. 2021) (declining to "slog" through the factors). Requiring

---

[13]The United States Supreme Court has observed that deciding a reasonable fee based on a factor-by-factor method "gave very little actual guidance to district courts." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563 (1986), *supplemented*, 483 U.S. 711 (1987). The Court explained that "[s]etting attorney's fees by reference to a series of sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results." *Id.*

otherwise would be "inefficient, to say the least[.]" *Home Depot*, 931 F.3d at 1091. In the end, the "factors are relevant only in the rare cases where they are not fully captured in the lodestar." *Id.*

Here, in declarations submitted with the motion, the primary lawyers for the defendants evaluate some or all of the factors. D518 at 29–30 (motion); D519 ¶ 15 (Anten's declaration); D520 ¶ 22 (Socolow's declaration); D521 ¶ 13 (Page's declaration). The undersigned considers the factors to the extent they are relevant but does not "march" or "slog" through them. *See Home Depot*, 931 F.3d at 1090–91 (quoted).

## C.   *Burdens*

### 1.   *Fee Applicant*

The fee applicant "has the burden of supplying the court with detailed evidence from which the court can determine a reasonable fee[.]" *Villano v. City of Boynton Beach*, 254 F.3d 1302, 1311 (11th Cir. 2001) (quoted authority omitted). Considering the burden, discrepancies in a fee application may be resolved against the fee applicant. *See, e.g.*, *Zediker*, 857 F. App'x at 611 n.18 (resolving contradictions in billing records against the fee applicant).

Here, Lewis Anten, a partner with Lewis Anten P.C. in Los Angeles, served as lead counsel. D519 ¶¶ 2, 5. He has represented Ja-Ru in all its intellectual property matters for more than 25 years. D519 ¶¶ 4, 15(k). He learned about the dispute "shortly before the service of the complaint[.]" D519 ¶ 5. He worked with associates Melissa Arbiter and Ivy Choderker. D519 ¶ 6.

The defendants provide a declaration, D519, and supplemental declaration, D528-2, of Anten. The declaration includes his curriculum vitae,

D519-1; Arbiter's curriculum vitae, D519-2 at 3; Choderker's curriculum vitae, D519-2 at 2; 175 pages of time entries of lawyers with Lewis Anten P.C. for work in the District of New Jersey and this Court, D519-3; and 19 pages of time entries of lawyers with Lewis Anten P.C. for work in the Federal Circuit, D519-4. A supplemental filing shows work the insurer challenged. D541-2. The lawyers billed in 15-minute increments until October 9, 2015, when the insurer began paying the bills, and the lawyers thereafter billed in 6-minute increments. D541 at 2–4; *see generally* D519-3 at 24. Anten opines the fees are reasonable considering this case was "a contentious IP case[] involving … years of litigation that … resolved as the parties were in the process of finalizing a lengthy Joint Pretrial Statement." D519 ¶ 15(*l*).

For local counsel when the case was in the District of New Jersey, Anten and Choderker worked with Brian Socolow, a partner with Loeb & Loeb LLP in its New York City office. D520 ¶¶ 1–3. Socolow and others with Loeb & Loeb first represented Ja-Ru in 2008 and have served as local counsel for Ja-Ru in two "similar actions" in federal court in New York. D520 ¶¶ 3, 22(ix). Socolow worked with associates Lindsay Feuer and Jodi Sarowitz and paralegals Shantanu Alam, Geri Papa, and Antoinette Pepper.[14] D520 ¶¶ 7–12; *see* D520-1 to 520-3.

---

[14]Socolow also worked with clerk Cummins. D520 ¶ 12. As earlier explained in this R&R, at the recent telephone conference, the defendants withdrew their request for fees for work by Cummins.

Socolow also worked with "CLT," for whom there are two entries in Loeb & Loeb's billing records for 1.3 hours of work at an hourly rate of **$297** for a total of **$386.10**. D520-2 at 16. Loeb & Loeb's invoices suggest "CLT" is "C.L. Treubert." *See* D520-1 at 32. Whether intentionally or by mistake, the defendants request no fees for Treubert's work. *See generally* D520 at 7. Accordingly, entries for work by Treubert are not considered here.

The defendants provide a declaration, D520, and supplemental declaration, D528-3, of Socolow. The declaration includes 41 pages of invoices of Loeb & Loeb, D520-1; 17 pages of time entries of lawyers, paralegals, and a clerk with Loeb & Loeb, D520-2; and a National Law Journal survey of rates of lawyers in large national firms, D520-3. The lawyers, paralegals, and clerk billed in 6-minute increments. *See generally* D520-2. Socolow opines that, considering the factors, the "total fee sum for work performed by the Firm represent[s] reasonable charges for the services and work performed[.]" D520 ¶ 22.

For local counsel after the case was transferred here, Anten and Choderker worked with Frederick Page, a partner with Holland & Knight LLP ("H&K") in its Jacksonville office. D519 ¶ 15(a); D521 ¶¶ 5, 13(a). Page worked with partners Michael Abel in the Jacksonville office, Courtney Batliner in the Boston office, and Ilene Pabian in the Miami office; associate Mark Goracke in the Boston office; and paralegals Anna Brinker (location unspecified) and Katie Payne (location unspecified). D521 at 3.

The defendants provide a declaration, D521, and supplemental declarations, D528-1, D537, of Page. One declaration includes his biography, D521-1; Batliner's biography, D521-2 at 2–4; Goracke's biography, D521-2 at 5–7; Pabian's biography, D521-2 at 8–9; and 21 pages of time entries of lawyers and paralegals with H&K, D521-3.[15] The defendants supplemented the entries

---

[15]In his declaration submitted with the fee motion, Page states the total fees for H&K are **$745,246**, but the original billing records total **$752,522.50**. D539 at 2. The undersigned asked the defendants whether the difference is the result of the following:

    a.  The hourly rate requested for Brinker and Payne is **$200**, but Brinker's work was billed at **$250**, and Payne's work was billed at **$275**.

with a table showing which entries the defendants consider work only on the copyright and patent claims. D541-1. The lawyers and paralegals billed in 6-minute increments. *See generally* D521-3. Page opines the fees requested for work by the H&K lawyers and paralegals are "reasonable for the local legal market for the work performed under the circumstances of this matter." D521 ¶ 7. He adds, "In rendering my opinion … I have considered the fact that H&K's total attorneys' and paraprofessionals' fees at our standard rates were actually significantly greater than the fees … for which reimbursement is sought." D521 ¶ 7.

The defendants provide a declaration of Thomas Bishop, a local lawyer and member in good standing of The Florida Bar. D543-1 (Bishop's original declaration not signed under either oath or penalty of perjury); D543-1 (Bishop's corrected declaration).[16] They asked him to provide "an opinion on the issue of reasonable billing rates and the reasonable expenditure of time" for the timekeepers with Lewis Anten P.C. and H&K. D543-1 ¶ 7. He provides an opinion on rates, but not hours. *See generally* D543-1.

---

b.  The hourly rate requested for Ilene Pabian is **$475**, but some — not all — of Pabian's work was billed at **$695**.

c.  Page states 736.8 hours are requested at **$555** an hour and 270 hours at **$475** an hour, but the billing records show 733.8 of his hours at the **$555** rate and 273 hours at the **$475** rate.

D539 at 2. The defendants confirmed those reasons for the difference. D541 at 5–6.

[16]"An unsworn written declaration may be used as evidence if the writer includes and signs a statement such as, 'I declare under penalty of perjury that the foregoing is true and correct.'" *Udoinyion v. Guardian Sec.*, 440 F. App'x 731, 735 (11th Cir. 2011) (citing 28 U.S.C. § 1746). At the recent telephone conference, the undersigned asked whether a page was missing from Bishop's original declaration and about the effect of Bishop's failure to sign the declaration under either oath or penalty of perjury. The defendants requested permission to correct the declaration. The undersigned granted their request.

2.     *Fee Opponent*

"Those opposing fee applications have obligations, too." *Barnes*, 168 F.3d at 428. "[O]bjections and proof from fee opponents concerning hours that should be excluded must be specific and reasonably precise." *Id.* (internal quotation marks and quoted authority omitted); *see also Duckworth v. Whisenant,* 97 F.3d 1393, 1397 (11th Cir. 1996) ("[T]he proof of the hours spent in litigation and any corresponding objections posed [must] be voiced with a similar exactitude."); *compare, e.g.*, *Barnes*, 168 F.3d at 428 ("The [fee opponents] … have discharged [their] obligation well. … [T]hey have carefully analyzed the billing records and done what the fee application itself should have done, which is to calculate the number of hours billed for completing each of various litigation tasks[.] … Defendants have put forward specific arguments designed to show that many of the hours submitted by the plaintiffs in connection with a given task indicate a lack of proper billing judgment[.]"), *with Rodriguez v. Molina Healthcare Inc.*, 806 F. App'x 797, 804 (11th Cir. 2020) (declining to reduce certain hours because the fee opponent failed to identify assertedly duplicative hours), *and Domond v. PeopleNetwork APS*, 750 F. App'x 844, 848–49 (11th Cir. 2018) ("The objected-to billing entries were not obviously excessive, duplicative, or indiscernible, so the district court did not abuse its discretion in concluding that [the fee opponents] had to do more than object without a full explanation.").

When the case was in the District of New Jersey, Russell Faegenburg, Stephen Lund, and Bruce Sales — all with Lerner, David, Littenberg, Krumholz & Mentlik LLP in New Jersey — represented Lanard. *See generally* D1–D87. In this Court, Richard Sybert, a partner with Gordon & Rees LLP in its Seattle and San Diego offices served as lead counsel for Lanard. *See*

*generally* D523-1. Sybert worked with at least five other lawyers with Gordon & Rees, including Holly Heffner in the San Diego office, *see* D130, D131, and Eric Thompson in the Miami office, *see* D523-10.

Lanard provides a declaration, D523-1, supplemental declaration, D538-1, and biography, D523-7, of Sybert. Lanard separately provides a declaration of Thompson. D523-10. Sybert offers opinions about rates paid by commercial general liability insurers under "advertising injury" policy provisions.[17] D523-1 ¶ 14. Sybert and Thompson present circumstances relating to the work requested by the defendants. D523-1 ¶¶ 3–11, 16; D523-10 ¶¶ 3, 4. The opinion and circumstances are discussed below.

### D.   Discretion

Determining a reasonable fee is committed to a district court's "sound discretion." *Perdue*, 559 U.S. at 558. "An abuse of discretion occurs if the [court] fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous." *In re Hillsborough Holdings Corp.*, 127 F.3d 1398, 1401 (11th Cir. 1997) (quoted authority omitted). An arithmetical error also could "constitute[] an abuse of discretion." *Barnes*, 168 F.3d at 439.

---

[17]Sybert states that, having worked with at least 10 insurance companies over the last 20 years in more than 100 engagements, he has "seen first-hand that every major insurer utilizes third party audit services as part of their bill review process," and that process "typically results in deductions that can range as high as 20% and beyond." D523-1 ¶ 17. After Sybert filed his declaration, the defendants explained that the insurer here challenged 4.3 percent of the time claimed by Lewis Anten P.C.; fees for that time had been included in the fee motion; but the defendants now exclude those fees from their fee request. D536 at 8, 18. Typical insurance deductions were never or are no longer relevant.

The discretionary standard "is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley*, 461 U.S. at 437; *see also Fox v. Vice*, 563 U.S. 826, 838 (2011) ("We can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it."); *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 846 F.3d 1159, 1163 (11th Cir. 2017) ("This standard necessarily implies a range of choices, and we will affirm even if we would have decided the other way if it had been our choice." (internal quotation marks and quoted authority omitted)).

In exercising its discretion, a district court must "provide a concise but clear explanation of its reasons for the fee award." *Hensley*, 461 U.S. at 437; *see also Perdue*, 559 U.S. at 558 ("It is essential that the judge provide a reasonably specific explanation for all aspects of a fee determination[.]"); *McKenzie v. Cooper, Levins & Pastko, Inc.*, 990 F.2d 1183, 1184 (11th Cir. 1993) ("The district court has great latitude in formulating attorney's fees awards, subject only to the necessity of explaining its reasoning so that we can undertake our review." (internal quotation marks and quoted authority omitted)); *Norman*, 836 F.2d at 1304 ("The court's order on attorney's fees must allow meaningful review — the district court must articulate the decisions it made, give principled reasons for those decisions, and show its calculation.").

"Some circuits explicitly state that the adequacy of a court's explanation should be carefully scrutinized where substantial fees are involved." *Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994). "Regardless, a court's explanation must provide for meaningful review." *Id.*

### E.    Court's Expertise

"Courts are often faced with inadequate fee applications or with claims for hours or fee rates which seem excessive." *Norman*, 836 F.2d at 1303. If "documentation is inadequate, the district court is not relieved of its obligation to award a reasonable fee, but the district court traditionally has had the power to make such an award without the need of further pleadings or an evidentiary hearing." *Id.* After all, the "court ... is itself an expert ... and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value."[18] *Id.* (quoted authority omitted).

Thus, if "the time or fees claimed seem expanded or there is a lack of documentation or testimonial support[,] the court may make the award on its own experience." *Id.*; *see Villano*, 254 F.3d at 1311 ("Although the party seeking fees has the burden of supplying the court with detailed evidence from which the court can determine a reasonable fee, where that party presents inadequate documentation the court may determine a reasonable award based on its own experience." (quoted authority omitted)).

A court has "wide discretion on when to use its expertise." *United States v. Patrol Servs., Inc.*, 202 F. App'x 357, 364 (11th Cir. 2006). If a fee applicant fails to satisfy its burden for a particular timekeeper, the court has options: the court may use its expertise, use the rate for someone with no experience, or exclude the timekeeper's fees altogether. *See id.* at 363–64 (discussing these

---

[18]"*Daubert* and its progeny — which require the trial court to serve as a gatekeeper regarding admissibility before a party can present an expert witness's testimony to the fact finder, simply do not apply to the trial court's reliance on *its own* expertise when reviewing a fee request." *Laney v. BBB Logistics, Inc.*, 844 F. App'x 203, 210 (11th Cir. 2021) (internal citations omitted).

options). If a court opts to exercise its expertise, the court must consider what it knows for "the type of litigation at bar" and must not determine a fee "with reference to overly generalized motions of the total range of fees for all federal civil litigation." *Perkins v. Mobile Hous. Bd.*, 847 F.2d 735, 738 (11th Cir. 1988).

Here, the Court may consider its own knowledge and experience for this type of intellectual property litigation.[19]

## F.   *Relevant Community*

The relevant community for assessing reasonable rates generally is "the place where the case is filed." *Barnes*, 168 F.3d at 437 (quoted authority omitted); *compare Cullens v. Ga. Dep't of Transp.*, 29 F.3d 1489, 1494 (11th Cir. 1994) (holding the district court did not commit reversible error in finding that Macon was the relevant community despite transfer to Atlanta because the case was filed in Macon), *with Farmers Coop. Co. v. Senske & Son Transfer Co.*, 572 F.3d 492, 500 (8th Cir. 2009) (holding the relevant community is where the case was tried, not from where the case was transferred).

The Federal Circuit has adopted the "forum rule," under which "the relevant community is defined by the geographic location of the trial court." *Whispell Foreign Cars, Inc. v. United States*, 139 Fed. Cl. 386, 392 (2018); *see, e.g.*, *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:02-cv-0134, 2016 WL 3522964, at *4–7 (M.D. Pa. June 28, 2016) (using Pennsylvania as the relevant community in awarding fees relating to an appeal to the Federal Circuit).

---

[19]The judges assigned to this case have more than 50 years' combined experience working as lawyers or judges in Jacksonville.

Here, Lanard filed this case in the District of New Jersey in March 2014, and the case was assigned to a district judge in Newark. D1. There, the parties mostly litigated Lanard's motion for a preliminary injunction and the defendants' motion to transfer. *See generally* D1–D92. The case arrived here in July 2015. D93. Lanard appealed to the Federal Circuit in April 2019. D480.

Fairness dictates that the relevant community is Newark when the case was there and Jacksonville thereafter, including during the appeal. The undersigned recommends using Newark and Jacksonville over the District of New Jersey and the Middle District of Florida because rates presumably vary widely among the big and small cities in the districts.

About the relevant community, the defendants contend only, "The appropriate market to consider for … rates [when the case was in the District of New Jersey] was the greater New York metropolitan legal market[.]" D536 at 4. The contention lacks support. The defendants provide neither a definition of "the greater New York metropolitan legal market" nor authority for extending the market beyond the New Jersey border and into New York City, which presumably has the highest or near-highest rates in the country.

## G.   *Current versus Historical Rates*

In 2010, because of an intervening United States Supreme Court opinion, the Eleventh Circuit "modified" its jurisprudence on delay between the time legal services are rendered and the time the lawyers are paid. *See Gray ex rel. Alexander v. Bostic*, 613 F.3d 1035, 1044 (11th Cir. 2010) ("Our existing circuit law on this subject must be read in light of, and modified to fit, the holdings in *Perdue* about enhancements for the delay in payment of

19

expenses and fees.").[20] The Eleventh Circuit explained that a lodestar enhancement for delay, like any other lodestar enhancement, is warranted only if exceptional circumstances are present; for example, if the delay was exceptional and "unjustifiably caused by the [fee opponent]." *Id.* at 1045. The Eleventh Circuit added that the enhancement "is accomplished '*either* by basing the award on current rates *or* by adjusting the fee based on historical rates to reflect its present value.'" *Id.* at 1046 (quoting *Perdue*, 559 U.S. at 556) (emphasis in *Gray*).[21]

_____

[20]The Eleventh Circuit had held that "where there is a delay the court should take into account the time value of money and the effects of inflation and generally award compensation at current rates rather than at historic rates." *Norman*, 836 F.2d at 1302. The Eleventh Circuit also had observed, "[U]sing current rates to account for the delay in payment is somewhat inaccurate as it assumes that the increase in legal fees mirrors that of inflation, which in many instances is not the case. A more accurate method for adjusting for delays in payment would be to apply to the award a figure which is recognized as representing the time value of money over the period of the litigation." *Gaines v. Dougherty Cnty. Bd. of Educ.*, 775 F.2d 1565, 1572 n.14 (11th Cir. 1985). The Eleventh Circuit expressly modified both approaches in light of the intervening Supreme Court opinion. *See Gray*, 613 F.3d at 1044.

[21]Lower courts appear to have different takes on current Eleventh Circuit jurisprudence on delay between the time legal services are rendered and the time the lawyers are paid. *Compare, e.g., Anderson v. Surgery Ctr. of Cullman, Inc.*, No. 2:12-cv-00598, 2018 WL 8807149, at *9 (N.D. Ala. Aug. 27, 2018) (stating that a court may use current rates to account for delayed payment but may not adjust the lodestar to account for delayed payment absent extraordinary circumstances), *and In re Delta/Airtran Baggage Fee Antitrust Litig.*, No. 1:09-MD-2089, 2015 WL 4635729, at *19 (N.D. Ga. Aug. 3, 2015) ("Plaintiffs do not seek an enhancement; they request an award calculated with current billing rates, which is standard in this circuit."), *with Edwards v. Astrue*, No. 7:10-cv-132, 2011 WL 5179599, at *1 (M.D. Ga. Oct. 11, 2011) ("Reimbursement of expenses shall be awarded using the current rates, rather than the historic rates, only when there is an exceptional delay that warrants an enhancement."), *R&R adopted*, No. 7:10-CV-132, 2011 WL 5179538 (M.D. Ga. Oct. 31, 2011), *and Hernandez v. Berlin Newington Assocs., LLC*, No. 3:10-CV-01333, 2018 WL 3599735, at *1 (D. Conn. July 27, 2018) (citing Eleventh Circuit jurisprudence and explaining that "[w]here the reason for enhancing attorneys' fees is based on the delay in payment, the delay must be exceptional and compensation is generally made either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value." (internal quotation marks and quoted authority omitted)).

Because the defendants proposed historical rates in the fee motion and do not contend the Court should address any delay in payment to their insurer, the Court need not decide which application of the jurisprudence is correct.

Here, in the fee motion and response, the parties say nothing about whether the Court should use current or historical rates except in a footnote in the motion: "To ensure the reasonableness of the requested fees, Defendants have used the actual historical rates for these attorneys as part of this fee request instead of current rates." D518 at 28 n.32. In response to a question raised at the recent telephone conference, the defendants, focusing on the rate requested for senior partners (**$475**), contended the rate is "less than the maximum 'reasonable rate' available both historically and currently." D543 at 4 (emphasis omitted). They explain they "sought this as a discounted rate and as a concession to Lanard to ensure the overall reasonableness of the fee requested." D543 at 4.

Lanard responds that no delay is present because the insurer already paid the law firms. D544 at 6. Lanard assumes the defendants request current rates and argues that if the Court adopts those rates, the Court should adjust them "to account for historically reasonable rates." D544 at 6. Lanard suggests this can be accomplished by viewing defense counsel's rate increases over the years, such as Anten's ("$600/hr, $550/hr, $475/hr, and $350/hr"), and gives examples, including this example: "Mr. Anten's rates should be adjusted by similar increments, then, to $475/hr (for entries billed at $600/hr), $425/hr (for entries billed at $550/hr), $350/hr (for entries billed at $475/hr), and $225/hr (for entries billed at $350/hr)."[22] D544 at 6–7.

---

[22]In response to a question by the undersigned ("Lewis Anten charges an hourly rate of $350 for work on March 18, 2018 and September 24, 2019. … Why is his rate sometimes reduced?" D539 at 2), the defendants explained, "This was an error in preparing the submission to the Court of the Anten Law Firm fee records. The actual bills provided to Lanard show the correct rates for Attorney Anten." D541 at 4. In other words, Anten never billed at an hourly rate of **$350** during this litigation. Why Lanard includes **$350** in its description of Anten's rates — after the defendants' explanation — is unclear.

Because the defendants proposed historical rates in the fee motion and do not contend the Court should address any delay in payment to their insurer, using historical rates is warranted.

## H.   *Rates*

Under the lodestar method, a reasonable rate is the prevailing market rate in the relevant community. *Perdue*, 559 U.S. at 551; *Rowe*, 472 So. 2d at 1151. The prevailing market rate is the rate charged for similar services by lawyers with reasonably comparable skill, experience, and reputation. *Norman*, 836 F.2d at 1299; *Rowe*, 472 So. 2d at 1151. Failing to apply that standard is reversible error. *See, e.g.*, *Norman*, 836 F.2d at 1305 (reversing where district court selected a rate as the rate charged by "old-line" firms in the community).

Determining the prevailing market rate for a lawyer's services is "inherently difficult." *Blum v. Stenson*, 465 U.S. 886, 895 n. 11 (1984). A court "is seldom presented with one figure as a prevailing market rate." *Norman*, 836 F.2d at 1300. "More typically," the movant requests "rates approximating the highest charged in the community," while the non-movant "generally submits evidence of the lowest rate charged in any part of the community." *Id.* Moreover, "rates vary from lawyer to lawyer, case to case, and client to client." *Id.* "To say that the prevailing market rate is the figure at either extreme or at a precise point between the extremes is a divination that cannot be made with the same certainty as ascertaining the value of a futures contract for pork bellies or wheat on a given day." *Id.* The United States Supreme Court has elaborated:

> Market prices of commodities and most services are determined by supply and demand. In this traditional sense there is no such thing as a

> prevailing market rate for the service of lawyers in a particular community. … The fees charged often are based on the product of hours devoted to the representation multiplied by the lawyer's customary rate. But the fee usually is discussed with the client, may be negotiated, and it is the client who pays whether he wins or loses. The [statutory] fee determination is made by the court in an entirely different setting: there is no negotiation or even discussion with the prevailing client, as the fee — found to be reasonable by the court — is paid by the losing party. Nevertheless, … the critical inquiry in determining reasonableness is now generally recognized as the appropriate hourly rate.

*Blum*, 465 U.S. at 895 n.11.

To satisfy its burden, the fee applicant must produce "satisfactory evidence" that the requested rates accord with prevailing market rates. *Norman*, 836 F.2d at 1299. "Satisfactory evidence at a minimum is more than the affidavit of the attorney performing the work." *Id.* "[S]atisfactory evidence necessarily must speak to rates actually billed and paid in similar lawsuits." *Id.* "Testimony that a given fee is reasonable is therefore unsatisfactory evidence of market rate." *Id.*

"Evidence of rates may be adduced through direct evidence of charges by lawyers under similar circumstances or by opinion evidence." *Id.* "The weight to be given to opinion evidence of course will be affected by the detail contained in the testimony on matters such as similarity of skill, reputation, experience, similarity of case and client, and breadth of the sample of which the expert has knowledge." *Id.*

Evidence of little or no value in determining a reasonable rate includes a declaration that a rate is reasonable without a detailed basis, expert analysis, or mention of the prevailing market rate; a declaration about an award made outside the relevant community without a showing that the prevailing market rates are the same in both communities; and a declaration about a rate charged

by a lawyer without a showing that the rate was charged in a similar case for a similar client by a lawyer of similar skill, experience, and reputation. *Norman*, 836 F.2d at 1304–05.

If a client and a lawyer have contracted for services at a particular rate, the rate "is a strong indication of a reasonable rate." *Tire Kingdom*, 253 F.3d at 1337; *accord Griffith v. McDonough*, No. 20-14464, 2021 WL 4461605, at *1 (11th Cir. Sept. 29, 2021); *see also Dillard v. City of Greensboro*, 213 F.3d 1347, 1354 (11th Cir. 2000) (explaining that the amount a lawyer charges a client is "powerful" and "perhaps the best" evidence of the lawyer's market rate). But the agreed-upon rate is neither a "cap" nor a "ceiling" in determining a reasonable rate. *Tire Kingdom*, 253 F.3d at 1337.

Once a court "has winnowed down the comparables offered by the parties" to those relating "to the facts and circumstances of the case, the client, and the attorney before it, … there might be a range in prevailing market rates." *Norman*, 836 F.2d at 1300. "That range is accounted for almost always by experience, skill and reputation." *Id.* "A closer analysis suggests that reputation and experience are usually only proxies for skill, which in a rational economic environment is the ultimate determinant of compensation level." *Id.*

"If the court believes that prevailing counsel was merely inefficient, that fact should be reflected in the hourly rate awarded." *Id.* at 1306; *accord Perkins*, 847 F.2d at 738 ("[If] the court believes that the matter has not been handled efficiently, the court may reflect that fact by decreasing the hourly rate to the market rate [of] lawyers of less skill and experience."); *see also Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983) ("A fee applicant cannot demand a high hourly rate — which is based on his or her

experience, reputation, and a presumed familiarity with the applicable law —
and then run up an inordinate amount of time researching that same law.").

"No two lawyers possess the same skills, and no lawyer always performs
at the same level of skill." *Norman*, 836 F.2d at 1300. The parties therefore
should "provide the court with a range of market rates for lawyers of different
skill levels (perhaps as measured by quality and quantity of experience)
involved in similar cases with similar clients, so that the court may interpolate
the prevailing market rate based on an assessment of the skill demonstrated
in the case at bar." *Id.*

About skill, the Eleventh Circuit has elaborated:

> Legal skill is a several faceted concept and there is no assurance
> that a level of attainment in one facet means that the practitioner will
> or has similarly attained in all facets. Legal skill may be a function of
> experience, but that is not always the case. Further, legal skill has no
> intrinsic value unless it is used to further the client's interest, which is
> to obtain a just result quickly and economically.

> At the beginning of a case skill is manifest in the kind of judgment
> shown in case assessment. This is evidenced by efforts where feasible to
> seek dispute resolution without litigation, or, if litigation appears
> necessary, by the decisions on theories to be included and parties to be
> sued.

> From the beginning and throughout a case, expertise in
> negotiations and tactics often advances a client's cause more quickly and
> effectively than the sustained and methodical trench warfare of the
> classical litigation model.

> Throughout, and particularly if litigation is begun, the word
> "skill" incorporates the notions of organization and efficiency. An
> attorney of great skill organizes his thoughts, his work, and his
> presentation in a logical and orderly way without lost motion or false
> starts so that each move builds upon the last to the achievement of the
> goal. Organization means that discovery devices and motions are
> thought out and not utilized in a random and erratic way or for the mere

purpose of going through established routines. Efficiency means doing well just what ought to be done and doing it in a minimum of time.

The underpinning for these facets of legal skill is knowledge, knowledge of trial practice and knowledge of the substantive law. A lawyer who has to educate himself generally in either or both of these two areas may ultimately be as effective as a specialist, but he has no right to expect to be reimbursed at the same rate as a lawyer who begins his preparation with the finer points raised by the particular case.

The final attribute of legal skill is perhaps the one the general public thinks of first — persuasiveness. Some clients prevail only because of the compelling merit of their case and in spite of their attorney's efforts to communicate a position. In other cases, usually close ones, the better advocate may actually sway the outcome on occasion. In the usual case, both the merits and the advocacy control the outcome. The measure of good advocacy is that the client's best positions are advanced clearly, crisply and compellingly.

In summary, ordinarily there are no quotations for the prevailing market rate for a given attorney's services. Instead, the best information … is usually a range of fees set by the market place, with the variants best explained by reference to an attorney's demonstrated skill.

*Id.* at 1300–01.

The court's job "in a given case" is "to interpolate the reasonable rate based on an analysis of the skills enumerated above which were exhibited by the attorney in the case at bar," while "remembering that the highest market rates are not theoretical rates for the perfect lawyer and that the lowest market rates are being earned not by imbeciles but by men and women who are proud to say they are attorneys, who are good enough to earn a livelihood from the profession, and who are at least well enough qualified to be admitted to the bar." *Id.* at 1301.

Here, in the fee motion, the defendants requested "discounted" hourly rates as high as **$747** for lawyers and **$364.50** for paralegals. D520 ¶¶ 19–21

26

& p. 7 n.3 (requested rates for Socolow and Alam for time they spent on the fee motion when the case was in Jacksonville). In their supplemental briefing, the defendants state their belief that the originally requested rates "are reasonable and consistent with prevailing rates charged by attorneys of comparable skills, experience and reputation." D536 at 2. But assertedly "to simplify the lodestar calculation," the defendants now request "uniform rates for senior partners, junior partners and associates regardless of the firm involved." D536 at 2; *see also* D541 at 4 (the defendants' later request concerning a uniform rate for paralegals).

Specifically, the defendants request hourly rates of **$475** for work by senior partners (partners with more than 20 years' experience), **$425** for work by a junior partner, **$350** for work by associates, and **$200** for work by paralegals:

| Name | Firm | Position | Approx. Years of Experience[23] | Rate Paid & Requested in Fee Motion | Rate Now Requested |
|---|---|---|---|---|---|
| Abel | H&K | Partner | 29 | 545 | 475 |
| Alam | Loeb & Loeb | Paralegal | 25 | 364.50 | 200 |
| Anten | Lewis Anten | Partner | 48 | 600, 550, 475 | 475 |
| Arbiter | Lewis Anten | Associate | 13 | 400, 350 | 350 |
| Batliner | H&K | Partner | 10 | 425 | 425 |
| Brinker | H&K | Paralegal | 35 | 200 | 200 |
| Choderker | Lewis Anten | Associate | 20 | 400, 350 | 350 |
| Feuer | Loeb & Loeb | Associate | 7 | 265.50, 396 | 350 |
| Goracke | H&K | Associate | 7 | 350 | 350 |

---

[23]The years of experience are approximate and based on declarations signed in 2020. *See* D519 at 4; D520 ¶¶ 6–11; D521 at 3.

| Pabian | H&K | Partner | 25 | 475 | 475 |
|--------|-----|---------|-----|-----|-----|
| Page | H&K | Partner | 28 | 525, 545, 555, 475 | 475 |
| Papa | Loeb & Loeb | Paralegal | 25 | 355.50 | 200 |
| Payne | H&K | Paralegal | ? | 200 | 200 |
| Pepper | Loeb & Loeb | Paralegal | 25 | 337.50, 346.50 | 200 |
| Sarowitz | Loeb & Loeb | Associate | 13 | 585 | 350 |
| Socolow | Loeb & Loeb | Partner | 25 | 630, 652.50 | 475 |

D518 at 28; D536 at 2–4; D541 at 4. Except for Feuer, the rates now requested are the same as, or lower than, the rates requested in the fee motion. The rates are lower than the ordinary rates charged by the firms. And the rates are the same as or lower than the rates the insurer paid.[24] *See* D528-1 ¶ 4; D528-2 ¶ 3; D528-3 ¶ 2.

Evaluating the skill of the lawyers and paralegals as a team based solely on the results obtained is difficult or impossible because the results — undeniably excellent — may have come from skill, or from the fact that the law favored the defendants, or from a combination of both.

Evaluating the skill of the team based on failing to obtain results quickly and economically is unwarranted because the gap between views on potential damages apparently was too wide to close regardless of skill. *See* D521 ¶ 13(a) (Page's declaration explaining that the defendants were "willing at all times to

---

[24]In response to the fee motion, Lanard complained that the defendants had failed to offer evidence of what the insurer actually paid. D523 at 36–37. At the undersigned's direction, D527, the defendants clarified, "The fees that Defendants have asked the Court to award were paid in full by Ja-Ru's insurance carrier (or Ja-Ru early in the case for a deductible) at the rates in the motion." D528 at 2. Lanard's complaint about fees requested versus fees actually paid has been resolved except to the extent that Lanard argues initial non-disclosure of insurer-challenged fees evidences a lack of good faith, addressed later in this R&R.

reasonably settle the dispute and not sell the accused device in the future, but never received anything close to a realistic settlement demand from Plaintiff, leaving Defendants no choice but to defend the case"); D523-1 ¶ 11 (Sybert's declaration explaining that the defendants' settlement offers "were premised on a narrow and restricted view of the claims with which we simply and fundamentally disagreed").

What can be said about skill is that the primary partners — Anten and Page — knew procedural and substantive law well and the team by and large presented the defendants' positions clearly, logically, and persuasively, though with force matching that of Lanard's counsel, which at times may have escalated or multiplied collateral disputes.

As to experience, for some lawyers and paralegals, the record contains little information. For Payne, the record contains only her law-firm position. *See generally* D521. For Abel, Alam, Brinker, Papa, and Pepper, the record contains only their law-firm positions and years of experience. *See generally* D520, D521. For Feuer, the record contains only her law-firm position, her law school, the year she obtained her Juris Doctor degree, and the statement she "maintains a broad-based litigation practice and is admitted in the District of New Jersey." *See generally* D520 ¶ 8. For Sarowitz, the record contains only her law-firm position, her law school, the year she obtained her Juris Doctor degree, the statement she has "extensive experience litigating matters involving intellectual property and is admitted to practice in the District of New Jersey," and the statement that after this lawsuit began, she "was hired by Donna Karan New York as an intellectual property attorney." *See generally* D520 ¶ 7.

For other lawyers and paralegals, the record contains more information. For Socolow, the record contains his law-firm position, his law school, his years of experience, the statement he has experience as lead counsel "in many matters," the statement he has practiced his "entire career" in New York except for a few years when he was an associate in Florida, and the statement he "litigate[s] business and intellectual property matters, including copyright matters, in state and [f]ederal courts, primarily in the New York City area." D520 ¶¶ 1, 6. For Anten, Arbiter, Batliner, Choderker, Goracke, Pabian, and Page, the record contains their law-firm positions, years of experience, and curricula vitae or biographies, which generally show employment, memberships, and honors commensurate with their years of legal practice. D519 ¶¶ 2, 4, 9; D519-1; D519-2; D521 ¶¶ 2, 3, 6; D521-1; D521-2.

Of note, Anten and Page are admitted to practice in the United States Patent and Trademark Office, with Anten having worked as an examiner there; Anten has represented toy companies in intellectual property matters for more than 45 years; Anten, Page, and Choderker all have more than 20 years of litigation experience, including experience in intellectual property litigation; and Pabian has worked on many appeals in many state and federal courts. D519 ¶¶ 3, 7; D519-1; D519-2; D521 ¶ 3; D521-1; D521-2 at 8. Anten also was a founding partner of a toy company with subsidiaries and other affiliated companies in many places, including Hong Kong. D519 ¶ 3. According to him, his experience "in the organization of Hong Kong companies and the interplay with China factories involved in the manufacture of toys[] came to the forefront" when Lanard tried to bring Ja-Ru's Hong Kong affiliate into this action. D519 ¶ 15(c).

As to reputation, the record contains only one opinion about one lawyer. Bishop opines that Page "enjoys an excellent reputation, and is a respected member of the trial bar."[25] D543-1 ¶ 12(A). Outside the record but a matter of common knowledge, Abel enjoys an excellent reputation in the Jacksonville legal community.

The record contains information about honors that may reflect on reputation, but not necessarily so.[26] Arbiter is a "5-star rated AVVO attorney." D519-2 at 3. Socolow was named a "New York Metro Super Lawyer" in Business Litigation by Thomson Reuters from 2009 to 2018 (among other unspecified distinctions). D520 ¶ 6. Page has the highest Martindale peer rating, received "Best Lawyer" for the Jacksonville market for "Intellectual Property Law" from 2006 to 2013 and for "Litigation — Intellectual Property" from 2014 to 2019, received recognition as "IP Litigator of the Year" for the Jacksonville market, and was named in the Florida *Super Lawyers* magazine in 2006. D521 ¶ 3; D521-1 at 3, 4. Pabian was named "Most Effective Lawyer, International Litigation" in the *Daily Business Review* in 2018. D521-2 at 9.

Despite that "satisfactory evidence necessarily must speak to rates actually billed and paid in similar lawsuits," *Norman*, 836 F.2d at 1299, for comparable cases, Anten and Page each state, "I am not sure there is a similar IP case to this one given the disparity between the fees incurred and what

---

[25]Based on his review of Anten's credentials, Bishop says, "I am impressed with Mr. Anten's experience in IP and toy related matters, and have no hesitation giving the opinion that he is highly competent, experienced and qualified to handle a matter such as this one, along with the other members of his team." D543-1 ¶ 12(B). (The declaration erroneously has two paragraphs labeled 12(B); this citation is to the first one.) Because Bishop bases his statement not on personal knowledge but on his review of Anten's credentials — something the Court can do — the statement is not considered an opinion about Anten's reputation.

[26]At least sometimes, commercially based and other honors may be a product of stellar marketing over stellar reputation.

should have been the amount in controversy." D519 ¶ 15(*l*); D521 ¶ 13(*l*). Still, in his supplemental declaration, Page details one proposed comparator:

> I was … involved in another intellectual property matter several years ago that was pending in the Middle District of Florida contemporaneously with the instant action. In that case, [H&K] took over from other firms and had to negotiate rates with the clients' [commercial general liability] carrier, which defended the case based on potential "advertising injury" coverage. The carrier eventually agreed to pay $475 for partners (junior and senior partners) and up to $335 for associates and $190 for paralegals for defending the client in that action. Rates have increased in the four years since that matter.

D537 ¶ 5.

The record contains only two opinions on whether the rates requested are the rates charged in the relevant community (Newark or Jacksonville) for similar services (defending against intellectual property claims and prosecuting intellectual property counterclaims) by lawyers with reasonably comparable skill, experience, and reputation (just described).[27]

---

[27]Based on familiarity with the "prevailing billing rates for lawyers of like skill, experience, training and background in complex commercial matters in Los Angeles," Anten opines that his, Arbiter's, and Choderker's requested rates "are well below the rates charged by comparable lawyers at comparable firms in the Los Angeles, California legal market for the type of work at issue in this matter." D519 ¶ 8. Whether the rates are reasonable in Los Angeles matters naught.

While acknowledging he is "not an expert on the Jacksonville, Florida legal market," Anten "believe[s]" that his, Arbiter's, and Choderker's rates "are commensurate with and, with [his] rate, even lower than the rates charged by comparable lawyers at comparable firms in the Jacksonville, Florida legal market for the type of work at issue in the matter." D519 ¶ 8. As a belief, not an opinion based on expertise about the Jacksonville market, the belief is entitled to no weight.

Socolow opines "the rates charged … by [Loeb & Loeb] represent reasonable charges for the services and work performed under the factors … regarding the reasonableness of [sic] attorneys' fee request." D520 ¶ 22. He adds, "Loeb & Loeb performed its services at hourly rates ranging from $295 to $725 an hour, which are consistent with the fees charged by other comparable litigators in this market." D520 ¶22(iv). The relevance of this opinion is unclear.

Bishop is the founder, principal, and shareholder of a Jacksonville firm and has practiced in North Florida since 1992 in areas that include complex and commercial litigation and on disputes involving intellectual property, D543-1 ¶¶ 2–4, 6. He is admitted to practice in several federal courts, including all federal courts in Florida; is AV-rated and has been recognized in other publications; is the past chair of the Trial Lawyers Section of The Florida Bar; and is familiar with the prevailing hourly rates in North Florida "and in the Middle District of Florida for lawyers of varying levels of experience, skill, and reputation." D543-1 ¶¶ 2–6. He contends he is "familiar with the type of work and time required in similar suits" and is "familiar with the difficulties of the questions involved, of the skill required to perform the required legal services properly, and other aspects of this and similar litigation." D543-1 ¶ 8. He explains he discussed the "matter generally with local defense counsel to better understand the matter" and examined "portions" of the file, including the fee motion, Anten's and Page's declarations, and "certain key pieces of the correspondence, pleadings, and motions[.]" D543-1 ¶¶ 9, 10.

Bishop opines, "This matter obviously involved complex points of law and factual issues, and required a high degree of skill to defend." D543-1 ¶ 12. For Abel, Anten, Arbiter, Batliner, Brinker, Choderker, Goracke, and Page (the lawyers and paralegals at Lewis Anten P.C. and H&K, excluding Pabian and

---

Socolow fails to specify the market on which he is basing the opinion (New York City and nearby areas?) and fails to specify that he is choosing the rates charged for similar services by lawyers or paralegals with reasonably comparable skill, experience, and reputation. *See generally* D520. Besides, he uses an incorrect range (the correct range is **$265.50** to **$747**).

Socolow points to the National Law Journal survey of rates of lawyers in large national firms he includes with his declaration and states, "The NLJ Survey shows that the billing rates charged by Loeb & Loeb attorneys were commensurate with, or below, rates charged for other similarly qualified attorneys at large law firms in the New York metropolitan area." D520 ¶ 23. Without a showing that the prevailing market rate is the same in Newark and New York City, this statement has little or no relevance.

Payne), he opines the rates requested in the fee motion are "consistent with the relevant legal market and the work necessary to defend this case," are "consistent and in line with similarly skilled professionals in North Florida and the Middle District of Florida," and "are consistent with those customarily charged for similar legal services." D543-1 ¶ 12. He further opines "that any law firm in this jurisdiction committed to excellence in advocacy, and to producing a high quality work product, would have charged similar rates for the defense of this action."[28] D543-1 ¶ 13.

Based on his familiarity with "the prevailing billing rates for lawyers of like skill, experience, training and background in complex commercial matters in the Jacksonville … legal market," Page opines that "the rates of H&K's lawyers submitted with the fee application are consistent with the rates charged by comparable lawyers at comparable firms in the Jacksonville … legal market for the type of work at issue in this matter." D521 ¶ 4. Based on his employment with H&K for 25 years, focus on intellectual-property and insurance-coverage matters, and experience negotiating rates with insurers, Page opines that "the rates paid by Ja-Ru's insurer …, ranging from $475 to $550 for senior partner work, $425 for junior partner work and $350 for

---

[28]In his declaration, Bishop discloses that he worked as a partner with H&K for seven years, from 1999 until 2006. D543-1 ¶ 4. Lanard argues the "[d]efendants' attempt to use a former colleague of theirs as a purported expert to justify their rates should be rejected out-of-hand generally as self-serving[.]" D523 at 31.

This argument lacks merit. The Florida Supreme Court has observed that lawyers generally "are willing to testify gratuitously for other lawyers on the issue of reasonable attorney's fees" as "a matter of professional courtesy." *Travieso v. Travieso*, 474 So. 2d 1184, 1186 (Fla. 1985). That a lawyer would ask a former colleague to extend this courtesy stands to reason. That a member in good standing of The Florida Bar would be less than forthcoming in a declaration submitted to a court to benefit a former colleague does not. Bishop's employment with H&K more than a decade ago, without more, is insufficient to undermine his credibility. "Out-of-hand" rejection of his opinions is unwarranted. *See* D523 at 31 (quoted).

associates, is more in line with prevailing rates for local work," while the rates requested in the supplement (D536) "are at or below the local market rates[.]"[29] D537 ¶¶ 3, 4.

The defendants detail the rates ordinarily charged by their lawyers and emphasize that they discounted those rates.[30] Under the standard, a reasonable rate might differ from the rate a lawyer ordinarily charges. *See Mayson v. Pierce,* 806 F.2d 1556, 1557–58 (11th Cir. 1987) (holding that, considering the record, the district court acted within its discretion in determining a reasonable hourly rate of $75 even if the lawyer "would normally have charged a higher rate"); *accord Turner v. Sec'y of the Air Force*, 944 F.2d

---

[29]The ranges Page describes in his declaration differ from the ranges in the fee motion, which were **$350** to **$747** for partners and **$265.50** to **$585** for associates. D518 at 28; D520 ¶ 19. Page presumably references the ranges for work by H&K lawyers only, though he is off there too. The range for work by H&K senior partners in the fee motion is **$475** to **$555**. D518 at 28.

[30]For Lewis Anten P.C., Anten explains the lawyers who worked on this case "have standard hourly rates ranging from $400 to $750." D519 ¶ 15(e). Anten states his hourly rate was **$650** when the case was filed, he reduced his rate to **$550** and set Arbiter's and Choderker's rates at **$400**, and, once insurance coverage was confirmed, he further reduced his rate to **$475** and Arbiter's and Choderker's rates to **$350**. D519 ¶ 6. He continues, "The ultimate discount was the result of negotiations with the [insurer]." D519 ¶ 15(e).

For Loeb & Loeb, Socolow explains his standard hourly rates — depending on the year — were **$700** to **$725**, associate Sarowitz's rate was **$650**, associate Feuer's rates were **$295** to **$440**, and the paralegals' rates were **$375** to **$405**. D520 at 7. In the fee motion, Socolow requested "an hourly rate (post discount) of **$747**" for work in 2019 without explaining a standard hourly rate for that year. D520 ¶ 19. Socolow states he provided the defendants "a courtesy discount[.]" D520 ¶ 13.

For H&K, Page states he reduced Batliner's and Goracke's Boston rates and Pabian's Miami rate so they would be "commensurate with … rates for Jacksonville[.]" D521 ¶ 6(b); *see also* D521 ¶ 13(a) ("In the exercise of billing judgment, I have decided to substantially discount the rates of our Boston and Miami attorneys who worked on this file … from their standard rates [by approximately 42% for Courtney Batliner, nearly 50% for Mark Goracke and 39% for Ilene Pabian] to account for the difference in market rates."). Page adds, "At the insurer's request and given the higher than expected fees on the file, [H&K] also agreed to a further discounted rate for handling the appeal with Lewis Anten P.C." D521 ¶ 9.

804, 809 (11th Cir. 1991) (affirming an award based on a rate lower than what the lawyer normally charged). The ordinary rates charged by lawyers in Los Angeles with Lewis Anten P.C., in New York City with Loeb & Loeb, and in Boston and Miami with H&K have no relevance. The ordinary rates charged by lawyers and paralegals with Loeb & Loeb in Newark and H&K in Jacksonville are relevant to the extent the firms presumably aim to base rates on the local market, but they are not determinative.

Recognizing that the defendants have the burden and considering the entire record summarized in the pending R&R and this supplemental R&R (including the rates the insurer actually paid), as well as the undersigned's own knowledge and expertise about rates for work on intellectual property litigation in Jacksonville, the following rates are reasonable as the rates charged for similar services by lawyers with reasonably comparable skill, experience, and reputation in New Jersey (2014 to June 2015) and Jacksonville (thereafter). Had the fee application included more than one comparable and a range of reasonable rates, the reasonableness determinations would have been easier.

For senior partners Abel (2016), Anten (2014 to 2020), Pabian (2019 and 2020), Page (2015 to 2020), and Socolow (2014, 2015, and 2019), a reasonable hourly rate is **$475** (the rate requested in the supplement) for work in 2014 and thereafter. Depending on the place and the year, the rate is at a low end, midpoint, or high end of a range of reasonable rates (approximately **$400** to **$600**).

For junior partner Courtney Batliner (2019), a reasonable hourly rate is **$425** (the rate requested in the fee motion and the supplement). The rate is at a midpoint to high end of a range of reasonable rates (approximately **$375** to

**$450**). Batliner joined the team to help with motions in limine and other pretrial work. D541-1 at 1–3. Lanard presents no objection to the entries for her work. *See generally* D523 at 32–35; D523-9.

For associates Arbiter (2016, 2017, and 2019), Choderker (2014 to 2020), and Goracke (2019), a reasonable hourly rate is **$300** for work in 2014 to 2017;[31] **$325** for work in 2018 and 2019; and **$350** for work in 2020 (the same or lower than the rates requested in the fee motion and supplement). The rates are at the low end of a range of reasonable rates (approximately **$265** to **$400**). More than half of Lanard's "Excessive" or "Excessive/Duplicative" objections concern the hours Choderker and Arbiter billed for their work. *See generally* D523-9. The objections are sound to the extent their hours reflect inefficiencies and limited specialized skill or knowledge for intellectual property litigation. For example, Choderker spent approximately 40 hours researching the law when the case first arrived. *See* D519-3 at 2–3. Arbiter later spent approximately 75 hours researching the law. *See generally* D519-3. Besides many hours of work by other lawyers, Choderker spent approximately 60 hours on the motion to transfer the case for convenience and related work. *See generally* D519-3. Choderker spent 5.75 hours "reading court's order and other documents from Florida court and emailing to client regarding same," D519-3 at 16 (7/9/2015), despite that the order was only three pages long and merely directed Lanard to file an amended pleading to cure shotgun deficiencies, D97, and no other papers from this Court had been filed except a track notice, D98. Besides many hours of work by other lawyers, Goracke spent more than 65 hours researching issues for the motions in limine. *See generally* D541-1 at 6–

---

[31]The recommended rate for Arbiter's and Choderker's work in 2014 to 2017 is the same. Although the rate presumably increased over time, the prevailing market rate was higher in 2014 and part of 2015 when the case was in New Jersey.

8. The insurer objected to some of Arbiter's and Choderker's hours as excessive. *See, e.g.*, D541-2 at 16 (insurer's complaint that Choderker's 2.3 hours for "a non-opposition appears to be an exorbitant amount of time"); D541-2 at 34–36, 38 (insurer's complaint that Arbiter's 39.5 hours researching trade dress were excessive); D541-2 at 45 (insurer's complaint that Arbiter's billing of 14 hours in one day was excessive).

For associate Feuer (2014 and 2015), a reasonable hourly rate is **$265.50** for work in 2014 (the rate requested in the fee motion and lower than the rate requested in the supplement) and **$300** for work in 2015 (lower than the rate requested in the fee motion and supplement). The rates are at the low end of a range of reasonable rates (approximately **$265** to **$400**). The record contains insufficient information about Feuer or comparators to justify higher rates. The **$265.50** rate for work in 2014 is appropriate because that is the rate the defendants requested in the fee motion. *See* D518 at 28; D520 ¶¶ 17, 21.

For associate Sarowitz (2014), a reasonable hourly rate is **$300** (lower than the rate requested in the fee motion and supplement). The rate is at the low end of a range of reasonable rates (approximately **$265** to **$400**). The record contains insufficient information about Sarowitz to justify a higher rate.

For paralegals Brinker (2018 and 2019), Papa (2014), and Pepper (2014 and 2015), a reasonable hourly rate is **$200** (the rate requested in the fee motion and supplement). The rate is toward the high end of a range of reasonable rates (approximately **$125** to **$225**) in consideration of the fact that each paralegal has more than two decades of experience and Lanard's counsel, at the recent telephone conference, stated he was unable to say the rate was unreasonable. No higher amount would be justified because the record shows no specialized experience and the entries in the billing record show ordinary,

not specialized, work. *See Duckworth*, 97 F.3d at 1398 ("Because there is no evidence regarding the paralegals' expertise in a civil rights case, the court finds that compensation at the lowest rate for paralegals outlined by [the movant's lawyer], $45 per hour, is an appropriate fee.").

For paralegals Alam (2019) and Payne (2019 and 2020), a reasonable hourly rate is **$125**. The rate is at the lowest point of a range of reasonable rates (approximately **$125** to **$225**). The record contains no information about Payne beyond her position as a paralegal, justifying no fees or fees at the lowest point of a range of reasonable rates. *See Patrol Servs.*, 202 F. App'x at 363–64. Alam's work is excluded from Loeb & Loeb's billing records, and all that is said about his work elsewhere is that, in addition 10.5 hours by Socolow, he spent 29.1 hours preparing Socolow's declaration included with the fee application.[32] D520 ¶ 20; *see* D520 (declaration); D521-1 (invoices); D521-2 (billing records); D521-3 (National Law Journal survey). The hours for the product (a standard declaration with a relatively small billing record and errors) reflect inefficiencies or limited specialized skill or knowledge justifying the rate.

Lanard argues the Court should apply lower hourly rates: **$325** for senior partners, **$300** for the junior partner, and **$265** for associates. D538 at 3–4. Lanard bases the rates on "the market hourly rate[s] for insurer payment of insureds' intellectual property cases, usually under the rubric of 'advertising injury.' " D523 at 31. Based on his extensive experience with dozens of

---

[32]About Alam's work, Socolow states only, "Mr. Alam's time on this matter was spent assisting in the preparation of this Declaration in support of Defendants' motion for attorneys' fees." D520 ¶ 11. In the fee motion, the defendants requested 29.1 hours for Alam's work at an hourly rate of **$364.50**. D520 at 7. Socolow himself spent 10.5 hours "in connection with the preparation" of his declaration at an hourly rate of **$747**. D520 ¶ 19, 7. All told, in the fee motion, the defendants requested 39.6 hours and a total of **$18,450.45** to prepare Socolow's declaration. D520 at 7.

"intellectual property cases on behalf of insurers" and personal knowledge,[33] Sybert contends that an hourly rate "significantly in excess" of **$265 to $325** "paid or agreed by an insurer" would be "above the applicable market rates for such work." D523-1 ¶ 14. Lanard relatedly argues that the Court should disregard Bishop's opinions because Bishop fails to consider that an insurer paid the fees. D523 at 31.

Lanard's arguments lack merit. Whether insurers generally pay less than what their insureds would have paid sans insurance is irrelevant to the standard — the rate charged in the relevant community for similar services by lawyers with reasonably comparable skill, experience, and reputation — absent application of the unwarranted assumption that professional legal services are payor dependent. *See Schafler v. Fairway Park Condo. Ass'n*, 147 F. App'x 113, 115 (11th Cir. 2005) (explaining that "a district court determining the amount of a reasonable fee under the lodestar formula need not consider insurance coverage or other indemnification agreements"); *cf. Blum*, 465 U.S. at 894–95 (holding nonprofit organizations are entitled to a fee award under 42 U.S.C. § 1988 computed based on reasonable market rates rather than on the lower salaries paid to the organizations' lawyers).

Lanard cites no case holding or even suggesting that the prevailing market rate should be the nationwide rate insurers generally pay for the defense of their insureds in intellectual property disputes. Lanard cites *St.*

---

[33]The "major part" of Sybert's practice for 44 years "has been and is insurance defense of intellectual property cases, on a regular, not occasional or episodic basis." D538 at 3. His firm "has in excess of 1,100 lawyers and, on information and belief, is the only firm in the United States with bricks-and-mortar offices in all 50 states." D538 at 3. "The major part of its business is insurance work, including handling cases for virtually all major insurers in the United States." D538 at 3. According to Lanard, "[t]he information submitted by Mr. Sybert is not his 'opinion' on insurance defense rates; it is his knowledge and experience." D538 at 3.

*Louis Condominium Ass'n v. Rockhill Insurance Co.*, No. 18-21365-CIV, 2019 WL 7905013, at *4 (S.D. Fla. Oct. 10, 2019), and pulls from the case the following quotation from *Beach Bars USA, LLC v. Indemnity Insurance Corp. of DC*, No. 11-60883-CIV, 2015 WL 11422318, at *4 (S.D. Fla. May 6, 2015): "[W]e find that based upon our expertise in [insurance litigation] a $350.00 hourly rate is the most that can be awarded ... for this type of case. Arguably, even that rate may be on the high side." D523 at 31. Both *St. Louis Condominium Ass'n* and *Beach Bars* are inapposite; the cases involved reasonable rates in insurance coverage disputes, not intellectual property disputes.

Lanard argues the Court should disregard Bishop's opinions because Bishop fails to provide reasoning. D523 at 31. Lanard's argument is sound to the extent Bishop fails to detail the comparable cases on which he bases his opinions, to identify the "complex points of law" he references, to describe his experience establishing local market rates, to offer ranges, or to distinguish the years involved. *Compare, e.g.,* D543-1 (Bishop's declaration), *with M.H. v. Comm'r of the Ga. Dep't of Cmty. Health*, 656 F. App'x 458, 462 (11th Cir. 2016) ("The expert affidavit ... provided robust detail. [The] expert opined that ... rates of $400 and $425 per hour were actually at the low end of the range for similar attorneys doing similar work in the Northern District of Georgia. To support this conclusion, he cited his eight years' experience using national publications to help establish rates for 100 lawyers within his own firm. [He] also cited [the] attorneys' experience litigating under Medicaid regulations, specifically those regulations related to disabled children. He testified not just to the effectiveness of the attorneys' work but also to their efficiency, noting that they 'staffed the matter very leanly ... avoiding duplication of effort.'"). Still, complete disregard of Bishop's opinions is unwarranted. Considering his

extensive litigation experience in Jacksonville and that he is the founder, principal, and shareholder of a firm in Jacksonville, *see* D543-1 ¶¶ 2, 4, giving some weight to his opinions is warranted.

Beyond arguing for hourly rates insurers generally pay, Lanard argues the Court should award rates no higher than the rates Lanard paid: **$425** for Sybert's work, **$400** for other partners' work, **$350** for senior counsel's work, and **$300** for associates' work.[34] D523-1 ¶ 13. Lanard points to Sybert's law-firm position and biography. D523-7. Like Anten, he has particular experience in the toy industry and in litigating intellectual property disputes. D523-1 ¶ 1; D523-7. Lanard observes that Anten's and Sybert's credentials and experience are "at least equivalent." D523 at 30. Sybert contends, "With great respect to the experience and credentials of defense counsel, I respectfully submit that there is no justification for an hourly billing rate in excess of my own[.]" D523-1 ¶ 13.

"[C]ourts can take into account the opposing party's billing to determine reasonable fees." *Home Depot*, 931 F.3d at 1089 n.22. "Where a party challenges the reasonableness of fees sought by an adversary, a useful source of relevant information in the form of a reference point may be the fees incurred by the objecting party. … Reciprocal discovery is often a useful measure of what reasonable rates are and what litigation actions were necessary in the case." *Id.* (quoting David F. Herr, *Annotated Manual for Complex Litigation* § 14:13 (4th ed. 2018)).

---

[34]The written record contains the rates Lanard paid the lawyers with Gordon & Rees but not the rates Lanard paid the lawyers with Lerner, David, Littenberg, Krumholz & Mentlik LLP when the case was in the District of New Jersey. During the recent telephone conference, Sybert expressed his belief that the rates were the same for both firms.

Here, with no contention or suggestion that the rates Lanard paid its lawyers are tied to the rates in Newark or Jacksonville, Lanard fails to show how the rates it paid its lawyers are relevant.[35] *See Martinez v. Hernando Cnty. Sheriff's Off.*, 579 F. App'x 710, 714 (11th Cir. 2014) (finding no clear error in the district court's finding that evidence was unpersuasive because the evidence failed to address the rates "actually billed and paid in similar lawsuits" in the relevant community).

Thus, the undersigned recommends these rates:

| Name | Position | Year | Rate Requested | Rate Recommended |
|------|----------|------|----------------|------------------|
| Abel | Partner | 2016 | 475 | **475** |
| Alam | Paralegal | 2019 | 200 | **125** |
| Anten | Partner | 2014–20 | 475 | **475** |
| Arbiter | Associate | 2016, 2017 2019 | 350 | **300** **325** |
| Batliner | Partner | 2019 | 425 | **425** |
| Brinker | Paralegal | 2018, 2019 | 200 | **200** |
| Choderker | Associate | 2014–17 2018, 2019 2020 | 350 | **300** **325** **350** |

---

[35]Citing declarations filed in other cases, the defendants observe that Sybert, in disclosing his rates for work on this case, failed to disclose that his standard hourly rate is **$595** and that he discounts his rate for Lanard based on his 30-year history with the company, including as its general counsel and vice president from 1993 to 2001. D536 at 3; *see also* D536-1 ¶ 7 (Sybert's declaration in another case in which he states his normal rate is **$595** but he discounts it for Lanard in recognition of a 30-year client relationship); D536-2 at 4 (Sybert's declaration in a case in the Southern District of California in which he opines that **$495** is "below market for sophisticated intellectual property litigation" for work done by senior partners in 2011 and 2012). At the recent telephone conference, Sybert represented he had not discounted his rates for Lanard in this case in consideration of the relationship. This Court need not decide whether Sybert discounted his rates for Lanard here. Regardless, Lanard fails to show the relevance of rates it paid its lawyers in Seattle, San Diego, and Miami.

| Feuer | Associate | 2014<br>2015 | 265.50 (motion)<br>350 (supplement) | **265.50**<br>**300** |
|-------|-----------|------|------|------|
| Goracke | Associate | 2014–17<br>2018, 2019<br>2020 | 350 | **300**<br>**325**<br>**350** |
| Pabian | Partner | 2019 | 475 | **475** |
| Page | Partner | 2015–20 | 475 | **475** |
| Papa | Paralegal | 2014 | 200 | **200** |
| Payne | Paralegal | 2019, 2020 | 200 | **125** |
| Pepper | Paralegal | 2014, 2015 | 200 | **200** |
| Sarowitz | Associate | 2014 | 350 | **300** |
| Socolow | Partner | 2014, 2015, 2019 | 475 | **475** |

## I. *Hours*

### 1. *General*

"The next step in the computation of the lodestar is the ascertainment of reasonable hours." *Norman*, 836 F.2d at 1301. "That determination, rather than being subject to 'a precise rule or formula,' is context-dependent." *M.H.*, 656 F. App'x at 463 (quoting *Hensley*, 461 U.S. at 436) (error in *M.H.*). "[T]he measure of reasonable hours is determined by the profession's judgment of the time that may be conscionably billed and not the least time in which it might theoretically have been done." *Norman*, 836 F.2d at 1306.

A fee applicant "should have maintained records to show the time spent on the different claims, and the general subject matter of the time expenditures ought to be set out with sufficient particularity so that the district court can assess the time claimed for each activity." *Id.* at 1303. Counsel "is not required to record in great detail how each minute of his time was expended." *Hensley*,

461 U.S. at 437 n.12. "But at least counsel should identify the general subject matter of his time expenditures." *Id.* "A well-prepared fee petition also would include a summary, grouping the time entries by the nature of the activity or stage of the case." *Norman*, 836 F.2d at 1303.

"Sworn testimony that, in fact, it took the time claimed is evidence of considerable weight on the issue of the time required in the usual case[.]" *Perkins*, 847 F.2d at 738. "But giving weight to sworn statements of fee applicants does not mean accepting those statements as gospel." *Barnes*, 168 F.3d at 430. "Courts should not delegate their duty to examine and judge the reasonableness of fee applications to the applicants." *Id.*

"Cases may be overstaffed, and the skill and experience of lawyers vary widely." *Hensley*, 461 U.S. at 434. In exercising billing judgment, a fee applicant should "make a good faith effort to exclude … excessive, redundant or otherwise unnecessary" hours. *Id.* "This must necessarily mean that the hours excluded are those that would be unreasonable to bill to a client and therefore to one's adversary *irrespective of the skill, reputation or experience of counsel*." *Norman*, 836 F.2d at 1301. "If it were otherwise, an inexperienced or unskillful attorney would face a double penalty." *Id.* "First, his hourly rate would be lowered and second, his time reduced." *Id.*

"If fee applicants do not exercise billing judgment, courts are obligated to do it for them, to cut the amount of hours for which payment is sought, pruning out those that are excessive, redundant, or otherwise unnecessary." *Barnes*, 168 F.3d at 428 (internal quotation marks omitted); *Perez v. Carey Int'l, Inc.*, 373 F. App'x 907, 911 (11th Cir. 2010) ("Even when a party prevails, the district court still must determine whether time was reasonably expended, and if it was not, that time should be excluded from the fee calculation.").

"In the final analysis, exclusions for excessive or unnecessary work on given tasks must be left to the discretion of the district court." *Norman*, 836 F.2d at 1301. "The district court will … be benefited by evidence of prevailing views among practitioners in the area on such subjects." *Id.* But "[g]eneralized statements that the time spent was reasonable or unreasonable of course are not particularly helpful and not entitled to much weight." *Id.*

Here, Anten, Socolow, and Page each declare that the entries from their respective firms show the time spent performing the described legal services. D519 ¶ 10 (Anten's declaration); D520 ¶¶ 13, 14 (Socolow's declaration); D521 ¶ 7 (Page's declaration). These declarations are given "considerable" weight on actual hours spent by the lawyers and paralegals, *see Perkins*, 847 F.2d at 738 (quoted), but are not treated as "gospel," *see Barnes*, 168 F.3d at 430 (quoted).

Based on their "experience with this matter," Anten and Page both opine the hours spent by the lawyers in their respective firms and requested in the fee motion are "reasonable, productive and non-duplicative[.]" D519 ¶ 10 (Anten's declaration); D521 ¶ 7 (Page's declaration). Anten further opines the hours are "reasonable given that this case involved over 6 years of contentious IP litigation." D519 ¶ 15(a). To the extent these opinions are generalized opinions on the reasonableness of the hours, they are "not entitled to much weight." *See Norman*, 836 F.2d at 1301 (quoted).

In trying to satisfy their burden of showing reasonable hours, the defendants have not made this Court's job easy. They provide no "summary, grouping the time entries by the nature of the activity or stage of the case." *See id.* at 1303 (quoted). With the fee motion, they submitted four billing records from three firms without a summary that groups entries by activity. D519-3,

D519-4, D520-2, D521-3. Thus, for example, to determine how many hours were spent on a particular task or activity using what the defendants provided, a reader must comb through multiple billing records. The firms also use different formatting, including how time is presented, with one firm billing in an hour-minute-second format, D519-3, D519-4, and the other firms billing in a one-tenth-hour format, D520-2, D521-3. One firm failed to include in its billing records time spent on the fee motion, instead summarily including that information in a declaration. D520 ¶¶ 19–21; *see generally* D520-2 (billing records). One firm failed to allocate fees in its submission with the current motion, prompting a request for the allocation and another billing record to consider, bringing to five the total number of billing records to review. *See* D521-3, D539, D541-1.

To avoid adding more paper to the already crowded docket and risk spurring a new round of arguments, the undersigned declined to direct the defendants to provide consolidated billing records with consistent formatting and ordered by date, not firm. But finding consolidated billing records helpful in determining reasonable hours, the undersigned undertook that endeavor. Consolidated billing records are Attachment A to this supplemental R&R. Later citations to "entries" are to line items in Attachment A.

The consolidated billing records comprise nearly 3,500 entries. The defendants' lawyers and paralegals spent most of their approximately 6,000 hours on drafting, responding to, and reviewing more than two dozen pleadings; defending against the motion to amend the pleadings; defending against the motion for a preliminary injunction; preparing the motion to transfer venue; preparing responses to 84 interrogatories and 183 document requests; propounding 53 interrogatories and 170 document requests;

preparing for and taking 13 depositions; preparing for and defending 18 depositions; traveling for depositions to more than a half-dozen states and Hong Kong; preparing, or defending against, the motions to compel discovery; preparing, or defending against, the motions to protect information; preparing the motion for sanctions; preparing, or responding to, the disclosures of 7 expert witnesses; preparing the motion for summary judgment; defending against the cross-motion for summary judgment; preparing, or responding to, the 7 *Daubert* motions; preparing, or responding to, the 25 issues in the motions in limine; preparing the joint final pretrial statement (not filed); preparing witness and exhibit lists (not filed); preparing the response brief and appendix for the appeal;[36] and preparing the current motions for fees and costs.[37] *See generally* Attachment A; D519 ¶ 15(a); D520 ¶ 4; D521 ¶ 13(a); D523-1 ¶¶ 4, 6–8; D535 at 6–8.

---

[36]As explained in the pending R&R, under Federal Circuit law, a party can request appellate fees in the district court. D535 at 22 n.19 (citing *PPG Indus., Inc. v. Celanese Polymer Specialties Co.*, 840 F.2d 1565, 1569 (Fed. Cir. 1988)). Lanard does not dispute — and neither side objected to the statement of law in the pending R&R — that this Court may award fees for appellate work as part of the entire case. *See generally* D523.

As explained in the pending R&R, under Florida law, a Florida trial court has no jurisdiction to award appellate fees. D535 at 28 n.21 (citing *H Greg Auto Pompano, Inc. v. Raskin*, 314 So. 3d 547, 549 n.1 (Fla. 3d DCA 2020)). Lanard does not contend — and neither side objected to the statement of law in the pending R&R — that state jurisdictional law is somehow a substantive law that should be applied here. *See generally* D523.

[37]Under federal law, parties generally can recover fees for establishing both an entitlement to fees and the amount of fees. *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1301 (11th Cir. 2010); *see, e.g.*, *Jackson v. State Bd. of Pardons & Paroles*, 331 F.3d 790, 798–99 (11th Cir. 2003) (Prison Litigation Reform Act of 1995); *Jean v. Nelson*, 863 F.2d 759, 780 (11th Cir. 1988) (Equal Access to Justice Act); *U.S. ex rel. Nurkin v. Health Mgmt. Assocs., Inc.*, No. 2:11-cv-14-JES-MRM, 2021 WL 423772, at *17 (M.D. Fla. Feb. 8, 2021) (False Claims Act).

Florida law is more complicated. *See Mallas v. Mallas*, 326 So. 3d 704, 706 (Fla. 4th DCA 2021) (explaining how some courts have applied the Florida Supreme Court's holding in *State Farm Fire & Casualty Co. v. Palma*, 629 So.2d 830 (Fla. 1993) — which addressed only an insurance statute — in other contexts to permit fees for establishing entitlement but not amount, and how the Fourth District Court of Appeal has distinguished *Palma* in other

The level of specificity required for ruling on an objection is "proportional to the specificity of the fee opponent's objection[]." *Home Depot*, 931 F.3d at 1089. If a fee opponent makes a specific objection, the court's order "should consist of more than conclusory statements." *Barnes*, 168 F.3d at 428. "Put differently, if a party objects to a subset of hours as unreasonable, the court should respond to that objection." *Home Depot*, 931 F.3d at 1089.

Here, in objecting to the hours, Lanard likewise has not made the Court's job easy. In its response to the fee motion, Lanard objects to some billing record entries as insufficiently detailed to permit review and others as duplicative, but some of Lanard's descriptions of the complained-of entries do not align with the descriptions in the billing records. *Compare* D523 at 32–36 (Lanard's objections), *with* D519-3, D519-4, D520-2, D521-3 (billing records). Lanard includes some of those entries and adds more in a spreadsheet listing approximately 469 entries. *See* D523-9. In the spreadsheet, Lanard objects to the hours in the entries as either "Excessive" or "Excessive/Duplicative," *see generally* D523-9, but in Sybert's declaration, he contends the spreadsheet lists "nearly 400 entries that [he] believe[s] to be duplicative, block billed, excessive, or otherwise improper," D523-1 ¶ 16. And when permitted to respond to the defendants' clarification of discrete matters, Lanard raised new arguments.

contexts to permit fees for establishing both entitlement and amount). The decisive considerations appear to be the statutory or contractual language, *see id.*, and whether the legal work on amount inures to the benefit of the client (allowed) or lawyer (not allowed), *see B & L Motors, Inc. v. Bignotti*, 427 So. 2d 1070, 1073–74 (Fla. 2d DCA 1983), *disapproved of on other grounds*, *Travieso v. Travieso*, 474 So. 2d 1184 (Fla. 1985).

This Court need not decide the proper interpretation of Florida law. Lanard does not contest that fees for establishing both entitlement and amount are allowed, *see generally* D523, the defendants are not requesting fees for the post-R&R time spent establishing amount, *see generally* D518, D536, and any previous time spent establishing amount cannot reasonably be segregated between the Lanham Act claim (for which fees for entitlement and amount are allowed) and the FDUTPA claim due to their significant substantive overlap.

*See* D539, D540 (orders); D541 (the defendants' response); D544 (Lanard's response). The undersigned addresses Lanard's objections in a manner commensurate with how Lanard has made them. *See* D523 at 32–36; D523-9.

Eleventh Circuit decisions "contemplate a task-by-task examination of the hours billed." *Barnes*, 168 F.3d at 429. But "[t]he rule is more practical." *Walker v. Iron Sushi LLC*, 752 F. App'x 910, 913 (11th Cir. 2018). "[T]rial courts need not, and indeed should not, become green-eyeshade accountants." *Fox*, 563 U.S. at 838. "The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Id.* "So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Id.*

If "the fee motion and supporting documents are so voluminous" that "an hour-by-hour review is simply impractical and a waste of judicial resources," the court "need not engage" in that review. *Loranger*, 10 F.3d at 783. Instead, the court may use "across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure." *Id.* A high fee request may show volume. *See, e.g.*, *Padurjan v. Aventura Limousine & Transp. Serv., Inc.*, 441 F. App'x 684, 687 (11th Cir. 2011) ("The more than $200,000 Padurjan seeks in attorneys' fees is indication enough that this case is voluminous.").

While a court has flexibility in determining which approach to use, the court cannot both conduct an hour-by-hour analysis and apply an across-the-board reduction of the hours. *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1351–52 (11th Cir. 2008); *Bujanowski v. Kocontes*, 359 F. App'x 112, 114 (11th Cir. 2009). Requiring one or the other ensures that a court "does not doubly-discount" the hours. *Bivins*, 548 F.3d at 1352.

If a court excludes hours, the court should identify the hours and explain why they were excluded. *Villano*, 254 F.3d at 1311. If a court performs mathematical calculations, the court should show the calculations. *Barnes*, 168 F.3d at 439. If a court applies an across-the-board reduction, the court must "concisely but clearly articulate" the reasons for the "specific percentage" chosen. *Loranger*, 10 F.3d at 783. Of course, the latter obligation assumes a well-prepared fee application. *See Mock v. Bell Helicopter Textron, Inc.*, 456 F. App'x 799, 802 (11th Cir. 2012) (observing that "the court's explanation for its 20% across-the-board cut in the total hours claimed was somewhat vague," but discerning no clear error because of "the volume and the documented disorganization of [the fee applicant's] submissions").

Here, the records are voluminous, and analyzing each entry would be impractical. To conserve judicial resources, a percentage-reduction approach is warranted. Of the options — a percentage reduction to the hours or a percentage reduction to the lodestar — a percentage reduction to the lodestar is preferable because 16 timekeepers are involved. The defendants take that approach in recommending a five-percent reduction to the lodestar. *See* D518 at 2 n.2, 30. And Lanard takes that approach in recommending other reductions to the lodestar. *See generally* D538. Despite a less-than-well-prepared fee application, the undersigned attempts to clearly explain the reason for the percentage ultimately chosen.

Although the undersigned has not scrutinized each of the nearly 3,500 entries, considering the amount at issue, the undersigned has generally reviewed each entry for block billing, insufficient detail, vagueness, redundancy, excessiveness, travel time, and other issues affecting reasonable hours, while avoiding the temptation to become a "green-eyeshade

accountant[]." *See Fox*, 563 U.S. at 838 (quoted). While the undersigned paid most attention to the specific entries to which Lanard objected, the undersigned did not limit review to those entries, aiming to recommend a reasonable fee without a windfall.

2.    *Block Billing, Insufficient Detail, and Vague Descriptions*

"Block billing" occurs when a lawyer includes multiple tasks in a single entry; "task billing" occurs when a lawyer itemizes the time spent on a specific task on a specific date. Both federal and Florida courts frown on block billing in the lodestar context because block billing renders determining the reasonableness of time spent on a task impossible, leaving the court to approximate the time that should be allocated to each task. *See, e.g.*, *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 971 (D.C. Cir. 2004); *Green v. City of New York*, 403 F. App'x 626, 630 (2d Cir. 2010); *Env't Mfg. Sols., LLC v. Peach State Labs, Inc.*, 274 F. Supp. 3d 1298, 1324 (M.D. Fla. 2017); *Moore v. Kelso-Moore*, 152 So. 3d 681, 682 (Fla. 4th DCA 2014). This Court has explained, "While attorneys cannot be expected to account for every second of their time, they should be expected to explain in discrete entries the nature of the work that they want a client or opposing party to pay them … to perform." *Kearney v. Auto–Owners Ins. Co.*, 713 F. Supp. 2d 1369, 1378 (M.D. Fla. 2010).

Here, the lawyers block billed approximately **10 percent** of the time. They block billed despite having researched the availability of attorney's fees as early as 2014 and thus knowing at the outset the importance of good recordkeeping. *See* entries 26, 27, 29 ("Legal research re: attorneys' fees recovery"). And they block billed despite knowing the difference between block billing and non-block billing. *Compare, e.g.*, entry 502 ("Review and analysis of discovery materials from Plaintiff's counsel; research and analyze location of

52

deposition issues given M.D. Fla. procedures; analysis of deposition scheduling requirements in new M.D. Fla. handbook; exchange correspondence with defense counsel on issues; further analysis of proposed reply and further preparation of Reply on Motion to Dismiss; further preparation of declaration on Motion to dismiss issues and analysis of exhibits for declaration"), *with* entry 396 ("Communications with defense counsel regarding filing Answer and Affirmative Defenses and Motion to Dismiss (.3); analysis of 3.01(g) issues (.2); multiple telephone conferences with Plaintiff's counsel's offices (.3); exchange correspondence with Plaintiff's counsel on motion issues (.5); review and analysis of and further preparation of Memorandum of Law in support of Motion to Dismiss (.5)").[38]

Block billing was particularly problematic here because block billing makes allocation among the four claims imprecise. *See, e.g.*, entry 219 ("Review and respond to emails regarding discovery, local patent rules, review Lanard letter regarding motion to transfer"); entry 225 ("Draft settlement letter.

---

[38]For additional examples of block billing, see entries 4, 9, 16, 18, 30, 32, 33, 35, 36, 42, 43, 45, 47–49, 51, 52, 54, 58, 59, 61, 63, 67, 68, 73, 90, 92–94, 101–03, 105–07, 110, 111, 115, 118, 124–26, 128, 131, 132, 138, 139, 143, 144, 150, 159, 162, 164, 166, 169, 170, 172, 176, 177, 180, 182, 188, 190, 192, 197, 199, 204, 206, 208, 213, 216, 218, 219, 221, 222, 225, 230, 236, 244, 247, 251, 252, 256, 260, 264, 265, 274, 286, 292, 298, 301, 303, 329, 330, 334, 336, 339, 340, 342, 348, 350, 352, 355, 358, 361, 363, 366, 369, 370, 379, 383, 385, 387, 388–91, 394, 406, 407, 410, 411, 416–19, 422, 423, 430, 431, 433, 434, 436–40, 442–44, 446, 447, 449, 451, 467, 474, 475, 480, 486, 488, 493, 502, 505, 510, 513, 514, 520, 535, 538, 539, 541, 545, 551, 553, 558, 561, 562, 565, 568, 570, 581, 582, 585, 589, 592, 594, 596, 597, 609, 613, 624, 625, 630, 639, 641, 642, 644, 650, 655, 660, 667–69, 671, 673, 675, 677, 680, 696, 698, 702, 738, 746, 763, 770, 774, 778, 782, 791, 792, 800, 802, 805, 811, 813–16, 824, 825, 828, 833, 843, 869, 871, 873, 883, 887, 892, 895, 897, 904, 912, 937, 948, 949, 997, 1013, 1016, 1034, 1037, 1038, 1040, 1083, 1084, 1090, 1107, 1163, 1164, 1169, 1170, 1172, 1175, 1183, 1190, 1250, 1305, 1330, 1331, 1337, 1367, 1451, 1460, 1488, 1560, 1608, 1660, 1684, 1714, 1723, 1808, 1842, 1848, 1864, 1869, 1890, 1892, 1896–98, 1902, 1906, 1909, 1918, 1927, 1928, 1931, 1933, 1935, 1942, 1943, 1948, 1954–56, 1962, 1964, 1966, 2018, 2021, 2023, 2027, 2038, 2041, 2057, 2062, 2079, 2083, 2099, 2185, 2202, 2214, 2221, 2245, 2250, 2255, 2261, 2282, 2285, 2292, 2296, 2342, 2347, 2362, 2383, 2384, 2386, 2413, 2513, 2580, 2600, 2661, 2663, 2668, 2673, 2675, 2681, 3091, and 3395.

Telephone conversation with client re: settlement. Review statutory damage copyright provisions"). At some point, the insurer complained about block billing and instructed the lawyers to stop the practice. D541-2 at 1, 15.

Relatedly, the defendants use generic descriptions in the billing records. *See, e.g.*, entry 150 ("Revise brief"); entry 1818 ("Revise summary judgment motion"); entry 1821 ("Revise summary judgment motion"); entry 1860 ("Further preparation of motions for filing"); entry 2081 ("Prepare opposition to motion"); entry 2182 ("Email to local counsel"); entry 2970 ("Legal research re: appeal"); entry 3040 ("Communications on Lanard brief"); entry 3231 ("Preparation of Brief"); entry 3226 ("Revisions to the appeal brief"); entry 3229 ("Further preparation of Brief"); entry 3231 ("Further preparation of Brief").[39]

The defendants explain that "there are certain tasks and projects in complex intellectual property cases — such as when preliminary injunction motions, summary judgment motions and appellate briefs are being prepared — that do not lend themselves to detailed descriptions of every facet of the tasks being performed each day." D536 at 8. The defendants continue, "Such projects are time intensive and fluid as record review, argument development, analysis of precedent, drafting and revising occurs over consecutive days." D536 at 8–9. The defendants argue that "Lanard's complaint about entries such as 'legal research for and drafting opposition to motion for preliminary injunction' or 'further preparation of brief' in the weeks leading up to filing deadlines seeks to elevate form over substance." D536 at 9.

---

[39]For additional examples of broadly described work, see entries 3067, 3156, 3160, 3168, 3171, 3178, 3192, 3195, 3196, 3199–204, 3207, 3208, 3213, 3214, 3219, 3220, 3233, 3234, 3235, 3239–42, 3245, 3252, 3253, 3263, 3265, and 3267.

For the three areas the defendants identify (preparing the response to the preliminary injunction motion, summary judgment motion, and appellate response brief), the generic descriptions reflect the reality of a lawyer's day and suffice for reviewing reasonableness. Even without more specificity, the Court can determine that hours spent on particular activities were excessive.

For other work, however, the lawyers described their work with insufficient details or otherwise too vaguely to convey the work they were doing. *See, e.g.*, entry 200 ("Amended Complaint and Reply"); entry 209 ("Motion to transfer"); entry 251 ("Review orders"); entry 261 ("Motion re: transfer"); entry 266 ("Motion to transfer. Final issues"); entry 360 ("Docketing"); entry 694 ("Privilege log"); entry 716 ("Document production"); entry 757 ("Motion Re: Copyright invalidity"); entry 1508 ("Final of Notice of Deposition of Lanard US and service").

Vagueness included using the words "communications with counsel" without explaining whether "counsel" were lawyers for Lanard or lawyers for the defendants, and if the latter, which lawyer or lawyers for the defendants. *See, e.g.*, entry 718 ("Communications with counsel on discovery and motion issues"); entry 1288 ("Communications with counsel regarding hearing issues"). Vagueness in this regard is particularly problematic because it makes determining redundancy or duplication difficult. The insurer also complained about vagueness. *See, e.g.*, 541-2 at 25 (insurer's complaint that "Consider" in entry, "Consider third party TRU deposition (Linda Gorman) time and location," is "vague and ambiguous").[40]

---

[40]For additional examples of the vague use of "communications" with "counsel," see entries 702, 709, 718, 722, 727, 730, 738, 746, 754, 765, 774, 778, 782, 785, 791, 800, 802, 811,

Reducing hours for block billing, insufficient detail, and vague descriptions addresses the failure to maintain good records, while declining to exclude the hours altogether recognizes that the lawyers and paralegals in fact worked during those hours.

### 3.    Redundant or Duplicative Work

"Redundant hours generally occur where more than one attorney represents a client." *Norman*, 836 F.2d at 1301–02. "There is nothing inherently unreasonable about a client having multiple attorneys, and they may all be compensated if they are not unreasonably doing the same work and are being compensated for the distinct contribution of each lawyer." *Id.* at 1302. "For that reason, a reduction for redundant hours is warranted only if the attorneys are unreasonably doing the same work." *Barnes*, 168 F.3d at 432 (internal quotation marks and quoted authority omitted). "An award for time spent by two or more attorneys is proper as long as it reflects the distinct contribution of each lawyer to the case and the customary practice of multiple-lawyer litigation." *Id.* "Thus, a fee applicant is entitled to recover for the hours of multiple attorneys if he satisfies his burden of showing that the time spent by those attorneys reflects the distinct contribution of each lawyer to the case and is the customary practice of multiple-lawyer litigation." *Id.* "But the fee

---

813, 814, 816, 819, 822, 824, 826, 828, 829, 895, 917, 918, 932, 1077, 1102, 1106, 1111, 1123, 1130, 1132, 1144, 1150, 1155, 1162, 1192, 1203, 1210, 1223, 1234, 1261, 1272, 1279, 1288, 1302, 1311, 1357, 1365, 1385, 1390, 1394, 1403, 1407, 1410, 1415, 1416, 1418, 1422, 1428, 1433, 1450, 1454, 1455, 1468, 1469, 1481, 1483, 1514, 1515, 1527, 1528, 1530, 1531, 1535, 1539, 1551, 1556, 1558, 1566, 1573, 1574, 1683, 1694, 1707, 1720, 1721, 1734, 1765, 1780, 1781, 1792, 1806, 1836, 1846, 1851, 1861, 1867, 1920, 1929, 1941, 1957, 1959, 2024, 2025, 2035, 2042, 2053, 2054, 2065, 2084, 2228, 2235, 2237, 2238, 2302, 2330, 2335, 2344, 2350, 2401, 2404, 2448, 2454, 2459, 2470, 2485, 2490, 2500, 2505, 2511, 2517, 2549, 2709, 2727, 2736, 2744, 2794, 2841, 2846, 2849, 2993, 3005, 3013, 3045, 3055, 3096, 3112, 3118, 3128, 3256, 3261, 3266, 3323, 3403, 3413, 3416, 3418, 3432, 3435, 3442, and 3445.

applicant has the burden of showing that, and where there is an objection raising the point, it is not a make-believe burden." *Id.*; *see id.* at 433, 435 (holding the fee applicants failed to satisfy their burden; "Neither the billing records nor the affidavits … shed any light on the distinct contribution, if any, each of the four attorneys made to the task of meeting the expert and reviewing his presentation the day before it was made."); *Perez*, 373 F. App'x at 911 ("All of the disallowed time involved consultations between multiple partners or one partner's review of another one's work. … [T]he district court's decision that the hours it disallowed were duplicative or unnecessary did not amount to an abuse of discretion.").[41]

Here, in his declaration, Anten explains the employment of multiple lawyers and multiple firms:

> I worked closely with … Fred Page, the primary H&K attorney to coordinate the representation of the Defendants in this matter. In this manner, we were able to avoid duplication of efforts. For example, depending on the needs of the case and workload of the attorneys involved, when I was unavailable due to depositions of fact witnesses, Mr. Page became more involved in the communication with some of the

---

[41]For similar cases applying Florida law, see *North Dade Church of God, Inc. v. JM Statewide, Inc.*, 851 So. 2d 194, 196 (Fla. 3d DCA 2003) ("The time sheets also reflect a significant amount of time spent in conferences between the partner and the associate who were working on the case as well as multiple attorneys performing or reviewing the same items. Duplicative time charged by multiple attorneys working on the case [is] generally not compensable."); *Brevard County v. Canaveral Properties, Inc.*, 696 So. 2d 1244, 1245 (Fla. 5th DCA 1997) ("[D]uplicate tasks performed by multiple attorneys [do] not meet th[e] criterion of reasonableness. … In making an attorney fee award, the court must consider the possibility of duplicate effort arising from multiple attorneys[.]"); and *Tomaino v. Tomaino*, 629 So. 2d 874, 875 (Fla. 4th DCA 1993) ("[B]oth prominent high-priced lawyers worked on the case plus various associates and paralegals from their respective offices. While there was some testimony that they did not duplicate each other's efforts, … that was not the case. … Even efforts to charge for the appearance of both lead counsel at hearings, depositions, and trial should be carefully scrutinized to avoid duplication and excessive fees[.] … This is not the case of the lead counsel having the assistance of associates. Instead, we have two lead counsels both charging top dollar for their duplicative efforts. Nothing was shown that the services of both were essential.").

experts and their preparation of reports. Mr. Page was also closely involved in the preparation of expert witness preparation and depositions (including out of state depositions), substantive summary judgment briefings and *Daubert* briefings. Mr. Page also played a primary role in the handling of the FDUTPA claim. Mr. Page played more of a joint role with me in the preparation of the Defendants' 11 motions in limine, the responses to Plaintiff's 7 motions in limine, and the preparation of other pretrial submissions due to the resources available at H&K and the volume of work required at that stage of the case. During this process, I approved the use of other IP attorneys within H&K in its Boston … office to assist on the research needed for and the preparation of the Defendants' motions in limine and other pretrial submissions, and the oppositions to the Plaintiff's motions in limine. Mr. Page also played a significant role in connection with Defendants' appeal brief filed in the Federal Circuit in this matter. During the appeals process, I approved the use of another attorney within H&K in Miami … to assist in matters related to the appeal.

D519 ¶ 15(a).

Socolow explains the work he and other lawyers and paralegals with Loeb & Loeb did when the case was in the District of New Jersey:

> During the course of Loeb & Loeb's representation of Defendants, I, along with associates and paralegals working under my supervision, worked with Lewis Anten, P.C. on all aspects of this case. A portion of the time that I and the associates and paralegals spent working on this matter was directly spent solely on copyright matters, including responding to Lanard's motion for preliminary injunction, which response was based on the copyright claim. We also spent time on matters jointly involving all the claims for which the time is not allocable to a particular claim. This work included assisting in preparing and filing answers on behalf of the Defendants, drafting the motion to dismiss and/or transfer venue to this Court, assisting with the required preliminary conferences, discovery matters, court appearances and other typical litigation matters.

D520 ¶ 4 (internal citation omitted).

Page explains the work he and other lawyers with H&K did when the case was here:

I was the primary H&K attorney (and at times the only H&K attorney) on the file and worked closely with Lewis Anten and Ivy Choderker of Lewis Anten, P.C. to coordinate the representation of the Defendants in this matter. In this manner, we were able to avoid duplication of efforts and primarily staff the file with three attorneys, with Lewis Anten as the lead. As local counsel, H&K was more involved in the discovery disputes and related motion and hearing practice than the day to day preparation of discovery responses, review of produced documents, depositions of witnesses or exchanges with Plaintiff's counsel. At times, however, and given my experience in IP litigation, my substantive role increased depending on the needs of the case and workload of the attorneys involved. For example, when Lewis Anten was unavailable due to depositions of fact witnesses, I became more involved in the communication with experts and their preparation of reports. This led to my also staying involved in expert witness preparation and depositions (including out of state depositions), substantive summary judgment briefings and *Daubert* briefings. H&K also played more of a joint role with Lewis Anten, P.C. in the preparation of the Defendants' 11 motions in limine, the responses to Plaintiff's 7 motions in limine, and the preparation of other pretrial submissions due to the resources available at H&K and the volume of work required at that stage of the case. During this process, as is common in H&K, I involved other IP attorneys within H&K in our Boston … office to assist on the research needed for and the preparation of the Defendants' motions in limine and other pretrial submissions, and the oppositions to the Plaintiff's motions in limine. … H&K also played a joint role with the appeal and the preparation of Defendants' Brief, with me and one of our appellate specialists, Ilene Pabian, doing the work (and we limited it to this team given how we split efforts with Lewis Anten, P.C., with H&K taking more of the lead on the patent and copyright sections of the brief, and Lewis Anten, P.C., taking the lead on the record citations, statement of facts and the trade dress related claims).

D521 ¶ 13(a). Page states, "At all times, I coordinated the H&K efforts with [Anten and Choderker] in an effort to avoid duplication of efforts." D521 ¶ 5. Page explains he removed fees "for certain junior attorneys and associates who assisted on the file." D521 ¶ 8.

Despite the lawyers' attempts to avoid redundancy, redundancy is apparent from the billing records, an inevitable product of 16 timekeepers (6 partners, 5 associates, and 5 paralegals). Beyond the statements in the

declarations, distinct contributions of the lawyers and paralegals are not provided, and for some tasks, not apparent from descriptions of the work in the billing records.[42] For example, for most court proceedings, three lawyers for the defendants attended.[43] Two lawyers researched the appellate standard of

---

[42]Besides redundancy, there may be at least one duplicate entry. *See* entries 3399 & 3400 (identical consecutive entries, both by Anten, both for one hour each, both for work on June 26, 2020, and both for "Review of procedure for filing attorneys fees for appeal"); *see also* D519-3 at 173 (Anten's billing records).

[43]For examples of multiple lawyers spending time preparing for, attending, and following up on court proceedings, see:

D44 (minutes showing two lawyers present for the defendants for a 1-hour hearing relating to the motion for a preliminary injunction); entry 151 (Anten; 3 hours preparing); entry 154 (Sarowitz; .9 hours preparing); entry 155 (Socolow; .4 hours preparing); entry 156 (Anten; 2 hours preparing; estimated travel time excluded); entry 157 (Sarowitz; 1.1 hours preparing); entry 158 (Anten; 2 hours attending; estimated travel time excluded); entry 159 (Sarowitz; 4.2 hours preparing, attending, and traveling);

D133 (minutes showing three lawyers present for the defendants for a 1-hour-and-40-minute discovery conference); entry 575 (Anten; 1.8 hours attending); entry 577 (Choderker; .6 hours preparing or following up); entry 579 (Choderker; 1.9 hours attending); entry 581 (Page; 4.3 hours preparing and attending); entry 582 (Anten; .3 hours preparing);

D137 (minutes showing three lawyers present for the defendants for a 30-minute discovery conference); entry 619 (Anten; .7 hours attending); entry 622 (Choderker; .6 hours attending); entry 624 (Page; 2.9 hours preparing and attending); entry 625 (Page; .4 hours analyzing minutes and other work);

D154 (minutes showing four lawyers present for the defendants for a 1-hour-and-40-minute oral argument on discovery issues); entry 788 (Anten; 3 hours preparing); entry 789 (Choderker; .2 hours preparing); entry 791 (Page; .9 hours preparing); entry 792 (Abel; 6.5 hours preparing and attending); entry 794 (Anten; 3 hours preparing and attending); entry 795 (Anten; .2 hours following up); entry 799 (Choderker; 2 hours attending); entry 800 (Page; 3.4 hours preparing, attending, and following up);

D155 (minutes showing three lawyers present for the defendants for a 29-minute discovery telephone conference); entry 818 (Choderker; .4 hours attending); entry 819 (Page; 1.5 hours attending and other work);

D237 (minutes showing three lawyers present for the defendants for a 28-minute discovery conference); entry 1288 (Page; .5 hours preparing); entry 1289 (Page; .8 hours preparing); entry 1292 (Choderker; .6 hours attending); entry 1293 (Choderker; .6 hours following up); entry 1295 (Page; 1.2 hours attending); entry 1296 (Page; 1.2

review.[44] Four lawyers researched the distinction between reversal, remand,

    hours preparing); entry 1299 (Anten; .8 hours preparing and attending); entry 1301 (Page; .1 hours following up);

    D263 (minutes showing three lawyers present for the defendants for a 37-minute telephone status conference); entry 1671 (Anten; 1.5 hours preparing and attending); entry 1682 (Choderker; .9 hours attending); entry 1683 (Page; .5 hours preparing and other work); entry 1684 (Page; 1.4 hours preparing and attending);

    D308 (minutes showing three lawyers present for the defendants for a 1-hour-and-34-minute oral argument on a motion to compel); entry 2040 (Anten; .5 hours preparing); entry 2043 (Page; 1 hour preparing); entry 2045 (Anten; 1.6 hours attending); entry 2047 (Choderker; 1.6 hours attending); entry 2049 (Page; 2.2 hours preparing); entry 2050 (Page; 2.3 hours attending); and

    D403 (minutes showing three lawyers present for the defendants for a 37-minute telephone status conference); entry 2324 (Choderker; 1.5 hours preparing); entry 2325 (Anten; .5 hours preparing); entry 2326 (Choderker; .1 hours preparing); entry 2327 (Choderker; .2 hours preparing); entry 2328 (Choderker; .6 hours preparing); entry 2329 (Page; .2 hours preparing); entry 2330 (Page; .5 hours preparing); entry 2331 (Choderker; .1 hours preparing); entry 2336 (Choderker; .2 hours preparing); entry 2337 (Page; .2 hours preparing); entry 2340 (Anten; .3 hours preparing); entry 2341 (Anten; .3 hours preparing); entry 2342 (Choderker; .2 hours preparing); entry 2344 (Page; .1 hours preparing); entry 2345 (Page; .3 hours preparing); entry 2353 (Anten; .2 hours preparing); entry 2356 (Anten; 2 hours preparing); entry 2358 (Choderker; .7 hours preparing); entry 2359 (Anten; 1.2 hours preparing); entry 2361 (Choderker; .6 hours preparing); entry 2363 (Choderker; .9 hours attending); entry 2364 (Page; 1 hour attending); entry 2365 (Page; 1.1 hours preparing); and entry 2366 (Choderker; .2 hours following up).

That Lanard also used multiple lawyers at court proceedings does not mean the defendants' lawyers were making distinct contributions.

    [44]For examples of work on the standard of review, see entry 2936 (Anten; .5 hours for "Legal research re: Federal Circuit cases for standard of review of Summary Judgment infringement cases and appeal of denial of motion to amend complaint to add parties"); entry 2937 (Choderker; 2 hours for "Legal research re: standard of review of the Federal Circuit re: summary judgment of patent, copyright, trade dress, and unfair competition, and motion to amend a complaint"); entry 2940 (Choderker; 2 hours for "Legal research re: standard of review of the Federal Circuit re: summary judgment of patent, copyright, trade dress, and unfair competition, and motion to amend a complaint; legal research getting recent Federal Circuit cases reviewing summary judgment of design patents"); entry 2952 (Choderker; 6.2 hours for "Legal research standard of review of Federal Circuit Court on issues and claims in motions for summary judgment, including Daubert rulings and drafting memo regarding same; drafting memo regarding Court's Daubert ruling in its Order re: Summary Judgment"); and entry 2953 (Anten; 1 hour for "Review of summary judgment standards and ruling of District Court not subject to de novo").

and vacatur.[45] Three or more lawyers worked on the appellate appendix.[46] Three lawyers and one paralegal read and responded to a notice of rule non-compliance from the Federal Circuit.[47] Three lawyers read and analyzed

---

[45]For examples of work on the appellate issue regarding the distinction between reversal, remand, and vacatur, see entry 3052 (Choderker; 1.2 hours for "Legal research: can the court of appeals make a substantive ruling on the MSJs; what decision can appeal court make make [sic], i.e., affirm, reverse, remand, etc."); entry 3057 (Anten; 2.5 hours for "Review of issues on appeal raised by Lanard re: reversal and request for Fed Cir to issue Summary Judgement for Lanard"); entry 3074 (Anten; 2 hours for "Legal research re: Reversal, Vacate, and Remand by Fed Cir."); entry 3081 (Anten; .5 hours for "Legal research re: issue of remand v. reversal"); entry 3083 (Choderker; 1.5 hours for "Legal research re: scope of appeal; reverse v. vacate and remand"); entry 3106 (Anten; 1 hour for "Legal research re: remand and reverse for draft opening"); entry 3147 (Page; .4 hours for "Analysis of reversal vs. vacate issues raised by Lanard"); entry 3163 (Choderker; 2.4 hours for "Drafting/revising standard of review section of appeal brief, and research re: reverse/remand issue for brief"); and entry 3167 (Pabian; 2 hours for "Review of E-Pass case and further research and analysis re distinction between reversal and vacating or remanding on summary judgment").

[46]For examples of joint work on the appendix, see entry 3021 (Choderker; .3 hours for "Telephone call with co-counsel Fred Page and Ilene Pabian to discuss Lanard's Appendix designations and our counter-designations"); entry 3023 (Pabian; .4 hours for "Further discussion with F. Page re Lanard's appendix designations and review of email to opposing counsel re same"); entry 3024 (Pabian; .4 hours for "Telephone calls with team re Lanard's appendix designations and issues re cross-designations"); and entry 3025 (Page; 1.6 hours for "Communications on appendix issues and preparation of correspondence to Lanard counsel on issues").

[47]For examples of the work reviewing and responding to the notice of non-compliance, see entry 3286 (Payne; .3 hours for "Review court's notice of non-compliance, including federal local rules re same"); entry 3287 (Pabian; 1.7 hours for "Review of and revisions to brief to correct selected appendix cites, call with Federal Circuit Clerk's office re selected appendix cites, discussion with I. Choderker and K. Isaac [Payne] re same and filing of corrected brief"); entry 3288 (Payne; 1.7 hours for "Review court's Notice of Non-Compliance, review court's internal operating procedures and rules, review brief's appendix cites to ensure compliance with the rules, file corrected brief"); entry 3290 (Choderker; 2 hours for "Reviewing Court's Notices of Non-Compliance re: Appendix and our brief, and corresponding with co-counsel and opposing counsel regarding same and how to fix it"); entry 3291 (Pabian; 1.2 hours for "Review Court's non-compliance orders re appendix, correspondence and briefing re same, call with I. Choderker re same"); entry 3292 (Choderker; .5 hours for "Telephone call with co-counsel regarding how to fix issues with appendix pagination noted in Court's Order of Non-Compliance in advance of call with opposing counsel"); entry 3294 (Anten; .6 hours for "Review issues with corrections to Appendix and confidentiality"); entry 3295 (Choderker; 1.6 hours for "Reviewing opposing counsel's draft of the Joint Motion to Waive Requirements of Appendix to address issues related to pagination and preparing redline draft with proposed changes thereto"); and entry 3296 (Choderker; 2.1 hours for "Telephone call with co-counsel

Lanard's appellate reply brief.[48] Four lawyers read the appellate decision.[49] The insurer also complained about duplicate or redundant work. *See, e.g.*, D541-2 at 4–5 (insurer's complaint that these tasks were duplicative: Choderker; "Telephone call with opposing counsel to explain to him a bit how things work at Ja-Ru and to identify key Ja-Ru (US) people are so they can narrow down deponents," and Anten; "Telephone conversation with attorney for Plaintiff re: information about witnesses for Ja-Ru and depositions. Review of initial disclosure information"); *see also* D541-2 at 1, 4–9, 11–13, 17–22, 24, 25, 29, 31, 33, 34, 36–38, 40, 42, 47, 49–52.

4.   *Excessive Hours*

Although "[s]worn testimony that, in fact, it took the time claimed is evidence of considerable weight on the issue of the time required in the usual case," cutting hours for excessiveness is appropriate if "the time claimed is obviously and convincingly excessive under the circumstances." *Perkins*, 847 F.2d at 738.

---

and opposing counsel regarding how to fix issues with appendix pagination noted in Court's Order of Non-Compliance and telephone calls with Court clerks regarding same").

[48]For examples of work relating to Lanard's reply brief, see entry 3262 (Choderker; 2.3 hours for "Reading Lanard's Reply appeal brief and looking up evidence cited therein"); entry 3263 (Anten; 2 hours for "Review reply brief and analysis"); entry 3265 (Pabian; .7 hours for "Review and analysis of Lanard's reply brief"); and entry 3267 (Page; 1.2 hours for "Analysis of Reply Brief").

[49]For work reading the appellate decision, see entry 3354 (Anten; 4 hours for "Review of successful appeal decision and telephone call with clients Re: further actions. Review of further appeal procedures and timing, including timing of remand to trial court for further proceedings"); entry 3356 (Choderker; 1 hour for "Reading Federal Circuit Court's Opinion and sending to clients and Insurance carrier; and reviewing upcoming docket dates in the case sent by co-counsel"); entry 3359 (Pabian; .4 hours for "Review and analysis of Federal Circuit opinion"); entry 3361 (Page; 1 hour for "Review and analysis of opinion of Federal Circuit and analysis of next steps, fee claim and potential means for Lanard to challenge decision").

Here, some time spent by the lawyers is obviously and convincingly excessive under the circumstances. The lawyers spent approximately 118 hours (equivalent to nearly 3 work weeks) on the motion to transfer for convenience, decided without a hearing.[50] The lawyers spent approximately 136 hours (equivalent to nearly 3.5 work weeks) researching trade dress despite having a team with extensive intellectual property expertise.[51] The lawyers spent approximately 258 hours (equivalent to nearly 6.5 work weeks) on motions in limine or responses to motions in limine.[52] Although the evidentiary disputes were many, several issues overlapped with issues previously presented in summary judgment and *Daubert* briefing. *Compare, e.g.*, D302, SD324 at 3, 11, 13–14, 16–19, 23 (motion for summary judgment arguing the functionality of the products precluded infringement), *with* D463

---

[50]For hours spent on the transfer motion and related work, see entries 36, 37, 42, 94, 111, 117, 123, 130, 133, 136, 141, 143, 144, 148, 162, 164, 166, 169, 170, 172, 190, 202, 209, 211, 214, 215, 216, 217, 219, 220, 223, 226, 227, 228, 230, 231, 234, 236, 238, 247, 248, 249, 250, 253, 255, 256, 258, 261, 262, 264, 266, 268, 272, 288, 291, 293, 294, 297, 299, 300, 301, 306, 309, 317, 320, 322, 327, 330, 331, 333, 336, 357, and 308.

[51]For hours spent researching law relating to trade dress, see entries 17, 20, 379, 541, 544, 928, 930, 931, 1134, 1142, 1148, 1151, 1165, 1166, 1196,1202, 1208, 1277, 1286, 1310, 1320, 1328, 1340, 1652, 1674, 1675, 1688, 1820, 2389, 2441, 2442, 2575, 2780, 2937, 2940, 2959, 3042, 3043, 3082, 3087, 3091, 3094, 3100, 3102, 3104, 3107, 3140, and 3216. Some of these entries include work on researching additional issues and drafting.

[52]For hours spent on the motions in limine, see entries 2203, 2204, 2205, 2207, 2209, 211, 2212, 2214, 2216, 2218, 2219, 2225, 2226, 2228, 2428, 2429, 2430, 2431, 2432, 2433, 2434, 2436, 2437, 2438, 2439, 2440, 2441, 2442, 2443, 2445, 2446, 2447, 2448, 2449, 2450, 2451, 2455, 2456, 2461, 2462, 2463, 2465, 2466, 2469, 2470, 2471, 2472, 2473, 2474, 2475, 2476, 2477, 2478, 2479, 2482, 2483, 2484, 2487, 2488, 2489, 2492, 2497, 2498, 2500, 2502, 2503, 2504, 2507, 2508, 2509, 2511, 2512, 2514, 2515, 2516, 2517, 2518, 2519, 2521, 2522, 2523, 2524, 2525, 2526, 2527, 2530, 2531, 2532, 2537, 2538, 2542, 2548, 2550, 2551, 2552, 2557, 2559, 2562, 2564, 2565, 2566, 2571, 2578, 2579, 2581, 2583, 2585, 2586, 2587, 2588, 2592, 2593, 2594, 2596, 2597, 2599, 2600, 2602, 2603, 2604, 2606, 2608, 2612, 2613, 2614, 2614, 2616, 2619, 2620, 2622, 2623, 2624, 2625, 2635, 2640, 2641, 2642, 2646, 2647, 2648, 2649, 2650, 2652, 2653, 2654, 2655, 2658, 2659, 2661, 2663, 2664, 2666, 2668, 2669, 2671, 2673, 2674, 2676, 2679, 2680, 2682, 2683, 2684, 2685, 2686, 2692, 2693, 2694, 2695, 2698, 2701, 2703, 2707, 2711, 2713, 2716, 2716, 2719, 2722, 2725, 2734, 2752, 2754, 2759, 2761, 2762, 2765, 2767, 2770, 2771, 2775, 2776, 2777, 2778, 2779, 2780, 2781, 2782, 2783, 2784, 2786, 2789, 2791, 2794, 2842, 2946, 3006, 3011, and 3492.

(response to Lanard's motion in limine to exclude references to functionality; rearguing the functionality of the products). For the appeal, the lawyers spent approximately 945 hours (equivalent to nearly 24 work weeks) drafting a response brief and preparing a joint appendix.[53] Three of the four lawyers working on the brief had also worked on summary judgment briefing, making them familiar with the facts, issues, and law. Of the 945 hours, the lawyers spent approximately 31 hours drafting the fact section[54] and approximately 157 hours (equivalent to nearly 4 work weeks) working on the appendix, including approximately 22 hours post-briefing in response to a Federal Circuit notice informing them they had failed to follow the appendix numbering format under the rules.[55] *See* D31 in Appeal No. 19-1781. The lawyers spent

---

[53]For hours spent on the appeal, see entries 2944, 2974, 2986, 2991, 2993, 2995, 2996, 2999, 3000, 3001, 3002, 3005, 3010, 3012, 3013, 3014, 3015, 3017, 3019, 3021, 3022, 3023, 3024, 3025, 3028, 3030, 3032, 3035, 3039, 3045, 3053, 3055, 3059, 3064, 3065, 3068, 3069, 3070, 3072, 3075, 3076, 3077, 3078, 3079, 3080, 3084, 3085, 3086, 3088, 3089, 3090, 3093, 3095, 3096, 3097, 3098, 3110, 3111, 3112, 3113, 3115, 3116, 3117, 3118, 3122, 3154, 3166, 3170, 3175, 3177, 3179, 3182, 3197, 3209, 3254, 3255, 3256, 3264, 3266, 3268, 3269, 3270, 3272, 3273, 3274, 3276, 3277, 3279, 3280, 3281, 3282, 3283, 3284, 3287, 3288, 3290, 3291, 3292, 3293, 3294, 3295, 3296, 3298, 3299, 3301, 3305, 3312, 3320, 3334, and 3335. Some of these entries are block billed.

For hours spent on the appendix in particular, see entries 3022, 3023, 3024, 3025, 3028, 3030, 3032, 3035, 3039, 3064, 3065, 3068, 3069, 3072, 3075, 3076, 3077, 3078, 3079, 3080, 3084, 3085, 3086, 3088, 3089, 3090, 3093, 3095, 3096, 3097, 3098, 3110, 3112, 3113, 3115, 3116, 3117, 3118, 3122, 3154, 3166, 3170, 3175, 3177, 3179, 3182, 3197, 3209, 3254, 3256, 3264, 3266, 3268, 3269, 3270, 3272, 3273, 3274, 3276, 3277, 3279, 3280, 3281, 3282, 3283, 3284, 3287, 3288, 3290, 3291, 3292, 3293, 3294, 3295, 3296, 3298, 3299, 3301, 3305, 3312, 3320, 3334, and 3335.

[54]For examples of hours spent on the fact section of the response brief, see entries 3119, 3121, 3143, 3150, 3153, 3155, 3158, 3182, 3185, 3189, 3193, 3197, and 3217.

[55]Some aspects of preparing an appendix require a lawyer's skill; for example, determining the appropriate contents, working with opposing counsel to designate the items in the record to include, and certifying compliance with the rule on confidential and sealed items. *See* Fed. Cir. R. 30(a)(1) (specifying the contents for an appendix); Fed. Cir. R. 30(b)(1) (requiring the parties to try to agree on designations); Fed. Cir. R. 30(g) (referencing the rule on filing confidential and sealed items). Some aspects do not; for example, arranging, paginating, and printing the appendix. *See* Fed. Cir. R. 30(c) (specifying the format of the

approximately 400 hours (equivalent to 10 work weeks) on the fee and cost motions *before* filing supplemental briefing and other papers.[56] The insurer also complained about excessive hours. *See, e.g.*, D541-2 at 35 (insurer's complaint that "39.5 hours have been billed to researching and drafting the trade dress section of the MSJ … is excessive"); *see also* D541-2 at 23, 27, 28, 33, 34, 40, 42, 43.

Billing in 15-minute increments instead of 6-minute increments likely caused at least some — albeit a small amount of — excessive time. *Compare, e.g.*, entry 240 (billing 15 minutes for "Emails to in-house counsel for [TRU] and Dolgencorp asking for update of inventory of Ja-Ru Chalk Pencil in stores"), *and* entry 357 (billing 15 minutes for "Emails to clients that Loeb & Loeb is withdrawing as local counsel because case was transferred"), *with* entry 1030 (billing 6 minutes for "Email to TRU re: 30b6 deponent"), *and* entry 1406 (billing 6 minutes for "Email to Dolgencorp re: Kenneth Marshall deposition").[57] The defendants contend this practice does not affect the reasonableness of the hours because their lawyers used billing judgment and

---

appendix). Some of the descriptions about work on the appendix are too generic or vague to determine whether the work was clerical.

[56]For hours spent on the fee and cost motions, see entries 1405, 1407, 1447, 1452, 2423, 2629, 2636, 2651, 2872, 2873, 2851, 2852, 2853, 2853, 2855, 2858, 2859, 2861, 2864, 2865, 2867, 2868, 2869, 2870, 2876, 2877, 2880, 2881, 2882, 2884, 2885, 2886, 2846, 2847, 2849, 2850, 2856, 2857, 2860, 2862, 2863, 2866, 2871, 2879, 2883, 2887, 2889, 2890, 2891, 2892, 2893, 2894, 2895, 2896, 2897, 2898, 2899, 2900, 2901, 2902, 2903, 2907, 2908, 2909, 2911, 2912, 2913, 2915, 2922, 2923, 2925, 2926, 2927, 2928, 2929, 2930, 2931, 2932, 2933, 3371, 3376, 3378, 3379, 3380, 3381, 3382, 3383, 3384, 3385, 3387, 3389, 3390, 3391, 3392, 3393, 3394, 3395, 3396, 3398, 3402, 3406, 3407, 3409, 3411, 3419, 3423, 3424, 3425, 3426, 3427, 3430, 3438, 3439, 3443, 3449, 3450, 3451, 3452, 3453, 3454, 3455, 3456, 3457, 3458, 3459, 3461, 3462, 3464, 3465, 3466, 3467, 3468, 3469, 3470, 3471, 3472, 3473, 3474, 3475, 3476, 3477, 3478, 3479, 3480, 3481, 3482, 3483, 3484, 3485, 3486, 3487, 3488, 3489, 3490, and 3491. *See also* D519 ¶¶ 19, 20.

[57]For other entries billed in 15-minute increments, see Lewis Anten P.C.'s billing records at D519-3 at 2–24.

did not always "round up," but they acknowledge that courts have made reductions for billing in 15-minute increments. D541 at 3 (citing cases). As they propose, a reduction for billing in 15-minute increments should be minor considering the relatively small amount of time at issue.[58] *See* D541 at 3–4.

5.     *Travel Time*

"[A]lthough there are no precise rules with respect to travel time, a fee applicant seeking to recover expenses incurred for retaining non-local counsel generally must show a lack of attorneys practicing in that place who are willing and able to handle his claims." *Martinez*, 579 F. App'x at 714 (internal quotation marks and quoted authority omitted); *see, e.g.*, *id.* ("Mr. Cornell is located in Weston, Florida, approximately a 3.5 [hour] trip to the Tampa courthouse where the case was filed and tried, which resulted in the 38 travel hours. We respect Martinez's right to retain counsel of his choice, but, like the district court, we do not think it reasonable to pass the costs of Mr. Cornell's travel on to the Sheriff's Office without a showing of a lack of local counsel."); *Hahamovitch v. Hahamovitch*, 133 So. 3d. 1062, 1063 (Fla. 4th DCA 2014) (reversing award of fees for travel time and directing the trial court to eliminate travel time from the fee award because "there was no evidence that competent counsel could not be obtained in Palm Beach County, nor was there a finding that the travel time was required due to any excessive or vexatious

---

[58]Other hours were not excessive but should have been omitted in the fee application in exercise of sound billing judgment. *See, e.g.*, entry 3128 (Page; .3 hours for "Communications regarding press inquiry"); entry 3134 (Page; .5 hours for "Communications with press and counsel on appeal issues"); entry 3351 (Anten; 1 hour for "Evaluation of Judges of Federal Appeal panel" after briefing and after oral argument was canceled); entry 3353 (Anten; .5 hours for "Review of Fed Cir decisions Re: SJ rulings by panel member" after briefing and after oral argument was canceled); entry 3365 (Choderker; .4 hours for "Drafting emails to the experts with status of case/winning on appeal"); entry 3375 (Anten; 2.5 hours for "Telephone conference with expert and client re: results of action").

litigation by the [opposing side]"). A court may exclude travel time and apply a percentage reduction without impermissibly double discounting as long as the court does not consider the travel time in deciding the percentage. *See Martinez*, 579 F. App'x at 714–16 (finding travel time was appropriately excluded and the court did not "impermissibly 'double count' because the factors considered by the court in determining the lodestar figure were not considered by the court in adjusting the lodestar downward by 75%").

Here, despite that the defendants removed their request for costs for Anten's travel between California and the forum states, acknowledging those costs are not recoverable because Lanard should not have to pay for their choice of California counsel to defend an action in New Jersey or Florida, D536 at 12, they continue to request fees for the hours Anten spent while traveling between California and the forum states.[59] The defendants make no argument that Jacksonville lawyers were unwilling or unable to handle the case, and the involvement of the H&K lawyers shows otherwise. The travel hours should have been excluded.

---

[59]For requests in the fee motion relating to Anten's travel between California and the forum states, see entry 156 (**$4,400** for 8 hours of Anten's time traveling to New Jersey on May 13, 2014, to attend the preliminary injunction hearing); entry 158 (**$4,400** for 8 hours of Anten's time returning from New Jersey on May 14, 2014); entry 806 (**$2,750** for 5 hours of Anten's time traveling to New Jersey on January 21, 2016, to prepare witnesses); entry 845 (**$2,750** for 5 hours of Anten's time traveling to Florida on February 2, 2016, to defend depositions, *see* D536 at 19); entry 858 (**$2,750** for 5 hours of Anten's time returning from Florida on February 8, 2016); entry 1723 (**$3,325** for 7 hours of Anten's time traveling to Florida on June 6, 2017, to defend expert Angela Ku's deposition, *see* D536 at 19); entry 2000 (**$3,800** for 8 hours of Anten's time traveling to Florida on July 18, 2017, for expert Michael Mard's deposition, *see* D536 at 19); entry 2020 (**$3,325** for 7 hours of Anten's time returning from Florida on July 21, 2017); entry 2092 (**$3,800** for 8 hours Anten's time traveling to Florida to attend the pre-appeal, court-ordered mediation on August 2, 2017, *see* D536 at 19); and entry 2102 (**$3,800** for 8 hours Anten's time returning on August 4, 2017, *see* D536 at 19).

6.      *Paralegal and Clerical Time*

Because paralegals often perform work "that might otherwise be performed by a lawyer and billed at a higher rate," such as "factual investigation, including locating and interviewing witnesses; assistance with depositions, interrogatories, and document production; compilation of statistical and financial data; checking legal citations; and drafting correspondence," a court may compensate a successful litigant for time spent by them if the prevailing practice in the local community is to separately bill for their work. *Missouri v. Jenkins*, 491 U.S. 274, 288 & n.10 (1989). "By encouraging the use of lower cost paralegals rather than attorneys wherever possible, permitting market-rate billing of paralegal hours encourages cost-effective delivery of legal services[.]" *Id.* at 288 (internal quotation marks and quoted authority omitted).

In contrast, work by "secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product" is usually subsumed in the rates already charged by attorneys. *Id.* at 285; *accord Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 580–83 (2008). If work is "purely clerical or secretarial," it should not be billed at paralegal or attorney rates, even if a paralegal or attorney performs it. *Jenkins*, 491 U.S. at 288 n.10.

Here, in requesting fees for work by paralegals, the defendants do not say that the prevailing practice in the local community is to separately bill for work by paralegals, but that practice is widely known and can be implied from the submissions. The paralegals mostly billed for work that might have

otherwise been done by a lawyer,[60] and Lanard does not contend otherwise, *see generally* D523 (Lanard's response to the fee motion); D538 (Lanard's response to the defendants' supplement). To the extent they did, their work is compensable.

Still, some paralegals and lawyers occasionally billed for clerical work. *See, e.g.*, entry 1255 ("Sending Notice of Deposition of Ja-Ru HK to client"); entry 1449 ("Printing out documents produced by Lanard re: Mini Chalk Pencil"); entry 2410 ("Teleconference with court's official court reporter regarding transcript of April status conference, receipt and review of invoice and payment via email of same").[61] The insurer also complained about billing for clerical work. *See, e.g.*, D541-2 at 25 (insurer's complaint that "Serving via email the Notices of Depositions of Blake Nichols and Logan Williams" is an "[a]dministrative task"); *see also* D541-2 at 11, 15, 37–40, 43.

Lanard complains that the defendants requested fees for 83.3 hours of paralegal work without showing the paralegal work was tantamount to work by counsel. D523 at 35–36. The complaint is unwarranted. Although the defendants confusingly lumped together all paralegal time in a chart in the fee motion, *see* D518 at 28, their billing records include entries for work by the paralegals that can be fairly described as tantamount to work by counsel.

---

[60]For work by the paralegals, see entries 78, 91, 137, 148, 268, 322, 2410, 2582, 2621, 2651, 2660, 2670, 2689, 2705, 2706, 2714, 2723, 2739, 2772, 2799, 2808, 2816, 2839, 2860, 2863, 2891, 2901, 3240, 3246, 3253, 3278, 3286, 3288, and 3311.

[61]For additional examples of clerical work, see entries 147, 178, 179, 201, 203, 207, 212, 237, 239, 259, 278, 281, 289, 306, 307, 310, 318, 324, 328, 360, 510, 561, 567, 787, 1255, 1354, 1396, 1449, 1466, 1477, 1561, 1864, 2139, 2140, 2410, 2756, 3246, 3306, and 3314.

7. *Allocation*

"[I]n the real world, litigation is … complex, involving multiple claims for relief that implicate a mix of legal theories and have different merits. Some claims succeed; others fail. Some charges are frivolous; others (even if not ultimately successful) have a reasonable basis." *Fox*, 563 U.S. at 833–34. "In short, litigation is messy, and courts must deal with this untidiness in awarding fees." *Id.* at 834.

"The question of whether claims are inextricably intertwined usually arises when a court seeks to apportion fees among unsuccessful and successful claims." *Yellow Pages*, 846 F.3d at 1163 n.3. The question also may arise if, as recommended here, a fee award is made for fewer than all successful claims. *See, e.g.*, *Pelc v. Nowak*, No. 8:11-cv-79-EAK-TGW, 2013 WL 3771233, at *3 (M.D. Fla. July 17, 2013), *aff'd*, 596 F. App'x 768 (11th Cir. 2015); *Blanco v. TransAtlantic Bank*, No. 07-20303-CIV, 2009 WL 2834947, at *5 (S.D. Fla. June 11, 2009), *R&R adopted in relevant part*, 2009 WL 2762361, at *4 (S.D. Fla. Aug. 31, 2009).

If the claims are "intertwined and share a common core of facts or a related legal theory, then a reasonable fee is allowed as to all hours expended on both sets of claims." *Yellow Pages*, 846 F.3d at 1163 n.3 (internal quotation marks and quoted authority omitted).

Ordinarily, "where part of the attorney's efforts are to go uncompensated, the burden is on the attorney to provide sufficient evidence for the court to make a correct division." *Loranger*, 10 F.3d at 782 (quoted authority omitted). Thus, if a fee application "does not permit easy division between compensable and non-compensable hours, a district court should

require the party seeking fees to refashion its request." *Id.* Florida law also generally assigns the burden to the fee applicant. *See Fischer as Tr. of Dorothy L. Fischer Tr. v. Fischer*, No. 4D20-1752, 2021 WL 6057845, at *2 (Fla. 4th DCA Dec. 22, 2021) (explaining that a fee applicant's burden of establishing a reasonable fee extends "to the issues for which fees are awardable or to show that the issues were so intertwined that allocation is not feasible" (quoted authority omitted)).

FDUTPA, however, "takes a broad view of compensable attorney time on a case involving a claim of a deceptive or unfair trade practice." *Mandel v. Decorator's Mart, Inc. of Deerfield Beach*, 965 So. 2d 311, 314 (Fla. 4th DCA 2007). FDUTPA provides, "In any civil litigation resulting from an act or practice involving a violation of [FDUTPA], … the prevailing party … may receive his or her reasonable attorney's fees … from the nonprevailing party." Fla. Stat. § 501.2105(1). To recover fees, the prevailing party's lawyer must "submit a sworn affidavit of his or her **time spent on the case** … to the trial judge[.]" *Id.* § 501.2105(2) (emphasis added). "The trial judge may award the prevailing party … a reasonable **legal fee for the hours actually spent on the case** as sworn to in an affidavit." *Id.* § 501.2105(3) (emphasis added).

Based on that statutory language, if an action includes a FDUTPA claim, allocation is appropriate only "if either (1) counsel admits that the other services provided in that action were unrelated to the FDUTPA claim, or (2) a party establishes that the services related to non-FDUTPA claims were clearly beyond the scope of a [FDUTPA] proceeding." *Diamond Aircraft Indus., Inc. v. Horowitch*, 107 So. 3d 362, 370–71 (Fla. 2013) (internal quotation marks and quoted authority omitted); *accord Alhassid*, 688 F. App'x at 759 (observing that the district court could have awarded fees for hours devoted to the entire

action, not just to the FDUTPA claim, because the work on those claims related in some way to establishing a FDUTPA violation); *see also Mandel*, 965 So. 2d at 314 (observing that FDUTPA contemplates "recovery of attorney's fees for hours devoted to the entire litigation" without requiring "allocation of attorney time between the" FDUTPA claim and other claims based on the same common core of facts unless "the attorney's services clearly were not related in any way to establishing or defending an alleged [FDUTPA] violation" (quoted authority omitted)).

Thus, for FDUTPA, "[i]t is the non-prevailing party's burden to show that 'the services related to non-FDUTPA claims were clearly beyond the scope of a [FDUTPA] proceeding.'" *Chow v. Chak Yam Chau*, 640 F. App'x 834, 843 (11th Cir. 2015) (quoting *Diamond Aircraft*, 107 So. 3d at 370); *see id.* ("[T]hat the FDUTPA claim was only one of nineteen claims and counterclaims litigated by the parties in this case[] says nothing about how much time was devoted to the various claims, the importance of each claim in the litigation, and whether some non-FDUTPA claims nonetheless fell within the scope of the FDUTPA claims." (internal quotation marks omitted)).

Here, for the Lanham Act, the defendants have satisfied their burden of showing the four claims (copyright, patent, trade dress, and FDUTPA) are intertwined and share a common core of facts and related legal theories. In the pleading, Lanard contended, "The aforementioned acts by Defendants in causing confusion among the relevant public and causing a false association or sponsorship between Defendants' goods and Lanard, in Florida and elsewhere, constitute unfair competition and unfair business practices contrary to … [FDUTPA.]" D103 at ¶ 55. During discovery, Lanard referenced the copyright, patent, and patent-pending notices on the Lanard Chalk Pencil in an answer

73

to an interrogatory asking about evidence to support the contention that the alleged trade dress acquired a secondary meaning.[62] D302-36 at 14; SD324 at 14. At the summary judgment stage, Lanard contended, "As the fourth claim, for unfair competition under Florida state law, is predicated on Defendants' violations of Lanard's patent, copyright, and trade dress rights, this claim should also survive summary judgment." D497 at 3. In a motion in limine, Lanard argued that the concept of "unfair and deceptive" competition" under FDUTPA is "extremely broad" and "[i]nfringement certainly falls under that rubric of reprehensible conduct." D455 at 13 n.3. As damages, Lanard made a general prayer for relief and argued for the same damages for all claims while also suggesting punitive damages were available under Florida law. D103 at 15–17; D455 at 8–13; D138 at 36. And in its response to the current fee motion, Lanard contends, "Lanard's FDUTPA claim was entirely derivative of its

---

[62]As additional factual overlap, the defendants observe several witnesses testified that Lanard's protected content was the overall appearance of the chalk pencil. *See* D536 at 14 (citing, e.g., D302-36 at 7–8; D324 at 7–8; D342 at 200; D343 at 52–54). The defendants explain:

> For trade dress to be protectable, it must be exclusive to a manufacturer because common features of products from multiple manufacturers cannot become indicative of source. This was problematic here given the number of pencil shaped products that exist because Plaintiff claimed only that the "overall appearance" of its pencil shaped product when used as a chalk holder was its trade dress. (D.E. 302-36, Resp. to Int. No. 10)[.]

> This mirrored Plaintiff's copyright and patent claims as Plaintiff's experts refused to identify specific protected expression or original features of Plaintiff, instead again claiming that the protected expression of Plaintiff was the "overall appearance" when used as a chalk holder. Thus, whether any specific trade dress in the chalk holder was exclusive to Plaintiff for secondary meaning purposes was intertwined with separating public domain and prior art features from any original expression of Plaintiff for copyright and design patent purposes. So, too, functionality questions were common to all the claims. Primarily functional features may not be protected under trade dress, copyright or design patent law. What could qualify as non-functional trade dress was very similar to that same issue under copyright and patent law.

D518 at 26.

copyright and patent infringement claims, as well as its Lanham Act-based trade dress claims."[63] D523 at 16. Moreover, much of the general legal work was for all claims, including work on the motion to transfer, protective orders, case management, motion for sanctions for violating the protective order, opposition to adding Ja-Ru HK as a party, status reports, statement of the facts and standard of review in the appellate response brief, and most pretrial work.

For FDUTPA, Lanard neither acknowledges its burden nor tries to satisfy it. Still, the defendants remove from their request fees for work only for the copyright and patent claims. *See* D536 at 13–14.

In the fee motion, the defendants contended the following allocations are appropriate at the district-court level using **$2,187,288** (before their proposed 5-percent discount): **$130,338** for the copyright claim;[64] **$89,390** for the patent

---

[63]For additional instances of overlap of the claims, see D299 at 1, SD326 at 1 ("Lanard is entitled to summary judgment on its unfair competition claim that is predicated on the indisputable infringement[.]"); D299 at 13, SD326 at 13 (Lanard's statement that Lanard is "assert[ing] claims for copyright, patent, and trade dress infringement, and related unfair competition claims against Defendants' [sic] arising out of their knock off products"); D454 at 6–7 (Lanard's argument, "The jury is certainly entitled to be informed of any rulings by the Court … that Lanard's patent, copyright, and/or trade dress are valid, Defendants' products infringe Lanard's copyright, patent, and/or trade dress, [and] Defendants have engaged in unfair competition by infringing Lanard's Chalk Pencil … . Those rulings would be directly pertinent to the remaining issues to be determined by the jury. For example, a ruling that Lanard's patent, copyright and/or trade dress are valid would certainly be relevant to the jury's determination of whether Defendants have (or could have) infringed that patent, copyright or trade dress. So to[o] would a ruling that Defendants' products infringe Lanard's rights in its Chalk Pencil be relevant to every other issue that would remain to be determined by the jury[.]"); D484 at 35 (Lanard's summary judgment argument that "[b]ecause Lanard's statutory and common law unfair competition claims under federal and Florida law are predicated on Defendants' indisputable infringement outlined in detail …, summary judgment in favor of Lanard on its unfair competition claim is also proper."); and D531 at 14 (Lanard's contention that the FDUTPA claim is ancillary to the copyright and patent claims).

[64]In the fee motion, for a suggested allocation of fees for the copyright claim at the district-court level, the defendants write, "**$130,338**," D518 at 27, but the declarations add

claim;[65] **$91,123** for the trade dress and FDUTPA claims; and **$1,875,897** for the claims jointly and for paralegal fees. D518 at 27; *see also* D519 ¶¶ 12, 13 (Anten's declaration); D520 ¶¶ 15–21 (Socolow's declaration); D521 ¶¶ 10–12 (Page's declaration). The defendants contended the following allocations are appropriate at the appellate-court level using **$436,675** (before their proposed 5-percent discount): **$42,770** for the copyright claim; **$45,428** for the patent claim; **$48,733** for the trade dress and FDUTPA claims; and **$299,745** for the claims jointly and for paralegal fees.[66] D518 at 27; *see also* D519 ¶¶ 12, 13 (Anten's declaration); D520 ¶¶ 15–21 (Socolow's declaration); D521 ¶¶ 10–12 (Page's declaration).

The allocations in the motion, *see* D518 at 27, fail to align with the allocations in the billing records, *see* Attachment A. Totaling the allocations in the fee motion results in **$173,108** for the copyright claim, **$134,818** for the patent claim, **$139,856** for the trade dress and FDUTPA claims, and **$2,175,642** for the claims jointly. D518 at 27. Those allocations for the copyright and patent claims (**$307,926**) are approximately 12 percent of the total (**$2,623,424**). D536 at 18.

But totaling the allocations in the billing records results in **$147,238.25** for the copyright claim, **$94,982.50** for the patent claim, **$132,564.50** for the trade dress and FDUTPA claims, and **$2,247,786.12** for the claims jointly. *See*

---

up to **$144,843.25**, D519 ¶ 13; D520 ¶ 21; D521 ¶ 11. In the motion, the defendants apparently failed to include the amount in Socolow's declaration (**$14,505.75**). D520 ¶ 11.

[65]In the fee motion, for suggested allocation of fees for the patent claim at the district court level, the defendants write "**$89,390**," D518 at 27, but the declarations add up to **$89,930**, D519 ¶ 13; D521 ¶ 11. The total in the chart in the fee motion is correct only if **$89,930** is used, suggesting the defendants inverted the numbers.

[66]In the supplement, the defendants state "**$29,745**" is for joint and paralegal fees. D536 at 12. This appears to be a typographical error.

Attachment A. Those allocations for the copyright and patent claims (**$242,220.75**) are approximately 9 percent of the total (**$2,622,571.37**).

The reason for the discrepancies is unclear, and all the work on which the defendants base their suggested allocations is unknown. The discrepancies appear to result from H&K's billing records. In his declaration, Page states **$74,945** was allocated to the copyright claim and **$55,202.50** to the patent claim. *See* D521 ¶ 11. Because the H&K billing records submitted with the current fee motion failed to allocate the entries, *see* D521-3, the undersigned asked the defendants to clarify the work by H&K on which Page based his suggested allocations. *See* D539 at 1. But the allocated amounts in the supplemental billing records, D541-1, fail to align with the allocations in Page's declaration. The supplemental billing records show **$34,750** for the copyright claim and **$14,827.50** for the patent claim. *See generally* D541-1.

The firms' billing records include entries for work on particular claims without allocations to particular claims. The records show that unallocated hours for work on the patent and copyright claims amount to approximately three percent of the hours, suggesting the defendants allocated those hours in the fee motion without identifying the hours in the billing records. *See, e.g.*, entry 32 ("Communications with Attorneys re: status. Review of file wrappers for patents and copyright information from Copyright Office"; 1.5 hours); entry 423 ("Legal research re invalidity of copyright and prior art. Review of patent file and prior art. Letter re: Rule 26 and motions to seek commissioner opinion re: copyright validity"; 3 hours).[67] Moreover, in the billing records, of the

---

[67]For other examples of work on particular claims without allocation, see entries 80 (copyright; 1 hour); 708 (patent; 2.5 hours); 951 (copyright and patent; .7 hours); 969 (copyright and patent; 2.5 hours); 971 (copyright and patent; .3 hours); 972 (copyright and

approximately 945 hours spent on the appeal, the defendants allocated only approximately 6 hours to the copyright claim, 12 hours to the patent claim, and 103 hours to the trade dress and FDUTPA claims. *See generally* Attachment A. For work in other areas, including pleadings, motions to dismiss, motions

patent; 1.7 hours); 973 (copyright and patent; 1.7 hours); 988 (trade dress; .53 hours); 1023 (copyright; 3.5 hours); 1029 (copyright; 5 hours); 1185 (copyright; .4 hours); 1226 (patent; .8 hours); 1281 (copyright; .4 hours); 1286 (trade dress and unfair competition; 3 hours); 1337 (copyright; 3 hours); 1554 (copyright and patent; 1.3 hours); 1583 (copyright and patent; 1.2 hours); 1680 (trade dress and unfair competition; 1 hour); 1686 (patent; .5 hours); 1692 (trade dress and unfair competition; 4.2 hours); 1748 (copyright and patent; 2 hours); 1735 (patent and other work; 2 hours); 1766 (copyright, patent, and other work; 8.3 hours); 1835 (copyright and patent; .3 hours); 1847 (copyright and patent and other work; .4 hours); 1863 (copyright, patent, and other work; 4.2 hours); 1864 (copyright, patent, and other work; .4 hours); 1868 (copyright and patent; .3 hours); 1871 (copyright and patent; 1.2 hours); 1876 (copyright and patent; .2 hours); 1879 (copyright and patent; .4 hours); 1893 (copyright and patent; 3.5 hours); 1913 (copyright and patent; 9.5 hours); 1934 (copyright and patent; 1.5 hours); 1938 (copyright, patent, and other work; .4 hours); 1942 (copyright and patent; 10.8 hours); 1945 (copyright, patent, and other work; 3.5 hours); 1947 (copyright and patent; 1.2 hours); 1949 (copyright and patent; .5 hours); 1950 (copyright and patent; 1.5 hours); 1951 (copyright and patent; 12 hours); 1957 (copyright and patent; .3 hours); 1960 (copyright and patent; 1.1 hours); 1970 (copyright and patent; .5 hours); 1972 (copyright and patent; 1.3 hours); 1973 (copyright and patent; 2 hours); 1974 (copyright and patent; 2.5 hours); 1979 (copyright and patent only; .4 hours); 1982 (copyright, patent, and other work; .4 hours); 1996 (copyright and patent; 1.1 hours); 2005 (copyright, patent, and other work; .3 hours); 2041 (copyright, patent, and other work; 5 hours); 2057 (copyright, patent, and other work; 2 hours); 2062 (copyright, patent, and other work; 7 hours); 2078 (copyright and patent; 5.5 hours); 2079 (copyright, patent, and other work; 3 hours); 2083 (copyright, patent, and other work; 2 hours); 2085 (copyright and patent; 7.8 hours); 2093 (trade dress; 2.5 hours); 2094 (trade dress; 4.5 hours); 2127 (copyright and patent; 2.5 hours); 2128 (copyright and patent; 2 hours); 2134 (copyright and patent; 2.6 hours); 2135 (copyright and patent; 6.6 hours); 2242 (unfair competition; .4 hours); 2351 (copyright; .5 hours); 2368 (unfair competition; 1 hour); 2370 (unfair competition; .6 hours); 2416 (copyright; .8 hours); 2422 (copyright and FDUTPA; 2.4 hours); 2499 (FDUTPA; .3 hours); 2505 (FDUTPA; .2 hours); 2592 (unfair competition/FDUTPA; 1.2 hours); 2907 (FDUTPA; 4 hours); 3108 (copyright; .7 hours); 3198 (copyright; 1.6 hours); 3325 (copyright; 1 hour); 3333 (patent; .5 hours); 3340 (copyright and other work; .7 hours); and 3341 (copyright and other work; 2.6 hours). For some of these hours, the work concerned an expert who worked only on the copyright or patent claims. *See* D310-2 (Kemnitzer's report on copyright and patent matters); D329-2 (Anders's rebuttal of Kemnitzer's report); D309-1 (Bagley's rebuttal of Kemnitzer's report). In the billing records, the defendants sometimes allocate work concerning these experts to the copyright and patent claims. *See* entry 1660 (Kemnitzer); entry 1824 (Kemnitzer); entry 1906 (Kemnitzer); entry 1910 (Kemnitzer); entry 2123 (Kemnitzer); entry 2132 (Kemnitzer); entry 1936 (Anders); entry 1937 (Anders); entry 1940 (Anders); entry 1975 (Bagley); entry 1976 (Bagley); entry 1978 (Bagley); and entry 1991 (Bagley).

for summary judgment, and the current fee motion, the defendants allocated all or nearly all work to the "joint" category. *See generally* Attachment A.

8.    *Reasonable Hours*

Recognizing that the defendants generally have the burden (except for allocation under FDUTPA), and considering the entire record summarized in the pending R&R and this supplemental R&R, the consolidated billing records in Attachment A, Lanard's objections, and the undersigned's own knowledge and expertise about work on intellectual property litigation in Jacksonville, reasonable hours are the hours requested (excluding hours for work by Cummins and Treubert, *see supra* footnote 14, and for Anten's travel between California and the forum states), *see* Attachment B, with an across-the-board **30-percent** reduction of the lodestar to account for block billing, insufficient detail, vagueness, redundancy or duplication, excessiveness, and other issues affecting reasonable hours (as challenged by the insurer and beyond),[68] as well as allocation conceded by the defendants.

Lanard emphasizes that the fees requested in the fee motion far exceed the fees Lanard paid its lawyers (**$1,885,606.67**).

The Eleventh Circuit has "on occasion questioned whether the number of hours spent on a case by defense counsel is relevant to a determination of the reasonable fees for plaintiffs' attorneys." *Henson v. Columbus Bank & Tr. Co.*, 770 F.2d 1566, 1574 (11th Cir. 1985); *see also Norman*, 836 F.2d at 1305

---

[68]To avoid doubly discounting the hours the insurer challenged and the defendants agree to exclude, D536 at 8, 18, the hours remain in the consolidated spreadsheet in Attachment A. The percentage selected is intended to exclude those hours as well as additional hours for other work.

n.3 ("[T]he time expended by opposing counsel is seldom relevant to a determination of hours reasonably expended on many tasks.").

Lanard fails to show the relevance of the hours its lawyers worked on the case. As the defendants persuasively argue, "Lanard … did not provide the detail needed to analyze this number fully, such as the hours incurred for each attorney prior to write-offs, the rate for each attorney, whether the rates were affected by a volume discount, and whether fees were not charged based on the results obtained." D518 at 27–28. "It is also not surprising that a plaintiff in this type of action would incur less total fees than three Defendants given the discovery sought from each party and the evidentiary burdens on Defendants in intellectual property cases." D518 at 28. "Regardless, Plaintiff's fees demonstrate this was an expensive case for both sides." D518 at 28.

Lanard argues the defendants' aggressive litigation tactics "greatly multiplied the hours and effort necessary." D523 at 14. As examples of those tactics, Lanard points to the defendants' attempt to reply when a reply was unnecessary, *see* D525 at 2–3; the defendants' objections to the pending R&R as just "a re-argument of their extensive prior briefing," *see* D531 at 1; and assertedly "incessant" emails usually to obtain "intelligence or free informal discovery" or to ask the same thing "over and over again" despite already knowing the answer, D523-1 ¶ 9; D523-10 ¶ 3; *see* D523-3 to D523-5 (emails); D523-13 (emails); D523-14 (emails); *see also* D523-10 ¶ 3 (Thompson's assertion that "defense counsel routinely peppered us with endless emails throughout the litigation").

Lanard's argument may have had merit if the aggressive litigation tactics had been one-sided. They were not. Having aggressively litigated the claims itself, Lanard should not have been surprised, and should not be heard

to complain, about the defendants' mirrored approach and resulting hours. The examples fail to support Lanard's argument. Requesting leave to reply is permitted by the rules, and leave was often provided for the Court's benefit. *See, e.g.*, D117, D126, D212, D217, D368, D369 (motions requesting leave and orders granting leave). At times, Lanard too unsuccessfully sought leave to reply. *See* D272, D292, D297, D305 (Lanard's unsuccessful motions requesting leave). The emails show not undue repetition or attempts to gain informal discovery (which would not be inappropriate in any event), but an inability to effectively communicate fairly attributable to both sides.

Lanard argues the copyright and patent claims were the main focus, with the trade dress and FDUTPA claims being "minor follow-on claims" receiving "scant attention" from the parties and the courts. D538 at 10, 14. Thus, Lanard contends, awarding fees for work jointly performed for all claims would be inequitable and result in a "windfall" to the defendants. D538 at 9.

Lanard's argument lacks merit. Lanard is the party that brought the trade dress and FDUTPA claims, and Lanard pursued those claims to the end in this Court and the Federal Circuit, demanding at least the same amount of damages for those claims as the other claims. Moreover, as explained, FDUTPA permits fees for all claims in a case involving a FDUTPA claim, and the fee opponent — not the fee applicant — has the burden of showing the services related to the non-FDUTPA claims were clearly beyond the scope of the FDUTPA claim, a burden Lanard has neither addressed nor attempted to satisfy.

Lanard argues, "Defendants' lack of documentation and lack of good faith effort to report fees actually paid constitutes grounds for this Court to reduce the award accordingly." D538 at 7. This argument likewise lacks merit.

The defendants had no duty to state in their fee application the exact fees the insurer paid and thus exhibited no bad faith in failing to do so. *See* D519 ¶ 11 (Anten's declaration with the fee motion in which he accurately states, "The vast majority of my fees have been paid by Ja-Ru's insurance carrier at the agreed upon rates[.]").

Responding to the defendants' objection to the pending R&R, Lanard argued for the first time the denial of attorney's fees under the Copyright Act and Patent Act preempts a fee award under FDUTPA.[69] D531 at 4, 10–14; *accord* D538 at 10 (Lanard's response to the defendants' supplemental briefing). To support its preemption argument, Lanard cites five cases: *Fenton v. Federal Insurance Administrator*, 633 F.2d 1119, 1121 (5th Cir. 1981); *West v. Harris*, 573 F.2d 873, 880–82 (5th Cir. 1978); *Myers v. United States*, 767 F.2d 1072, 1074 (4th Cir. 1985); *Hubbard v. SoBreck, LLC*, 554 F.3d 742, 744–47 (9th Cir. 2009); *Kohler v. Presidio International, Inc.*, 782 F.3d 1064, 1070–71 & n.4 (9th Cir. 2015); and *Moffett v. Halliburton Energy Services, Inc.*, 291 F.3d 1227, 1237 (10th Cir. 2002). D531 at 10–14. The defendants contend their removal of fees for work only on the copyright and patent claims "should moot" the preemption argument "as the fees requested would have been incurred even if no patent or copyright claim had been alleged." D536 at 12–13.

How Lanard would benefit from succeeding on its preemption argument is unclear because preemption would not apply to the Lanham Act under which the defendants may be awarded the same fees. Regardless, Lanard offers no

---

[69]As explained in the pending R&R, the defendants raised preemption as a ground for dismissal of the Florida claims. *See* D113 (motion to dismiss); D302 (motion for summary judgment). The Court decided the motions on other grounds. *See* D263, D468. This Court addressed preemption in another case involving claims under the Copyright Act and FDUTPA. *See Arbitron Inc. v. Renda Broad. Corp.*, No. 3:13-cv-716-MMH-JRK, 2014 WL 1268587, at *9–10 (M.D. Fla. Mar. 27, 2014).

persuasive support for its argument. Only *Fenton* and *West* bind this Court, and they are inapplicable. In each case, the court denied attorney's fees under state law because the underlying claim was under federal law. *See Fenton*, 633 F.2d at 1122; *West*, 573 F.2d at 881. The other cases do not bind this Court and are unpersuasive because they address different laws and circumstances. *See Myers*, 767 F.2d at 1074 (Federal Employees Health Benefits Act); *Hubbard*, 554 F.3d at 744–47 (Americans with Disabilities Act); *Kohler*, 782 F.3d at 1070--71 (Americans with Disabilities Act); *Moffett*, 291 F.3d at 1237 n.6 (Employee Retirement Income Security Act).

Thus, reasonable hours are the hours requested (excluding hours for work by Cummins and Treubert, *see supra* footnote 14, and for Anten's travel between California and the forum states), *see* Attachment B, with an across-the-board **30-percent** reduction of the lodestar to account for the issues affecting reasonable hours.

9.   *Reasonable Fees*

The reasonable rates multiplied by the hours expended (excluding hours for work by Cummins and Treubert, *see supra* footnote 14, and for Anten's travel between California and the forum states), results in a lodestar of **$2,328,862.20**. *See* Attachment B. **Thirty percent** of that amount is **$1,630,203.54**. Considering the undersigned's "overall sense" of the lawsuit and the aim of administering "rough justice," this amount is reasonable. *See Fox*, 563 U.S. at 838 (quoted).

## II.  Costs

In the cost motion, the defendants requested **$102,764.55** in costs, comprising **$26,698.01** in costs under 28 U.S.C. § 1920 and **$76,066.54** in costs under FDUTPA. D477 at 6–7. The defendants sought costs for transcripts, deposition videos, deposition videoconferencing, photocopies, expert witnesses, witness appearances, mediation, and travel (hotels, airfares, parking, and a car rental). D477 at 7–19.

In the pending R&R, the undersigned recommends taxing **$21,256.11** in costs under § 1920 for deposition transcripts, photocopies, and witness fees, excluding from the requested amount **$5,441.90**, comprising **$151.25** for a transcript of a status conference and **$5,290.65** for deposition "extras" (for example, fees for facility rentals, wait times, parking and tolls, shipping and handling, expedited service, and condensed and rough transcripts). D535 at 118–20. Neither side objected to the recommendation.

Remaining at issue is whether the defendants are entitled to costs under FDUTPA that are not taxable under § 1920. In the defendants' supplemental briefing, they remove previously requested costs for out-of-state counsel's travel to the forum states. D536 at 12. Besides the **$5,441.90** excluded as costs under § 1920, the defendants now request **$72,718.17** in costs under FDUTPA. Specifically, the defendants request costs for: (1) expert witness time to attend meetings, review documents, prepare reports, and prepare for depositions (**$59,783.90**); (2) the deposition of Lanard's expert witness Larry Myer (**$1,350**); (3) the pre-judgment, court-ordered mediation (**$900**); (4) deposition videoconferencing (**$1,229.66**); (5) hotel accommodations to review documents in Hong Kong (**$546.89**); and (6) airfare and other travel-related items to take

and defend depositions outside of the forum states (**$8,907.72**). D477 at 7–20; D536 at 2, 12, 19, 20.

For the proposition they are entitled to costs under FDUTPA, the defendants rely on the fee-and-cost provision of FDUTPA; a footnote in *Chow*, 640 F. App'x at 836 n.4; an opinion from this Court relying on the same footnote — *Altair S.R.L. v. His Wind, LLC*, No. 5:15-cv-329-JSM-PRL, 2016 WL 1728931, at *4 (M.D. Fla. Apr. 29, 2016); and an opinion from this Court relying on *Altair — HRCC, Ltd. v. Hard Rock Cafe International (USA), Inc.*, No. 6:14-cv-2004-PGB-KRS, 2018 WL 1863778, at *9 (M.D. Fla. Mar. 26, 2018), *R&R adopted*, No. 6:14-cv-2004-PGB-KRS, 2018 WL 1863779 (M.D. Fla. Apr. 13, 2018). D477 at 4–5; D536 at 11. Lanard acknowledges the same proposition, citing another district court case relying on *Chow — Korman v. Iglesias*, No. 18-21028-CIV, 2018 WL 6978693, at *6 (S.D. Fla. Dec. 6, 2018), *R&R adopted*, No. 18-21028-CIV, 2019 WL 127002 (S.D. Fla. Jan. 3, 2019). D499 at 7. But Lanard also argues, "Allowing Defendants to recover additional categories of costs pursuant to FDUTPA's broader standard would permit an improper circumvention of the strictures of Section 1920." D499 at 8. In the pending R&R, the undersigned relied on the same footnote for the same proposition. *See* D535 at 29. Closer analysis, however, indicates the defendants are not entitled to costs beyond those allowed by federal law.

In federal court, costs generally are governed by Federal Rule of Civil Procedure 54(d)(1) and 28 U.S.C. §§ 1821 and 1920. Rule 54(d)(1) provides, "Unless a federal statute, these rules, or a court order provides otherwise, costs — other than attorney's fees — should be allowed to the prevailing party." Sections 1821 and 1920 limit the costs allowed. *See* D535 at 107–12 (pending R&R discussing taxable costs).

In Florida courts, costs generally are governed by section 57.041 of the Florida Statutes. Under that statute, "[t]he party recovering judgment **shall** recover all his or her legal costs and charges" and "[c]osts may be collected by execution on the judgment or order assessing costs." Fla. Stat. § 57.041 (emphasis added). But if a civil action is governed by a statute with "a more particular provision concerning the taxation of costs, the more particular provision controls." *Morales v. Rosenberg*, 919 So. 2d 476, 480 (Fla. 3d DCA 2005). Thus, if a statute provides that the prevailing party "may" recover costs, that discretionary provision — not the mandatory provision in section 57.041(1) — applies. *See Ruffa v. Saftpay, Inc.*, 163 So. 3d 711, 715 (Fla. 3d DCA 2015) (declining to apply section 57.041 instead of the more specific statute under which an award for costs is discretionary).

FDUTPA is in that category, providing that (1) a prevailing party "**may** receive his or her reasonable attorney's fees and costs from the nonprevailing party"; (2) "[t]he attorney for the prevailing party shall submit a sworn affidavit of his or her time spent on the case and his or her costs incurred for all the motions, hearings, and appeals to the trial judge who presided over the civil case"; (3) "[t]he trial judge **may** award the prevailing party the sum of reasonable costs incurred in the action plus a reasonable legal fee for the hours actually spent on the case as sworn to in an affidavit"; and (4) "[a]ny award of attorney's fees or costs shall become a part of the judgment and subject to execution as the law allows." Fla. Stat. § 501.2105(1)–(4) (emphasis added).

To determine costs, Florida courts use the "Statewide Uniform Guidelines for Taxation of Costs in Civil Cases." *See In re Amends. to Unif. Guidelines for Tax'n of Costs*, 915 So. 2d 612, 613–14 (Fla. 2005) (discussing

the guidelines).[70] Under the guidelines, the movant has the burden of showing "that all requested costs were reasonably necessary either to defend or prosecute the case at the time the action precipitating the cost was taken." *Id.* at 614; *see* 28 U.S.C. § 1920(2) & (4) (permitting costs for transcripts, exemplification, and copies if "necessarily obtained for use in the case"). Costs that "should" be taxed include a fee for an expert witness to sit for a deposition. *In re Amends.*, 915 So. 2d at 616; *see* Fla. R. Civ. P. 1.390(c) (providing for a reasonable fee for an expert witness whose deposition is taken and allowing the fee to be taxed as costs). Costs that "may" be taxed include a mediator's fee and reasonable travel expenses of an expert witness when traveling more than 100 miles. *In re Amends.*, 915 So. 2d at 617. Costs that "should not" be taxed include a lawyer's travel time and expenses. *Id.* The guidelines "are advisory only," *id.* at 614, but if a court deviates from them, the court must "make specific findings as to the unique and extraordinary circumstances justifying such an award," *Rodrigo v. State Farm Fla. Ins. Co.*, 166 So. 3d 933, 934 (Fla. 4th DCA 2015); *accord Bunin v. Matrixx Initiatives, Inc.*, 197 So. 3d 1109, 1110–11 (Fla. 4th DCA 2016).

---

[70]According to the Florida Supreme Court, "[t]he taxation of costs in any particular proceeding is within the broad discretion of the trial court." *In re Amends.*, 915 So. 2d at 614. "The trial court should exercise that discretion in a manner that is consistent with the policy of reducing the overall costs of litigation and of keeping such costs as low as justice will permit." *Id.* "With this goal in mind, the trial court should consider and reward utilization of innovative technologies by a party which subsequently minimizes costs and reduce the award when use of innovative technologies that were not used would have resulted in lowering costs." *Id.*

The Florida Supreme Court does not limit application of the guidelines to costs under section 57.041(1), *see generally id.*, and courts use the guidelines for costs awardable under other Florida laws, *see, e.g.*, *Woodbridge Holdings, LLC v. Prescott Grp. Aggressive Small Cap Master Fund*, 193 So. 3d 2, 4 (4th DCA 2015) (Fla. Stat. § 607.1331); *Delmonico v. Crespo*, 127 So. 3d 576, 579 (Fla. 4th DCA 2012) (Fla. Stat. § 768.79); *Elder v. Islam*, 869 So. 2d 600, 601–03 (Fla. 5th DCA 2004) (Fla. Stat. § 448.08).

Here, the defendants ask this Court to tax costs under both federal law (Rule 54(d)(1), § 1821, and § 1920) and state law (FDUTPA).

In federal court, "[t]he award of costs is governed by federal law." 10 Charles A. Wright et al., *Federal Practice and Procedure* § 2669 (4th ed. 2021). This is generally true even if the underlying claim is under state law. *See Stender v. Archstone-Smith Operating Tr.*, 958 F.3d 938, 947 (10th Cir. 2020) ("Because Rule 54(d) falls well within the statutory authorization of the Rules Enabling Act and its displacement of Colorado state law would not impair any state substantive right, we hold that a federal court exercising diversity jurisdiction has no power to award costs under [certain Colorado statutes]."); *Humann v. KEM Elec. Coop., Inc.*, 497 F.3d 810, 813 (8th Cir. 2007) ("Humann also contends that the district court erred in taxing costs in accordance with Fed. R. Civ. P. 54(d), instead of in accord with state law. The award of costs in federal court is governed by Rule 54(d), rather than by state law that conflicts with Rule 54."); *Carter v. Gen. Motors Corp.*, 983 F.2d 40, 43 (5th Cir. 1993) ("[F]ederal procedural law ordinarily governs the award of costs in diversity cases.").

"[A]pplying federal law [on costs] does not violate the *Erie* doctrine[] because '[v]ariations between state and federal practice in the assessment of costs after the case has been disposed of do not appear likely to promote forum shopping or to affect the outcome of the litigation in any significant way.'" *Carter*, 983 F.2d at 43–44 (quoting Wright et al., *supra*, § 2669) (internal quotation marks omitted); *see also Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 689 (5th Cir. 1991) ("[N]o violence is done to the twin aims of the *Erie* doctrine by the application of federal procedural provisions to the taxing of costs[.]").

Thus, taxation of expert witness fees beyond the per diem fees in § 1821 is reversible error, even if the underlying claim is under state law.[71] *See Kivi v. Nationwide Mut. Ins. Co.*, 695 F.2d 1285, 1289 (11th Cir. 1983) (holding "the entitlement to expert witness fees under the Florida Statutes is not a substantive right," reversing award of $1,000 in expert fees, and rejecting the argument that "if the state law provides for an award of expert witness fees they may be assessed as costs by the district court in a diversity case"); *accord Cronin v. Wash. Nat'l Ins. Co.*, 980 F.2d 663, 672 (11th Cir. 1993) (reversing taxation of $10,393.64 in costs, including $5,640.25 in expert witness fees, and remanding with instructions to determine expert fees in accordance with § 1821); *Ageloff v. Delta Airlines Inc.*, 860 F.2d 379, 390 (11th Cir. 1988) (reversing taxation of expert witness fees beyond the amount authorized by § 1821), *modified on other grounds*, 867 F.2d 1268 (11th Cir. 1989).

Applying this general jurisprudence in *Primo v. State Farm Mutual Automobile Insurance Co.*, this Court held that in a diversity case, the recovery of costs under section 768.79 of the Florida Statutes (Florida's offer-of-judgment statute) is governed by federal law, not Florida's law. No. 3:13-cv-64-TJC-MCR, 2015 WL 5474349, at *2 (M.D. Fla. Sept. 15, 2015), *aff'd*, 661 F. App'x 661 (11th Cir. 2016). This Court explained that while the Florida statute is a "substantive law that allows a party in a diversity case to recover fees and costs, the specific costs recoverable are those specified in" § 1920, "not what might be recoverable under Florida law." *Id.* This Court concluded that the

---

[71]In *Henning v. Lake Charles Harbor & Terminal District*, the former Fifth Circuit recognized an exception to the rule that a prevailing party in federal court is not entitled to expert fees beyond those in § 1821. 387 F.2d 264, 267 (5th Cir. 1968). The court held that under Louisiana condemnation law, a landowner has a substantive right to expert fees because without them the landowner would not receive just compensation required by the state's constitution. *Id.* "*Henning* has been confined … to such proceedings." *Seal v. Knorpp*, 957 F.2d 1230, 1237 (5th Cir. 1992).

statute's reference to "costs" and the guidelines are not the type of explicit statutory authority necessary for the court "to disregard the general rule that costs recoverable in federal court are limited to those" in § 1920. *Id.*

"Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007). In the footnote in *Chow* on which the parties rely, the Eleventh Circuit states, "In addition to the award of taxable costs, FDUTPA allows for the award of non-taxable costs, i.e. those costs that are not taxable under federal law at 28 U.S.C. § 1920." 640 F. App'x at 836 n.4. The footnote was dictum in the background section — not in the analysis section — of the opinion and cited without analysis FDUTPA's fee-and-cost provision, Fla. Stat. § 501.2105(1)–(4). Indeed, whether a federal court can award costs outside of § 1920 under FDUTPA was neither presented as an issue on appeal nor analyzed by the Eleventh Circuit or the lower court. *See generally Chow v. Chau*, No. 09-21893-CIV, 2014 WL 11429307 (S.D. Fla. Sept. 30, 2014); Appellants' Initial Brief, No. 14-14654 (filed Dec. 1, 2014); *Chow*, 640 F. App'x 834.

Both as dictum and as a statement in an unpublished opinion, the statement in *Chow* is not controlling authority. Moreover, because the statement is unaccompanied by analysis, the statement is unpersuasive. For the same reason, the district court cases relying on the statement (or relying on other district court cases relying on the statement) are unpersuasive. In federal court, costs are governed by Rule 54(d)(1), § 1821, and § 1920, not by FDUTPA. Nothing in FDUTPA or cases interpreting FDUTPA suggests "costs" under FDUTPA has an expanded meaning moving them into the realm of a substantive right belonging to the prevailing party. And nothing in the

defendants' briefing suggests the requested costs fall under the category of attorney's fees, which, unlike costs, are a substantive right.[72] Accordingly, taxing costs under FDUTPA and beyond § 1920 is unwarranted.[73]

## III.    Recommendation

The undersigned recommends entering an order:

(1)    **granting in part and denying in part** the defendants' motion for costs, D477, as supplemented, D536;

(2)    **granting** the defendants' request for costs under § 1920 and taxing costs against Lanard in the amount of **$21,256.11**;

(3)    **denying** the defendants' request for additional costs under FDUTPA;

(4)    **granting in part and denying in part** the defendants' motion for a fee award, D518, as supplemented, D536, D541;

(5)    **granting** the defendants' request for a fee award under the Lanham Act and FDUTPA and awarding fees in the amount of **$1,630,203.54**;

(6)    **denying** the defendants' request for a fee award under the Copyright Act and Patent Act; and

(7)    **directing** the Clerk of Court to enter judgment for the defendants and against Lanard for **$21,256.11** in costs and **$1,630,203.54** in attorney's fees.

---

[72]"FDUTPA and its fee-shifting provision are substantive for *Erie* purposes." *Horowitch v. Diamond Aircraft Indus., Inc.*, 645 F.3d 1254, 1259 (11th Cir. 2011).

[73]Even if this Court could tax costs under FDUTPA and beyond § 1920, taxing many of the requested costs would be unwarranted as contrary to the guidelines. While the defendants have shown the circumstances justify a fee award under FDUTPA, they have not tried to show "unique and extraordinary circumstances" justifying deviation from the guidelines or the policies they foster. *See Rodrigo*, 166 So. 3d at 934 (quoted); *see generally* D477, D536.

## IV.     Objections and Responses

"Within 14 days after being served with [an R&R on a dispositive motion], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id.* A party's failure to specifically object to the proposed findings and recommendations alters the scope of review, including waiver of the right to challenge anything to which no specific objection was made. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b)(3); 11th Cir. R. 3-1.

Here, the parties have until **February 16, 2022**, to file any objections to this supplemental R&R or move for an extension of time to file objections.

**Entered** in Jacksonville, Florida, on February 2, 2022.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:     The Hon. Marcia Morales Howard
       Counsel of record